## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**VOICE OF THE EXPERIENCED,**
*on behalf of itself and its members*, **ET AL.**　　**CIVIL ACTION**

**VERSUS**　　　　　　　　　　　　　**NO. 23-331-JWD-SDJ**

**R. KYLE ARDOIN,** *in his official capacity*
*as Secretary of State of Louisiana*, **ET AL.**

### RULING AND ORDER

This matter comes before the Court on the *Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)* ("*Motion to Dismiss*"), (Doc. 32), filed by Defendant, Secretary of State of Louisiana Nancy Landry ("Defendant," "Secretary of State," or "Landry").[1] Plaintiffs Voice of the Experienced ("VOTE"), Power Coalition for Equity and Justice ("Power Coalition"), and League of Woman Voters of Louisiana (the "League") oppose the motion. (Doc. 58.) The Secretary of State has filed a reply. (Doc. 65.)

Also before the Court is *Plaintiffs' Motion for Preliminary Injunction*, (Doc. 21), which Plaintiffs have supplemented, (Docs. 69, 153). Defendant Landry opposes the *Motion for Preliminary Injunction*, (Doc. 70), and has responded to Plaintiffs' supplement, (Doc. 154). Plaintiffs have filed a reply. (Doc. 73.) A preliminary injunction hearing was held on October 25, 2023, and October 31, 2023. (Docs. 105, 113.) The parties have filed post-hearing briefs, (Docs. 132, 133), and replies thereto, (Docs. 134, 135).

---

[1] Plaintiffs originally named former Secretary of State of Louisiana R. Kyle Ardoin as a defendant in this matter. Louisiana has elected a new Secretary of State since the filing of Plaintiffs' *Motion to Dismiss*. Pursuant to Federal Rule of Civil Procedure 25(d), Louisiana's new Secretary of State, Nancy Landry, has automatically taken former Secretary of State R. Kyle Ardoin's place as a defendant in this matter. (*See also* Doc. 140 (Defendant's *Notice of Substitution*).)

The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.  For the following reasons, the *Motion to Dismiss* is granted in part and denied in part, and the *Motion for Preliminary Injunction* is denied.

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 3

  A.   Louisiana Felony Disenfranchisement in General .................................................. 3

  B.   Background ............................................................................................................... 5

    1.   The Parties .......................................................................................................... 5

    2.   Allegations in the Complaint .............................................................................. 6

    3.   Causes of Action ................................................................................................. 8

    4.   Prayer for Relief ............................................................................................... 12

    5.   Procedural History ............................................................................................ 13

II.  DISCUSSION ......................................................................................................... 16

  A.   Legal Standard ....................................................................................................... 17

    1.   Rule 12(b)(1) ..................................................................................................... 17

    2.   Rule 12(b)(6) ..................................................................................................... 19

  B.   12(b)(1): Sovereign Immunity ............................................................................... 20

    1.   Parties' Arguments ........................................................................................... 20

    2.   Applicable Law ................................................................................................. 26

    3.   Analysis ............................................................................................................. 30

  C.   12(b)(1): Standing .................................................................................................. 35

    1.   Standing in General .......................................................................................... 35

    2.   Organizational Standing ................................................................................... 36

  D.   12(b)(6): NVRA Notice ......................................................................................... 45

    1.   Parties' Arguments ........................................................................................... 45

    2.   Applicable Law ................................................................................................. 48

    3.   Analysis ............................................................................................................. 51

  E.   12(b)(6): NVRA Claims ........................................................................................ 57

    1.   Parties' Arguments ........................................................................................... 57

    2.   Applicable Law ................................................................................................. 59

    3.   Analysis ............................................................................................................. 68

F.   12(b)(6): Equal Protection ................................................................ 71
    1.   Parties' Arguments ................................................................ 71
    2.   Applicable Law ................................................................ 79
    3.   Analysis ................................................................ 81
III.   LEAVE TO AMEND ................................................................ 84
IV.   CONCLUSION ................................................................ 86

## I.   INTRODUCTION

On May 1, 2023, VOTE, Power Coalition, and the League filed the present action against Landry in her official capacity as Secretary of State of Louisiana. (*Compl.*, Doc. 1 at 1.) This lawsuit concerns La. R.S. § 18:177(A)(1): Louisiana's requirement that disenfranchised felons, who were registered to vote prior to disenfranchisement, provide documentation to their respective registrars in order to have their voter registrations reinstated. In their *Complaint for Declaratory and Injunctive Relief* ("*Complaint*"), Plaintiffs allege that La. R.S. § 18:177(A)(1)'s paperwork requirement violates the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20505(a)(1) and 20507(a)(1), and the Equal Protection Clause of the Fourteenth Amendment. (*Id.* at 23–30.)

### A.   Louisiana Felony Disenfranchisement in General

As is explained in depth in Part.II(E)(2)(b), *infra*, Louisiana's Constitution grants the Legislature the power to disenfranchise those under orders of imprisonment for felony convictions. La. Const. art. I, § 10(A). The Legislature exercises this power through La. R.S. § 18:102(A), which provides for certain classes of citizens who are ineligible to register or vote.

When the Legislature disenfranchises those under orders of imprisonment for felony convictions and those individuals were registered to vote prior to their disenfranchisement, their registrations become suspended as opposed to canceled. *See id.* § 18:176. To reinstate their

suspended registrations, they must meet the criteria and follow the procedures set forth in La. R.S.

§ 18:177(A)(1):

§177. Reinstatement of registration after suspension

A.(1) The registration of a person whose registration has been suspended by the registrar of voters pursuant to R.S. 18:176(A) shall be reinstated when the person appears in the office of the registrar and provides documentation from the appropriate correction official showing that such person is no longer under an order of imprisonment or, if the person is under such an order, that the person has not been incarcerated pursuant to the order within the last five years and the person is not under an order of imprisonment related to a felony conviction pursuant to election fraud or any other election offense pursuant to R.S. 18:1461.2.

Both La. R.S. § 18:102(A) and La. R.S. § 18:177(A)(1) were amended in Act 636 of the

2018 legislative session, effective March 1, 2019. 2018 La. Acts 636. Act 636 amended La. R.S.

§ 18:177(A)(1) to read as it does today. *See id.*; La. R.S. § 18:177(A)(1). However, La. R.S.

§ 18:102(A) has been amended again since Act 636. *See* 2021 La. Acts 127. In Act 127 of the 2021

legislative session, effective February 1, 2022, the Legislature amended the 2018 version of La.

R.S. § 18:102 in the following way, thus striking the statute's former requirement to submit

paperwork:

§102.  Ineligible persons

A.  No person shall be permitted to register or vote who is:

(1)

*                *                *

(b)  Except as provided in Subparagraph (c) of this Paragraph, a person who is under an order of imprisonment for conviction of a felony and who has not been incarcerated pursuant to the order within the last five years shall not be ineligible to register or vote based on the order ~~if the person submits documentation to the registrar of voters from the appropriate correction official showing that the person has not been incarcerated pursuant to the order within the last five years~~.

4

*Id.* [2]

## B. Background

### 1. The Parties

There are four parties at issue in the motions before the Court: (1) VOTE; (2) Power Coalition; (3) the League; and (4) Landry.

Plaintiff VOTE "is a nonpartisan, grassroots nonprofit organization founded and operated by formally incarcerated people" that advocates on behalf of those formerly incarcerated in various areas including voting rights. (*Compl.* ¶ 13, Doc. 1.) "VOTE engages its membership through direct organizing, voter education, registration drives, and know-your-rights workshops, and is considered a leader in criminal justice and voting rights reform both nationally and in Louisiana." (*Id.*)

Plaintiff Power Coalition "is a nonpartisan coalition of community-based organizations . . . [that] educates and empowers voters across Louisiana." (*Id.* at ¶ 16.) "Power Coalition's work includes outreach to voters impacted by the criminal legal system in Louisiana, working with partners, including VOTE, to provide voter education and engagement to eligible individuals with prior felony convictions, most of whom are Black Louisianans." (*Id.*)

Plaintiff League "is a nonpartisan, nonprofit organization that seeks to encourage informed and active participation in government." (*Id.* at ¶ 18.) "The League ensures that all eligible individuals have the opportunity and the information needed to vote, with a particular focus on traditionally underrepresented and underserved communities, including voters impacted by the criminal legal system, people of color, and first-time voters." (*Id.*)

---

[2] When quoting amendments, words in ~~struck through~~ type are deletions from the existing law the Legislature had made, and words underscored are additions to the existing law the Legislature had made.

Defendant Landry is Louisiana's Secretary of State and chief election officer. (*Id.* at ¶ 20.) As Secretary of State, Landry is statutorily tasked with the duty to "administer the laws relating to custody of voting machines and voter registration . . . ." La. R.S. § 18:18(A).

### *2. Allegations in the Complaint*

In Louisiana, convicted felons are temporarily disenfranchised upon incarceration, but, if not convicted of an election crime, "the right to vote is restored automatically on discharge of sentence or once five years have elapsed since incarceration." (*Compl.* ¶ 2, Doc. 1.) Once a person's order of imprisonment expires or, if not an election crime, five years have passed since incarceration, the person's voting rights are restored, and the person is automatically removed from the Department of Public Safety and Correction's list of ineligible voters, which is sent to the Secretary of State monthly. (*Id.* at ¶ 65.) This list only includes those who are currently disenfranchised, "except those few individuals who were restored the right to vote since the last monthly batch was processed." (*Id.* at ¶ 73.)

Both the Louisiana and federal voter registration forms require an applicant to attest to their eligibility, and neither form requires an applicant to produce additional documentation. (*Id.* at ¶ 61–62.) For those who were not registered to vote prior to incarceration, they can register to vote like any other eligible voter. (*Id.* at ¶¶ 2, 52–54, 58.) However, those who were registered to vote prior to incarceration enter a "suspended" status, and for their re-registration to be accepted, they must present documentary proof in person at their parish registrar's office of their renewed eligibility. (*Id.*)

"[S]ome registrars will only accept a specific document—called a voting rights certification, issued by the Office of Probation and Parole—that the appropriate corrections official (typically the desk clerk) will print from their internal 'CAJUN' database in order to remove the

suspension listing . . . ." (*Id.* at ¶ 68.) "Additionally, state law does not specify whom the appropriate corrections official is, so individuals must guess as to how to obtain proof of eligibility." (*Id.* at ¶ 69.) It is estimated that because of an inability to provide the required paperwork, thousands of otherwise eligible voters have been unable to register to vote. (*Id.* at ¶ 77.)

Regarding those with out-of- state convictions, "corrections officials have refused to give voting rights certification to voters whose convictions were out of state. Likewise, some registrars will only accept the voting rights certification provided by the State, such that there is no way for those voters to prove their eligibility." (*Id.* at ¶ 70.)

On October 22, 2020, Plaintiff VOTE sent Defendant a letter notifying her that Louisiana's Paperwork Requirement was not in compliance with the NVRA. (*Id.* at ¶ 44.) Likewise, Plaintiffs League and Power Coalition sent Defendant a letter on August 26, 2022, which Plaintiffs describe as the "First Notice Letter," notifying her that Louisiana's paperwork requirement violates the NVRA. (*Id.* at ¶ 78.) Defendant sent a letter in response to Plaintiffs League and Power Coalition's August 26, 2022 letter on September 22, 2022, explaining "[her] position that the NVRA does not preempt the reinstatement process and that registration is distinct from reinstatement." (*Id.* at ¶ 79.) Further, "[she] had communicated with all registrars that they should only require documentation for suspended voters, not new voter registrants." (*Id.*) Plaintiffs League and Power Coalition sent Defendant a "Second Notice Letter" on October 28, 2022, reiterating "the ongoing violation of the NVRA and requested all records and communications between Defendant and the parish registrars concerning the implementation of Act 127." (*Id.* at ¶ 80.) Defendant responded to Plaintiffs' records request on February 17, 2023, stating that upon receipt of payment for 25 cents per page, she would produce 83 pages of responsive records. (*Id.* at ¶ 81.) However, Defendant did not

address the substantive portions of the Second Notice Letter. (*Id.*) On February 22, 2023, Defendant produced the responsive documents upon receipt of payment. (*Id.*)

Defendant sent an additional letter to Plaintiffs on March 8, 2023, "requesting certain follow up information about affected voters and clarifying the contents of Plaintiffs' Second Notice Letter." (*Id.* at ℙ 82.) Plaintiffs VOTE, Power Coalition, and the League responded to Defendant's March 8 follow up letter on March 31, 2023, providing her the requested information and noting "that the required period for pursuing a private cause of action under the NVRA elapsed on January 26, 2023, and that, absent further action to correct the paperwork requirement, Plaintiffs would proceed to explore their legal rights." (*Id.* at ℙ 83.) "Plaintiffs requested a final response by April 14, 2023"; however, Defendant did not respond and, to date, still enforces the paperwork requirement. (*Id.* at ℙℙ 83–85.)

### 3. Causes of Action

Plaintiffs assert two causes of action. The first is a violation of the NVRA, 52 U.S.C. § 20501 *et. seq*. The second is a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution under 42 U.S.C. § 1983.

#### a.   NVRA Claims

Regarding the first cause of action, Plaintiffs asserts that "Section 8 of the NVRA requires that all registrars place on the rolls facially eligible registrants upon timely submission of a valid registration form." (*Id.* at ℙ 87 (citing 52 U.S.C. § 20507(a)(1)).) It is sufficient to establish facial eligibility through a valid registration form with an affirmation or oath under penalty of perjury attesting to one's eligibility. (*Id.* at ℙ 88 (citing *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1194–95 (10th Cir. 2014)).) A disenfranchised citizen's right to vote is automatically restored upon no longer being in the class of individuals that is stripped of their right to vote by

statute. (*Id.* at ¶ 89 (citing *Fox v. Mun. Democratic Exec. Comm. of City of Monroe*, 328 So. 2d

171, 174 (La. Ct. App. 2d Cir. 1976)).) Further,

> By completing a valid voter registration form and swearing or attesting that they
> meet the standards for voting after a felony conviction, the applicant creates a
> presumption of eligibility—regardless of whether they have previously been
> "suspended" from the rolls. The fact that someone has been previously "suspended"
> is not information establishing ineligibility and therefore does not justify
> Defendant's paperwork requirement. Moreover, Defendant and local election
> officials have access to accurate eligibility information for people with past
> convictions.

(*Id.* at ¶ 90–91.) Therefore, by refusing to register facially eligible applicants solely on the basis

of one's prior "suspension" due to past felony convictions, Defendant violates Section 8 of the

NVRA. (*Id.* at ¶ 92.)

Likewise, Defendant's policy and practice also violates Section 6 of the NVRA. (*Id.* at ¶ 93

(citing 52 U.S.C. § 20505(a)(1)).) This section "requires states to 'accept and use' the Federal

Form application[,]" which "does not require the applicant to submit any additional documentation

along with the application to register to vote." (*Id.*) "The Supreme Court has held that the 'accept

and use' mandate is a mandate for states to accept the Federal Form 'as sufficient' for registration."

(*Id.* at ¶ 94 (emphasis omitted) (citing *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 10

(2013)).) Since the Federal Form does not require documentary proof of eligibility, "Louisiana's

paperwork requirement to prove eligibility for suspended applicants with past convictions is

inconsistent with the NVRA's mandate that States accept and use the Federal Form." (*Id.* at ¶ 96

(internal quotations and citation omitted).) Further, Section 6 also permits states to create their

own mail voter registration form, but such forms must meet the Federal Form's requirements. (*Id.*

at ¶ 97.) However, state mail voter registration forms

> may require only such identifying information (including the signature of the
> applicant) and other information (including date relating to previous registration by
> the applicant), as is necessary to enable the appropriate State election official to

assess the eligibility of the applicant and to administer voter registration and other parts of the election process.

(*Id.* (citing 52 U.S.C. § 20508(b)(1)).)

Plaintiffs asserts that "[t]he paperwork requirement imposed on suspended voters with past felony convictions violates Section 6 and Section 8 because it exceeds the information necessary for election officials to assess an applicant's eligibility, particularly given the guaranteed statutory access election officials have to the requisite information." (*Id.* at ▯ 98.) Further, Defendant's interpretation of La. R.S. § 18:177 that creates additional documentation requirements to register to vote is preempted by Sections 6 and 8 of the NVRA. (*Id.* at ▯ 99.)

> Defendant attempts to skirt the NVRA's requirements by distinguishing "registration" under La. R.S. § 18:101 *et seq.* and "reinstatement" under La. R.S. § 18:177. *See* Ex 2 at 2. According to Defendant, "registration" applies to those who are seeking to register to vote whose rights have not been suspended because of a felony conviction. *Id.* Registration is covered by the National Voter Registration Act, such that additional documentation is not required to submit a voter registration form. *Id.* However, "reinstatement," according to Defendant, is a process separate from voter registration, and therefore not covered by the National Voter Registration Act. *Id.* at 3. Thus, according to Defendant, suspended voters cannot submit a registration form and instead must provide documentary proof of eligibility to become active registrants. *Id.* at 3–4.

(*Id.* at ▯ 100.) There is nothing in the NVRA to suggest that that its voter registration requirements only apply to how states treat new registrants. (*Id.* at ▯ 101.) Likewise, Plaintiffs have complied with the NVRA's notice requirements through providing Defendant the August 26, 2022 and October 28, 2022 written notices of the alleged violations. (*Id.* at ▯ 102.) Therefore, by refusing to accept and use formally suspended voters' voter registrations forms without providing documentary proof of eligibility, Defendant has violated, and continues to violate, the NVRA. (*Id.* at ▯ 103.)

b.   Equal Protection Claim

Regarding the second cause of action, Plaintiffs assert that

> [i]t is well established that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Thus, "the State may not[,] by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–[0]5 (2000).

(*Id.* at ₱ 105.) Even though they are similarly situated, new registrants with past convictions are treated differently than "suspended" voters with past convictions seeking to become active registered voters, thus violating the Equal Protection Clause. (*Id.* at ₱ 106.) Louisiana's distinction between "new" and "suspended" voters is arbitrary under state and federal law for purposes of voter registration. (*Id.* at ₱ 107.) Regardless of "new" or "suspended" status, the NVRA's requirements are applicable to all persons who submit a voter registration form. (*Id.* (citing 52 U.S.C. § 20507(a)(1)).) "Both groups have the same purpose for applying to register—to be added to the active voter rolls so they can cast a ballot on Election Day[,]" and "regardless of whether the State labels the process 'registration' or 'reinstatement,' the mechanism for being added to the voter rolls is the same—completing either the state or federal registration form." (*Id.* at ₱₱ 108–09.) Further, whether a voter is added by "registration" or "reinstatement" is immaterial because the outcome is the same—they will follow the same regulations and process for casting a ballot. (*Id.* at ₱ 110.) Thus, even though similarly situated, "reinstatement" voters face different, unnecessarily burdensome, and arbitrary barriers than those faced by "registration" voters. (*Id.* at ₱ 111.)

Despite changing its law in 2021 to remove the documentary proof requirement in La. R.S. § 18:102, Louisiana "has interpreted and has stated that it will interpret [La. R.S. § 18:177(A)(1)] as retaining the documentary proof requirement for voters whose registration was suspended due

to a felony conviction." (*Id.* at ₱ 112.) Louisiana already has access to the information it requires these individuals to produce, and "Louisiana's statutory scheme already provides for extensive sharing of conviction records between the Secretary of State's Office, the Department of Public Safety and Corrections, and local registrars." (*Id.* at ₱ 113 (citing La. R.S. §§ 171, 171.1, 175, 176).) Therefore, "the State could readily communicate information to its agencies regarding when a voter with a felony conviction is eligible." (*Id.* at ₱ 114.) Instead, Louisiana's documentary requirement "places the burden onto the individual to track down and even pay for records which are already in the possession of the State, creating an arbitrary and unnecessary barrier to voting." (*Id.* at ₱ 115.) "Furthermore, it is irrational for registrars to not use the lists in their possession of ineligible voters to verify both the eligibility of *new* and suspended registrants." (*Id.* at ₱ 116.) "The failure to use this information creates unnecessary risks for good-faith new registrants who may simply be mistaken about their eligibility to vote." (*Id.*)

Plaintiffs assert that to deny or abridge one's right to vote, Louisiana's scheme to do so must be narrowly tailored to meet a compelling government interest, absent a less restrictive means. (*Id.* at ₱ 117.) Louisiana's practice "is not narrowly tailored to any potential state interest, as there are much more efficient and indisputably less restrictive means for parish registrar offices to receive such information." (*Id.* at ₱ 118.) Likewise, "there is not even a rational basis to require the individual to produce additional documentation of those criminal records which are already in the State's possession, much less a compelling or important reason to do so." (*Id.* at ₱ 119.)

### 4. Prayer for Relief

Plaintiffs request the Court to declare (1) "that Defendant's requirement that facially[] eligible voter registrants present documentation beyond the voter registration form in order to become actively registered to vote violates the NVRA"; and (2) "that Defendant's arbitrary

distinction in the treatment of suspended voters versus new voters violate[s] the Equal Protection Clause of the Fourteenth Amendment." (*Id.* at 30.) Plaintiffs further request the Court to "[e]njoin Defendant from requiring documentary proof of eligibility from voter registrants who were previously suspended for a felony but who present valid voter registration forms and do not appear on the DPSC's list of currently disqualified voters." (*Id.*) Moreover, Plaintiffs request the Court to order (1) "Defendant to issue statewide guidance that parish registrars may not require documentary proof of eligibility from facially eligible voter registrants that do not appear on the DPSC's list of currently disqualified voters and to provide sufficient training and supervision to ensure that the guidance is followed"; and (2) "Defendant to prominently display relevant guidance for people with felony convictions on their website, in laymen language that is easy to understand." (*Id.*) Lastly, Plaintiffs request reasonable attorney's fees and costs, as well as other relief the Court deems proper. (*Id.*)

### 5. Procedural History

On May 22, 2023, Plaintiffs filed their *Motion for Preliminary Injunction* prohibiting Defendant from requiring "suspended" voter registrants to provide documentary proof of eligibility before registering to vote. (Doc. 21 at 1.)  The following day, Plaintiffs filed a *Motion for Expedited Consideration* on the *Motion for Preliminary Injunction*. (Doc. 23.) A status conference was subsequently set for May 31, 2023. (*Id.*) Defendant filed an *Opposition to Plaintiffs' Motion for Expedited Consideration*, and Plaintiffs replied in support of the *Motion for Expedited Consideration*. (Docs. 24, 25.) On May 31, 2023, Plaintiffs' *Motion for Expedited Consideration* was denied at a status conference. (Doc. 27.)

Also at the May 31, 2023 status conference, the Court ordered the parties to file simultaneous briefs to address the following:

(1) the *Purcell* doctrine, with an eye specifically toward this Court's decision in *Singleton v. East Baton Rouge Parish School Board*, 621 F. Supp. 3d 618 (M.D. La. 2022); and (2) the Legislative action raised by the Defendant. Specifically:

- In *Singleton*, this Court declined to take up an election challenge partly on the grounds that the election was 2–4 months away and that this meant it was too close to the election.

- However, the Court cited one Supreme Court case where Justice Kavanaugh, who has spearheaded the *Purcell* doctrine, said that 4 months was too close to the election for the Court to get involved. That case is *Merrill v. Milligan*, 142 S. Ct. 879 (2022).

- The Court also cited *Ardoin v. Robinson*, 142 S. Ct. 2892 (2022), where the Supreme Court stayed a decision of the Fifth Circuit where the election was 5 months away. There's some ambiguity in how to read *Ardoin*, but this Court views *Ardoin* as a clear indication that the Supreme Court believed 5 months was too close to an election as well.

- In this matter, Plaintiffs represent that the election is less than 5 months away, which seems in line with *Ardoin* and not substantively or substantially different from *Merrill*.

- Additionally, Plaintiffs' response in the record on *Purcell* is as follows (1) this case is different than *Singleton* because it involves different delays, and (2) *Purcell* doesn't look at time alone. As to the second point, Plaintiffs are correct—under *Singleton*, a party can overcome the timing issue if he can show "that changes to [the] election were feasible without significant cost, confusion, or hardship[,]" *Singleton*, 621 F. Supp. 3d at 629, but for that the Court will need evidence, particularly from the Secretary of State. As to whether *Singleton* is different because it involves different delays, that too will require the consideration of evidence and more than what is currently in the record.

- Additionally, the Court has done some preliminary research and it looks like *Ardoin* will be decided this term. The parties are to inform the Court if this is not the case, but regardless, that seems like an additional reason to hold off on rendering an opinion.

- Finally, the possibility of a Legislative solution seems like a good reason to delay further action. Plaintiffs say Legislative action will not moot this action because: (1) the new law, as passed, would not cure the problems Plaintiffs complain of, and (2) the legislation is currently a bill, not a law, and it's too risky to delay. As to the former, Plaintiffs' argument doesn't change the fact that a new law will change the way the Court looks at the situation, and this would require further briefing. As to the latter, while Plaintiffs are right that any delay risks exacerbating the *Purcell* principle, at this point, it appears that the case is already too close to the election to comply with *Purcell*.

(*Id.* at 2–3.) The parties filed briefs addressing these issues. (Docs. 69, 72.)

14

Following the May 31, 2023 status conference, Defendant filed her *Motion to Dismiss* on June 14, 2023. (Doc. 32.) Plaintiffs then filed their response in opposition to the *Motion to Dismiss* on July 5, 2023. (Doc. 58.) Defendant filed her reply memorandum in support of the *Motion to Dismiss* on July 19, 2023. (Doc. 65.)

On the same day that Defendant filed her *Motion to Dismiss*, the Court held a status conference in which it ordered that the preliminary injunction hearing be reset for July 5, 2023, at 9:00 a.m. via Zoom. (Doc. 34 at 3.) On June 22, 2023, Defendant filed *Opposed Motion for Continuance* ("*Motion to Continue*"), asking the Court to continue the July 5, 2023 preliminary injunction hearing. (Doc. 42.) Plaintiffs filed a response opposing Defendant's *Motion to Continue* (Doc. 46). The Court granted Defendant's *Motion to Continue*. (Doc. 48.) The Court granted the motion for the following reason:

> The urgency for the July 5, 2023, hearing on Plaintiff's preliminary injunction was predicated on the need to hear the case as soon as possible so as to avoid any *Purcell* issue that might arise with the upcoming gubernatorial election in October 2023. However, that preliminary injunction was based solely on claims arising under the National Voter Registration Act ("NVRA"). Defendant has asserted that the NVRA applies only to federal elections, not state elections. The Court agrees with Defendant's position.

(*Id.* at 1–2.) On October 16, 2023, Defendant also filed a sealed *Motion to Challenge the Confidentiality Designation of Certain Members*. (Doc. 96.) At the October 19, 2023 status conference, the parties agreed that any individual subject to the protective order would be referred to anomalously (e.g., "Plaintiff 1" and "Plaintiff 2"). (Doc. 101 at 1.)

A preliminary injunction hearing was held on October 25, 2023, and October 31, 2023. (Docs. 105, 113.) The parties have filed post-hearing briefs, (Docs. 132, 133), and replies thereto, (Docs. 134, 135). Plaintiffs also filed a *Notice of Supplemental Authority* on April 26, 2024, (Doc. 153), to which Defendant has filed a response, (Doc. 154).

## II.    DISCUSSION

Defendant filed her *Motion to Dismiss* pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim. (Doc. 32-1 at 3.) Regarding Defendant's 12(b)(1) argument, Defendant asserts that Plaintiffs' suit must be dismissed because (1) she has sovereign immunity; and (2) Plaintiffs lack standing. With respect to Defendant's 12(b)(6) argument, Defendant asserts that (1) there are deficiencies in Plaintiffs' NVRA notice;[3] (2) Plaintiffs have not adequately pled NVRA claims; and (3) Plaintiffs have not adequately pled an equal protection claim. In short, the Court will grant in part and deny in part Defendant's *Motion to Dismiss*.

With respect to Defendant's sovereign immunity argument, the *Motion to Dismiss* is denied. The Court finds there to be a sufficient relationship between Louisiana's Secretary of State and the enforcement of La. R.S. § 18:177(A)(1) to implicate the *Ex parte Young* exception to sovereign immunity.

Regarding Defendant's Article III standing argument, the Court finds that Plaintiffs do have Article III standing by way of Plaintiff Power Coalition's organizational standing. With respect to this issue, Defendant's *Motion to Dismiss* is denied.

The Court finds that with regard to Defendant's NVRA notice arguments, the *Motion to Dismiss* is granted in that Plaintiff VOTE did not provide proper notice under the NVRA. Therefore, Plaintiff VOTE is dismissed for purpose of the NVRA claims only. Moreover, the Court reads the *Complaint* to only allege violations of 52 U.S.C. §§ 20505(a)(1) and 20507(a)(1), but to

---

[3] Defendant urges dismissal under Rules 12(b)(1) and 12(b)(6) in the alternative with regard to the issue of NVRA notice. (*See* Doc. 32-1 at 14.) The Court finds an analysis under Rule 12(b)(6) most appropriate. *See Am. Civ. Rts. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779 (W.D. Tex. 2015) ("The National Voter Registration Act (NVRA) notice provision is nonjurisdictional; therefore, when a plaintiff fails to fulfill the notice provision, the complaint should be dismissed pursuant to rule governing motions for failure to state a claim, rather than rule governing motions to dismiss for lack of subject-matter jurisdiction. 52 U.S.C.A. § 20510(b)(1); Fed. R. Civ. P. 12(b)(1, 6).").

the extent that the *Complaint* alleges violations of statutes other than 52 U.S.C. §§ 20505(a)(1) and 20507(a)(1), or statutes referenced within those provisions, Defendant's *Motion to Dismiss* is granted.

With respect to Defendant's argument that La. R.S. § 18:177(A)(1) preempts 52 U.S.C. §§ 20505(a)(1) and 20507(a)(1), the Court finds that these statutes are not in direct conflict. Therefore, the *Motion to Dismiss* in this regard is granted, and these claims are dismissed without prejudice. Consequently, Plaintiffs' *Motion for Preliminary Injunction* is denied, as Plaintiffs' basis for their *Motion for Preliminary Injunction* is their NVRA claims.

Moreover, regarding Defendant's equal protection argument, Defendant's *Motion to Dismiss* is denied, as the Court finds that Plaintiffs have prudential standing and have pled an adequate claim under the *Anderson*/*Burdick* framework.

Further, the Court will grant Plaintiffs leave to amend to address the above-mentioned deficiencies if same can be cured in good faith.

### A.  Legal Standard

#### *1. Rule 12(b)(1)*

A party may raise the defense of lack of subject matter jurisdiction in a motion brought under Federal Rule of Civil Procedure 12(b)(1). *See* Fed. R. Civ. P. 12(b)(1). "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal citation omitted)).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *McDaniel v.*

*United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). But, "[a] motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders*, 143 F.3d at 1010; *see also Ramming*, 281 F.3d at 161 (citing *Home Builders* with approval).

There are two forms of Rule 12(b)(1) challenges to subject matter jurisdiction: "facial attacks" and "factual attacks." *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). "A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate Gen. of the State of Qatar*, 313 F. Supp. 3d 815, 819 (S.D. Tex. 2018) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)). In considering a "facial attack," a court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient the complaint stands." *Paterson*, 644 F.2d at 523.

Conversely, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings—such as testimony and affidavits—may be considered." *Harmouche*, 313 F. Supp. 3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (citation omitted). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* (citation omitted). When a factual attack is made, the plaintiff, as the party seeking to invoke jurisdiction, must "submit facts through some evidentiary method and . . . prov[e] by a

preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

### 2. Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hamilton v. Dall. Cnty.*, 79 F.4th 494, 499 (5th Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). The Court does "not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.' " *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.' " *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

The Court's "task, then, is 'to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.' " *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing

*Iqbal*, 556 U.S. at 678)). "[A] claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].' " *Calhoun v. City of Hous. Police Dep't*, 855 F. App'x 917, 919–20 (5th Cir. 2021) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

Additionally, "[i]n determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted).

## B. 12(b)(1): Sovereign Immunity

### 1. Parties' Arguments

#### a.  Defendant's Memo in Support (Doc. 32-1)

Defendant first argues that as Secretary of the State of Louisiana, she is entitled to sovereign immunity against Plaintiffs' equal protection claim. (Doc. 32-1 at 3.) Louisiana has not waived its Eleventh Amendment sovereign immunity, and a suit against a state official acting within his or her official capacity is treated as if it is a suit against the state itself. (*Id.* at 4.) The Supreme Court in *Ex parte Young* established an exception to this general rule, allowing individuals to sue state officials in their official capacities for prospective equitable relief when such an official violates federal law. (*Id.*) However, the state official must have some connection to enforcing the act in question for the *Ex parte Young* exception to apply. (*Id.* at 5 (citing *Tex. Democratic Party v. Hughs*, 860 F. App'x 874, 879 (5th Cir. 2021).) To have such a connection,

> (1) the official "must have more than the general duty to see that the laws of the state are implemented;" (2) "the official must have the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty;" and (3) " 'enforcement' means 'compulsion or constraint.' " "If the official does

not compel or constrain anyone to obey the challenged law, enjoining that
official could not stop any ongoing constitutional violation."

(*Id.* (quoting *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022)).)

Here, the *Ex parte Young* exception does not apply because Plaintiffs seek to enjoin the
Secretary of State "from requiring documentary proof of eligibility from voter registrants who
were previously suspended for a felony but who present valid voter registration forms and do not
appear on the DPSC's list of currently disqualified voters" and to order Secretary Landry "to issue
statewide guidance that parish registrars may not require documentary proof of eligibility from
facially eligible voter registrants that do not appear on the DPSC's list of currently disqualified
voters and to provide sufficient training and supervision to ensure that the guidance is followed."
(*Id.* (internal quotations omitted) (quoting *Compl.*, Doc. 1 at 30).) Louisiana Revised Statute
§ 18:177(A)(1), the paperwork requirement, is found in Title 18, Chapter 4, Part IV, which is titled
"Reports to Registrars." (*Id.*) Likewise, the statute clearly provides that registrars implement the
paperwork requirement. (*Id.* at 6.) Thus, Secretary Landry does not have a sufficient connection
to La. R.S. § 18:177(A)(1); registrars do. (*Id.* at 5–6.)

This is consistent with the Secretary of State's September 22, 2022 letter, which only
provides assistance and direction to the registrars regarding the paperwork requirement's
procedures. (*Id.* at 6 (citing Doc. 17-2 at 4).) While the Secretary of State does have a duty to see
that the laws of the state be carried out, this is merely a general duty. (*Id.*) Likewise, there is nothing
in Louisiana's Election Code providing that the Secretary of State enforce registrars' obligations
under the paperwork requirement or compel registrars to carry out such requirement. (*Id.* at 7.)
Instead, the Louisiana Election Code "imputes 'certain responsibilities on the [parish] registrars,'
including the responsibility to receive 'documentation from the appropriate correction official' in
order to reinstate a voter's registration previously suspended for conviction of a felony." (*Id.* at 8.)

Therefore, the *Ex parte Young* exception is inapplicable, and Defendant is entitled to sovereign immunity. (*Id.* at 9.)

Defendant cites to two Fifth Circuit cases to support her argument that the *Ex parte Young* exception is inapplicable: *Texas Democratic Party v. Hughs*, 860 F. App'x 874 (5th Cir. 2021) and *Texas Alliance for Retired Americans v. Scott*, 28 F.4th 669 (5th Cir. 2022). (*Id.* at 7–8.) In both cases, the Fifth Circuit found that the *Ex parte Young* exception did not apply because the Secretary of State did not have a sufficient connection to the enforcement of the law at issue. (*Id.*) Defendant argues that the similarities between these two cases and the present case further support her assertion that she is entitled to sovereign immunity, and thus Plaintiffs' equal protection claim under the Fourteenth Amendment should be dismissed for lack of subject matter jurisdiction. (*Id.*)

b.   Plaintiffs' Opposition (Doc. 58)

In response to Defendant's argument that she is entitled to sovereign immunity as the Secretary of State of Louisiana, Plaintiffs argue that the *Ex parte Young* exception is applicable, and thus Defendant is not entitled to sovereign immunity. (Doc. 58 at 9.) The Fifth Circuit has held, assert Plaintiffs, that "only a 'scintilla of "enforcement" by the relevant state official with respect to the challenged law' is sufficient to invoke the *Ex parte Young* exception." (*Id.* at 10 (quoting *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019)).) Plaintiffs argue that though the Secretary of State's duties under the paperwork requirement are shared with the registrars, "[she] has direct enforcement authority over the registrars with respect to the challenged act and has shown [her] willingness to exercise that duty well beyond a 'scintilla of enforcement.' " (*Id.*)

Plaintiffs argue that Defendant has a scintilla of enforcement over the paperwork requirement for four reasons. First, the Secretary of State is specifically tasked with enforcing voter registration laws. (*Id.* at 11 (citing La. R.S. § 18:18(A) ("The secretary of state shall

22

administer the laws relating to custody of voting machines and voter registration . . . .")).)

Likewise, the Secretary of State is tasked with enforcing the NVRA and ordering compliance with

the Act. (*Id.*) "As the remedy for the NVRA violation would be the same as the remedy for the

equal protection violation, Defendant necessarily has the authority to administer the remedy for

the constitutional violation." (*Id.*) Second, Defendant has specifically instructed registrars in the

past "that individuals who were previously registered and are eligible to vote after a felony

conviction can only do so if they go through the 'reinstatement process' and present the challenged

paperwork while 'no documentation is needed' for first time registrants." (*Id.* (emphasis omitted)

(citing Doc. 17-5 at 7–8).) To this end, Defendant "cannot claim to have no connection to

enforcement of [her] own guidance to parish registrars." (*Id.*) Third, the Secretary of State is

specifically tasked with developing the voting rights certification, which is the reinstatement

paperwork. (*Id.* at 12.) Fourth, Defendant "has repeatedly demonstrated [her] willingness to

exercise [her] duties by compelling denials of voter registrations and constraining registration

without the paperwork." (*Id.*) Plaintiffs argue that

> As noted above, shortly after the passage of Act 127, the Secretary of State issued instructions directing all parish registrars to continue to require documentary proof of eligibility to "reinstate" previously registered voters. ECF 17-5 at 7–8 (Compl., Ex. 5). But, even further, the Secretary also directs the registrars regarding how to handle specific voter registrations for people subject to the "reinstatement" process. *See, e.g.*, *id.* at 52–54. Furthermore, the Secretary's executive counsel and outside counsel have even stepped in and *directly* contacted voter registrants instructing them that they cannot register to vote without submitting the documentary proof of eligibility. *See, e.g.*, *id.* at 40–48. Even *one instance* of direct enforcement by the Secretary alone is enough to constitute the requisite scintilla of enforcement. *See* [*Tex.*] *Democratic Party v. Abbott*, 978 F.3d at 179.

(*Id.*)

Plaintiffs then go on to distinguish Defendant's cited authority: *Texas Democratic Party v.*

*Hughes*, 860 F. App'x 874 (5th Cir. 2021). (*Id.* at 12–13.) Plaintiffs instead find the Fifth Circuit's

decision in *Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020) to be controlling. (*Id.* at 13.) In that case,

> the Fifth Circuit applied *Ex [p]arte Young*, because the absentee ballot request form created by the Secretary of State in that case *did contain* the challenged requirement. 978 [F].3d at 180. The Fifth Circuit found the requisite "scintilla of enforcement" in the charge to the Secretary to design the absentee ballot application form because that form included the challenged age restriction. *Id.* at 179–80. Like *TDP v. Abbott,* Defendant is, by statute, involved in creating the paperwork at issue.
>
> As in *TDP v. Abbott*, the Secretary's statutory duties here are much more specific and directly connected with the constitutional violation. In addition to being tasked by the legislative enactment with creating the challenged paperwork itself, *see* La. Acts 2018, No. 636 § 2, the Secretary is also specifically tasked with, *inter alia*, prescribing instructions that shall be applied by the registrars. [La. R.S. §] 18:18(A)(3). In line with that duty, the Secretary has issued instructions to the registrars that they shall not allow suspended individuals to register to vote without the documentary proof of eligibility—the root of the constitutional violation. ECF 17-5 at 7–8 (Compl., Ex. 5). While the duty to enforce the Paperwork Requirement is shared with the parish registrars, who often handle frontline application of the requirement, that is no bar to application of *Ex [p]arte Young.* In *TDP v. Abbott*, the Fifth Circuit held that requisite *Ex [p]arte Young* connection exists even where enforcement duties are shared between the Secretary of State and the local registrars. 978 F.3d at 179–80.

(*Id.*)

For these reasons, Plaintiffs argue that Defendant has the requisite connection to the challenged statute in this case that has directly caused the alleged constitutional violation. (*Id.* at 13–14.) She also is required by statute to create the paperwork at the heart of this controversy and is engaged in the involvement of the paperwork requirement through her own actions and through the registrars. (*Id.* at 14.) Thus, the *Ex parte Young* exception is applicable. (*Id.*)

### c.   Defendant's Reply (Doc. 65)

Defendant argues that she "lacks the requisite connection to enforcement of the documentation requirement of La. R.S. [§] 18:177. As such, the *Ex [p]arte Young* exception to sovereign immunity does not apply, and Defendant is entitled to sovereign immunity as to

Plaintiffs' claims of equal protection." (Doc. 65 at 3.)

First, Defendant asserts that Plaintiffs' argument that the *Ex parte Young* exception applies lacks merit because "none of the statutes cited by Plaintiffs charge the Secretary of State with enforcement of the documentation requirement of La. R.S. [§] 18:177." (*Id.* at 1.) Moreover, Defendant asserts that pursuant to La. R.S. § 18:58(A), "enforcement is unequivocally the responsibility of the registrars of voters." (*Id.*)

Next, Defendant argues that the Secretary of State has not repeatedly demonstrated "willingness to exercise his duties by compelling denials of voter registrations and constraining registration without the paperwork." (*Id.* at 2 (internal quotations omitted) (quoting Doc. 58 at 12).) As an initial matter, Defendant maintains that voter registration and reinstatement of registration are separate processes under Louisiana law, and only reinstatement of registration is at issue in this case. (*Id.* at 2 n.4.) Then, Defendant asserts that the examples of purported enforcement that Plaintiffs cite to in Exhibit 5 of their *Complaint* merely demonstrate direction and assistance, not enforcement. (*Id.* at 2.) Further, Defendant asserts that the "cited communications, none of which were sent to Plaintiffs," also do not provide a sufficient connection to enforcement of La. R.S. § 18:177 because they do not (1) make a specific threat or indicate that enforcement was forthcoming; or (2) state that Plaintiffs, the registrars, or any suspended voters have violated any law. (*Id.* (citing *Tex. Democratic Party*, 978 F.3d at 181).)

Defendant also disputes Plaintiffs' reliance on *Texas Democratic Party v. Abbott* to support the contention that because Defendant was tasked with developing the reinstatement documentation, she had the requisite connection to enforcement of La. R.S. § 18:177. (*Id.*) Defendant asserts that *Abbott* is inapposite to the present case on this point because Plaintiffs take issue with the very requirement that documentation be presented for reinstatement, as

opposed to the Plaintiffs in *Abbott* who took issue with the design of the documentation created by the Secretary of State. (*Id.* at 2–3.)

Lastly, Defendant disputes Plaintiffs' contention "that by seeking the same remedy for their equal protection claims as their NVRA claims, Defendant should be deprived of sovereign immunity for the equal protection claims." (*Id.* at 3 n.9 (citing Doc. 58 at 11).) This is because, Defendant argues, "[s]eeking the same relief for alleged violations of federal law and alleged constitutional violations is not an exception to sovereign immunity." (*Id.*)

### 2. Applicable Law

#### a.   Sovereign Immunity and *Ex parte Young*

"The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest. Thus, [t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (alteration in original) (citations and internal quotations omitted). Accordingly, "[t]he Eleventh Amendment bars claims against a state brought pursuant to 42 U.S.C. § 1983." *Aguilar v. Tex. Dep't of Crim. Just.*, 160 F.3d 1052, 1054 (5th Cir. 1998) (citing *Farias v. Bexar Cty. Bd. Of Trustees for Mental Health Mental Retardation Servs.*, 925 F.2d 866, 875 n.9 (5th Cir. 1991)).

Nevertheless, "[i]n *Ex [p]arte Young*, 209 U.S. 123 [] (1908), the Supreme Court carved out an exception to Eleventh Amendment immunity." *Id.* "The [*Ex parte Young*] Court held that enforcement of an unconstitutional law is not an official act because a state can not confer authority on its officers to violate the Constitution or federal law." *Id.* (citing *Am. Bank & Trust Co. of Opelousas v. Dent*, 982 F.2d 917, 920–21 (5th Cir. 1993)). "To meet the *Ex [p]arte Young* exception, a plaintiff's suit alleging a violation of federal law must be

brought against individual persons in their official capacities as agents of the state, and the relief sought must be declaratory or injunctive in nature and prospective in effect." *Id.* (citing *Saltz v. Tenn. Dep't of Emp. Sec.*, 976 F.2d 966, 968 (5th Cir. 1992)).

"In conducting our *Ex parte Young* analysis, we first consider whether the plaintiff has named the proper defendant or defendants." *City of Austin*, 943 F.3d at 998. "Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends." *Id.* "Where no state official or agency is named in the statute in question, we consider whether the state official actually has the authority to enforce the challenged law." *Id.* Next,

> [o]nce it's clear that the named defendant is proper, [Fifth Circuit] precedent directs us to read the language in *Young* and *Verizon* [*Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002)] together. Such an approach results in two analyses that help us to determine whether the *Young* exception applies to the relevant state official. We conduct a *Verizon* "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." 535 U.S. at 645 []. We also decide whether the official in question has a "sufficient connection [to] the enforcement" of the challenged act. *Young*, 209 U.S. at 157 []; *see Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017) ("First, as the district court noted, [plaintiff] claims an ongoing violation of federal law and seeks prospective relief . . . . Next, we hold state defendants have a sufficient connection to the enforcement of the [challenged law].").

*Id.* (fifth and seventh alteration in original).

However, the Fifth Circuit "has struggled to define this 'connection' requirement." *Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022); *see also Tex. All. for Retired Ams.*, 28 F.4th at 672 (same observation); *Tex. Democratic Party*, 978 F.3d at 179 (explaining how the Fifth Circuit has not "spoken with conviction about all the relevant details of the 'connection' requirement"). As the Fifth Circuit has explained:

> The precise scope of the "some connection" requirement is still unsettled, but the requirement traces its lineage to *Young* itself. We do know, though, that it is not

27

enough that the official have a "*general* duty to see that the laws of the state are implemented." [*Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)] (emphasis added). And "[i]f the official sued is not statutorily tasked with enforcing the challenged law, then the requisite connection is absent and our *Young* analysis ends." [*In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020)] (quotation marks omitted).

Moreover, a mere connection to a law's enforcement is not sufficient—the state officials must have taken some step to enforce. But how big a step? Again, the line evades precision. One panel observed that " '[e]nforcement' typically involves compulsion or constraint." [*K.P. v. Leblanc*, 627 F.3d 115, 124 (5th Cir. 2010)]. Another defined it as "a demonstrated willingness to exercise" one's enforcement duty. *Morris*, 739 F.3d at 746. But the bare minimum appears to be "some scintilla" of affirmative action by the state official. [*City of*] *Austin*, 943 F.3d at 1002.

*Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400–01 (5th Cir. 2020) (second and third alteration in original) (footnotes omitted). However, when recently faced with this issue, the Fifth Circuit described this connection requirement as follows:

To satisfy the required enforcement connection, the state official must have a duty beyond "the general duty to see that the laws of the state are implemented." Rather, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." This analysis is " 'provision-by-provision': The officer must enforce 'the particular statutory provision that is the subject of the litigation.' " We have defined "enforcement" as "compulsion or constraint," so "[i]f the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." Plaintiffs need only show a "scintilla of enforcement by the relevant state official."

*Book People, Inc. v. Wong*, 91 F.4th 318, 335 (5th Cir. 2024) (footnotes omitted).

b.  Louisiana's Election Code

Again, under Louisiana's paperwork requirement, "The registration of a person whose registration has been suspended by the registrar of voters pursuant to R.S. 18:176(A) shall be reinstated when the person appears in the office of the registrar and provides documentation . . . ." La. R.S. § 18:177(A)(1). This statute is within Part IV of Louisiana's Election Code titled "Reports to Registrars." Louisiana Revised Statutes § 18:58 describes the powers and duties of registrars:

§58. Powers and duties of registrars

A. Subject to the direction of the secretary of state and as provided by law, the registrar in each parish shall be responsible for the registration of voters in the parish he serves and for the administration and enforcement of the laws and the rules and regulations of the secretary of state relating to the registration of such voters.

*Id.* § 18:58(A).  Moreover, "[e]xcept as otherwise provided by law, the duties of the registrar are ministerial in character . . . ." *Id.* § 18:66(A). Under Louisiana law, "[m]inisterial duties are duties in which no element of discretion is left to the public officer. A ministerial duty is simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law." *Hoag v. State*, 2004-0857 (La. 12/1/04); 889 So. 2d 1019, 1024 (citations omitted).

In contrast, the power and duties of the Secretary of State are as follows:

§18. Secretary of state; powers and duties

A. The secretary of state shall administer the laws relating to custody of voting machines and voter registration, and for this purpose he shall:

> (1) Subject to applicable civil service laws and applicable provisions of this Title, employ and fix the salaries and duties of necessary staff to carry out such functions.

> (2) Direct and assist the registrars of voters of the state with respect to matters pertaining to the registration of voters as provided by law.

> (3) Prescribe uniform rules, regulations, forms, and instructions, which shall be approved by the attorney general and thereafter shall be applied uniformly by each registrar of voters in the state. These rules, regulations, forms, and instructions shall include but not necessarily be restricted to forms of applications for registration, records, affidavits and statements, documents, and general procedures to be used by the registrars of voters, none of which shall be inconsistent with the constitution and laws of the United States or of this state.

> (4) Be responsible for obtaining statistics and data relating to the registration of voters from the registrars throughout the state and for the compilation of such statistics and data in an annual report which shall be submitted to the Legislature of Louisiana not later than the first day of each regular session.

29

(5) Perform such other functions and duties and exercise such other powers as are conferred upon him by this Title.

(6) Coordinate the responsibilities of this state under the National Voter Registration Act of 1993 (P.L. 103-31) as required by 52 U.S.C. 20509.

La. R.S. § 18:18(A)(1)–(6). With respect to Louisiana's paperwork requirement, Act 636 of the 2018 legislative session required the Secretary of State to work with the Department of Public Safety and Corrections prior to the Act's effective date "to develop a form or forms to allow a person who is or was under an order of imprisonment for conviction of a felony to meet the requirements of" now La. R.S. § 18:177(A)(1). 2018 La. Acts 636.

### 3. Analysis

The Court must determine whether Plaintiffs' claims against the Secretary of State in her official capacity are barred by the Eleventh Amendment. With respect to Plaintiffs' NVRA claims, the Court finds that sovereign immunity is not implicated, as the Act establishes a private right of action for aggrieved individuals. *See* 52 U.S.C. § 20510. Thus, "Congress's abrogation of immunity under the NVRA is clear and unequivocal[,]" and Plaintiffs' NVRA claims are not barred by the Eleventh Amendment. *Stringer v. Hughs*, No. 20-46, 16-257, 2020 WL 6875182, at *19 (W.D. Tex. Aug. 28, 2020). *See also Lane v. Pena*, 518 U.S. 187, 192 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text . . . .").

To determine if Plaintiffs' 42 U.S.C. § 1983 claim is barred by the Eleventh Amendment, a more in-depth analysis is required. It is undisputed and clear from Plaintiffs' *Complaint* that they are seeking prospective declaratory and injunctive relief for an ongoing violation of Plaintiffs' rights under the Fourteenth Amendment. (*See Compl.*, Doc. 1 at 30; Doc. 32-1 at 5.)  Thus, the *Ex parte Young* exception to the Eleventh Amendment's sovereign immunity is implicated so long as

30

Secretary of State Landry is a proper defendant and there is an adequate connection between her and the enforcement of Louisiana's paperwork requirement, La. R.S. § 18:177(A)(1).

First, the Court will look to the text of La. R.S. § 18:177(A)(1) itself to determine whether Secretary of State Landry is the proper defendant in this matter. *See Book People, Inc.*, 91 F.4th at 335. The Louisiana Supreme Court has laid out the following guidelines for interpreting statutes:

> Legislation is the solemn expression of the legislative will; thus, the interpretation of legislation is primarily the search for the legislative intent. *Cat's Meow, Inc. v. City of New Orleans*, 98–0601 [] (La. 10/20/98)[;] 720 So. 2d 1186, 1198; *La. Safety Ass'n of Timbermen Self–Insurers Fund v. La. Ins. Guar. Ass'n*, 09–0023 [] (La. 6/26/09)[;] 17 So. 3d 350, 355–56. *See also* La. R.S. [§] 24:177(B)(1). When a law is clear and unambiguous, and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of the legislative intent. La. R.S. [§] 1:4. The starting point for interpretation of any statute is the language of the statute itself. *See, e.g.*, *Cat's Meow*, [] 720 So. 2d at 1198; *Timbermen*, []17 So. 3d at 356. Additionally, "all laws pertaining to the same subject matter must be interpreted in *pari materia*, or in reference to each other." *See, e.g.*, *State v. Williams*, 10–1514 (La. 3/15/11)[;] 60 So. 3d 1189, 1191; La. [Civ. Code] art. 13. When, on the other hand, a statute is not clear and unambiguous, or its application leads to absurd consequences, we rely on secondary rules of statutory interpretation to discern the meaning of the statute at issue. *See Red Stick Studio Dev., L.L.C. v. State ex rel. Dep't of Econ. Dev.*, 10–0193 [] (La. 1/19/11)[;] 56 So. 3d 181, 187–88 (quotation omitted). In such cases, the statute "must be interpreted as having the meaning that best conforms to the purpose of the law. Moreover, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole." *Id.*

*Pierce Founds., Inc. v. Jaroy Const., Inc.*, 2015-0785 (La. 5/3/16); 190 So. 3d 298, 303. Considering these guidelines, the Court does not find that the Louisiana Legislature statutorily tasked anyone with the enforcement of the La. R.S. § 18:177(A)(1). Again, the statute uses the specific language: "The registration of a person whose registration has been suspended by the registrar of voters pursuant to R.S. 18:176(A) *shall be reinstated when the person appears in the office of the registrar and provides documentation . . . .*" La. R.S. § 18:177(A)(1) (emphasis added). Though the statute mentions registrars, the statute does not specify who does the reinstatement

once paperwork is given to the registrars. Thus, for the Secretary of State to be a proper defendant, she must have the authority to enforce La. R.S. § 18:177(A)(1). *See City of Austin*, 943 F.3d at 998 ("Where no state official or agency is named in the statute in question, we consider whether the state official actually has the authority to enforce the challenged law.").

The Court finds that the Louisiana Secretary of State does have the authority to enforce La. R.S. § 18:177(A)(1). The Secretary of State's powers and duties under Louisiana's Election Code include "administer[ing] the laws relating to . . . voter registration, and for this purpose [s]he shall . . . [d]irect and assist the registrars of voters of the state with respect to matters pertaining to the registration of voters as provided by law . . . ." La. R.S. § 18:18(A)(2). Administrating voter registration laws and "direct[ing]" local registrars "with respect to" matters relating to Louisiana's voter registration weigh heavily in favor of the Secretary of State having statutory authority to enforce voter registration laws such as La. R.S. § 18:177(A)(1). As such, the Court finds that Louisiana's Secretary of State is a proper defendant in this matter and must next determine whether there is a sufficient connection between the Secretary of State and the actual enforcement of La. R.S. § 18:177(A)(1).

Despite any uncertainty as to the scope of the Fifth Circuit's connection requirement, it is clear from the statutory construction of Louisiana's Election Code and specific actions taken by the Secretary of State that at the very least there is a scintilla of enforcement between the Secretary of State and La. R.S. § 18:177(A)(1). When reading the paperwork requirement (La. R.S. § 18:177(A)(1)) *in pari materia* with the powers and duties of registrars (La. R.S § 18:58(A)), the powers and duties of the Secretary of State (La. R.S. § 18:18), and the Legislature's characterization of registrars' duties as ministerial (La. R.S. § 18:66(A)), it is clear that Louisiana's Election Code provides for a chain of command when carrying out voter registration laws.

32

Registrars have a duty to enforce voter registration laws, but that duty is ministerial in nature, meaning registrars cannot make judgment calls. *See id.* §§ 18:58(A), 18:66(A); *Hoag*, 889 So. 2d at 1024. Thus, when an issue arises to where registrars would need to exercise discretion, they must seek direction from the Secretary of State, whose duty it is to "direct and assist the registrars of voters of the state with respect to matters pertaining to the registration of voters . . . ." La. R.S. § 18:18(A)(2). Once the registrar receives the direction and assistance on how to proceed, they take that guidance and enforce it.

This hierarchy is evidenced by the exhibits Plaintiffs attached to their *Complaint*. (*See* Doc. 17-5 at 7–8, 40–48, 52–54.) Document 17-5 at 7–8 is a letter from former Secretary of State Kyle Ardoin to the Registrar of Voters regarding Act 127 of the 2021 legislative session. Within this letter, the Former Secretary of State discusses the changes under this Act and mentions the following with respect to La. R.S. § 18:177(A)(1):

> As a reminder, Act 127 did not change the reinstatement process for suspended voters. In order to be reinstated, a suspended voter must continue to provide "documentation from the appropriate correction official showing that such person is no longer under an order of imprisonment or, if the person is under such an order, that the person has not been incarcerated pursuant to the order within the last five years and the person is not under an order of imprisonment related to a felony conviction pursuant to election fraud or any other election offense pursuant to R.S. 18:1461.2." (See La. R.S. 18:177)

(*Id.* at 7.)

Document 17-5 at 52–54 is an email exchange between individuals from the Secretary of State's office and the Terrebonne Registrar of Voters. In this exchange, the Terrebonne Registrar of Voters asked representatives from the Secretary of State's office for their thoughts on the course of action she planned to take in response to a letter from an inmate seeking information about voter registration. (*Id.* at 53.) In response, the Secretary of State's Executive Counsel stated: "I agree with sending him information on reinstatement. That process was not changed with the new law.

See below for additional information." (*Id.* at 52.) The Secretary of State's Executive Counsel then attached the language of La. R.S. § 18:177(A)(1) and stated that the statute was not amended by Act 127. (*Id.*)

Document 17-5 at 40–48 contains two different email chains: one between representatives from the Secretary of State and the Orleans Registrar of Voters and another between representatives from the Secretary of State and the actual individual that was the subject of the inquiry, which was then forwarded to the Orleans Registrar of Voters. To the Court, it seems that when reading the two email chains together, the individual attempted to registered to vote online, but he was subject to La. R.S. § 18:177(A)(1), so his attempted registration did not go through. It is unclear to the Court what happened from there, whether that be that the individual reached out to the Secretary of State's office inquiring why his registration did not go through or whether the Secretary of State's office reached out to the individual once the individual was flagged in the Secretary of State's system. Whatever the case may be, the Secretary of State's representative then directs the individual to the registrar:

> Under state law, La. R.S. [§] 18:177 (see below also) you will need to appear in person at the Orleans Parish Registrar of Voters Office to complete your registration. When you appear in person, you will also need to provide documentation from the appropriate corrections official. As you mentioned you had some questions regarding that documentation. If you do have any questions regarding these requirements, please do not hesitate to contact the Registrar of Voters Office or our office. Both Danielle Duplessis Hammond and Monchel Montrose at the office will be able to assist you in the Registrar's Office.
>
> The Registrar of Voters Office in Orleans Parish is located at:
>
> CITY HALL, 1300 PERDIDO ST., #1W24
> NEW ORLEANS, LA 70112-2127

(*Id.* at 43.) The representative from the Secretary of State went on to state: "Please do not hesitate to contact me or Celia Cangelosi as well if you have any questions." (*Id.*)

Considering these emails and the statutory hierarchy provided for in Louisiana's Election Code, the Court finds that at the very least there is a scintilla of enforcement between Louisiana's Secretary of State and La. R.S. § 18:177(A)(1). Moreover, given this hierarchy, a judgment against Defendant will produce the relief sought by Plaintiffs. For example, if this Court were to declare La. R.S. § 18:177(A)(1) unconstitutional and/or in violation of the NVRA and enjoin the Secretary of State from enforcing such, the Secretary of State could do so. The Secretary of State would direct registrars that La. R.S. § 18:177(A)(1) is invalid and that they must stop enforcing it. Under Louisiana's Election Code, the registrars would be bound to carry out this directive, as their role is ministerial in nature, and thus they have no discretion to make any judgment call to the contrary.

For these reasons, the Court finds that Louisiana's Secretary of State has a sufficient connection to La. R.S. § 18:177(A)(1), and thus the *Ex parte Young* exception to the Eleventh Amendment's sovereign immunity applies. Therefore, Defendant's *Motion to Dismiss* with respect to this issue is denied.

### C.  12(b)(1): Standing

#### 1. Standing in General

"The standing doctrine is a threshold inquiry to adjudication, which defines and limits the role of the judiciary." *In re FEMA Trailer*, 570 F. Supp. 2d 851, 853 (E.D. La. 2008) (citing *McClure v. Ashcroft*, 335 F.3d 404, 408 (5th Cir. 2003)). "It is well settled that unless a plaintiff has standing, a federal district court lacks subject matter jurisdiction to address the merits of the case." *Id.* "In the absence of standing, there is no 'case or controversy' between the plaintiff and defendant which serves as the basis for the exercise of judicial power under Article III of the constitution." *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)). "The key question is

35

whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant federal court jurisdiction." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal citations and quotations omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." *Id.* at 560–61 (citations, quotations, and alterations omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (citations and quotations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* (citation omitted). Further, in the case of multiple plaintiffs, as long as one plaintiff has standing to bring a claim, the other plaintiffs do as well. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017); *Horne v. Flores*, 557 U.S. 433, 446–47 (2009); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189 n.7 (2008). *See also* Aaron-Andrew P. Bruhl, *One Good Plaintiff Is Not Enough*, 67 DUKE L.J. 481 (2017).

### 2. Organizational Standing

#### a. Parties' Arguments

Defendant argues that no Plaintiffs have organizational standing. (Doc. 32-1 at 10–13.) With respect to Power Coalition, Defendant contends that Power Coalition has not alleged an adequate diversion of resources to establish organizational standing. (*Id.* at 10–11.) Since "[b]y its own admission, [Power Coalition] fulfills its strong voting-related mission by answering hotline

36

calls about voting-related matters[,]" voters calling in with questions about reinstatement after being suspended for a felony conviction cannot constitute a diversion of resources. (*Id.* at 10.) "Moreover, the law challenged here has been the law in Louisiana since 1997; the Coalition cannot claim to be expending resources to research, understand[,] and educate the public on any new law." (*Id.* at 11.) Defendant also argues that "[b]oth the League and the Coalition claim diversion of resources by assisting individuals to navigate the process; however, navigating the process is not the alleged NVRA or equal protection violation; the documentation requirement is the alleged violation." (*Id.*)

In opposition, Plaintiffs assert that Power Coalition has organizational standing because it "allege[s] that [it] divert[s] significant resources to educate and assist voter registrants who cannot register to vote unless they obtain and submit the required paperwork." (Doc. 58 at 16 (citing *Compl.* ¶¶ 17, 19, Doc. 1).) "All of these activities would be unnecessary but for the Paperwork Requirement; thus the Paperwork Requirement directly creates an injurious drain on the organizations' limited resources." (*Id.* (citing *Compl.* ¶¶ 17, 19, Doc. 1).) In response to Defendant's argument that Plaintiffs have not suffered a diversion of resources because civic engagement and voter registration are at the core of the Plaintiffs' missions, Plaintiffs cite to *Clark v. Edwards*, 468 F. Supp. 3d 725, 746 (M.D. La. 2020), in which the Middle District found "that the plaintiff organization's anticipation of higher demand for services and work monitoring the impact of the challenged policies was not an injury." (*Id.*) Plaintiffs argue that *Clark* is distinguishable from the present case because Plaintiffs here have alleged that the activities causing the drain on their resources are different than their everyday activities, which the plaintiffs in *Clark* did not. (*Id.*) Plaintiffs also look to *NAACP v. City of Kyle, Texas*, 626 F.3d 233, 238 (5th Cir.

2010) as an example of a case that is similar to *Clark*, both in the factual background and result.

(*Id.* at 17.) Specifically, Plaintiffs argue:

> [I]n *NAACP v. City of Kyle, Texas*, the Fifth Circuit did not find an organization injury because the plaintiff had "not explained how the activities [it undertook in response to the challenged law], . . . differ from the [organization]'s routine . . . activities." 626 F.3d 233, 238 (5th Cir. 2010). On the other hand, the organizational Plaintiffs here have alleged that Defendant's violation of the law causes them to undertake activities that they would not otherwise engage in, as the Paperwork Requirement causes them to go out of their way to help individual registrants in efforts to mitigate the Paperwork Requirement's real-world impact on their members and the public. *See* [*OCA-Greater Hous. v. Tex.*, 867 F.3d 604, 611–12 (5th Cir. 2017)]. It should go without saying, absent the Paperwork Requirement, Plaintiffs would expend no resources assisting voters in obtaining and submitting this type of documentation. As such, these activities are distinct and apart from their "routine . . . activities." *NAACP*, 626 F.3d at 238.

(*Id.* (second and third alteration in original).)

Therefore, in sum, since "the Paperwork Requirement causes members, constituents, and others assisted by Plaintiff organizations to be denied voter registration despite being eligible, [t]his directly harms Plaintiff organizations' ability to fulfill their purposes, which, as Defendant correctly points out, include increasing electoral participation among people impacted by the criminal legal system." (*Id.*) Thus, all Plaintiffs have organizational standing.

In reply, Defendant maintains that Plaintiffs do not have organizational standing because they have failed to allege a sufficient injury-in-fact. (Doc. 65 at 3–4.) First, Defendant asserts that Plaintiffs' claim that they divert resources to educate and assist individuals with voter registration due to the paperwork requirement is irrelevant because this is not a case that takes issue with initial voter registration. (*Id.* at 3.) Rather, this "case arises out of Louisiana's process for reinstatement of voter registration after suspension for conviction of a felony, La. R.S. [§] 18:177(A), which differs from initial voter registration." (*Id.*)

Further Defendant asserts that Plaintiffs have failed to allege an injury-in-fact because the

activities cited by Plaintiffs "are, undoubtedly, a part of Plaintiffs' 'general activities and mission.' " (*Id.* at 4 (quoting *Clark*, 468 F. Supp. 3d at 746).) Specifically, Plaintiffs allege that their core missions "include increasing electoral participation among people impacted by the criminal legal system"; thus, Defendant argues that assisting voters with the reinstatement process following a felony conviction does not cause Plaintiffs to "go out of their way." (*Id.* at 3–4 (citing Doc. 58 at 17; *Clark*, 468 F. Supp. 3d at 746).) Further, Defendant takes issue with "Plaintiffs['] 'claim to be expending resources to research, understand, and educate the public' on a new law" since the documentation for reinstatement has been required by Louisiana law since 1997. (*Id.* at 4 (quoting *Clark*, 468 F. Supp. 3d at 746–47).)

### b.  Applicable Law

" '[O]rganizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.' " *OCA-Greater Hous.*, 867 F.3d at 610 (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)). *See also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).

Thus, for example, in *OCA-Greater Houston v. Texas*, a Chinese voting rights organization claimed as its injury-in-fact the " 'additional time and effort spent explaining the Texas provisions at issue to limited English proficient voters' because 'addressing the challenged provisions frustrate[d] and complicate[d] its routine community outreach activities.' " 867 F.3d at 610. The Fifth Circuit explained:

> The undisputed summary-judgment evidence established that OCA's primary mission is voter outreach and civic education, particularly "getting out the vote" among its members. Because a substantial portion of OCA's membership consists of people with limited English proficiency, Texas's voter interpreter restriction has deterred some of them from voting. In response, OCA calibrated its outreach efforts to spend extra time and money educating its members about these Texas provisions

and how to avoid their negative effects. Specifically, OCA employees and volunteers must carefully explain to those it contacts, in the language they understand, that when they bring an interpreter to a Texas polling location, the interpreter must identify his or herself as an "assistor" rather than as an "interpreter" to avoid being turned away under Texas law like Das's son was. And OCA explains that these in-depth conversations take more time than merely explaining the requirements of the VRA, and therefore OCA must spend more time on each call (and reach fewer people in the same amount of time) because of Texas's law.

*Id.*

Defendants in that case, on the other hand, relied on *NAACP v. City of Kyle, Texas*, 626

F.3d 233 (5th Cir. 2010), where the Fifth Circuit found no organizational standing. *Id.* at 611. The

Fifth Circuit rejected Defendant's position and explained:

The *City of Kyle* plaintiffs were dedicated lobbying groups who claimed their lobbying and litigation-related expenses as their injury. It is fundamental that no plaintiff may claim as injury the expense of preparing for litigation, for then the injury-in-fact requirement would pose no barrier. The key fact in *City of Kyle* was that every claimed "injury" either was undertaken to prepare for litigation (such as the commissioning of a $15,000 study on the impact of the ordinances—a study that the plaintiffs then relied on at trial to demonstrate disparate impact) or was no different from the plaintiffs' daily operations (such as the vice president's spending time reviewing ordinances).

Here, by contrast, OCA is not a lobbying group. It went out of its way to counteract the effect of Texas's allegedly unlawful voter-interpreter restriction—not with a view toward litigation, but toward mitigating its real-world impact on OCA's members and the public. For instance, it undertook to educate voters about Texas's assistor-versus-interpreter distinction to reduce the chance that other voters would be denied their choice of interpreter in the way that Das was—an undertaking that consumed its time and resources in a way they would not have been spent absent the Texas law. Hence, the Texas statutes at issue "perceptibly impaired" OCA's ability to "get out the vote" among its members.

*Id.* at 611–12 (quoting *Havens Realty*, 455 U.S. at 379). The appellate court also rejected

Defendant's attempt to disqualify all "prelitigation" expenses:

Every qualifying injury-in-fact will necessarily occur "prelitigation," and an expense can be incurred before litigation but still be *related* to the future litigation. The bar against claiming litigation expenses as injury is not one of temporal relation, but one of substantive relation. In *City of Kyle*, the expenses occurred

prelitigation but were related to litigation. Here, the expenses occurred prelitigation and are unrelated to litigation. That is the critical distinction.

*Id.* at 612.  The Fifth Circuit concluded its analysis:

> To be sure, OCA's injury was not large. But the injury alleged as an Article III injury-in-fact need not be substantial; "it need not measure more than an 'identifiable trifle.' " [*Fowler*, 178 F.3d at 358.] This is because "the injury in fact requirement under Article III is qualitative, not quantitative, in nature." [*Id.* at 357–58.] Our remark in *City of Kyle* that those plaintiffs could have established standing by "identif[ying] any specific projects that the HBA had to put on hold or otherwise curtail in order to respond to the revised ordinances[,]" [*City of Kyle*, 626 F.3d at 238,] was not a heightening of the *Lujan* standard, but an example of how to satisfy it by pointing to a non-litigation-related expense. Indeed, the Supreme Court has commanded that, in determining whether an organization has organizational standing, "we conduct the same inquiry as in the case of an individual." [*Havens Realty*, 455 U.S. at 378.] So to the extent that Texas would read *City of Kyle* as imposing a higher burden on organizations seeking to establish standing, we must disagree. We rather agree with the district court that OCA has satisfied its burden under *Lujan* to show an injury-in-fact.

*Id.* (third alteration in original).

Similarly, in *Greater New Orleans Fair Housing Action Center v. Kelly*, a sex-based housing discrimination case, the court found that an organization had adequately pled standing. 364 F. Supp. 3d 635, 640 (E.D. La. 2019).  Looking at the above cases, the court began its discussion:

> Nonprofit organizations can suffer an Article III injury when a defendant's actions frustrate their missions and force them to "divert significant resources to counteract the defendant's conduct." [*City of Kyle*, 626 F.3d at 238 (citing *Havens Realty*, 455 U.S. at 379); *OCA-Greater Hous.*, 867 F.3d at 612.] For instance, the Fifth Circuit has held that an organization devoted to promoting civic participation among Chinese and Asian Pacific Americans suffered an Article III injury when it diverted its resources to educate the community about how to avoid the alleged discriminatory effects of a Texas voting law. *OCA-Greater [Hous.]*, 867 F.3d at 612.

*Id.* at 646.  In finding that plaintiff had adequately alleged standing, the court explained:

> Here, plaintiff alleges that it has been injured because defendants have frustrated its mission of combating housing discrimination in the New Orleans community. Specifically, plaintiff alleges it has expended resources, including "staff time and

organizational funds," to "engage in education and outreach activities to counteract the effects" of defendants' alleged discrimination. These activities allegedly include creating and circulating brochures and advertisements addressing sex discrimination and sexual harassment in housing, as well as making presentations on these topics to student groups. Plaintiff asserts that as a result of these expenditures, it has been forced to divert resources away from other planned projects and activities, including (1) other investigative initiatives; (2) recruitment of financial sponsors for its annual fair housing summit; and (3) development and publication of new fair housing educational materials. This diversion of resources has allegedly caused plaintiff to suffer decreased funding and a delay in providing its usual educational services to the community.

These factual allegations are sufficient to plead an Article III injury, because plaintiff alleges that it has diverted its resources toward education and outreach activities to address the impact of defendants' alleged discriminatory practices. *See* [*OCA-Greater Hous.*, 867 F.3d at 610–12; *Havens Realty* [], 455 U.S. at 379 []] (plaintiff sufficiently pleaded Article III injury by alleging it "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices"). Importantly, plaintiff specifically alleges that it undertook these activities to counteract the effects of defendants' alleged discrimination, and not to prepare for this litigation. *See OCA-Greater* [*Hous.*], 867 F.3d at 611 ("It is fundamental that no plaintiff may claim as injury the expense of preparing for litigation, for then the injury-in-fact requirement would pose no barrier."). Plaintiff has also identified with sufficient particularity other projects it has had to put on hold or curtail in order to address the impact of defendants' alleged actions—*i.e.*, preparing for its annual fair housing summit and publishing new educational materials. *Cf. City of Kyle*, 626 F.3d at 238 (ruling that plaintiff lacked standing in part because at trial it failed to specify what other specific projects it had to put on hold to respond to defendant's alleged discriminatory ordinance). Finally, it is immaterial that this alleged injury may have amounted to only a minimal expenditure of plaintiff's resources, because an Article III injury "need not measure more than an identifiable trifle." *OCA-Greater* [*Hous.*], 867 F.3d at 612 (quoting [*Fowler*, 178 F.3d at 358]).

*Id.* at 646–47 (footnotes omitted).[4]   The Court also distinguished another Fifth Circuit case by

emphasizing that this decision was reached at the pleading phase:

---

[4] The court also noted:

> Plaintiff also alleges that it has been injured because of its expenditures on "witness interviews and testing" to "identify defendants' unlawful discrimination." [Doc. 1 at 18, ¶ 105]. These expenses qualify as an Article III injury to the extent they were undertaken solely to identify or confirm defendants' alleged discriminatory practices, and not to prepare for litigation. *See Havens Realty* [], 455 U.S. at 379; *OCA-Greater* [*Hous.*], 867 F.3d at 611; *City of Kyle*, 626 F.3d at 238 (plaintiff's expenditure of $ 15,000 for a study on the impact of defendant's allegedly discriminatory ordinance,

Because the case here is merely at the pleading stage, plaintiff need not prove that its efforts have led to a drain on its resources. Plaintiff need only allege facts demonstrating each element of standing. [*Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)]; *Lujan*, 504 U.S. at 561 [] (the plaintiff must establish each element of standing "with the manner and degree of evidence required at the successive stages of the litigation"). Plaintiff has met this requirement for each element of Article III standing.

*Id.* at 648.

c.   Analysis

The Court finds that Power Coalition has clearly alleged a diversion of resources due to the paperwork requirement. With respect to Power Coalition's diversion of resources, Plaintiffs allege the following in their *Complaint*:

Power Coalition diverts significant resources from its other activities related to its core mission to assist voters with registering to vote after suspension. Specifically, Power Coalition runs the Louisiana branch of the national election protection hotline, 866-OUR-VOTE. Through the hotline, Power Coalition assists voters who have issues or questions about voting in Louisiana during an election period and runs the hotline for every statewide and local election in Louisiana. When voters call in with questions about voter registration after they were suspended for a felony conviction, Power Coalition must divert significant resources to assisting those individuals meeting the paperwork requirement. In addition to the hotline, Power Coalition provides voter education to hundreds of thousands of Louisiana voters and eligible individuals across the state. For eligible individuals on the suspended list, Power Coalition must divert significant resources providing additional education and assistance about complying with the paperwork requirement that it would not otherwise have to do. Resources expended on navigating the onerous process for these voters would otherwise be spent on Power Coalition's engagement with more Louisiana voters and encouraging them to vote.

(*Compl.* ¶ 17, Doc. 1.)

---

which plaintiff then relied upon at trial to prove the ordinance's disparate impact, was not an Article III injury); *Fowler*, 178 F.3d at 358 (compilation of statistical evidence regarding the impact of an allegedly discriminatory voter registration law, when put together "in connection" with the lawsuit, was not an Article III injury). As already addressed, plaintiff has sufficiently pleaded a constitutional injury even without this allegation.

*Id.* at 647 n.87.

43

Construing the *Complaint* "liberally," *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009), Plaintiffs demonstrate that they, like the voting rights organization in *OCA-Greater Houston*, will likely go "out of [their] way to counteract the effect of [Louisiana's] allegedly unlawful [paperwork requirement]—not with a view toward litigation, but toward mitigating its real-world impact . . . ." *OCA-Greater Hous.*, 867 F.3d at 612. *See also Kelly*, 364 F. Supp. 3d at 647 (citing *OCA-Greater Hous.*, 867 F.3d at 611) ("Importantly, plaintiff specifically alleges that it undertook these activities to counteract the effects of defendants' alleged discrimination, and not to prepare for this litigation."); *Compl.* ¶ 16, Doc. 1 ("Power Coalition advances its mission with the support of a small staff, community volunteers, and a membership of nonprofit and advocacy organizations. Collectively, Power Coalition's network unites around an integrated civic engagement strategy to amplify the voices of those who have been historically marginalized, with a focus on Black Louisianans and communities of color. Power Coalition's work includes outreach to voters impacted by the criminal legal system in Louisiana, working with partners, including VOTE, to provide voter education and engagement to eligible individuals with prior felony convictions, most of whom are Black Louisianans.").

Moreover, as in *Havens Realty*, Plaintiffs' "ability to provide" other services to their members is "perceptibly impaired" by the allegedly wrongful paperwork requirement, so "there can be no question that [it] has suffered injury in fact." *Havens Realty*, 455 U.S. at 379. *See also Kelly*, 364 F. Supp. 3d at 647 ("These factual allegations are sufficient to plead an Article III injury, because plaintiff alleges that it has diverted its resources toward education and outreach activities to address the impact of defendants' alleged discriminatory practices.").

And, as *OCA-Greater Houston* recognized, it is irrelevant if Plaintiffs have not identified in their *Complaint* "specific projects that [they] had to put on hold or otherwise curtail," as that is

44

"but an example of how to satisfy" the *Lujan* standard. *OCA-Greater Hous.*, 867 F.3d at 612 (citations omitted). As the Fifth Circuit said, "an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *Id.* (citations and internal quotations omitted).

Lastly, as *Kelly* recognized, since this is "merely at the pleading stage, plaintiff need not *prove* that its efforts led to a drain on its resources. Plaintiff need only allege facts demonstrating each element of standing." *Kelly*, 364 F. Supp. 3d at 648 (citations omitted). Here, Plaintiffs' allegation with respect to Power Coalition satisfy this standard. Plaintiffs adequately alleged a diversion of resources to satisfy injury in fact, and to the Court, the other remaining standing elements seem adequately alleged to as well, especially given that these elements are not in dispute. Thus, the Court finds that Plaintiff Power Coalition has standing.

Since in multi-plaintiff cases one plaintiff having standing establishes standing for all, the Court finds that all Plaintiffs have adequately alleged organizational standing to survive Defendant's *Motion to Dismiss*. *See Town of Chester, N.Y.*, 581 U.S. at 439; *Horne*, 557 U.S. at 446–47; *Crawford*, 553 U.S. at 189 n.7. *See also* Bruhl, *One Good Plaintiff Is Not Enough*, *supra*. Therefore, Defendant's *Motion to Dismiss* with respect to this issue is denied.

### D.  12(b)(6): NVRA Notice

#### 1. Parties' Arguments

In her memo in support of her *Motion to Dismiss*, Defendant asserts the following regarding NVRA notice:

> A person aggrieved by a violation of the NVRA must first provide written notice of the violation to the state's chief election official. Only if the violation is not corrected within 90 days after receipt of notice of the violation (or within 20 days after receipt of the notice if the violation occurred within 120 days before the election for federal office) may the person aggrieved bring a civil action for declaratory and injunctive relief. In the context of standing to bring a private action pursuant to 52 U.S.C. § 20510(b), "failure to provide notice is fatal." "No standing

is therefore conferred if no proper notice is given since the 90-day period never
runs."

(Doc. 32-1 at 13 (emphasis and footnotes omitted).) VOTE, argues Defendant, did not allege in

the *Complaint* that it sent Defendant pre-suit notice, and it only appeared in the March 31, 2023

letter, which was not a notice to sue letter because it indicated that the notice period had already

elapsed. (*Id.* at 14.) Therefore, VOTE's NVRA claims must be dismissed, as it cannot use the other

Plaintiffs to establish standing. (*Id.*) With respect to Power Coalition and the League, "their NVRA

claims are limited to alleged violations of 52 U.S.C. § 20505(a)(1) and 20507(a)(1), as those are

the only NVRA sections identified in the August [26], 2022 Notice to Sue letter." (*Id.*) "The pre-

suit notice requirement under the NVRA is violation specific, as the purpose of the notice is to

allow the potential NVRA defendant the opportunity to cure the violation alleged in the letter."

(*Id.* at 14–15.) Therefore, Plaintiffs cannot obtain relief for the alleged violations of the NVRA

except for 52 U.S.C. § 20505(a)(1) and § 20507(a)(1) because the Court only has subject matter

jurisdiction over the claims alleged in the Notice to Sue letter. (*Id.* at 15.)

In opposition, Plaintiffs assert that "Defendant is flatly wrong that Plaintiffs failed to

sufficiently allege that they provided adequate notice of all claims in their Complaint." (Doc. 58

at 19.) Plaintiffs gave Defendant notice letters in August 2022, on October 28, 2022, and on March

31, 2023. (*Id.* at 20 (citing Docs. 3, 5, 9).) Defendant does not dispute that the August 2022 and

October 28, 2022 letters are notice letters, but she incorrectly categorizes the March 31, 2023

notice letter as not being a notice letter because it indicated that the notice period had already

lapsed. (*Id.*) Plaintiffs argue that they correctly allege in their *Complaint* that the "March 31, 2023

letter 'provided Defendants the requested information and noted that the required period for

pursuing a private cause of action under the NVRA elapsed on January 26, 2023, and that, absent

further action to correct the Paperwork Requirement, Plaintiffs would proceed to explore their

legal rights.' " (*Id.* (citing *Compl.* ¶ 83, Doc. 1).) The March 31, 2023 letter also incorporated the prior letters by reference. (*Id.*) Plaintiffs argue that this information is sufficient for Defendant to be able to identify and cure the alleged violations, which they had actual notice of as early as August 2022. (*Id.* at 20–21.) Further, Defendant continued these NVRA violations even after the notice period had expired, which further underscores Plaintiffs' argument that the March 31, 2023 letter was an additional notice letter. (*Id.* at 21.)

Additionally, Plaintiffs' allegations in their *Complaint* are the same as those in the notice letters. (*Id.*) "Specifically, Plaintiffs allege in their Complaint that Defendant has violated the NVRA by: (1) refusing to accept and use the Federal Form or a conforming state form, and (2) refusing to ensure that every eligible voter is placed on the rolls." (*Id.* (citing *Compl.* ¶¶ 86–103, Doc. 1; *id.* at ¶¶ 78–83 (attaching Notice letters as exhibits)).) Additionally, Defendant does not dispute that in the first notice letter Plaintiffs alleged violations of NVRA Sections 6 and 8. (*Id.*) In every letter, Plaintiffs made Defendant aware of the fact that if the violations were not remedied, they would seek a remedy in federal court. (*Id.* (citing Doc. 17-1 at 4; Doc. 17-3 at 7; Doc. 17-7 at 4).) Therefore, argues Plaintiffs, they have sufficiently alleged compliance with the notice period. (*Id.*)

In reply, Defendant argues that Plaintiffs failed to comply with the notice requirements of 52 U.S.C. § 20510(b)(1) prior to filing the instant lawsuit. (Doc. 65 at 5.) Defendant asserts that Plaintiffs' Opposition did not discuss the cases cited by Defendant in support of this contention. (*Id.*) Further, Defendant contends that the one case Plaintiffs cite to "does not excuse the scant details set forth in their letters prior to filing the instant lawsuit." (*Id.*) Thus, "[w]hile Plaintiffs attempt to broaden the violations outlined in their purported notice letters to encapsulate the several NVRA claims set forth in their Complaint, the letters speak for themselves and are limited

to setting forth violations of 52 U.S.C. §§ 20505(a)(1) and 20507(a)(1)." (*Id.*)

Lastly, Defendant asserts that "VOTE must be dismissed under the precedent of *Scott*. Having failed to satisfy the statutory notice requirement, there is no basis for VOTE to seek relief for itself or its members in this proceeding for alleged NVRA violations." (*Id.* at 6.) Defendant contends that "Plaintiffs do not dispute that VOTE never provided the notice that is required by [52] U.S.C. § 20510(b)(1)." (*Id.* at 5.) Further, Defendant asserts that the case Plaintiffs cite to, *Ferrand v. Schedler*, No. 11-926, 2011 WL 3268700, at *6 (E.D. La. July 21, 2011), is not persuasive, as it predates *Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014), which held "that 'failure to provide notice is fatal' and piggybacking is not allowed." (*Id.* at 5 n.19.) Thus, VOTE's appearance alongside other Plaintiffs in a letter dated March 31, 2023, the purpose of which was merely to address questions raised in regard to prior letters, did not constitute a notice letter itself. (*Id.*) Further, that letter was sent less than 90 days before this suit was filed. (*Id.* at 5 n.20 (citing 52 U.S.C.A. § 20510(b)(2)).)

### *2. Applicable Law*

Under 52 U.S.C. § 20510(b),

(1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

(3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

"The apparent purpose of the notice provision is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation." *Ga. State Conf. of NAACP v.*

48

*Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012) (citing *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997)). In relation to this purpose, "courts have found that an NVRA notice is sufficient if it 'sets forth the reasons for [the] conclusion' that a defendant failed to comply with the NVRA, and, when 'read as a whole, [it] makes it clear that [the plaintiff] is asserting a violation of the NVRA and plans to initiate litigation if its concerns are not addressed in a timely manner.' " *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1348 (N.D. Ga. 2016) (alterations in original) (quoting *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012)). "[N]otice as to one potential NVRA violation is not the equivalent of notice as to all potential NVRA violations." *Bellitto v. Snipes*, 268 F. Supp. 3d 1328, 1334 (S.D. Fla. 2017). "Rather, a potential NVRA defendant must have notice of exactly what violation or violations have been alleged in order to have a meaningful opportunity to attempt complete compliance before facing litigation." *Id.*

There is some debate as to whether this notice is required to file a NVRA claim. The Sixth Circuit in *Association of Community Organizations for Reform Now v. Miller* held that notice to the state is not required before filing suit for declaratory or injunctive relief under the NVRA. *Miller*, 129 F.3d at 837–38. However, the Fifth Circuit held the opposite in *Scott v. Schedler*:

> An aggrieved party "may provide written notice of the violation to the chief election official of the state involved." NVRA § 11(b)(1). Although notice is framed here as permissive rather than mandatory, other NVRA provisions indicate that notice is mandatory. For instance, the NVRA provides that "[i]f the violation is not corrected within 90 days after receipt of [the] notice . . . the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." *Id.* at § 11(b)(2). "No standing is therefore conferred if no proper notice is given, since the 90–day period never runs." [*Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1335.]

*Scott*, 771 F.3d at 835 (first alteration in original) (footnote omitted).

In *Scott*, the Fifth Circuit addressed the Sixth Circuit's decision in *Miller* and found it distinguishable:

> Scott admits that, although the NAACP provided Schedler with notice, he himself did not. But Scott maintains that notice is not necessary here because, as the NAACP had provided notice of the defendants' alleged non-compliance with the NVRA, no notice was required from him personally. Scott points to *Ass'n of Cmty. Orgs. for Reform Now ("ACORN") v. Miller*, 129 F.3d 833 (6th Cir.1997), which held that because ACORN had provided Michigan with proper NVRA notice, the individuals in the suit were not required to provide notice themselves. *Miller* noted that the purpose of the notice requirement was to "provide states . . . an opportunity to attempt compliance before facing litigation." *Id.* at 838. Because Michigan already had "clearly indicate[d] that [it] would continue to refuse to comply with the Act until forced to do so by judicial intervention," notice from the individual plaintiffs would have been "unnecessary" and "futile." *Id.*

> We hold that Scott's failure to provide notice is fatal to his suit. He cannot piggyback on the NAACP's notice for several reasons. Most importantly, *Miller*'s exception to the NVRA's notice requirement is wholly devoid of textual support in the statute. No subsequent cases following *Miller* have addressed *Miller*'s complete lack of statutory authority. *See, e.g.*, [*Judicial Watch, Inc.*, 993 F. Supp. 2d at 922–23;] *Kemp*, 841 F. Supp. 2d at 1335.

*Id.* at 835–36 (first, second, and third alteration in original). In determining that the notice at issue was insufficient, the Fifth Circuit held the following:

> It is also apparent to us that the NAACP's notice letter was too vague to provide Schedler with "an opportunity to attempt compliance" as to Scott "before facing litigation." [*Miller*, 129 F.3d at 838.] In the letter, the NAACP alleged NVRA violations only in broad terms and certainly did not mention Scott by name. Specifically, the letter (1) alleged that Louisiana was not providing voter registration services at public assistance offices, citing a decline in the voter registration forms that the public assistance agencies had collected; (2) cited a survey illustrating that numerous people were not provided with a voter registration form in connection with their application for benefits, recertification, or change of address; (3) cited a survey suggesting agency personnel were not familiar with their voter registration obligations under the NVRA; and (4) stated that numerous agencies did not have hard copies of voter registration forms. The letter's surveys and statistics put Schedler on notice neither that the violations concerned the declination form nor that they involved Scott. Moreover, when Schedler finally received notice of the violations Scott alleged through Scott's complaint, the DCFS attempted to provide Scott with voter registration forms. Providing a potential plaintiff with a voter registration form is "exactly [the] sort of compliance attempt" that "pre-litigation notice was meant to encourage." *Kemp*, 841 F. Supp. 2d at 1336.

> To the extent that Scott seeks relief for himself in this action, he has no basis for relief because he did not file notice. And consequently, he is not entitled to seek relief for others, either.

*Id.* at 386 (alteration in original).

### 3. Analysis

#### a.  Did VOTE provide sufficient NVRA notice?

Power Coalition and the League sent the Secretary of State notice letters of NVRA violations on August 26, 2022, and October 28, 2022, which in their *Complaint* Plaintiffs described as the "First Notice Letter" and "Second Notice Letter," respectively. (*Compl.* ¶¶ 78, 80, Doc. 1.) As Plaintiffs explain in their *Complaint*, VOTE then joined Power Coalition and the League's correspondences with the Secretary of State on March 31, 2023:

> On March 31, 2023, Plaintiffs VOTE, Power Coalition, and the League sent a response to Defendant's March 8 follow up letter. Ex. 7. Plaintiffs provided Defendants the requested information and noted that the required period for pursuing a private cause of action under the NVRA elapsed on January 26, 2023, and that, absent further action to correct the paperwork requirement, Plaintiffs would proceed to explore their legal rights. *Id.* at 3. Plaintiffs requested a final response by April 14, 2023. *Id.*

(*Id.* at ¶ 83.)

The Fifth Circuit has made clear that each plaintiff must give their own NVRA notice and that one plaintiff cannot piggyback to another plaintiff's NVRA notice. *Scott*, 771 F.3d at 835–86. There are less than 90 days between the March 31, 2023 letter and May 1, 2023 when Plaintiffs filed suit, and thus the March 31, 2023 letter cannot constitute proper NVRA notice. Plaintiff VOTE likewise cannot use Plaintiffs Power Coalition and the League's "First Notice Letter" and "Second Notice Letter" as their own NVRA notice. Instead, VOTE needed to have filed their own notice letter 90 days prior to May 1, 2023.

Plaintiffs did attach to their *Complaint* an October 22, 2020 letter from VOTE to the Secretary of State that Plaintiffs, at the preliminary injunction hearing, claimed constituted VOTE's NVRA notice. Thus, the Court must now determine whether Plaintiff VOTE's October 22, 2020 letter constitutes proper notice of the alleged NVRA violations that are the subject of the present lawsuit. The Court finds that VOTE's October 22, 2020 letter does not constitute proper NVRA notice for three reasons.

First, in Plaintiffs' *Complaint* and throughout briefing on the *Motion to Dismiss* and *Motion for Preliminary Injunction*, Plaintiffs never claim that the October 22, 2020 letter is a NVRA notice letter for purposes of this suit. (*See Compl.* ❡ 78, Doc. 1 (describing the August 26, 2022 letter as the "First Notice Letter")); (*Memo in Support of Motion for PI*, Doc. 21-1 at 15 ("Plaintiffs provided the statutorily required notice to Defendant of the violations of the National Voter Registration Act ('NVRA') on October 28, 2022.")); (*Plaintiffs' Reply to Defendant's Opposition to Motion for PI*, Doc. 73 at 8 ("Plaintiffs provided three notice letters to Defendant: one in August 2022, ECF No.17-1, another on October 28, 2022, ECF No. 17-3, and a final letter on March 31, 2023. ECF No. 17-7." (footnote omitted))); (*Plaintiffs' Opposition to Defendant's MTD*, Doc. 58 at 20 ("Plaintiffs provided three notice letters to Defendant: one in August 2022, ECF 17-1 (Comp. Ex. 1), another on October 28, 2022, ECF 17-3 (Compl. Ex. 3), and a final letter on March 31, 2023. ECF 17-7 (Compl. Ex. 7)." (footnote omitted))); (*id.* at 20–21 ("This is plainly information sufficient for Defendant to identify and cure the violation, about which they had actual notice since at least August 2022.").) It was not until the Court brought the October 22, 2020 letter to Plaintiffs' attention at the preliminary injunction hearing that they argued this letter constitutes a notice letter for purposes of the present suit.

Second, at the preliminary injunction hearing, Norris Henderson, executive director of VOTE, was questioned about the October 22, 2020 letter and explained that the letter was "complaining about the implementation of Act 636." (Doc. 120 at 117).[5] Mr. Henderson recalled that after the letter was sent, VOTE worked together with the Secretary of State and agreed upon the language for Act 127 of 2021, which the Secretary of State agreed not to oppose. (*Id.*) VOTE worked with the Secretary of State, Representative Jenkins, author of Act 127, and VOTE's lobbyist in the passage of Act 127 of 2021. (*Id.* at 117–18.)

Again, "[t]he apparent purpose of the notice provision is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation." *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1335. Mr. Henderson's Testimony proves that the October 22, 2020 letter does not serve this purpose. Following the October 22, 2020 letter, the Secretary of State worked with VOTE to help pass legislation to cure the NVRA violation alleged therein. After Act 127 was passed and implemented, Power Coalition and the League submitted their August 26, 2022 letter, which describes alleged NVRA violations following the implementation of Act 127:

> [I]t is our clients' understanding and experience that many if not all parish registrars require documentary proof that voters are no longer under an order of imprisonment or that five years have passed since incarceration under the order. This policy and practice is likely driven by an outdated interpretation of La. [R.S.] § 18:177, which parallels the former requirement in La. [R.S.] § 18:102 that an individual present such documentation in order to restore their right to vote. 2018 La. Act[s] [] 636 (H.B. 265). However, Act 127 of 2021 removed the documentation requirement from § 18:102, making clear that an individual who is no longer under an order of imprisonment or who has not been incarcerated under such after five years is restored to the right to vote *regardless* of whether that paperwork is presented to the registrar. 2021 La. Act[s] [] 127 (H.B. 378). Having been restored, these individuals stand in the same shoes as any other voter and cannot

---

[5] The Court notes that it can take judicial notice of testimony from the preliminary injunction hearing when analyzing Defendant's *Motion to Dismiss. See Gomez v. Galman*, 18 F.4th 769, 775 (5th Cir. 2021) (per curiam) (quoting *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) ("In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint[;] (2) documents attached to the complaint[;] and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201."). *See also Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018).

be required to jump through additional hoops to register to vote. Thus, policies or practices requiring this documentation in order to register violate the NVRA's prohibition on additional documentary requirements beyond the registration form as well as its mandate to register eligible voters upon application. 52 U.S.C.A. §§ 20505(a)(1), 20507(a)(1). Again, this is true whether that individual was previously registered to vote or is a new registrant.

[Louisiana Revised Statutes] § 18:177 need not and should not be read to require documentary proof of eligibility after a felony for any person eligible to vote under § 18:102. Although it states that a person who provides this documentation shall be registered, it does not prohibit the registration of those who do not present it.

(Doc. 17-1 at 3 (footnote omitted).) Since VOTE's October 22, 2020 letter was drafted prior to Act 127, that letter did not give the Secretary of State "the opportunity to attempt compliance with [the NVRA's] mandates before facing litigation" in the same way that the August 26, 2022 and October 28, 2022 letters did. *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1335.

Third, it is clear form the text of the October 28, 2022 and March 31, 2023 letters that these letters and the August 26, 2022 letter are the relevant letters in connection with the present lawsuit, not VOTE's October 22, 2020 letter. In the October 28, 2022 letter, Power Coalition and the League state: "Our first notice letter of August [26], 2022, informed you that requiring documentary proof of eligibility of facially eligible voter registrants violates the National Voter Registration Act of 1993 (NVRA)." (Doc. 17-3 at 2.) Moreover, in the March 31, 2023 letter, Power Coalition, the League, and VOTE state: "Please note that the notice period required prior to pursuing a private cause of action under the NVRA elapsed on January 26, 2023." (Doc. 17-7 at 4.) A footnote to this sentence added:

Our October 28, 2022 notice letter was sent within 120 days of the November 8, 2022 federal election, so your office was technically required to respond within 20 days, on November 17, 2022. *See* 52 U.S.C. § 20510(b). However, we would have accepted response by the standard 90-day period, on January 26, 2023. We still have not received a substantive response to the October 28, 2022 letter, such that the notice period has expired.

54

(*Id.* at 4 n.5.) Likewise, the August 26, 2022 letter does not mention or make any reference to the October 22, 2020 letter. Thus, when reading these three letters in conjunction with one another, it is clear that they are separate from VOTE's October 22, 2020 letter.

For these reasons, the Court finds that VOTE's October 22, 2020 letter does not constitute proper NVRA notice, and since suit was filed less than 90 days after the March 31, 2023 letter, neither does VOTE's March 31, 2023 letter. Therefore, VOTE never gave proper notice under the NVRA and must be dismissed for purposes of Plaintiffs' NVRA claims only. Thus, Defendant's *Motion to Dismiss* with respect to this issue is granted, and Plaintiff VOTE is dismissed from this suit for purposes of Plaintiffs' NVRA claims.[6]

> b. What violations of the NVRA did Power Coalition and the League give notice of?

To determine what NVRA violations Plaintiffs gave the Secretary of State notice of, the Court must next look to the language of the "First Notice Letter" (August 26, 2022) and the "Second Notice Letter" (October 28, 2022). Again, the purpose of a notice letter is to alert the Secretary of State of a potential NVRA violation so that she would have an opportunity to cure such violation before litigation ensues. *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1335. "[N]otice as to one potential NVRA violation is not the equivalent of notice as to all potential NVRA violations." *Bellitto*, 268 F. Supp. 3d at 1334. "Rather, a potential NVRA defendant must have notice of exactly what violation or violations have been alleged in order to have a meaningful opportunity to attempt complete compliance before facing litigation." *Id.*

The August 26, 2023 letter clearly states:

> Power Coalition for Equity and Justice [and] the League of Women Voters of Louisiana . . . write to notify you that Louisiana's voter registration policies and practices requiring documentary proof of eligibility after a felony conviction violate

---

[6] For the remainder of this Ruling's discussion of Plaintiffs' NVRA claims, the Court's reference to "Plaintiffs" refers to Plaintiffs Power Coalition and the League only.

the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. §§ 20505(a)(1), 20507(a)(1). Insofar as those practices are driven by an interpretation of La. [R.S.] § 18:177, that interpretation also violates and is preempted by the same provisions of the NVRA.

(Doc. 17-1 at 2.) Plaintiffs further explain how the Secretary of State's practices violate 52 U.S.C.

§§ 20505(a)(1), 20507(a)(1). (*Id.* at 2–4.)

The October 28, 2022 letter begins by explaining:

Our first notice letter of August [26], 2022, informed you that requiring documentary proof of eligibility of facially eligible voter registrants violates the National Voter Registration Act of 1993 (NVRA). Specifically, requiring documentary proof of voting rights restoration in addition to a voter registration form violates the NVRA's requirements that states accept and use the federal voter registration form and to ensure that any eligible registrant is placed on the rolls. 52 U.S.C. §§ 20505(a)(1), 20507(a)(1).

(Doc. 17-3 at 2.) This letter also requests, pursuant to 52 U.S.C. § 20507(i), certain records

pertaining to the State's implementation of La. R.S. § 18:177. (*Id.* at 6–7.) The letter concludes by

clearly articulating all alleged violations of the NVRA:

As stated in our previous letter, we believe that Louisiana law can and should be reconciled with the NVRA. While La. R.S. [§] 18:177 states that a person's registration shall be reinstated when the person presents documentary proof of eligibility in person, it does not in its plain language prevent reinstatement or re-registration under other circumstances. *Compare* La. R.S. [§] 18:177 ("The registration of a person whose registration has been suspended by the registrar of voters pursuant to R.S. 18:176(A) shall be reinstated when the person appears in the office of the registrar and provides [documentary proof of eligibility]") *with* Ariz. Rev. Stat. § 16-166(F) (requiring – prior to its pre-emption – county recorders to "reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship"). However, if the law did preclude eligible voters in suspended status from being able to register and vote absent presenting documentary proof of eligibility, then it would be pre-empted by the NVRA. [*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013)]. We again give notice that the current policy violates the NVRA, pursuant to 52 U.S.C. § 20510 (b)(1)–(2). Finally, we give notice of our request for certain communications related to the implementation of La. R.S. [§] 18:177, pursuant to Section 8(i) of the NVRA, 52 U.S.C.A. § 20507(i).

(*Id.* at 7.)

56

Given the overall purpose of the NVRA's notice provision, the Court finds that Plaintiffs properly put the Secretary on notice of potential violations of 52 U.S.C. §§ 20505(a)(1) and 20507(a)(1).[7] The Court reads the *Complaint* to only allege violations of these statutes, but to the extent that the *Complaint* alleges violations of statutes other than 52 U.S.C. §§ 20505(a)(1) and 20507(a)(1), or statutes referenced therein, Defendant's *Motion to Dismiss* is granted.

## E.  12(b)(6): NVRA Claims

### 1. Parties' Arguments

#### a.  Defendant's Memo in Support (Doc. 32-1)

Defendant argues that Plaintiffs failed to state a claim under the NVRA because their NVRA claims are preempted by state law. (Doc. 32-1 at 15.) Section 2 of the Fourteenth Amendment's right of the state to disenfranchise convicted felons extends to restoration of a felon's right to vote. (*Id.* at 15–16.) "Since federal law defers to the states to decide who is an eligible voter, it does not define how voters with criminal convictions must be treated or whether or how they may be restored the right to vote." (*Id.* at 16.) To support this assertion that state law preempts the NVRA in the realm of felony re-enfranchisement, Defendant cites to the Third Circuit decision in *American Civil Rights Union v. Philadelphia City Commissioners*, in which the court found that the district court was "clearly correct" in determining that state law preempted the NVRA. (*Id.* (citing *Am. Civ. Rts. Union v. Phil. City Comm's.*, 872 F.3d 175, 180 (3d. Cir. 2017)).)

Further, under the NVRA, a state is not required to allow a convicted felon to vote in an election if that felon is ineligible to vote under state law. (*Id.* at 17.) Defendant asserts that convicted felons in Louisiana are only able to vote again once their registrations are reinstated pursuant to La. R.S. § 18:177(A)(1), and there is no such thing as automatic reinstatement, as

---

[7] Though not referenced in the *Complaint* and thus not at issue, the Court notes that Plaintiffs also gave proper notice of its request for records pursuant to 52 U.S.C. § 20507(i).

Plaintiffs contend. (*Id.*) "Just as an 18-year-old is only eligible to vote once he makes application for registration, Plaintiffs' reliance on the La. R.S. [§] 18:102 eligibility requirements fails to recognize that even a person eligible to vote must take the required action to have his eligibility recognized." (*Id.*) Therefore, Plaintiffs have not pled a sufficient cause of action under the NVRA, and Plaintiffs NVRA claims should be dismissed. (*Id.*)

b. Plaintiffs' Opposition (Doc. 58)

Plaintiffs argue that the NVRA applies to all people seeking to register to vote regardless of whether someone is a convicted felon. (Doc. 58 at 22 (citing 52 U.S.C. § 20503(a)).) Moreover, Defendant's argument under Section 2 of the Fourteenth Amendment is without merit (*Id.*) Plaintiffs assert that under mandatory language in Act 127, a convicted felon's right to vote is automatically restored upon eligibility (*Id.*) Upon restoration, federal law dictates the method of registration. (*Id.*)

> Therefore, the discretion afforded [to] the state by the Constitution is immaterial; the state used that discretion to create an affirmative right to vote, which is now subject to the protections provided by federal law. Any attempt to relabel the voter registration process as "reinstatement" is thus preempted by federal law.

(*Id.* (internal citations omitted).)

Plaintiffs also argue that Defendant's contention that "[j]ust as an 18-year-old is only eligible to vote once he makes application for registration" further proves Plaintiffs' point. (*Id.* at 23.) Plaintiffs contend that "[j]ust as the NVRA governs a newly 18-year-old's application to register to vote, so too does it govern the application to register of an eligible person with a past conviction." (*Id.*)

Likewise, argues Plaintiffs, the NVRA applies to all voters seeking to register, regardless of whether the voter is seeking reinstatement or new registration. (*Id.*) All voters, whether seeking

reinstatement or new registration, are seeking the same outcome of becoming an active registered voter and follow the same regulations and process for casting a ballot. (*Id.*)

Lastly, Plaintiffs contend that since Defendant's position is that Louisiana law preempts the NVRA, Defendant failed to raise any defenses against Plaintiffs' NVRA claims and thus has waived these potential defenses. (*Id.* at 23–24.)

### c.  Defendant's Reply (Doc. 65)

Defendant argues that Plaintiffs failed to state a claim for relief arising under the NVRA because "it is well established that voting eligibility with regard to felon disenfranchisement is an issue of State law." (Doc. 65 at 6 (citations omitted).) Defendant further asserts that "[t]he same legal basis for finding that the [Voting Rights Act of 1965] is preempted by a state's ability to determine whether felons should be eligible voters similarly supports preemption as to the NVRA" because the two are "related law[s]." (*Id.* at 7.)[8]

### *2. Applicable Law*

### a.  Felony Disenfranchisement in General

Under Section Two of the Fourteenth Amendment, the right to vote can be limited by state law. As the United States Supreme Court explained in *Lassiter v. Northampton City Board of Elections*,

> The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, absent of course the discrimination which the Constitution condemns. Article I, s 2 of the Constitution in its provision for the election of members of the House of Representatives and the Seventeenth Amendment in its provision for the election of Senators provide that officials will be chosen "by the People." Each provision goes on to state that "the [e]lectors in each State shall [have] the [q]ualifications requisite for [e]lectors of the most numerous [b]ranch of the State [l]egislature[s]."

---

[8] Defendant cites to several examples from various circuits finding that the Voting Rights Act of 1965 does not apply to the area of felon disenfranchisement to support this assertion. (Doc. 65 at 6–7 (citing *Simmons v. Galvin*, 575 F.3d 24, 37 (1st Cir. 2009); *Hayden v. Pataki*, 449 F.3d 305, 321 (2d Cir. 2006); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1234 n.39 (11th Cir. 2005).)

So while the right of suffrage is established and guaranteed by the Constitution[,] it is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress acting pursuant to its constitutional powers, has imposed. While s 2 of the Fourteenth Amendment, which provides for apportionment of Representatives among the States according to their respective numbers counting the whole number of persons in each State (except Indians not taxed), speaks of "the right to vote," the right protected "refers to the right to vote as established by the laws and constitution of the state."

We do not suggest that any standards which a State desires to adopt may be required of voters. But there is wide scope for exercise of its jurisdiction. Residence requirements, age, previous criminal record are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters.

360 U.S. 45, 51 (1959) (internal citations omitted).

To this end, the Court has long recognized that under Section Two of the Fourteenth Amendment, states can disenfranchise those with felony convictions. *See Richardson v. Ramirez*, 418 U.S. 24, 54 (1974) ("[T]he exclusion of felons from the vote has an affirmative sanction in s 2 of the Fourteenth Amendment . . . ."). *See also Hunter v. Underwood*, 471 U.S. 222, 233 (1985). As the Court explained in *Richardson v. Ramirez*, felony disenfranchisement is not only evident in the text of Section Two itself but also through the intent of the framers. *Richardson*, 418 U.S. at 48, 54.

Further light is shed on the understanding of those who framed and ratified the Fourteenth Amendment, and thus on the meaning of s 2, by the fact that at the time of the adoption of the Amendment, 29 States had provisions in their constitutions which prohibited, or authorized the legislature to prohibit, exercise of the franchise by persons convicted of felonies or infamous crimes.

*Id.* at 48 (footnote omitted).

b.   Felony Disenfranchisement in Louisiana

i.   *Louisiana's Present Statutory Scheme*

The Louisiana Constitution provides that "[e]very person who is both a citizen of the state and of the United States, upon reaching eighteen years of age, shall have the right to register and vote, except that this right may be suspended for a person . . . who is under an order of imprisonment for conviction of a felony." La. Const. art. I, § 10(A). Thus, the Louisiana Constitution gives the Legislature the discretionary power to temporarily disenfranchise individuals who are "under an order of imprisonment for a conviction of a felony." *Id.* The Louisiana Legislature has exercised this discretionary power through La. R.S. § 18:102(A), which states in pertinent part:

§102. Ineligible persons

A. No person shall be permitted to register or vote who is:

(1)(a) Under an order of imprisonment, as defined in R.S. 18:2, for conviction of a felony, except as provided in Subparagraph (b) of this Paragraph.

(b) Except as provided in Subparagraph (c) of this Paragraph, a person who is under an order of imprisonment for conviction of a felony and who has not been incarcerated pursuant to the order within the last five years shall not be ineligible to register or vote based on the order.

(c) Notwithstanding any other provision of law, no person shall be permitted to register or vote pursuant to this Section if he is convicted of a felony offense of election fraud or any other election offense pursuant to R.S. 18:1461.2 and he is under an order of imprisonment.

"Under an order of imprisonment" is defined as "a sentence of confinement, whether or not suspended, whether or not the subject of the order has been placed on probation, with or without supervision, and whether or not the subject of the order has been paroled." La. R.S. § 18:2(12).

Under La. R.S § 18:191, "The registration of any person as provided in [Louisiana's Election Code] shall remain in effect for so long as the registration is not canceled for a cause and

61

in the manner set forth in [the Election Code]." Louisiana Revised Statutes § 18:176 discusses suspension and cancellation of registrations. Within this statute, the Louisiana Legislature distinguishes when registrations are suspended and when they are cancelled. *Cf. id.* § 18:176(A)(3)(b) (suspension of registration for felony convictions) *with id.* § 18:176(C) (cancelation of registration per death). As per the statute, those registrants who are ineligible to vote per La. R.S. § 18:102(A)(1) and who fail to appear and show cause within 21 days of receipt of their notice of suspension will have their registrations suspended, not cancelled:

§176. Suspension and cancellation of registration and challenge of unlawful registration on the basis of reports

A.(1) The registrar shall send a notice to each person listed on a report received pursuant to R.S. 18:171 or 171.1 and to any person the registrar has reason to believe is ineligible to register or vote pursuant to R.S. 18:102(A)(1). The notice shall be mailed first class, postage prepaid, to the address on file at the registrar's office.

(2) The notice shall state that the registrar has information that the registrant is under an order of imprisonment for conviction of a felony and that the conviction is for an election offense or the registrant has been incarcerated pursuant to the order within the last five years. The notice shall inform the person that he must appear in person at the office of the registrar of voters within twenty-one days after the date on which the notice was mailed to show cause why his registration should not be suspended.

(3)(a) If the registrant appears and shows cause within the twenty-one days, the registrar shall not suspend the registration.

(b) If the registrant fails to appear within the required twenty-one days, the registrar shall suspend the registration in the state voter registration computer system and, if necessary, by drawing in red ink a line through the registrant's name on the precinct register and the duplicate precinct register. Such line shall be initialed by the registrar or employee of the registrar. The registrar shall note in the registrant's information on the state voter registration computer system and, if the original application is available in hard copy in the registrar's office, on the original application for registration that the registrar has been notified of an order of imprisonment for conviction of a felony which makes the registrant ineligible to register or vote pursuant to R.S. 18:102(A)(1), and he shall note also the date of the suspension and the date of the report, when applicable. If the original

62

application is available in hard copy in the registrar's office, the registrar shall remove the original application from his file of eligible voters and shall place it in his suspension file. In addition, each person whose registration is suspended under this Subsection shall immediately be notified of the suspension and the reason therefor.

(4) A list of names and addresses of the notices sent under this Subsection and whether or not each registrant responded to such notice shall be maintained for a period of two years and shall be open to inspection and copying as provided in R.S. 18:154.

*Id.* § 18:176(A).

Once one's registration is suspended per La. R.S. § 18:176(A), to reinstate that registration, they must follow the protocol provided for in La. R.S. § 18:177(A)(1):

§177. Reinstatement of registration after suspension

A.(1) The registration of a person whose registration has been suspended by the registrar of voters pursuant to R.S. 18:176(A) shall be reinstated when the person appears in the office of the registrar and provides documentation from the appropriate correction official showing that such person is no longer under an order of imprisonment or, if the person is under such an order, that the person has not been incarcerated pursuant to the order within the last five years and the person is not under an order of imprisonment related to a felony conviction pursuant to election fraud or any other election offense pursuant to R.S. 18:1461.2.

### ii.    *Relevant Legislative History*

Louisiana Revised Statutes § 18:102 was enacted in Act 697 of the 1976 legislative session and became effective January 1, 1978. *See* 1976 La. Acts 697. Louisiana Revised Statutes § 18:177 was enacted in Act 1420 of the 1997 legislative session and became effective January 1, 1998. *See* 1997 La. Acts 1420. Both statutes have been amended numerous times since their enactments, and a few amendments warrant some discussion to lay the foundation for understanding Louisiana's current felon disenfranchisement statutory scheme.

In Act 636 of the 2018 legislative session, effective March 1, 2019, the Louisiana Legislature amended La. R.S. §§ 18:102 and 18:177 in the following ways:

§102.  Ineligible persons

A.  No person shall be permitted to register or vote who is:

(1)(a)  Under an order of imprisonment, as defined in R.S. 18:2(8), for conviction of a felony~~; or,~~ except as provided in Subparagraph (b) of this Paragraph.

(b) Except as provided in Subparagraph (c) of this Paragraph, a person who is under an order of imprisonment for conviction of a felony and who has not been incarcerated pursuant to the order within the last five years shall not be ineligible to register or vote based on the order if the person submits documentation to the registrar of voters from the appropriate correction official showing that the person has not been incarcerated pursuant to the order within the last five years.

(c)  Notwithstanding any other provision of law, no person shall be permitted to register or vote pursuant to this Section if he is convicted of a felony offense of election fraud or any other election offense pursuant to R.S. 18:1461.2 and he is under an order of imprisonment.

§177.  Reinstatement of registration after suspension

A.(1)  The registration of a person whose registration has been suspended by the registrar of voters pursuant to R.S. ~~18:176 for conviction of a felony~~ 18:176(A) shall be reinstated when the person appears in the office of the registrar and provides documentation from the appropriate correction official showing that such person is no longer under an order of imprisonment or, if the person is under such an order, that the person has not been incarcerated pursuant to the order within the last five years and the person is not under an order of imprisonment related to a felony conviction pursuant to election fraud or any other election offense pursuant to R.S. 18:1461.2.

2018 La. Acts 636. Moreover, in Section 2 of Act 636, the Legislature stated the following:

Prior to the effective date of this Act, the secretary of state shall work with the Department of Public Safety and Corrections to develop a form or forms to allow a person who is or was under an order of imprisonment for conviction of a felony to meet the requirements of R.S. 18:102(A)(1) and 177(A) as amended by this Act.

*Id.*

In Act 127 of the 2021 legislative session, effective February 1, 2022, the Louisiana Legislature once again amended La. R.S. § 18:102, but not La. R.S. § 18:177. *See* 2021 La. Acts 127. In doing so, the Legislature struck the statute's requirement to submit paperwork:

64

§102.  Ineligible persons

A.  No person shall be permitted to register or vote who is:

(1)

\*       \*       \*

(b)  Except as provided in Subparagraph (c) of this Paragraph, a person who is under an order of imprisonment for conviction of a felony and who has not been incarcerated pursuant to the order within the last five years shall not be ineligible to register or vote based on the order ~~if the person submits documentation to the registrar of voters from the appropriate correction official showing that the person has not been incarcerated pursuant to the order within the last five years~~.

*Id.*

Louisiana Revised Statutes § 18:177 has not been amended since 2018 La. Acts 636, and § 18:102 has not been amended since 2021 La. Acts 127.

### c.  The Election Clause and Preemption

"Under the Constitution's Election Clause, Congress may enact laws that preempt state election laws concerning federal elections." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 399 (5th Cir. 2013) (citing *Foster v. Love*, 522 U.S. 67, 69 (1997)). "When it does, the federal legislation renders any conflicting state laws inoperative." *Id.* (citing *Ex parte Siebold*, 100 U.S. 371, 384 (1879)). " 'To this end, state election laws cannot "directly conflict" with federal election laws on the subject.' " *Id.* (quoting *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 896 (5th Cir. 2012) (citing *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000))). *See also Voting Integrity Project, Inc.*, 199 F.3d at 775 ("Thus, a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject.").

The United States District Court for the Southern District of Mississippi has described this preemption standard when presented with the issue of whether the NVRA preempted Mississippi

law:

> The Elections Clause of the U.S. Constitution provides that "the Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. Congress has the power under the Elections Clause to enact laws that "preempt state election laws concerning federal elections." *Voting for Am.*, 732 F.3d at 399 (citing [*Foster*, 522 U.S. at 69]). State laws are "inoperative" if they "directly conflict with federal election laws on the subject." *Id.*; *see also Ex parte Siebold*, 100 U.S. [at 384] ("[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative. No clashing can possibly arise."). Because Congress's power to enact the NVRA derives from the Elections Clause, *see Voting for Am.*, 732 F.3d at 399, preemption analysis in this case is governed by that clause, not the Constitution's Supremacy Clause, *see [Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–16 (2013)].

> There is no "presumption against preemption" in Elections Clause cases. *See id.* at [13]. Rather, "[w]hen Congress legislates with respect to the "Times, Places and Manner" of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States." *Id.* at [14] (emphasis in original). The Supreme Court thus has noted that in construing whether State law conflicts with Federal legislation regarding elections, "the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id.*

> The Court also notes that legislation concerning the conduct of elections must be examined in light of the particular federal-state balance achieved in that arena. The Founders of the United States delegated substantial authority over Federal elections to the States. Congress has the authority to restrict, but has been cautious to circumscribe, the States' powers over the conduct of elections. *See, e.g., Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 [] (1986) (upholding, against a First Amendment challenge, defendant's rule permitting independent voters to vote in party primaries, but noting that "the Constitution grants to the States a broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives' "). A State's authority over its elections is particularly potent with regard to procedural regulations and rules to oversee and ensure the integrity of elections, even to Federal office. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 [] (1995). Under the Elections Clause, "[t]he power of Congress over . . . congressional elections is paramount, and may be exercised at any time, and to any extent which it deems expedient[.]" [*Inter Tribal Council of Ariz., Inc.*, 570 U.S. at 8–16]. That Congress *may* enact laws preempting conflicting State laws does not mean, however, that it necessarily intends to do so in the regular course or that its legislation in the field of elections should be read more broadly than Congress intended. *See Ex parte Siebold*, 100 U.S. [at 392].

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 729–731 (S.D. Miss. 2014) (footnotes omitted).

*See also id.* at 732 (footnote omitted) ("Resolution of the issue whether the NVRA preempts Mississippi law in this case boils down to whether the NVRA mandates disclosure of unredacted documents, thereby overriding voter registrants' privacy interests.  If so, the NVRA would directly conflict with Mississippi's Redaction Provisions, which preclude such disclosures, and the NVRA would preempt Mississippi law. If the NVRA does not mandate universal disclosure, then the two laws do not conflict, there is no preemption, and the Mississippi law requiring redaction of birthdates controls.").

Likewise, the United States District Court for the Eastern District of Texas has utilized a similar Election Clause preemption standard:

> The Elections Clause itself is a "default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." [*Foster*, 522 U.S. at 69] (citation omitted). The substantive scope of the Elections Clause is vast—the Supreme Court has found the "time, place, and manner" of federal elections to be "comprehensive words" that "provide a complete code for congressional elections" in order "to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 [] (1932). When there is no federal law that directly conflicts with state law regulating the time, place, and manner of federal elections, then state law controls by default. [*Voting for Am.*, 732 F.3d at 399]. If a federal law enacted under Congress's Elections Clause power directly conflicts with state law regulating the same, then the federal law controls and the analysis concludes. *Id.*; *see* [*Inter Tribal Council of Ariz., Inc.*, 570 U.S. at 15] ("[T]here is no compelling reason not to read Elections Clause legislation simply to mean what it says.").

*Tex. Voters All. v. Dall. Cnty.*, 495 F. Supp. 3d 441, 467–68 (E.D. Tex. 2020).

### d.  Relevant NVRA Provisions

The NVRA provides that "[e]ach State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission pursuant to section 20508(a)(2)

of [the Act] for the registration of voters in elections for Federal office." 52 U.S.C. § 20505(a)(1). Under 52 U.S.C. § 20508(a)(2): "the Election Assistance Commission—in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office . . . ." Further, under 52 U.S.C. § 20507(a)(1):

**(a) In general:**

In the administration of voter registration for elections for Federal office, each State shall—

(1) ensure that any eligible applicant is registered to vote in an election—

(A) in the case of registration with a motor vehicle application under section 20504 of this title, if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(B) in the case of registration by mail under section 20505 of this title, if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(C) in the case of registration at a voter registration agency, if the valid voter registration form of the applicant is accepted at the voter registration agency not later than the lesser of 30 days, or the period provided by State law, before the date of the election; and

(D) in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

### *3. Analysis*

As the Supreme Court has made clear, Louisiana has the authority to set eligibility requirements for those with felony convictions. *See Richardson*, 418 U.S. at 54. Thus, the Court's analysis hinges on the following question: when are disenfranchised felons, who were registered

to vote prior to disenfranchisement, once again eligible to vote under Louisiana's felony disenfranchisement statutory scheme?

The parties dispute whether the right to vote for those subject to La. R.S. § 18:177(A)(1) is restored automatically or upon completion of the statute's paperwork requirement. However, an analysis of Louisiana's Election Code shows that the right to vote of those subject to La. R.S. § 18:177(A)(1) is restored upon completion of the statute's paperwork requirement.

Again, "[t]he registration of any person as provided in [Louisiana's Election Code] *shall remain in effect for so long as the registration is not canceled* for a cause and in the manner set forth in [the Election Code]" (La. R.S. § 18:191 (emphasis added)), and those subject to La. R.S. § 18:177(A)(1) have suspended rather than cancelled registrations (*id.* § 18:176(A)(3)(b)). Thus, such registrations are still "in effect," just in an inactive state, and since never cancelled, re-registering would create duplicate registrations. Therefore, Louisiana has developed a reinstatement process by which suspended registrations can become active, allowing those with reinstated registrations the eligibility to vote.

Given this, the Court finds that the Legislature has made a clear distinction between registration and reinstatement, and those subject to La. R.S. § 18:177(A)(1) are not eligible to vote until completing the statute's paperwork requirement. The Court recognizes that eligibility to vote is generally discussed in La. R.S. § 18:102(A)(1). However, as the Louisiana Supreme Court has stated:

> Where two statutes deal with the same subject matter, they should be harmonized if possible, as it is the duty of the courts, in the construction of statutes, to harmonize and reconcile laws. *LeBreton v. Rabito*, 97–2221 [] (La. 7/8/98)[;] 714 So. 2d 1226, 1229; *Chappuis v. Reggie*, [] 62 So. 2d 92, 95 (1952); La. Civ. Code art. 13. However, if there is a conflict, the statute specifically directed to the matter at issue must prevail as an exception to the statute more general in character. *LeBreton*, [] 714 So. 2d at 1229; *Kennedy v. Kennedy*, 96–0732 [] (La. 9/9/97)[;] 699 So. 2d 351, 358 (on rehearing).

*McGlothlin v. Christus St. Patrick Hosp.*, 2010-2775 (La. 7/1/11); 65 So. 3d 1218, 1228. *See also* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 183 (2012) ( "If there is a conflict between a general provision and a specific provision, the specific provision prevails."). Therefore, as the more specific provision on the subject matter, La. R.S. § 18:177(A)(1)'s paperwork requirement prevails when determining the voting eligibility of those who were registered to vote prior to disenfranchisement.[9]

Since La. R.S. § 18:177(A)(1) determines the eligibility of those who were registered to vote prior to disenfranchisement, the Court finds that, assuming all allegations in Plaintiffs' *Complaint* to be true, as the Court is bound to do when analyzing a Rule 12(b)(6) *Motion to Dismiss*, Plaintiffs have not plead proper claims under the NVRA. Louisiana Revised Statutes § 18:177(A)(1) is not preempted by the NVRA because the statutes are not in direct conflict. Instead, La. R.S. § 18:177(A)(1) is an illustration of Louisiana acting pursuant its long-recognized power to determine the voting eligibility of those with felony convictions, a power that is also acknowledged within the NVRA itself. *See* 52 U.S.C. § 20507(a)(3)(B) ("In the administration of voter registration for elections for Federal office, each State shall . . . provide that the name of a registrant may not be removed from the official list of eligible voters except . . . as provided by State law, by reason of criminal conviction . . . .").

Accordingly, Defendant's *Motion to Dismiss* is granted with respect to this issue, and Plaintiffs' NVRA claims are dismissed without prejudice. Moreover, Plaintiffs only seek a preliminary injunction with regard to their NVRA claims. Given the Court's dismissal of these claims, Plaintiffs' *Motion for Preliminary Injunction* is consequently denied.

---

[9] The Court also notes that in the 2023 legislative session, the Legislature had the opportunity to amend La. R.S. § 18:177(A) so that the burden of submitting paperwork was taken off the individual but chose not to do so. *See* H.B. 396, Reg. Sess. (La. 2023) (unenacted).

## F.  12(b)(6): Equal Protection

### 1. Parties' Arguments

      a.   Defendant's Memo in Support (Doc. 32-1)

         i.   *Prudential Standing*

Defendant argues that for Plaintiffs to assert a constitutional right on behalf of a third party, Plaintiffs must have prudential standing to do so. (Doc. 32-1 at 17–18.) Plaintiffs' equal protection claim, argues Defendant, must be dismissed pursuant to Rule 12(b)(6) unless Plaintiffs can establish (1) "whether the party asserting the right has a close relationship with the person who possesses the right"; and (2) "whether there is a hinderance to the possessor's ability to protect his own interests." (*Id.* at 18 (internal quotations omitted) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)).)

The constitutional right at issue here, the right to vote, belongs to individuals, not organizations like Plaintiffs. (*Id.*) Thus, Plaintiffs must allege a close relationship with the people they represent to have prudential standing. (*Id.*) Neither Power Coalition nor the League have done so, and neither has VOTE. (*Id.*) Although VOTE comes close to doing so by alleging that it is suing on behalf of its members, which VOTE failed to identify in its *Complaint*, "membership alone is not sufficient to allege a close relationship." (*Id.*) Likewise, "none of the Plaintiffs have alleged a hinderance to any individual's ability to protect his own interest." (*Id.* (footnote omitted).)

To support her point that Plaintiffs have not established a close relationship, Defendant relies on the Supreme Court's decision in *Kowalski v. Tesmer*, in which the Court determined that an attorney-client relationship was not a close enough relationship to establish prudential standing. (*Id.* (citing *Kowalski*, 543 U.S. 125).) Defendant argues the following:

> Like the attorneys in *Kowalski,* Plaintiffs are attempting to assert the constitutional rights of "as yet unascertained" voters who may, in the future, seek their assistance with reinstatement of their voting rights. Not only do Plaintiffs lack a close relationship with these alleged voters, but "they have no relationship at all." If the attorney-client relationship is insufficient to confer third-party standing, it follows that Plaintiffs do not have third party standing to assert the constitutional rights of unidentified, hypothetical individual voters.

(*Id.* at 19 (footnotes omitted).)

Defendant also notes that "this is not a case in which enforcement of the challenged law against Plaintiffs would result indirectly in the violation of third parties' rights" because since Plaintiffs are not voters, the paperwork requirement cannot be enforced against them. (*Id.* (emphasis omitted).)

*ii.*    <u>*Equal Protection*</u>

While Plaintiffs contend that the Court should evaluate its equal protection claim under a rational basis/heightened scrutiny test, Defendant argues that the proper framework for analyzing Plaintiffs' equal protection claim is the *Anderson*/*Burdick* farmwork. (*Id.* at 20.) However, regardless of the framework utilized, Plaintiffs have failed to state an adequate claim under the Equal Protection Clause of the Fourteenth Amendment. (*Id.*)

Under the *Anderson*/*Burdick* framework, the Court must examine Louisiana's paperwork requirement and determine "(1) whether the process poses a 'severe' or instead a 'reasonable, nondiscriminatory' restriction on the right to vote and (2) whether the state's interest justifies the restriction." (*Id.* at 21.) The paperwork requirement is not severe because of "the burden to the voters as a whole, and not just a small number of voters." (*Id.* (emphasis omitted).) Further, it is only "a mere inconvenience, at best, . . . [which] does not constitute a severe burden under the *Anderson*/*Burdick* framework." (*Id.* at 22.) Louisiana is likewise justified in imposing its paperwork requirement. (*Id.* at 23.) "[T]he documentation requirement is the state's chosen method

72

by which registrars of voters verify that a voter marked as suspended in the state computer registration system is eligible to have his voter registration reinstated." (*Id.*) Moreover, "[t]his method ensures voter eligibility, prevents voter fraud, and helps ensure integrity." (*Id.*) Therefore, since the burden is not severe and the state is justified in imposing such a burden, Louisiana's paperwork requirement is constitutional under the *Anderson*/*Burdick* framework. (*Id.* at 24.)

Under a rational basis/heightened scrutiny analysis, Louisiana's paperwork requirement is also constitutional. (*Id.* at 25.) First, the Fifth Circuit does not consider felon re-enfranchisement to concern a fundamental right. (*Id.* at 24–25.) Likewise, persons with felony convictions are not considered a suspect class. (*Id.* at 25.) Thus, Louisiana's paperwork requirement is subject to rational basis scrutiny. (*Id.* at 24–25.) In the present case, "the State has a rational basis for requiring a person whose voter registration was suspended for conviction of a felony to present documentation from the appropriate corrections official in order to reinstate his voter registration." (*Id.* at 25.) Therefore, Louisiana's paperwork requirement passes rational basis scrutiny and is constitutional. (*Id.*) Thus, Plaintiffs have failed to allege a valid claim under the Equal Protection Clause of the Fourteenth Amendment. (*Id.*)

b.  Plaintiffs' Opposition (Doc. 58)

i.  *Prudential Standing*

In response to Defendant's argument, Plaintiffs assert that the Fifth Circuit has held that establishing associational standing is enough to satisfy prudential standing. (Doc. 58 at 25 (citing *Tex. Democratic Party v. Hughs*, 860 F. App'x 874 (5th Cir. 2021); *Vote Org. v. Callanen*, 39 F.4th 297, 304 (5th Cir. 2022)).) Therefore, VOTE has prudential standing since it has associational standing. (*Id.*)

Even though Power Coalition and the League do not have associational standing, they still have prudential standing because they bear a close relationship to those currently affected by the paperwork requirement and those who will be affected upon eligibility. (*Id.*) "Plaintiffs regularly assist and engage individuals with prior felony convictions who seek to re-register to vote after becoming eligible again." (*Id.* (citing *Compl.* ¶¶ 16–19, Doc. 1).) Such activity "includes direct contact with individuals in assisting those individuals in registering to vote, educating individuals about the Paperwork Requirement, and advocating on behalf of those individuals in support of better legislation affecting individuals with prior felony convictions who seek to vote." (*Id.* at 25–26.)

Plaintiffs also dispute Defendant's assertion that the affected individuals Plaintiffs represent are "as yet unascertained." (*Id.* at 26.) "Plaintiff VOTE has provided Defendant with a list of affected members, attached a declaration from an affected member to its Motion for Preliminary Injunction, and have attached to this response an additional declaration from an affected member." (*Id.*) Plaintiffs' argument rests on the fact that the affected individuals are ascertainable. (*Id.*) Specifically, these individuals are ascertainable because, as mandated by Louisiana law, Defendant has a list of ineligible voters and a list of suspended voters in her possession, which Plaintiffs have access to since the list is public record. (*Id.*)

Plaintiffs also assert that Defendant is incorrect in contending that "none of the Plaintiffs have alleged a hinderance to any individual's ability to protect his own interests." (*Id.* (internal quotations omitted).) Plaintiffs argue that such a "hinderance" is not as high a burden to meet as Defendant claims. (*Id.*) "The Supreme Court has found a sufficient hinderance where the third-party might be 'chilled from . . . assertion (of their own rights)' by a desire to protect their privacy 'from the publicity of a court suit.' " (*Id.* (alterations in original) (citing *Carey v. Population Servs.*

*Int'l*, 431 U.S. 678, 684 n.4 (1977)).) Compared to *Carey*, Plaintiffs argue that they have clearly alleged a hindrance. (*Id.* at 27.) Moreover, the Supreme Court has also found that "the mere lack of sufficient incentive for the third party to sue [is adequate] to meet this criteria." (*Id.* (citing *Campbell v. Louisiana*, 523 U.S. 392, 397–98 (1998)).) To this end, Plaintiffs argue that they have clearly alleged a hindrance:

> Any individual voter impacted by this system is unlikely to have the resources or sufficient incentive to mount a lawsuit. Moreover, many voters who will be affected are currently incarcerated and are thus practically unable to challenge the Paperwork Requirement on their own behalf. *See, e.g.*, [*Compl.* ¶¶ 33–34, Doc. 1] (describing requirements for automatic restoration of rights for those who are no longer incarcerated). This is exactly the type of hindrance from "advancing their own constitutional rights against the [state] scheme" that third-party standing is intended to circumvent. *Cf.* [*Kowalski*, 543 U.S. at 126]. Plaintiffs, then, are the most appropriate parties to assert the [e]qual [p]rotection Claims on behalf of affected individuals.

(*Id.*)

## ii. *Equal Protection*

Plaintiffs dispute Defendant's contention that the classification at issue does not involve a fundamental right. (*Id.* at 28.) Instead, Plaintiffs argue that "[w]hen the right to vote is implicated, the classification is subject to strict scrutiny." (*Id.* (citing *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)).) Specifically, Louisiana law grants certain convicted felons the right to vote, and by doing so, "the Constitution requires that any regulation creating a classification on the franchise be narrowly tailored to meet a compelling governmental interest." (*Id.*) "In other words, just because Louisiana *could* disenfranchise people with convictions, that does not mean it can forever treat those individuals—after their rights are restored—as second-class voters." (*Id.*) Plaintiffs then cite to *Bush v. Gore*, arguing that "[t]he Court was careful to explain that the right to vote in a presidential election is not guaranteed, but nonetheless, once that right is doled out, it must be allocated and implemented in accordance with Equal Protection." (*Id.*)

In applying strict scrutiny to the present matter, Plaintiffs argue that since "there are much more efficient and indisputably less restrictive means for parish registrar offices to receive the information necessary to ascertain eligibility for affected individuals[,]" Louisiana's paperwork requirement is not narrowly tailored to achieve any potential state interest. (*Id.* at 29.) With regard to less restrictive means available, Plaintiffs argue that "[b]ecause Louisiana maintains records of an individual's order of imprisonment, and because the channels of communications and policies already exist to share information regarding when an individual becomes ineligible, the State could readily communicate information to its agencies regarding when a voter with a felony conviction is eligible." (*Id.*)

Plaintiffs also argue that they plausibly allege that in the event the Court finds rational basis scrutiny to apply, there is no rational basis for Louisiana's paperwork requirement:

> It is irrational for registrars to not use the lists in their possession of ineligible voters to verify both the eligibility of new and suspended registrants. [(*Compl.* ¶ 116, Doc. 1.)] The failure to use this information creates unnecessary risks for good-faith new registrants who may simply be mistaken about their eligibility to vote. *Id.* There is no rational basis for placing the burden on voters to submit documentation which the State already possesses. [(*Id.* at ¶ 119.)]

(*Id.*)

Plaintiffs disagree with Defendant's argument that the *Anderson*/*Burdick* framework should apply. (*Id.*) However, in the event that the Court does apply the *Anderson*/*Burdick* framework, Plaintiffs assert that the paperwork requirement is still unconstitutional, "for the same reasons that Plaintiffs plausibly allege that the Paperwork Requirement is an impermissible classification." (*Id.*) Plaintiffs contend that under this framework, "a court 'must weigh the character and magnitude of the asserted injury' to voting rights 'against the precise interests put forward by the State as justifications for the burden imposed by its rule.' " (*Id.* at 29–30 (quoting *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 143 (5th Cir. 2020)).) Further,

"[w]hen the burden is not severe, a court should only upload 'reasonable, nondiscriminatory restrictions.' " (*Id.* at 30 (citing *Tex. League of United Latin Am. Citizens*, 978 F.3d at 143).) Plaintiffs argue that they have alleged a severe burden for the reasons previously described. (*Id.*) However, even if the Court does not find the burden to be severe, it is discriminatory and unreasonable because even though the state has the means to do otherwise, it treats similarly situated voters differently solely based on their status as a new or previous registrant. (*Id.*) With regard to the government interest in the paperwork requirement, Plaintiffs assert:

> Defendant nakedly posits that the Paperwork Requirement "ensures voter eligibility, prevents voter fraud, and helps ensure election integrity." [(Doc. 31-2 at 23.)] Mere recitations of generally valid state interests do not undermine the sufficiency of Plaintiffs' well-pleaded allegations. Moreover, as Plaintiffs allege, the Paperwork Requirement does nothing of the sort. Rather, Plaintiffs allege that the policy *increases* the likelihood for error and *decreases* the likelihood that eligible voters will register. [(*Compl.* ¶ 77, Doc. 1.)] By placing the burden on the voter to submit documentation, rather than using the information he already has, Defendant's policy does the opposite of what he purports it to do. [(*Id.* at ¶¶ 66–70, 76–77, 115.)] As such, there is no reason, much less a compelling reason, to implement the Paperwork Requirement. [*Id.* at ¶ 119.)]

(*Id.*) Therefore, Plaintiffs contend that they have adequately alleged an equal protection claim. (*Id.*)

### c. Defendant's Reply (Doc. 65)

In reply, Defendant contends that Plaintiffs failed to state a claim for relief arising under the Equal Protection Clause because they lack third-party standing and do not satisfy the requisite level of scrutiny. (Doc. 65 at 10.) As to the first contention, "Defendant maintains that Plaintiffs' failure to specifically identify any affected individuals in the Complaint, whether members of VOTE or not, precludes a finding that any of the Plaintiffs have the requisite close relationship to assert an equal protection claim on behalf of third parties." (*Id.* at 8.) Defendant bases this assertion on the fact that Plaintiffs attempt to present matters outside of the pleadings in response to

Defendant's motion; therefore, Defendant contends that those materials should be excluded. (*Id.* at 7–8.) Further, the two declarations of members provided by Plaintiffs are immaterial, as one of them had his voter registration reinstated prior to this case, and thus has no actual, ongoing stake in the litigation, and the other member is not eligible for reinstatement. (*Id.* at 7 n.30.)

Defendant also contends that "Plaintiffs' Opposition fails to identify a hindrance to these third parties' ability to protect their own constitutional interests." (*Id.* at 8.) Defendant asserts that the two cases relied on by Plaintiffs, *Singleton v. Wulff* and *Carey v. Population Services International*, are distinguishable from this case in that "the documentation requirement challenged by Plaintiffs cannot be enforced against Plaintiffs because they are organizations, not voters." (*Id.*) Defendant further asserts that Plaintiffs' reliance on "the confidentiality concerns set forth in their Motion for Protective Order as a hindrance to the third parties' ability to assert their own interests" lacks merit. (*Id.* (footnote omitted).) Defendant argues the "confidentiality concerns do not constitute a sufficient hindrance to a third-party's ability to protect his own constitutional interests," because the right at issue is not within a sensitive area of personal privacy and the persons upon whose behalf they claim to have filed suit are already identified on lists that are public record. (*Id.* (citing *Carey*, 431 U.S. at 684 n.4; Doc. 58 at 26).) For these reasons, Defendant argues that "Plaintiffs have failed to demonstrate prudential standing to assert the rights of third parties and thus, have failed to state a claim for relief arising under the Equal Protection Clause of the Fourteenth Amendment." (*Id.* at 9.)

Next, Defendant asserts that Plaintiffs "failed to state a claim against [her] under both the *Anderson/Burdick* framework and the Rational Basis/Heightened Scrutiny test." (*Id.*) Defendant argues that under Fifth Circuit precedent, "the *Anderson/Burdick* analysis should be utilized for 'constitutional challenges to specific provisions of [a] [s]tate's election laws.' " (*Id.* (quoting

*Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 222 (5th Cir. 2020)).) Since Plaintiffs are challenging "Louisiana Revised Statute[s] [§] 18:177(A), alleging that it violates their equal protection rights, or that of their members[,]" the "challenge should be analyzed under the *Anderson/Burdick* framework." (*Id.*)

### 2. Applicable Law

#### a. Prudential Standing

As the United States Supreme Court has explained:

> The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 [] (1975) (citing *Barrows v. Jackson*, 346 U.S. 249 [] (1953)). . . . In addition to the immutable requirements of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." [*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 545 U.S. 464, 474–74]. Like their constitutional counterparts, these "judicially self-imposed limits on the exercise of federal jurisdiction," *Allen v. Wright*, 468 U.S. 737, 751 [] (1984), are "founded in concern about the proper—and properly limited—role of the courts in a democratic society," *Warth*, [422 U.S.] at 498 []; but unlike their constitutional counterparts, they can be modified or abrogated by Congress, [*see id.* at 501].

*Bennett v. Spear*, 520 U.S. 154, 162 (1997).

> When bringing a claim on behalf of a third party, the Supreme Court has
>
> recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute, [*Singleton v. Wulff*, 428 U.S. 106, 112 (1976)]; the litigant must have a close relation to the third party, *id.*[] at 113–[]14 []; and there must exist some hindrance to the third party's ability to protect his or her own interests. *Id.*[] at 115–[]16 []. *See also Craig v. Boren*, 429 U.S. 190 [] (1976).

*Powers v. Ohio*, 499 U.S. 400, 410–11 (1991). *See also Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014) (citing *Kowalski*, 543 U.S. at 129–30) ("The rule for third-party standing requires the named plaintiff to have suffered an injury

in fact and to share a 'close' relationship with third-parties who face an obstacle inhibiting them from bringing the claim on their own behalf.").

Moreover, a finding of third party standing as to one plaintiff satisfies standing as to all plaintiffs. *See, e.g.*, *id.* (citing *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981); *Allandale Neighborhood Ass'n v. Austin Transp. Study Pol'y Advisory Comm.*, 840 F.2d 258, 263 (5th Cir. 1988)) ("Because the physician-plaintiffs have third-party standing to assert the rights of their patients in this litigation, as well as standing to assert their own rights, we need not consider the issue of standing as it relates to the remaining plaintiffs." (footnote omitted).)

b. Equal Protection

As a division of this Court has explained:

Although the Constitution explicitly empowers state legislatures to regulate the "Times, Places and Manner of holding Elections," [U.S. Const. art. I, § 4, cl. 1] and "[e]lection laws will invariably impose some burden upon individual voters," [*Burdick v. Takushi*, 504 U.S. 428, 433 (1992)] state regulations may not *unduly* burden the right to vote. The Equal Protection Clause provides one restraint against any such undue burden. [*See McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969) ("[O]nce the States grant the franchise, they must not do so in a discriminatory manner").]

In *Burdick v. Takushi*, the United States Supreme Court instructs that

[t]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions. [*Burdick*, 504 U.S. at 434.]

When cases fall somewhere between strict scrutiny and rational basis review, the *Anderson-Burdick*[, *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick*, 504 U.S. 428,] framework provides that "a more flexible standard applies." [*Burdick*, 504 U.S. 428 at 434. "The appropriate standard for evaluating a claim that a state

80

law burdens the right to vote is set forth in *Anderson*." *Id.* at 438.] In these cases, featuring a moderate burden on the right to vote, the court must weigh that burden against " 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' " [*Id.* (quoting *Anderson*, 460 U.S. at 789).] If the State's interests outweigh the burden on Plaintiffs' right to vote, the voting restrictions survive the [e]qual [p]rotection challenge.

*Harding v. Edwards*, 487 F. Supp. 3d 498, 506 (M.D. La. 2020) (Dick, C.J.) (footnote citations added internally within text). *See also Richardson*, 978 F.3d at 235 ("The *Anderson*/*Burdick* rubric requires us to examine two aspects of Texas's signature verification procedures: (1) whether the process poses a 'severe' or instead a 'reasonable, nondiscriminatory' restriction on the right to vote and (2) whether the state's interest justifies the restriction.").

### 3. Analysis

#### a.  Prudential Standing

As analyzed above, Plaintiffs properly allege that Power Coalition satisfies Article III standing, namely that it suffered an injury in fact by diverting significant resources to combat the mandates of La. R.S. § 18:177(A)(1)'s paperwork requirement. Thus, Power Coalition satisfies the first element of third party standing set forth in *Powers*. *Powers*, 499 U.S. at 411.

With regards to the second element set forth in *Powers* that the Plaintiff has a close relationship with the third party, *id.*, Power Coalition has sufficiently alleged such. (*See, e.g.*, *Compl.* ⁋ 17, Doc. 1 ("Power Coalition runs the Louisiana branch of the national election protection hotline, 866-OUR-VOTE. Through the hotline, Power Coalition assists voters who have issues or questions about voting in Louisiana during an election period and runs the hotline for every statewide and local election in Louisiana. When voters call in with questions about voter registration after they were suspended for a felony conviction, Power Coalition must divert significant resources to assisting those individuals meeting the paperwork requirement. In addition

81

to the hotline, Power Coalition provides voter education to hundreds of thousands of Louisiana voters and eligible individuals across the state. For eligible individuals on the suspended list, Power Coalition must divert significant resources providing additional education and assistance about complying with the paperwork requirement that it would not otherwise have to do.").)

With respect to the last *Powers* element of whether the third party suffers from a hinderance that prevents them from suing on their own behalf, *Powers*, 499 U.S. at 411, Plaintiff Power Coalition has also adequately alleged a hinderance. Plaintiffs allege in their *Complaint* that part of Power Coalition's mission and purpose is "to amplify the voices of those who have been historically marginalized," in particular those with felony convictions. (*Compl.* ‖ 16, Doc. 1.) As the Supreme Court explained in *Carey v. Population Services International*, suits that involve a "sensitive area of personal privacy" often deter third parties from bringing suit on their own behalf, as one's desire to protect their privacy would be compromised through the publicity of a lawsuit. 431 U.S. at 684 n.4. A lawsuit involving one's re-enfranchisement after a prior felony conviction is certainly an area of personal privacy that would deter individuals from bringing suit on their own behalf, especially when such individuals have historically been marginalized by way of disenfranchisement. Further, though felony convictions are part of the public record, these public records would not receive the same level of publicity that a lawsuit would. As such, the Court finds there to be a hinderance, and thus the third *Powers* element is satisfied.

Finding all three *Powers* elements satisfied, the Court finds that Power Coalition satisfies third party standing. Given such, Plaintiffs VOTE and the League do as well. *See Planned Parenthood of Greater Tex. Surgical Health Servs.*, 748 F.3d at 589. Therefore, Defendant's *Motion to Dismiss* with regard to this issue is denied.

82

b.  Equal Protection

The Court finds that Plaintiffs have alleged a valid equal protection claim under the *Anderson/Burdick* equal protection framework. First, Plaintiffs have alleged a severe burden. When analyzing the contours of what constitutes a severe burden, the Fifth Circuit has discussed how the burden on the right to vote of a small group of voters will likely not be severe. *See Richardson*, 978 F.3d at 236. However, Plaintiffs allege that "thousands of otherwise eligible individuals" are burdened by La. R.S. § 18:177(A)(1). (*See Compl.* ⁋ 77, Doc. 1.) Moreover, Plaintiffs allege that there is no unform procedure for what documents are required under La. R.S. § 18:177(A)(1), nor is there directive as to where and who those subject to the statute should obtain such documents from. (*See id.* at ⁋⁋ 66–69.) Instead, "individuals must guess as to how to obtain proof of eligibility." (*Id.* at ⁋ 69.) When construing these allegations in a light most favorable to the Plaintiffs, the Court finds that subjecting thousands to a cat-and-mouse document chase is a severe burden on one's right to vote.

Finding the burden to be severe, the Court must next determine whether La. R.S. § 18:177(A)(1)'s burden is "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotations omitted). The Court finds that Plaintiffs adequately allege that Louisiana's paperwork requirement "is not narrowly tailored to any potential state interest, as there are much more efficient and indisputably less restrictive means for parish registrar office to receive such information." (*Compl.* ⁋ 118, Doc. 1.) Specifically, Plaintiffs allege that such information is already readily available to the State:

> 113.    The State already has access to all the information which it demands the voter to produce, including records of the individual's order of imprisonment and proof that the individual has not been incarcerated under that order in the preceding five years.

\*\*\*

114.    Because Louisiana maintains records of an individual's order of imprisonment, and because the channels of communications and policies already exist to share information regarding when an individual becomes ineligible, the State could readily communicate information to its agencies regarding when a voter with a felony conviction is eligible.

115.    The requirement that an individual must produce records themselves places the burden onto the individual to track down and even pay for records which are already in possession by the State, creating an arbitrary and unnecessary barrier to voting.

116.    Furthermore, it is irrational for registrars to not use the lists in their possession of ineligible voters to verify both the eligibility of *new* and suspended registrants. The failure to use this information creates unnecessary risks for good-faith new registrants who may simply be mistaken about their eligibility to vote.

\*\*\*

119.    However, there is not even a rational basis to require the individual to produce additional documentation of those criminal records which are already in the State's possession, much less a compelling or important reason to do so.

(*Id.* at ¶¶113–16, 119.)

Assuming Plaintiffs allegations in their *Complaint* as true, as the Court is bound to do when addressing Defendant's *Motion to Dismiss*, the Court finds that Plaintiffs have alleged a severe burden on the right to vote that is not narrowly tailored to meet a compelling state interest. As such, Plaintiffs have alleged an adequate equal protection claim under the *Anderson*/*Burdick* framework, and Defendant's *Motion to Dismiss* with respect to this issue is denied.

### III.    LEAVE TO AMEND

"Federal Rule of Civil Procedure 15(a) requires the trial court to grant leave to amend 'freely,' and the language of this rule 'evinces a bias in favor of granting leave to amend.' " *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) (quoting *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1162 (5th Cir. 1982)). "[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a

claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1995). In

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co*., the court said:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

313 F.3d 305, 329 (5th Cir. 2002). Further:

> As the numerous case[s] ... make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

*JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 642 (M.D. La. 2018) (deGravelles,

J.) (quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357

(3d ed. 2016)).

Thus, the Court will, in accordance with wise judicial practice, allow Plaintiffs leave to

amend their *Complaint* to cure the above deficiencies, if they can do so. *See Watkins v. Gautreaux*,

515 F. Supp. 3d 500, 519 (M.D. La. 2021) (deGravelles, J.) (citing, *inter alia*, *Fetty v. La. State

Bd. of Private Sec. Exam'rs*, 611 F. Supp. 3d 230, 250 (M.D. La. 2020) (deGravelles, J.)).

However, Plaintiffs' counsel is reminded of their obligations under Federal Rule of Civil Procedure 11(b).

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's *Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)* (Doc. 32) is **GRANTED IN PART** and **DENIED IN PART**. With respect to Plaintiffs' NVRA claims—namely Defendant's arguments as to (1) Plaintiff VOTE's NVRA notice; (2) the extent to which the *Complaint* alleges NVRA violations outside of those discussed in the pertinent notice letters; and (3) preemption—the *Motion to Dismiss* is **GRANTED**, and Plaintiffs' NVRA claims are **DISMISSED WITHOUT PREJUDICE.** In all other respects, the *Motion to Dismiss* is **DENIED.**

**IT IS FURTHER ORDERED** that given the Court's dismissal of Plaintiffs' NVRA claims, *Plaintiffs' Motion for Preliminary Injunction* (Doc. 21) is consequently **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs shall have twenty-eight (28) days from the Court's ruling on Defendant's *Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)* (Doc. 32) in which to cure the above deficiencies regarding their NVRA claims if same can, in good faith, be cured. If Plaintiffs fails to do so, all remaining deficient claims will be dismissed with prejudice.

Signed in Baton Rouge, Louisiana, on <u>May 13, 2024</u>.


_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**