# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**VOICE OF THE EXPERIENCED,**
*on behalf of itself and its members,* **ET AL.**

**VERSUS**

**R. KYLE ARDOIN,** *in his official capacity*
*as Secretary of State of Louisiana*, **ET AL.**

**CIVIL ACTION**

**NO. 23-331-JWD-SDJ**

## RULING AND ORDER

This matter comes before the Court on the *Motion to Strike and Motion to Dismiss Plaintiffs' First Amended Complaint* ("*MTS*" and "*MTD*") (Doc. 176) filed by defendant Nancy Landry, in her official capacity as Secretary of State of Louisiana ("Defendant," "Secretary of State," or "Landry").[1] Plaintiffs Voice of the Experienced ("VOTE"), Power Coalition for Equity and Justice ("PCEJ" or "Power Coalition") and League of Women Voters of Louisiana ("the League") (collectively, "Plaintiffs") oppose the motions. (Doc. 180.) Defendant filed a reply. (Doc. 181.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the *MTS* is denied, and the *MTD* is granted in part and denied in part.

## TABLE OF CONTENTS

I.  INTRODUCTION...................................................................................................3
    A.  Louisiana Felony Disenfranchisement in General...........................................3
    B.  The Parties.......................................................................................................4
    C.  Procedural Background ...................................................................................5
    D.  *FAC* ...............................................................................................................6
        1.  Allegations in the *FAC*...............................................................................6

---

[1] Plaintiffs originally named former Secretary of State of Louisiana R. Kyle Ardoin as a defendant in this matter. Louisiana has elected a new Secretary of State since the filing of Plaintiffs' initial complaint. Pursuant to Federal Rule of Civil Procedure 25(d), Louisiana's new Secretary of State, Nancy Landry, has automatically taken the place of former Secretary of State R. Kyle Ardoin as a defendant in this matter. (*See also* Doc. 140 (Defendant's Notice of Substitution).)

2.    NVRA Notice..................................................................................................9
3.    Causes of Action............................................................................................11
II.    *MTS*................................................................................................................15
A.    Legal Standard................................................................................................15
B.    Parties' Arguments.........................................................................................18
1.    *MTS* (Doc. 176)...........................................................................................18
2.    *Opposition* (Doc. 180)................................................................................21
3.    *Reply* (Doc. 181).........................................................................................24
C.    Law and Analysis...........................................................................................25
1.    NVRA Claims.................................................................................................25
2.    Equal Protection Claim..................................................................................27
III.    *MTD*...............................................................................................................28
A.    Rule 12(b)(1) Standard...................................................................................28
B.    12(b)(1): Sovereign Immunity.......................................................................29
1.    Parties' Arguments.........................................................................................29
2.    Applicable Law...............................................................................................30
3.    Analysis..........................................................................................................34
C.    12(b)(1): Article III Standing.........................................................................36
1.    Parties' Arguments.........................................................................................36
2.    Applicable Law...............................................................................................40
3.    Analysis..........................................................................................................46
D.    NVRA Notice..................................................................................................51
1.    Parties' Arguments.........................................................................................51
2.    Applicable Law...............................................................................................54
3.    Analysis..........................................................................................................55
E.    Rule 12(b)(6) Standard...................................................................................57
F.    12(b)(6): NVRA Claims.................................................................................58
1.    Parties' Arguments.........................................................................................58
2.    Applicable Law...............................................................................................63
3.    Analysis..........................................................................................................72
G.    12(b)(6): Equal Protection.............................................................................78
1.    Parties' Arguments.........................................................................................78
2.    Applicable Law...............................................................................................81
3.    Analysis..........................................................................................................84
H.    12(b)(7): Failure to Join a Required Party....................................................87
1.    Rule 12(b)(7) Standard...................................................................................87
2.    Parties' Arguments.........................................................................................89
3.    Law and Analysis...........................................................................................90
IV.    LEAVE TO AMEND............................................................................................92
V.    CONCLUSION....................................................................................................94

## I.    INTRODUCTION

On September 6, 2024, in response to this Court's ruling on a previous *Motion to Dismiss* (Doc. 155), VOTE, PCEJ, and the League filed the *First Amended Complaint for Declaratory and Injunctive Relief* ("*FAC*") against Defendant. (Doc. 168.) This lawsuit concerns Louisiana Revised Statutes § 18:177(A)(1)—Louisiana's requirement that disenfranchised felons, who were registered to vote prior to their disenfranchisement, provide documentation to their respective registrars in order for their voter registrations to be reinstated. In the *FAC*, Plaintiffs allege that § 18:177(A)(1)'s paperwork requirement violates the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20505(a)(1); 20507(a)(1), (5); 20507(b)(1); 20508(b)(1), (2)(A); and the Equal Protection Clause of the Fourteenth Amendment. (Doc. 168 at ¶¶ 117, 125, 127, 153, 163, 180.)

### A.    Louisiana Felony Disenfranchisement in General

As explained in depth later in this ruling, Louisiana's Constitution grants the Legislature the power to disenfranchise those under orders of imprisonment for felony convictions. La. Const. art. I, § 10(A). The Legislature exercises this power through La. R.S. § 18:102(A), which provides for certain classes of citizens who are ineligible to register or vote.

When the Legislature disenfranchises individuals under orders of imprisonment for felony convictions, and those individuals have already registered to vote, their registrations become suspended, as opposed to canceled. *See* La. R.S. § 18:176. To reinstate their suspended registrations, such individuals must meet the criteria and follow the procedures set forth in § 18:177(A)(1):

§177. Reinstatement of registration after suspension

A.(1) The registration of a person whose registration has been suspended by the registrar of voters pursuant to R.S. 18:176(A) shall be reinstated when the person appears in the office of the registrar and provides documentation from the appropriate correction official showing that such person is no longer under an order

of imprisonment or, if the person is under such an order, that the person has not been incarcerated pursuant to the order within the last five years and the person is not under an order of imprisonment related to a felony conviction pursuant to election fraud or any other election offense pursuant to R.S. 18:1461.2.

Both § 18:102(A) and § 18:177(A)(1) were amended in Act 636 of the 2018 legislative session, effective March 1, 2019. 2018 La. Acts 636. Act 636 amended § 18:177(A)(1) to read as it does today. *See id.*; La. R.S. § 18:177(A)(1). However, § 18:102(A) was amended again after Act 636. *See* 2021 La. Acts 127. Specifically, in Act 127 of the 2021 legislative session, effective February 1, 2022, the Legislature struck § 18:102(A)'s paperwork requirement:

§102.  Ineligible persons

A.  No person shall be permitted to register or vote who is:

(1)

*      *      *

(b)  Except as provided in Subparagraph (c) of this Paragraph, a person who is under an order of imprisonment for conviction of a felony and who has not been incarcerated pursuant to the order within the last five years shall not be ineligible to register or vote based on the order ~~if the person submits documentation to the registrar of voters from the appropriate correction official showing that the person has not been incarcerated pursuant to the order within the last five years~~.

*Id.*[2] "'Under an order of imprisonment' means a sentence of confinement, whether or not suspended, whether or not the subject of the order has been placed on probation, with or without supervision, and whether or not the subject of the order has been paroled." La. R.S. § 18:2(18).

**B.  The Parties**

There are four parties involved in these motions: Secretary of State Landry, who brings these motions, and Plaintiffs, who oppose them.

---

[2] When quoting amendments, words in ~~struck through~~ type are deletions from the existing law the Legislature had made, and words underscored are additions to the existing law the Legislature had made.

Plaintiff VOTE "is a nonpartisan, grassroots nonprofit organization founded and operated by formerly incarcerated people." (Doc. 168 at ¶ 18.) VOTE has chapters in New Orleans, Baton Rouge, and Lafayette, with members throughout the state. (*Id.*) It advocates for the full restoration of rights for currently and formerly incarcerated people. (*Id.*) "VOTE's membership is comprised of formerly incarcerated people and their family members, as well as community members." (*Id.*) VOTE members assist currently incarcerated eligible voters in registering to vote, "following up with them on if they need additional documentation of eligibility," and ensuring that these voters have access to absentee ballots. (*Id.*) "VOTE also engages its membership through direct organizing, voter education, registration drives, and know-your-rights workshops . . . ." (*Id.*)

Plaintiff PCEJ "is a nonpartisan coalition of community-based organizations." (*Id.* at ¶ 23.) Its headquarters is in New Orleans. (*Id.*) PCEJ's mission involves "an integrated civic engagement strategy to amplify the voices of those who have been historically marginalized, with a focus on Black Louisianans and communities of color." (*Id.*) This includes working independently and with organizations like VOTE "to provide voter registration, education, and engagement to eligible individuals with prior felony convictions, most of whom are Black Louisianans." (*Id.*)

Plaintiff "League is a state chapter of the League of Women Voters of the United States . . . . The League has six chapters across Louisiana . . . ." (*Id.* at ¶ 25.) "The League's mission is to encourage informed and active participation in government, increase voter understanding of major public policy issues, and influence public policy through education and advocacy." (*Id.*) It focuses its mission on those in underrepresented and underserved communities. (*Id.*)

### C. Procedural Background

This lawsuit was filed on May 1, 2023. (Doc. 1.) Three weeks later, Plaintiffs filed a motion for preliminary injunction. (Doc. 21.) Defendant filed a motion to dismiss and opposed the motion

for preliminary injunction. (Doc. 32.) The parties fully briefed both of these motions, and the Court held a preliminary injunction hearing. (Doc. 155 at 1–2.) On May 13, 2024, the Court granted in part and denied in part the motion to dismiss and denied the preliminary injunction. (*Id.* at 86.) The Court granted the motion to dismiss "as to (1) Plaintiff VOTE's NVRA notice; (2) the extent to which the *Complaint* alleges NVRA violations outside of those discussed in the pertinent notice letters; and (3) preemption." (*Id.*) Plaintiffs were given 28 days to amend the *Complaint*. (*Id.*)

Plaintiffs requested an extension of time to file an amended complaint so that they could comply with the NVRA notice requirements. (Doc. 159.) After briefing on the issue, the Court allowed Plaintiff an extension until September 6, 2024. (Doc. 162.) Plaintiff filed the *FAC* on September 6, 2024. (Doc. 168.) Defendant moved to strike and to dismiss the *FAC* on October 7, 2024. (Doc. 176.)

### D.  *FAC*

#### 1.  *Allegations in the* **FAC**

The following factual allegations are primarily taken from the *FAC* (Doc. 168). The well-pled allegations are assumed to be true for purposes of the motion to dismiss. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). And because Defendant has only made a facial attack upon the complaint under Federal Rule of Civil Procedure 12(b)(1), this Court is merely required "to look to the sufficiency of the allegations in the complaint" when deciding whether it has jurisdiction. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981); *see also* Section III.A, *infra*.

Plaintiffs claim that § 18:177(A)(1)'s paperwork requirement is "burdensome, discriminatory, and unnecessary . . . ." (Doc. 168 at ¶ 1.) This requirement also treats similarly situated individuals differently, because it applies only to those disenfranchised individuals who

were previously registered to vote, not those who were never registered to vote or who were convicted of a felony but never incarcerated. (*Id.* at ¶ 2.) The information required by § 18:177(A)(1) is already available to registrars, so the paperwork requirement unnecessarily burdens the right to vote. (*Id.* at ¶ 3.)

Central to Plaintiffs' claims is their view that Act 127 lifted the paperwork requirement for "individual[s] who ha[ve] not been under an order of imprisonment or incarcerated pursuant to the order within five years." (*Id.* at ¶¶ 41–42.) According to Plaintiffs, restoration of the right to vote after the five-year suspension is automatic. (*Id.*) Currently, though, Louisiana law requires additional steps for those individuals who were registered to vote before their disenfranchisement. (*Id.* at ¶¶ 47–48 (citing La. R.S. § 18:177).) Plaintiffs contend that, if the paperwork requirement is a voting eligibility requirement, then it conflicts with other provisions of Louisiana law. (*Id.* at ¶ 50.)

The Department of Public Safety and Corrections ("DPSC") has created a "Voter Rights Certificate" ("VRC"). (*Id.* at ¶ 39.) A VRC is produced at the Louisiana Probation and Parole Offices. (*Id.*) It has "bec[o]me the standard form that the DPSC provide[s] to individuals with felony convictions who need[] the additional documentation to register to vote." (*Id.*) "Even though other forms of documentation may certify the same information as the VRC . . . parish registrars often only accept VRCs as valid documentation for reinstatement." (*Id.* at ¶ 56.) And often, an individual must request a VRC in person at a Probation and Parole Office. (*Id.* at ¶ 57.) This "in-person" requirement poses a barrier for individuals who are currently incarcerated (e.g., for misdemeanors) but nonetheless eligible for reinstatement. (*Id.* at ¶ 58.) "Additionally, state law does not specify the appropriate corrections official from whom to obtain the required paperwork, so individuals must guess as to how to obtain proof of eligibility." (*Id.* at ¶ 87.) Plaintiffs allege

that "some corrections officials have refused to give a VRC to voters whose convictions were out of state. Likewise, some registrars will only accept the VRC provided by the State, such that there is no way for voters with out-of-state felony convictions to prove their eligibility." (*Id.* at ¶ 88.)

Further, Plaintiffs allege that parish registrars are not being properly trained by Defendant. (*Id.* at ¶ 59.) Plaintiffs report that some registrars are requiring new registrants and those whose registrations were never suspended to comply with the paperwork requirement. (*Id.*) This is "[t]he result of Defendant's confusing policy." (*Id.*) "Whether such paperwork is required varies from parish to parish, as some parish registrars are aware that such individuals need not provide documentation of eligibility while other parish registrars are not." (*Id.* at ¶ 60.)

States are required to maintain a voter registration list containing each registered voter's name and registration information. (*Id.* at ¶ 62 (citing 52 U.S.C. §20183(a)(1)(A)).) States are also required to "coordinate their computerized lists with State agency records on felony status." (*Id.* (quoting 52 U.S.C. § 20183(a)(2)(A)(ii)) (cleaned up).) DPSC sends Defendant information about those who are disenfranchised under § 18:171, which Defendant is required to report to the parish registrars. (*Id.* at ¶ 63 (citing La. R.S. § 18:171(C)(4)).) "Similar requirements apply to the U.S. Attorney for federal convictions." (*Id.* (citing La. R.S. § 18:171.1).)

DPSC issued a regulation in August 2022, "requiring that the agency issue the list of ineligible individuals pursuant to La. R.S. 18:171 to parish registrars on a monthly basis." (*Id.* at ¶ 66 (citing Doc. 168-4 at 8–13).) This list is up to date and conforms with Louisiana's law on disenfranchisement, unlike the suspended voters list, "which includes thousands of individuals who were once ineligible, but who have since become eligible." (*Id.* at ¶¶ 10, 66.) The suspended voters list does not automatically update when a voter becomes eligible to vote under the law. (*Id.* at ¶ 79.)

The federal voter registration form "require[s] that the applicant swear or affirm that they meet the eligibility requirements of their state." (*Id.* at ¶ 67.) In Louisiana, these eligibility requirements include the applicant's felony conviction and incarceration status. (*Id.*) If applicants attest that they meet these requirements, they are "facially eligible to vote absent information establishing their ineligibility." (*Id.*) Neither the federal form nor Louisiana's state-specific instructions request additional documentation. (*Id.* at ¶ 68.)

Plaintiffs claim that, despite Louisiana's bifurcated treatment of those previously registered to vote versus new registrants, "voters in both of these supposedly distinct processes are functionally equivalent." (*Id.* at ¶ 72.) Voters in either category must submit either the federal or the Louisiana voter registration form. (*Id.*) And neither the federal nor the Louisiana voter registration form mentions additional documentation for those seeking reinstatement of a suspended registration. (*Id.*) These two groups are treated differently simply because of when they registered to vote. (*Id.* at ¶ 73.) The differential treatment is felt especially by individuals who are detained pre-trial or incarcerated for a misdemeanor, as they are eligible to vote but cannot appear in person "to obtain and deliver the VRC." (*Id.* at ¶ 77.)

### 2. NVRA Notice

Plaintiffs sent multiple letters advising Defendant of the alleged NVRA violations discussed above. On October 22, 2020, VOTE sent a notice letter, saying "that the paperwork requirement violated the NVRA's prohibition on additional documentation, and that multiple aspects of the paperwork requirement and its implementation violated the NVRA's mandate that election programs and activities be 'uniform' and 'nondiscriminatory.'" (*Id.* at ¶ 95 (citing Doc. 168-1.).)

On August 26, 2022, PCEJ and the League sent Defendant a notice letter, saying that the paperwork requirement violated the NVRA. (*Id.* at ¶ 96 (citing Doc. 168-2).) Defendant replied to this letter on September 22, 2022, with its position that the reinstatement process is not preempted by the NVRA and that reinstatement and registration are distinct processes. (*Id.* at ¶ 97 (citing Doc. 168-3).)

PCEJ and the League sent another notice letter on October 28, 2022, notifying Defendant of the ongoing violations of the NVRA and requesting records and communications with parish registrars regarding "the implementation of Act 127." (*Id.* at ¶ 98 (citing Doc. 168-4).) Defendant replied to this letter on February 17, 2023, complying with the document request, but not responding to the NVRA notice. (*Id.* at ¶ 99 (citing Doc. 168-5).) Defendant sent a follow-up letter on March 8, 2023, requesting information about voters affected by the paperwork requirement. (*Id.* at ¶ 100 (citing Doc. 168-7).)

On March 31, 2023, all three Plaintiffs responded to Defendant's follow-up letter, providing the requested information and noting that the time which they needed to wait before filing an NVRA claim had elapsed. (*Id.* at ¶ 101 (citing Doc. 168-8).) Plaintiffs requested a response by April 14, 2023. (*Id.*) Defendant did not respond by this date. (*Id.* at ¶ 102.)

After the ruling on the initial motion to dismiss, Plaintiffs sent Defendant a notice letter on May 31, 2024, specifying the alleged violations of the NVRA. (*Id.* at ¶¶ 104–105 (citing Doc. 168-9).) Defendant responded to this letter on August 30, 2024, denying the allegations but stating that "a reminder of the uniform felony procedures will be sent to all registrars of voters which will include the relevant election laws, including the 2021 amendment to La. R.S. 18:102." (*Id.* at ¶ 106 (citing Doc. 168-10 at 7).)

### 3. Causes of Action

Plaintiffs identify six causes of action. The first five claim violations of the NVRA, 52 U.S.C. § 20501 *et seq*. The sixth alleges a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983.

### a. Count One

Plaintiffs claim that Louisiana is prohibited from disenfranchising those "individuals who are not under an order of imprisonment for conviction of a felony." (Doc. 168 at ¶ 111 (citing La. Const. art. I, § 10(A)).) However, Louisiana's paperwork requirement can prevent the reinstatement of those no longer under an order of imprisonment. (*Id.* at ¶ 113.) Plaintiffs say that complying with the paperwork requirement cannot be an eligibility requirement to vote when the individual cannot constitutionally be disenfranchised. (*Id.* at ¶ 114.) "For this group, the paperwork requirement must be construed as a requirement of voter registration rather than a requirement of voter restoration." (*Id.* at ¶ 115.) This is because these voters have had their right to vote automatically restored. (*Id.* at ¶ 116.)

Under 52 U.S.C. § 20507(a)(1), registrars are required to accept all valid registration forms from eligible individuals. (*Id.* at ¶ 117.) Further, states must "'accept and use' the federal voter registration form, prohibiting them from creating additional documentation requirements to register to vote beyond the form itself." (*Id.* (citing 52 U.S.C. § 20505(a)(1); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) [hereinafter *ITCA*]).) Plaintiffs claim that the NVRA prevents states from requiring additional documentation, as those who attest to their eligibility are facially eligible to vote. (*Id.*)

> Section 8 of the NVRA requires that all registrars place on the rolls facially eligible registrants upon timely submission of a valid registration form. 52 U.S.C. § 20507(a)(1) (requiring that each state "shall . . . ensure that any eligible applicant

11

is registered to vote" in federal elections if the eligible applicant timely submits a "valid voter registration form").

(*Id.* at ¶ 118.)

Plaintiffs allege that "[o]nce individuals are no longer in the class of individuals stripped of the right to vote by statute, that right as protected by the Louisiana Constitution has been automatically restored without the need for any further action." (*Id.* at ¶ 120 (citing *Fox v. Mun. Democratic Exec. Comm. of City of Monroe*, 328 So. 2d 171, 174 (La. App. 2 Cir. 1976)).) They contend that "Louisiana's refusal to register" those whose registrations were suspended but are now eligible to vote violates NVRA Section 8, 52 U.S.C. § 20507(a)(1). (*Id.* at ¶ 123.)

States must "accept and use" the Federal form "as sufficient" for voter registration. (*Id.* at ¶ 125 (citing *ITCA*, 570 U.S. at 10).) Any additional requirement for registration or reinstatement would violate NVRA Section 6. (*Id.* at ¶¶ 124–25 (citing 52 U.S.C. § 20505(a)(1)).)

Plaintiffs claim that the paperwork requirement is preempted by NVRA Sections 6 and 8. (*Id.* at ¶ 129.) Defendant cannot avoid the NVRA requirements by drawing an arbitrary distinction between registration and reinstatement. (*Id.* at ¶ 130.) Under Plaintiffs' interpretation, reinstatement is functionally equivalent to registration. (*Id.* at ¶ 131.) Reinstatement must occur by the registration deadline, and the outcome of each is the same: A person who has not been reinstated after suspension is not allowed to vote, just as someone who is not registered is not allowed to vote. (*Id.*)

### b. Count Two

Plaintiffs' second count alleges that the paperwork requirement violates the NVRA as applied to individuals "who are still on probation or parole after imprisonment but are eligible [to vote] because it has been five years or more since they were actually incarcerated under an order of imprisonment." (*Id.* at ¶ 135.) Act 636 added this class of persons to those who must comply

12

with the reinstatement process to vote. (*Id.* at ¶ 137.) The paperwork requirement is not an eligibility requirement to have the right to vote restored; rather, it is a re-registration requirement for those that are already eligible to vote. (*Id.* at ¶ 138.)

### c.  Count Three

Plaintiffs claim that some parish registrars require new registrants to comply with the paperwork requirement. (*Id.* at ¶¶ 142–43.) New registrants are not required by § 18:177(A)(1) to submit documentation of eligibility with their registration. (*Id.* at ¶ 143.) The paperwork requirement has created confusion as to whom it applies. (*Id.* at ¶ 144.) The application of the paperwork requirement to new registrants violates NVRA Section 6. (*Id.* at ¶ 145.) As applied to new registrants, the paperwork requirement is an additional requirement and violates the "accept and use" provision of the NVRA, as well as the NVRA's provision that eligible voters be registered. (*Id.* at ¶ 146 (citing 52 U.S.C. §§ 20507(a)(1); 20508(b)(1); 20505(a)(1), (2)).)

Plaintiffs allege that, as chief election official, Defendant is responsible under the NVRA for "ensuring compliance across the state." (*Id.* at ¶ 147.) She is responsible for ensuring the parish registrars do not violate her guidance and deny registrations that should not be denied. (*Id.* at ¶ 148.) However, many parish registrars are still requiring new registrants to comply with the paperwork requirement, because of Defendant's guidance. (*Id.*) "The actions of the registrars are attributable to confusion created by the Secretary's paperwork requirement and instruction and enforcement, or lack thereof, to date." (*Id.* at ¶ 149.) These violations could be cured by enjoining the paperwork requirement or having Defendant give clearer guidance. (*Id.* at ¶ 150.)

### d.  Count Four

Next, Plaintiffs claim that "the paperwork requirement imposes discriminatory and disuniform requirements among eligible voters with prior felony convictions, based solely on their

prior registration status." (*Id.* at ¶ 154.) This violates NVRA Section 8's requirement that the State maintain voter registration rolls in a "uniform [and] nondiscriminatory" manner. (*Id.* at ¶ 153 (quoting 52 U.S.C. § 20507(b)(1)) (internal quotation marks omitted) (alteration made by Plaintiffs).)

Further, registrars in different parishes are applying the paperwork requirement differently, with some requiring new registrants to comply. (*Id.* at ¶ 155.) Plaintiffs allege that this non-uniform application is forbidden by 52 U.S.C. § 20507(b)(1). (*Id.* at ¶ 156.) Again, Plaintiffs say that, as chief election official, Defendant is responsible for ensuring compliance with the NVRA. (*Id.* at ¶ 157.)

e.   Count Five

Plaintiffs' final NVRA claim is, "in the alternative, if reinstatement is considered an eligibility criterion, Defendant's state registration form and instructions for the federal form violate the NVRA for failing to specify it as such." (*Id.* at ¶ 161.) NVRA Section 8 requires that states inform voter applicants of any eligibility requirements, either through the federal or state voter form. (*Id.* at ¶ 162 (citing 52 U.S.C. § 20507(a)(5)).) Mail-in registration forms likewise must specify eligibility requirements. (*Id.* at ¶ 163 (citing 52 U.S.C. § 20508(b)(2)(A)).) If the Court decides that reinstatement is an eligibility criterion, Defendant must comply with the NVRA and state it on registration forms. (*Id.* at ¶ 164.)

f.   Count Six

Finally, Plaintiffs claim that the paperwork requirement violates the Equal Protection Clause of the Fourteenth Amendment. (*Id.* at ¶ 169.) "It is well established that 'a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.'" (*Id.* at ¶ 168 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)).)

Even though new registrants and suspended voters face different requirements, there is no reason for this differential treatment. (*Id.* at ¶¶ 170–71.) Both classes submit the same forms to become active voters and vote on Election Day. (*Id.* at ¶¶ 172–73.) Likewise, both classes cast their ballots in the same way. (*Id.* at ¶ 174.) "Despite being similarly situated, voters applying for what the State labels 'reinstatement' face different, arbitrary, and unnecessarily burdensome barriers." (*Id.* at ¶ 175.)

Information regarding an individual's status is already available to the state. (*Id.* at ¶ 176.) This information could be communicated to parish registrars without requiring individuals to produce the paperwork themselves. (*Id.* at ¶¶ 176–77.) Requiring individuals to produce the paperwork "creat[es] an arbitrary and unnecessary barrier to voting that is insurmountable for some voters." (*Id.* at ¶ 177.) As an example, Plaintiffs refer to those suspended individuals who are eligible to be reinstated, but who are incarcerated and therefore cannot comply with the in-person requirement. (*Id.* at ¶ 178.) There is no exception to the in-person requirement for these individuals to be reinstated. (*Id.*) Again, parish registrars are not uniformly applying the paperwork requirement, so "whether the paperwork requirement applies to an individual with a felony conviction arbitrarily boils down to their parish of registration." (*Id.* at ¶ 179.)

Plaintiffs claim that the paperwork requirement is not narrowly tailored to a compelling state interest and therefore violates the Equal Protection Clause. (*Id.* at ¶¶ 180–82.)

## II.    *MTS*

### A.  Legal Standard

Federal Rule of Civil Procedure 12(f) provides in relevant part: "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The district court possesses considerable discretion in disposing of

a Rule 12(f) motion to strike redundant, impertinent, immaterial, or scandalous matter." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (3d ed. 2025); *see also United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012) (noting that the Fifth Circuit "review[s] a district court's ruling on a motion to strike for abuse of discretion").

A party urging a motion to strike must meet certain requirements. "[M]otion[s] to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." *Coney*, 689 F.3d at 379 (quoting *Augustus v. Bd. of Pub. Instruction of Escambia Cnty.*, 306 F.2d 862, 868 (5th Cir. 1962)); *see also Gilchrist v. Schlumberger Tech. Corp.*, 321 F.R.D. 300, 302 (W.D. Tex. 2017) (citing *Coney*, 689 F.3d at 379).

Further, the movant must show that the "presence [of the challenged allegations] in the pleading throughout the proceeding will be prejudicial." *F.D.I.C. v. Niblo*, 821 F. Supp. 441, 449 (N.D. Tex. 1993) (citing *Augustus*, 306 F.2d at 868); *see also Glob. Adr, Inc. v. City of Hammond*, No. 03-457, 2003 WL 21146696, at *1 (E.D. La. May 15, 2003) (Engelhardt, J.) (citing *Niblo*, 821 F. Supp. at 449); Wright & Miller, *supra*, at § 1382 ("Thus, it is not surprising that a motion to strike frequently has been denied when the court believes that no prejudice could result from the challenged allegations, even though the offending matter literally is within one or more of the categories set forth in Rule 12(f). This has been true, for example, if the pleadings will be withheld from the jury or if the jury is carefully instructed as to the weight to be given the pleadings."). As Wright & Miller states:

> [T]here appears to be general judicial agreement, as reflected in the extensive case law on the subject, that [motions to strike] should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of *significant* prejudice to one or more of the parties to the action.

Wright & Miller, *supra*, at § 1382 (emphasis added); *see also Niblo*, 821 F. Supp. at 449 (citing *Augustus*, 306 F.2d at 868); *Glob. Adr*, 2003 WL 21146696, at *1 (citing *Niblo*, 821 F. Supp. at 449). *Cf. Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835, 852 (E.D. La. 2011), *on reconsideration in part*, No. 11-871, 2012 WL 1230736 (E.D. La. Apr. 12, 2012) ("A motion to strike should be granted only when 'the allegations are prejudicial to the defendant or immaterial to the lawsuit.'" (quoting *Harris v. USA Ins. Companies*, No. 11-201, 2011 WL 3841869, at *1 (E.D. La. Aug. 30, 2011) (quoting *Johnson v. Harvey*, No. 96-3438, 1998 WL 596745, at *7 (E.D. La. Sept. 8, 1998)))). This standard is a "heavy burden," *Gilchrist*, 321 F.R.D. at 302, and a "high bar," *Glob. Adr*, 2003 WL 21146696, at *1.

Looking at the specific grounds for striking, "'[i]mmaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded, or a statement of unnecessary particulars in connection with and descriptive of that which is material." Wright & Miller, *supra*, at § 1382. "Unnecessary jurisdictional allegations may be eliminated as immaterial as may averments of evidentiary facts." *Id.* "In addition, superfluous historical allegations also have been subject to a motion to strike, although allegations of this type may be permitted in a pleading if they are relevant to the claim for relief or provide useful background for the parties and the court in the absence of any prejudice." *Id.*

With respect to the procedural aspects of motions to strike, "[a] motion to strike must comply with the requirement in Rule 7(b) that motions state with particularity the grounds therefor and set forth the nature of relief or type of order sought." *Id.* at § 1380. "All well-pleaded facts are taken as admitted on a motion to strike but conclusions of law or conclusions drawn from the facts do not have to be treated in that fashion by the district judge." *Id.* "The district court also should refrain from becoming enmeshed in the merits of the action or the legal sufficiency of the

pleadings, although this may be difficult to prevent when the relevance or materiality of the challenged allegations is in issue on the motion." *Id.* at § 1382. "If the court grants a motion to strike redundant, immaterial, impertinent, or scandalous material, its order should delineate the matter to be eliminated with some care so as to avoid the excision of unobjectionable allegations and to prevent unnecessary controversy over the scope of the order." *Id.* Thus, "[i]f the district court determines that certain references in a pleading are prejudicial, only those references and not the entire paragraphs containing them should be stricken." *Id.* at § 1380.

"[T]he action of striking a pleading should be sparingly used by the courts." *Coney*, 689 F.3d at 379 (quoting *Augustus*, 306 F.2d at 868). "[S]triking a portion of a pleading is a drastic remedy . . . ." *Niblo*, 821 F. Supp. at 449 (citing *Augustus*, 306 F.2d at 868). Consequently, "motions under Rule 12(f) are viewed with disfavor and are infrequently granted." *Niblo*, 821 F. Supp. at 449 (citing *Augustus*, 306 F.2d at 868). "Any doubt about whether the challenged material is redundant, immaterial, impertinent, or scandalous should be resolved in favor of the non-moving party." Wright & Miller, *supra*, at § 1382.

### B. Parties' Arguments

#### 1. MTS *(Doc. 176)*

Defendant first argues that Plaintiffs' *FAC* is a supplemental, rather than amended, complaint. (Doc. 176-1 at 5–6.) According to Defendant, this is a matter of timing: While an amendment concerns events that happened before the suit was filed, a supplement "set[s] forth new facts affecting the controversy that have occurred since the original pleading was filed." (*Id.* at 6 (citing *Blackwell v. Thai Speed, Inc.*, No. 07-4629, 2008 WL 782556, at *2 (N.D. Cal. Mar. 24, 2008)).)

a.  NVRA Claims

Defendant notes that the *FAC* contains allegations of events after the original *Complaint*

was filed on May 1, 2023. (*Id.*) Specifically:

> • "On May 31, 2024, Plaintiffs sent a notice letter to Defendant Landry, alleging
> violations of the NVRA. *See* Ex. 9." [(Doc. 168 at ¶ 105.)]
> • "On August 30, 2024, Defendant responded to Plaintiffs' notice letter. *See* Ex. 10.
> Defendant rejected Plaintiffs' allegations but stated that 'a reminder of the uniform
> felony procedures will be sent to all registrars of voters which will include the
> relevant election laws, including the 2021 amendment to La. R.S. 18:102.' *Id.* at 6."
> [(Doc. 168 at ¶ 106.)]
> • "More than ninety days have elapsed since Plaintiffs sent their May 31, 2024
> notice letter. To date, Defendant has not cured the paperwork requirement. This suit
> follows." [(Doc. 168 at ¶ 107.)]
> • "Plaintiffs complied with the NVRA's notice requirement by providing Defendant
> with written notices of the violation on…May 31, 2024. *See* Exs…9. Defendant has
> failed to correct the violation within the ninety-day period required under 52
> U.S.C. § 20510(b)(1) and set forth in Plaintiffs'…May 31, 2024 correspondence."
> [(Doc. 168 at ¶¶ 132, 139.)]
> • "Plaintiffs complied with the NVRA's notice requirement by providing Defendant
> with written notices of the violation on May 31, 2024. *See* Ex. 9. Defendant has
> failed to correct the violation within the ninety-day period required under 52 U.S.C.
> § 20510(b)(1) and set forth in Plaintiffs' May 31, 2024 correspondence." [(Doc.
> 168 at ¶¶ 159, 166.)]

(*Id.* at 7.) Because these events happened after the *Complaint* was filed on May 1, 2023, the

allegations are supplements to the original pleading. (*Id.*)

Defendant looks to the May 31, 2024 notice letter, which alleges violations of 52 U.S.C.

§§ 20205(a)(2), 20507(a)(5), 20507(b)(1), 20508(b)(1), and 20508(b)(2)(A), in addition to the

original notice letter's allegations of violations of §§ 20205(a)(1) and 20507(a)(1). (*Id.* at 8.) These

are new allegations, not noticed before the first complaint was filed. (*Id.*) Defendant argues that

allegations of her statutory responsibility for certain registrars, of the lack of uniformity in the

application of the paperwork requirement between parishes, and of the failure to list the paperwork

requirement as an eligibility criterion in state form and instructions for the federal forms are all

new allegations. (*Id.*) She says that this expands the claims from only dealing with suspended

voters to "first-time registrants or other non-suspended voters." (*Id.* at 8–9.) Defendant argues that because she was not given notice of these claims at least 90 days before the suit was filed on May 1, 2023, Plaintiffs' attempts to assert these claims are supplements, not amendments. (*Id.* at 9–10.) She argues that Plaintiffs should have obtained leave of Court to file a supplemental complaint and that the Court's granting leave to amend the *Complaint* did not change this obligation. (*Id.* at 10.)

Defendant argues that the *FAC* should be stricken because it was filed without leave of Court. (*Id.* (citing Fed. R. Civ. P. 15(d)).) "Courts routinely strike entire pleadings which are not authorized by the rules." (*Id.* (citing *Blackwell*, 2008 WL 782556, at *3–4).) She says that since the *FAC* is essentially a supplemental pleading filed without leave, it should be stricken. (*Id.* at 10–11.) Defendant cites to *Bobby's Country Cookin' LLC v. Waitr Holdings, Inc.*, No. 19-552, 2020 WL 97391 (W.D. La. Jan. 7, 2020), where the court struck in its entirety an amended complaint that contained allegations of events occurring after the initial complaint was filed. (Doc. 176-1 at 11.) Defendant requests that the Court do the same here. (*Id.* at 12.)

b.  Equal Protection Claims

Defendant argues that amendments to Plaintiffs' equal protection claims were not permitted, as the Court only granted leave to amend the NVRA claims. (*Id.* at 14.)

> Paragraphs 169, 171, 176, and 177 of Count 6 of the *FAC* contain additions and/or deletions from the corresponding paragraphs of Count 2 of the initial *Complaint*, paragraphs 106, 107, 113, 115, respectively. [(Doc. 168; Doc. 1.)] Paragraph 170 of the *FAC* revised and replaced paragraph 112 of the initial *Complaint*.

(*Id.* at 12.) Paragraphs 178 and 179 of the *FAC* were also amendments. (*Id.*) These paragraphs contain allegations challenging § 18:177(A)(1) as applied to "individuals in jail who seek reinstatement of a suspended voter registration" and "first-time registrants and/or individuals who were never incarcerated for felony conviction." (*Id.* at 13.) Defendant says that the initial *Complaint* contained no allegation as to incarcerated individuals, but now challenges

20

§ 18:177(A)(1)'s in-person requirement. (*Id.*) Likewise, she argues that the *Complaint* only challenged § 18:177(A)(1)'s documentation requirement as applied to those seeking reinstatement of voting rights, but the *FAC* challenges it as applied to those registering to vote for the first time or who were not incarcerated for the conviction. (*Id.*)

Defendant argues that, because these claims were not included in the original *Complaint* and Plaintiffs were not given leave to amend their equal protection claims, they should be stricken. (*Id.* at 14.) Further, the deadline to amend pleadings—outside of leave given in a ruling on a motion to dismiss—was November 15, 2023. (*Id.*) Thus, Defendant asserts that Plaintiffs violated the Federal Rules of Civil Procedure by filing an unauthorized pleading, and the entire *FAC* should be stricken. (*Id.*)

### c.  Prejudice

Defendant claims that she will be prejudiced if the *FAC* is not stricken. (*Id.* at 15.) She says that Plaintiffs are attempting "to introduce new issues into the pending suit, almost a year and a half after it was filed." (*Id.*) This will require more discovery and delay final adjudication of the claims, thus prejudicing Defendant. (*Id.* (citing *Haralson v. Campuzano*, 356 F. App'x 692, 699 (5th Cir. 2009)).)

### 2.  **Opposition** (*Doc. 180*)

Plaintiffs argue that Defendant has not established that the *FAC* has "no possible relation to the controversy." (Doc. 180 at 13 (quoting *Nixion v. Bates*, No. 23-7034, 2024 WL 2977880, at *3 (E.D. La. June 13, 2024)).) Further, there is no argument that the *FAC* is "redundant, immaterial, impertinent, or scandalous." (*Id.* (citing Fed. R. Civ. P. 12(f)).) According to Plaintiffs, the *MTS* attempts "to relitigate [Defendant's] initial objections to this Court's grant of leave for Plaintiffs to amend their Complaint." (*Id.*) Defendant objected to Plaintiffs' request for an extension of time

to comply with the NVRA notice requirements and file an amended complaint, "arguing that Plaintiffs 'apparently seek to supplement their Complaint.'" (*Id.* (quoting Doc. 160 at 3).) But Plaintiffs assert that the Court rejected this argument in its order extending the deadline to file the amended complaint. (*Id.*) Additionally, Plaintiffs say that they did not add an equal protection claim regarding the documentation requirement for new registrants, but rather expanded on the claims already contained in the *Complaint*. (*Id.* at 5 n.1.)

Plaintiffs aver that the allegations connected to the 2024 Notice Letter are not supplemental, because the violations of which it gives notice were ongoing before the initial *Complaint* was filed. (*Id.* at 14.) They say that these new allegations were properly characterized as amendments because "[a]n amended complaint may include factual allegations that were not originally pled, especially facts that were discovered during the pendency of the litigation." (*Id.* (citing *Louisiana v. Bank of Am. Corp.*, No. 19-638, 2020 WL 3966875, at *4 (M.D. La. July 13, 2020)).) Plaintiffs say this is the case with the *FAC*. (*Id.*)

During the course of discovery, Plaintiffs were made aware that the paperwork requirement was being applied differently in different parishes, and that it was/is preventing incarcerated individuals from registering to vote. (*Id.* at 14–15.) Plaintiffs argue that they included this information in the 2024 Notice Letter, waited the requisite amount of time under the NVRA, and then filed the *FAC* to include these new allegations. (*Id.* at 15–16.)

Next, Plaintiffs argue that this Court's holding that § 18:177(A)(1) did not conflict with the NVRA does not affect their current NVRA claims. (*Id.* at 16.) As to Counts One and Two, they say that "the Louisiana Constitution does not allow disenfranchisement of individuals who are no longer under an order of imprisonment, meaning those individual's rights must be automatically restored upon release under state law." (*Id.*) "Counts [Three] and [Four] regard the nonuniform

application of the Paperwork Requirement across parishes based on facts learned during the litigation, and do not turn on whether reinstatement is a criterion for eligibility." (*Id.*) Finally, Plaintiffs assert that they clarified Count Five, arguing "in the alternative that if reinstatement is a condition of voter eligibility, Defendant's failure to state it as such on the state and federal voter registration form violates the NVRA." (*Id.*) Plaintiffs argue that any changes to their equal protection claims simply fill out the story set forth in the original *Complaint*, and all allegations arise out of the same occurrences. (*Id.* at 17.)

If the Court decides that the *FAC* is a supplemental pleading, Plaintiffs request that the Court nevertheless accept it. (*Id.* (citing *Spencer Cnty. Redevelopment Comm'n v. AK Steel Corp.*, No. 09-66, 2011 WL 3806947, at *2 (S.D. Ind. Aug. 26, 2011)).) They say that it is within the Court's discretion to do so. (*Id.* (citing Fed. R. Civ. P. 15).) Plaintiffs argue that Defendant has not shown that the *FAC* has no relation to the original claims, and thus has not met the standard for a motion to strike. (*Id.* at 17–18.)

Finally, Plaintiffs argue that Defendant will not be prejudiced by the *FAC*. (*Id.* at 18.) They say the relevant factors to determine prejudice—"delay, whether the challenged statements will unnecessarily prolong or prevent discovery, or increase the parties' expenses"—would be present if the *FAC* were to be stricken. (*Id.* (quoting *Hi-Tech Elec., Inc. of Del. V. T&B Constr. & Elec. Servs., Inc.*, No. 15-3034, 2017 WL 660645, at *2 (E.D. La. Feb. 15, 2017)).) Plaintiffs aver that there was no delay, as the *FAC* was filed only one week after the NVRA 90-day delay period. (*Id.*) Further, they argue that "any additional discovery will be limited," as many of the claims are purely legal. (*Id.*) Plaintiffs say that if the *FAC* is stricken, the litigation would be expanded and delayed further, as they would simply request leave to file the pleading again or file a new lawsuit. (*Id.*)

Plaintiffs distinguish *Bobby's Country Cookin'*, cited by Defendant, saying the court there struck the pleading because the defendant was prejudiced by not having the opportunity to oppose the filing. (*Id.* at 19 (citing *Bobby's Country Cookin'*, 2020 WL 97391, at *2).) Here, Defendant opposed the *Motion for Extension*, making the arguments made here. (*Id.*) But these arguments were rejected by the Court. (*Id.*) Plaintiffs argue that "Defendant had the opportunity to address Plaintiffs' 2024 Notice Letter by remedying and responding to the violations, so they cannot claim that they were unaware of Plaintiffs' allegations before Plaintiffs filed their Amended Complaint." (*Id.*) Therefore, Plaintiffs argue, Defendant has not suffered prejudice. (*Id.*)

### 3. Reply (Doc. 181)

Defendant argues that "Plaintiffs ignored the Court's order which granted them leave [to amend] on a very limited basis," which was only to cure any deficiencies in their NVRA claims. (Doc. 181 at 2.) She asserts that Plaintiffs did not obtain leave to amend their equal protection claims, and the Court's order giving an extension of time to file the amended pleading did not expand the scope of the leave to amend. (*Id.*) Instead, Defendant says, Plaintiffs sent a new NVRA Notice, then attempted to reassert the preemption argument that the Court had dismissed. (*Id.* at 2–3.) She argues that Plaintiffs did not cure the deficiencies regarding preemption, but simply restated the same claims. (*Id.* at 3–4.)

Defendant avers that any information regarding violations that was first noticed in the 2024 Notice is supplemental, because notice was given after the suit was filed. (*Id.* at 4.) This includes Plaintiffs' claims regarding currently incarcerated individuals and lack of uniformity between parishes. (*Id.*)

Defendant argues that it is of no matter that she did not argue that the *FAC* was not related to the controversy, because Plaintiffs violated the Court's order. (*Id.* at 5.) However, she now

asserts that the *FAC* "do[es] not bear any relation to the controversy because the Plaintiffs were not given permission to supplement their complaint, nor were the Plaintiffs given permission to amend their Equal Protection claims or to re-urge their same failed preemption claims." (*Id.*) Defendant reiterates that the Court may strike an entire pleading for failure to comply with a court order. (*Id.* (citing *Bobby's Country Cookin'*, 2020 WL 97391, at *2).) Defendant says that her opposition to the *Motion for Extension* did not deal with Plaintiffs' supplemental claims, only whether additional time should be granted. (*Id.* (citing Doc. 160).)

Finally, Defendant avers that Plaintiffs would not be prejudiced if the *MTS* were granted. (*Id.* at 6.) She says discovery was almost completed when Plaintiffs filed the *FAC*, and since it "exceeds the bounds of the Court's order," additional discovery will be needed, prejudicing Defendant. (*Id.*)

### C. Law and Analysis

#### 1. NVRA Claims

First, the Court must determine if the *FAC* is a supplemental complaint. Federal Rule of Civil Procedure 15(d) governs supplemental pleadings:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

Fed. R. Civ. P. 15(d).

> Amended and supplemental pleadings differ in two respects. The former relate to matters that occurred prior to the filing of the original pleading and entirely replace the other pleading; the latter deal with events subsequent to the pleading to be altered and represent additions to or continuations of the earlier pleadings.

6A Mary Kane Kay & Howard M. Erichson, *Federal Practice & Procedure* § 1504 (3d ed. 2025).

Defendant argues that the allegation in the *FAC* regarding the May 2024 Notice Letter constitutes a supplementation to the *Complaint*. (Doc. 176-1 at 6.) The May 2024 Notice Letter was sent on May 31, 2024. (Doc. 168 at ¶ 105.) This was a year after the original complaint was filed in May 2023. (Doc. 1.) The allegations of notice refer to an event that happened subsequent to the original pleading. Therefore, the allegations regarding the May 2024 Notice Letter are supplemental. *See* Kay & Howard, *supra* § 1509.

Although Defendant is correct that the *FAC* is partially supplemental, this does not automatically warrant striking the pleading. Plaintiffs were originally given 28 days to "cure the above deficiencies regarding their NVRA claims if same can, in good faith, be cured." (Doc. 155 at 86.) Plaintiffs moved for an extension of time to file an amended complaint, as they would need at least 90 days from the time the letter was sent before they could re-allege their NVRA claims. (Doc. 159.) Defendant was given the opportunity to respond, at which time she raised an argument against supplementation. (Doc. 160 at 3–4.) Oral argument was heard by the Magistrate Judge who granted the extension. (Docs. 161, 162.)

Because the Court allowed Plaintiffs to remedy the deficiencies in their NVRA notice, and later extended the time in which Plaintiffs could do so, the *FAC* will not be stricken on the grounds that it was an unauthorized supplemental complaint. "[M]otion[s] to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." *Coney*, 689 F.3d at 379 (quoting *Augustus*, 306 F.2d at 868). Defendant has not shown that the supplements to the NVRA claims have no relation to the controversy, and the Court finds that they are related. Specifically, the May 2024 Notice builds upon the NVRA violations pled in the original complaint. (Doc. 168-9.) The new alleged violations deal with the impact of the paperwork requirement. (*Id.*)

Any additions to the *FAC* stem from the interpretation and implementation of § 18:177(A)(1), the basis for the original *Complaint*.

Further, Defendant has not established that she would be prejudiced by allowing this pleading. She was given the opportunity to oppose an extension of time, which she acknowledged would involve a supplement to the pleadings. (Doc. 160 at 3–4.) Defendant simply states that more discovery would need to be conducted. (Doc. 176-1 at 15.) However, discovery is still ongoing and would not need to be reopened in response to this pleading. (Doc. 195; Doc. 201.) Allowing the *FAC* will therefore not prejudice Defendant. The *MTS* will be denied on these grounds.

### 2. Equal Protection Claim

The Court also will not strike Plaintiffs' amended equal protection claim. "Federal Rule of Civil Procedure 15(a) requires the trial court to grant leave to amend 'freely,' and the language of this rule 'evinces a bias in favor of granting leave to amend.'" *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) (quoting *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1162 (5th Cir. 1982)). Although the Court did not grant Plaintiffs leave to amend their equal protection claim, the added sections do not change Plaintiffs' claim. The two paragraphs on which Defendant focuses—Paragraphs 178 and 179—simply provide examples of how the right to vote is impacted by § 18:177. (Doc. 168 at 45.) They show how the distinction between new registrants and suspended voters affects incarcerated individuals and how parish registrars have not uniformly applied the paperwork requirement due to Defendant's confusing policies. (Doc. 168 at ¶¶ 178–79.) This further supports Plaintiffs' claims that the burden on the right to vote affects many people and is thus severe—as will be discussed in more detail below. The amendment did not significantly impact Plaintiffs' equal protection claim, and thus the Court will allow the amendment. The *MTS* will be denied on this ground.

III.    **MTD**

    **A. Rule 12(b)(1) Standard**

In a Rule 12(b)(1) motion, a party may raise the defense of lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). But "[a] motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss.*, 143 F.3d at 1010; *see also Ramming*, 281 F.3d at 161 (citing *Home Builders Ass'n of Miss.* with approval).

There are two forms of Rule 12(b)(1) challenges to subject matter jurisdiction: "facial attacks" and "factual attacks." *See Paterson*, 644 F.2d at 523. Relevant here, "[a] facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate Gen. of the State of Qatar*, 313 F. Supp. 3d 815, 819 (S.D. Tex. 2018) (citing *Paterson*, 644 F.2d at 523). In considering a "facial attack," the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient

the complaint stands." *Paterson*, 644 F.2d at 523. In contrast, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings—such as testimony and affidavits—may be considered." *Harmouche*, 313 F. Supp. 3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (citation omitted). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* When a factual attack is made, the plaintiff, as the party seeking to invoke jurisdiction, must "submit facts through some evidentiary method and . . . prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

## B. 12(b)(1): Sovereign Immunity

### 1. Parties' Arguments

#### a. *MTD* (Doc. 176)

Defendant submits that she is entitled to sovereign immunity against Plaintiffs' equal protection claim for the reasons stated in her original *Motion to Dismiss*. (Doc. 176-1 at 29.) In sum, she argues that the *Ex parte Young* exception to sovereign immunity does not apply because she did not have a sufficient connection to the enforcement of the paperwork requirement. (Doc. 155 at 20–21.) Defendant says that she simply provides guidance to parish registrars regarding § 18:177(A)(1), which is in line with her general duty to see that the laws of Louisiana are enforced. (*Id.* at 21.)

b.  *Opposition* (Doc. 180)

Plaintiffs argue that the *Ex parte Young* exception does apply. (Doc. 180 at 32.) They, like Defendant, incorporate their arguments from the briefing on the original *Motion to Dismiss*. (*Id.*) Plaintiffs argue that Defendant's role in the enforcement of § 18:177(A)(1) meets the "scintilla of enforcement" requirement. (Doc. 155 at 22.) They identify four facts supporting this argument: (1) "the Secretary of State is specifically tasked with enforcing voter registration laws"; (2) Defendant has instructed parish registrars regarding the paperwork requirement for a reinstated voter; (3) "the Secretary of State is specifically tasked with developing the voting rights certification, which is the reinstatement paperwork"; and (4) "Defendant 'has repeatedly demonstrated [her] willingness to exercise [her] duties by compelling denials of voter registrations and constraining registration without the paperwork." (*Id.* at 22–23 (third and fourth alterations in original).) Plaintiffs say that Defendant offered no new arguments to change this Court's finding that Defendant is involved in the enforcement of § 18:177; therefore, the *Ex parte Young* exception applies. (*Id.* at 32–33.)

c.  *Reply* (Doc. 181)

Defendant argues that her communications to parish registrars are not instructions and should not be considered enforcement. (Doc. 181 at 9.)

### 2.  *Applicable Law*

a.  Sovereign Immunity and *Ex parte Young*

"Generally, 'sovereign immunity bars private suits against nonconsenting states in federal court.'" *Book People, Inc. v. Wong*, 91 F.4th 318, 334 (5th Cir. 2024) (quoting *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019)). "This bar also applies to suits like this one 'against state officials or agencies that are effectively suits against a state.'" *Id.* (quoting *Paxton*, 943 F.3d

at 997). "Under the *Ex parte Young* exception to sovereign immunity, however, a plaintiff can seek prospective injunctive relief 'against individual state officials acting in violation of federal law.'" *Id.* (quoting *Paxton*, 943 F.3d at 997 (citation omitted)). "These state officials must 'have some connection with the enforcement of the allegedly unconstitutional law.'" *Id.* (quoting *United States v. Abbott*, 85 F.4th 328, 337 (5th Cir. 2023) (internal quotation marks and citation omitted)).

"To satisfy the required enforcement connection, the state official must have a duty beyond 'the general duty to see that the laws of the state are implemented.'" *Id.* at 335 (quoting *Paxton*, 943 F.3d at 999–1000 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014))). "Rather, the official must have 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Id.* (quoting *Paxton*, 943 F.3d at 1000 (quoting *Morris*, 739 F.3d at 746)). "This analysis is 'provision-by-provision': The officer must enforce 'the particular statutory provision that is the subject of the litigation.'" *Id.* (quoting *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020))). "We have defined 'enforcement' as 'compulsion or constraint,' so if the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Id.* (cleaned up).

"Plaintiffs need only show a 'scintilla of enforcement by the relevant state official.'" *Id.* (quoting *Tex. Democratic Party,* 978 F.3d at 179 (internal quotation marks and citation omitted)). The Fifth Circuit has "noted that the Article III standing analysis and *Ex parte Young* analysis significantly overlap, such that a finding of standing tends toward a finding that a plaintiff may sue the official under the *Ex parte Young* exception." *Id.* (cleaned up).

Additionally, "the inquiry into whether a suit is subject to the *Young* exception does not require an analysis of the merits of the claim." *Paxton*, 943 F.3d at 998 (citing *Verizon Md., Inc.*

*v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002)). "Rather, 'a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."'" *Id.* (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (alteration in original) (quoting *Verizon*, 535 U.S. at 645)).

The Fifth Circuit recognized the balance in *United States v. Abbott*. There, the appellate court found that *Ex parte Young* did not apply to an action against the governor because the challenged order "plainly delegate[d] all remaining enforcement discretion to DPS," not the governor, who had "no ongoing authority over DPS." *Abbott*, 85 F.4th at 336. In doing so, the Fifth Circuit explained:

> True, plaintiffs need not show that the Governor, like Attorney General Young, is so intent on bringing enforcement proceedings that he has, in violation of a court-issued injunction, obtained and served upon an individual plaintiff a court order mandating compliance with an allegedly unconstitutional state law; and only a stint in federal prison in contempt of court can stop him from instituting enforcement proceedings. *See Ex parte Young*, 209 U.S. at 126–27 [ ]; [*Stewart*, 563 U.S. at 254]. But plaintiffs do need to identify at least some enforcement action that the Governor will initiate for this court to enjoin. *See* [*Whole Woman's Health v. Jackson*, 595 U.S. 30, 43 (2021)]. After all, we can only "enjoin named defendants from taking *specified* unlawful actions." *See id.* at 44 [ ] (emphasis added).

*Id.*

### b. Louisiana's Election Code

Again, under Louisiana's paperwork requirement, "[t]he registration of a person whose registration has been suspended by the registrar of voters pursuant to R.S. 18:176(A) shall be reinstated when the person appears in the office of the registrar and provides documentation." La. R.S. § 18:177(A)(1). This statute is within Part IV of Louisiana's Election Code, titled "Reports to Registrars." Section 18:58 describes the powers and duties of registrars:

§58. Powers and duties of registrars

A. Subject to the direction of the secretary of state and as provided by law, the registrar in each parish shall be responsible for the registration of voters in the

32

> parish he serves and for the administration and enforcement of the laws and the rules and regulations of the secretary of state relating to the registration of such voters.

*Id.* § 18:58(A). Moreover, "[e]xcept as otherwise provided by law, the duties of the registrar are ministerial in character." *Id.* § 18:66(A). Under Louisiana law, "[m]inisterial duties are duties in which no element of discretion is left to the public officer. A ministerial duty is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law." *Hoag v. State*, 2004-0857 (La. 12/1/04), 889 So. 2d 1019, 1024 (citations omitted).

In contrast, the power and duties of the Secretary of State are as follows:

§18. Secretary of state; powers and duties

A. The secretary of state shall administer the laws relating to custody of voting machines and voter registration, and for this purpose he shall:

(1) Subject to applicable civil service laws and applicable provisions of this Title, employ and fix the salaries and duties of necessary staff to carry out such functions.

(2) Direct and assist the registrars of voters of the state with respect to matters pertaining to the registration of voters as provided by law.

(3) Prescribe uniform rules, regulations, forms, and instructions, which shall be approved by the attorney general and thereafter shall be applied uniformly by each registrar of voters in the state. These rules, regulations, forms, and instructions shall include but not necessarily be restricted to forms of applications for registration, records, affidavits and statements, documents, and general procedures to be used by the registrars of voters, none of which shall be inconsistent with the constitution and laws of the United States or of this state.

(4) Be responsible for obtaining statistics and data relating to the registration of voters from the registrars throughout the state and for the compilation of such statistics and data in an annual report which shall be submitted to the Legislature of Louisiana not later than the first day of each regular session.

(5) Perform such other functions and duties and exercise such other powers as are conferred upon him by this Title.

(6) Coordinate the responsibilities of this state under the National Voter Registration Act of 1993 (P.L. 103-31) as required by 52 U.S.C. 20509.

La. R.S. § 18:18(A)(1)–(6). With respect to Louisiana's paperwork requirement, Act 636 of the 2018 legislative session required the Secretary of State to work with the Department of Public Safety and Corrections prior to the Act's effective date "to develop a form or forms to allow a person who is or was under an order of imprisonment for conviction of a felony to meet the requirements of" what is now La. R.S. § 18:177(A)(1). 2018 La. Acts 636.

### 3. Analysis

Defendant offered no new argument supporting her claim of sovereign immunity. As set forth more fully in this Court's ruling on the original *Motion to Dismiss* (Doc. 155), Defendant is not covered by sovereign immunity in this case. First, "[w]ith respect to Plaintiffs' NVRA claims, the Court finds that sovereign immunity is not implicated, as the Act establishes a private right of action for aggrieved individuals." (Doc. 155 at 30 (citing 52 U.S.C. § 20510).) Therefore, sovereign immunity has been abrogated for NVRA claims. (*Id.* (quoting *Stringer v. Hughes*, No. 20-46, 16-257, 2020 WL 6875182, at *19 (W.D. Tex. Aug. 28, 2020)).)

As to Plaintiffs' equal protection claim, Plaintiffs seek "prospective declaratory and injunctive relief for an ongoing violation of Plaintiffs' rights under the Fourteenth Amendment." (*Id.*) "Thus, the *Ex parte Young* exception to the Eleventh Amendment's sovereign immunity is implicated so long as Secretary of State Landry is a proper defendant and there is an adequate connection between her and the enforcement of Louisiana's paperwork requirement, La. R.S. § 18:177(A)(1)." (*Id.* at 30–31.)

In its previous ruling, the Court examined Louisiana's voting statutory scheme. (*Id.* at 31.) Although § 18:177(A)(1) does not task anyone with its enforcement, Defendant, as Secretary of State, has the duty and power to "administer the laws relating to . . . voter registration, and for this purpose the secretary of state shall . . . [d]irect and assist the registrars of voters of the state with

34

respect to matters pertaining to the registration of voters as provided by law." La. R.S. § 18:18(A)(2). Directing local registrars regarding voter registration and administering voter registration laws indicate that Defendant has the authority to enforce § 18:177(A)(1). (Doc. 155 at 32.) Therefore, Defendant is a proper defendant. (*Id.*)

Next, there is at least "a scintilla of enforcement between the Secretary of State and La. R.S. § 18:177(A)(1)." (*Id.*) When reading the paperwork requirement from § 18:177(A)(1) together with the powers and duties given to the Secretary of State and parish registrars, "it is clear that Louisiana's Election Code provides for a chain of command when carrying out voter registration laws." (*Id.*) "Registrars have a duty to enforce voter registration laws, but that duty is ministerial in nature, meaning registrars cannot make judgment calls." (*Id.* at 33 (citing La. R.S. §§ 18:58(A), 18:66(A)).) The Secretary of State, on the other hand, provides guidance to registrars on how to handle registration of voters. (*Id.*)

In its previous ruling, the Court looked to copies of correspondences between the Secretary of State and parish registrars, and between the Secretary of State and a voter impacted by the paperwork requirement. (*Id.* at 33–34.) These documents were also attached to the *FAC*. (*See* Doc. 168-6 at 7–8, 40–48, 52–54.) The Court concluded, "[c]onsidering these emails and the statutory hierarchy provided for in Louisiana's Election Code, the Court finds that at the very least there is a scintilla of enforcement between Louisiana's Secretary of State and La. R.S. § 18:177(A)(1)." (Doc. 155 at 35.) Further, if an injunction were to be entered against Defendant to stop enforcement of § 18:177(A)(1), she would have to direct the registrars to stop enforcing the paperwork requirement and they, in turn, would be required to comply since the nature of their duties is ministerial and with no right of discretion. (*Id.*) Therefore, there is a sufficient connection between

Defendant and § 18:177(A)(1), and the *Ex parte Young* exception to sovereign immunity applies. (*Id.*) The *MTD* will be denied on this issue.

### C. 12(b)(1): Article III Standing

#### 1. *Parties' Arguments*

##### a. <u>*MTD* (Doc. 176)</u>

Defendant argues that the Fifth Circuit has "held [that] diversion of resources, alone, does not constitute an injury-in-fact." (Doc. 176-1 at 17 (citing *Louisiana Fair Housing Action Ctr., Inc. v. Azalea Garden Props., LLC*, 82 F.4th 345 (5th Cir. 2023)).) According to Defendant, in order to allege organizational standing through diversion of resources, a plaintiff must show "how its diversion of resources impaired its ability to achieve its mission"—specifically, "how the purported diversion of resources postponed, curtailed, or cancelled the planned activities or how it affected [the organization's] ability to achieve its mission." (*Id.* at 18 (quoting *Azalea Garden*, 82 F.4th at 353).)

Defendant contends that Plaintiffs have failed to make such a showing here. (*Id.* at 19.) She says that, because § 18:177(A)(1) was in effect before VOTE and PCEJ were formed, Plaintiffs may not claim that the statute's provisions caused them to divert resources. (*Id.*)

Defendant also asserts that PCEJ and the League did not allege a cognizable injury-in-fact. (*Id.* at 20–21.) She says that these Plaintiffs' standing arguments are based on § 18:177(A)(1)'s violating the NVRA. (*Id.*) This Court previously ruled that § 18:177(A)(1) is not preempted by the NVRA; thus, Defendant argues, Plaintiffs cannot claim that they have been harmed by attempting to counteract its effects. (*Id.*)

Defendant further argues that PCEJ and the League may not establish standing through diversion of resources. (*Id.*) She suggests that educating those impacted by § 18:177(A)(1) and

other efforts taken by PCEJ "advance rather than impair [PCEJ's] mission (i.e. to educate and empower voters across Louisiana)." (*Id.*) Likewise, Defendant argues that the League's mission, "seeking to ensure that all eligible individuals 'have the opportunity and the information needed to vote,'" is furthered when the League educates the public on § 18:177(A)(1). (*Id.* at 22.) Defendant avers that any extra time taken to educate a suspended felon about § 18:177(A)(1) falls within Plaintiffs' missions, and "diverting resources from one core mission activity to another does not suffice to establish a cognizable injury for standing purposes." (*Id.* at 20–22 (citing *Azalea Garden*, 82 F.4th at 345).)

Regarding VOTE, Defendant first addresses VOTE's associational standing. (*Id.* at 22.) She contends that VOTE has not named a member that has sustained injury due to § 18:177(A)(1), and thus VOTE has not met the requirements for associational standing. (*Id.* at 23.) Defendant repeats her argument that VOTE cannot allege an injury-in-fact because this Court found that § 18:177(A)(1) was not preempted by the NVRA. (*Id.* at 23–24.)

As to organizational standing, Defendant again says that VOTE has not alleged an injury-in-fact because § 18:177 does not violate the NVRA. (*Id.* at 24.) She argues that VOTE's mission is being fulfilled when it educates the public on § 18:177, and so it may not establish standing through diversion of resources. (*Id.* at 25.)

b. *Opposition* (Doc. 180)

Plaintiffs argue that all three of them have organizational standing and have been injured, and that VOTE has associational standing on behalf of its members who have been injured. (Doc. 180 at 20.) They say they "need not identify in their complaint 'specific projects that they had put on hold or otherwise curtail as that is but an example of how to satisfy the *Lujan* standard.'" (*Id.* at 21 (citing Doc. 155 at 44–45) (referring to *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).)

Plaintiffs assert that only one of them must have standing, and the Court found in its previous ruling that all had satisfied the organizational standing requirement. (*Id.*)

Plaintiffs cite to *Scott v. Schedler*, 771 F.3d at 831, 837 (5th Cir. 2014), arguing that an organization may meet the standing requirement in an NVRA case "where the organization 'devoted resources to counteract [the defendant's] allegedly unlawful practices' in failing to comply with the NVRA's provisions." (*Id.* at 22 (alteration in original).)

Plaintiffs claim that they have alleged organizational standing. (*Id.*) PCEJ must spend "up to two or three times" the amount of time with voters with felony convictions than those without, mainly because of § 18:177(A)(1)'s paperwork requirement. (*Id.* at 22–23.) The League must divert resources from focusing on target demographics to educating those affected by § 18:177(A)(1). (*Id.* at 23.) VOTE likewise must divert resources it would otherwise use elsewhere to educate voters. (*Id.*)

Plaintiffs respond to Defendant's reliance on *Azalea Garden* by arguing that Defendant has misunderstood their allegations. (*Id.* (citing *Azalea Garden*, 82 F.4th at 354).) They maintain that, in *Azalea Garden*, the Fifth Circuit "clarified that diversion of resources standing requires 'explain[ing] how any curtailment of these projects perceptibly impaired [an organization's] ability to achieve its mission.'" (*Id.* (quoting 82 F.4th at 354) (alteration in original).) Plaintiffs say that they have met this standard, given the above. (*Id.* at 23–24.)

Plaintiffs argue that educating voters about the paperwork requirement in § 18:177(A)(1) may constitute diversion of resources, as all that is required is a "perceptible impairment to an organization's ability to carry out its mission." (*Id.* at 24 (quoting *Azalea Garden*, 82 F.4th at 353) (cleaned up).) Plaintiffs cite a recent Supreme Court case, which held that "'there can be no question' that an organization experiences an injury-in-fact where the defendant's challenged

action has 'perceptibly impaired' the organization's 'ability to provide' direct services to individuals it aids." (*Id.* (quoting *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 395 (2024)).)

Although educating voters falls within the broad scope of Plaintiffs' missions, they "do so in service of amplifying historically marginalized voters' voices through civic engagement." (*Id.* (emphasis omitted).) "Impairment of PCEJ's ability to amplify the voices of historically marginalized people through getting out the vote, especially Black Louisianans, constitutes an injury in fact to their core business activity of direct voter registration assistance." (*Id.*) Similarly, the League's goal of encouraging Louisiana voters to vote is impaired by having to educate voters on the paperwork requirement. (*Id.* at 25–26.) While educating voters is broadly in line with VOTE's mission to advocate for the full restoration of rights for incarcerated people, VOTE is still diverting resources to educate voters on the paperwork requirement specifically. (*Id.* at 26.)

Plaintiffs argue that it is of no moment that this Court found that § 18:177(A)(1) was not preempted by the NVRA, and thus did not violate the NVRA. (*Id.*) They say that Defendant's arguments go to the merits of their NVRA claim, which does not impact their standing to bring the claim. (*Id.*)

VOTE argues that it has associational standing because its members were injured and "would have standing in their own right." (*Id.* at 27.) VOTE asserts that it has properly alleged how its members have been affected by § 18:177(A)(1), and so has properly alleged standing. (*Id.* at 27–28.) Further, individual participation from VOTE's members is not necessary, as an injunction would benefit both VOTE and its members. (*Id.* at 28.)

VOTE says that it need not identify the individual members who have been injured. (*Id.* (citing *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) ("We are aware of no precedent holding that an association must set forth the name of a particular member in its

complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing.")).)

### c. _Reply_ (Doc. 181)

Defendant replies that PCEJ's purported injury—having less time to educate voters who are not suspended—is not a cognizable injury. (Doc. 181 at 6.) Defendant asserts that PCEJ has not shown that its mission has been perceptibly impaired by § 18:177(A)(1) because any education that it undertakes is within its mission and is routinely done. (_Id._ at 6–7.) Further, the League sets out to educate "voters impacted by the criminal legal system," which, Defendant argues, includes educating them about § 18:177(A)(1). (_Id._)

Finally, Defendant avers that VOTE cannot establish organizational standing. (_Id._ at 7–8.) Defendant again claims that educating voters is VOTE's mission, and educating voters about § 18:177(A)(1) does not impair that mission. (_Id._) Defendant argues that VOTE's efforts to educate the public, "such as holding public education workshops and creating original resources and materials," does not create standing. (_Id._ at 8.)

Defendant did not address associational standing in her reply brief. (_Id._)

### 2. **Applicable Law**

### a. Standing in General

"A proper case or controversy exists only when at least one plaintiff 'establish[es] that [she] ha[s] standing to sue' . . . ." _Murthy v. Missouri_, 603 U.S. 43, 57 (2024) (quoting _Raines v. Byrd_, 521 U.S. 811, 818 (1997)); _accord Dep't of Com. v. New York_, 588 U.S. 752, 766 (2019). A plaintiff "must show that [he or] she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" _Murthy_, 603 U.S. at 57 (quoting _Clapper v. Amnesty Int'l USA_, 568 U.S.

398, 409 (2013) (internal quotation marks omitted)). "These requirements help ensure that the plaintiff has 'such a personal stake in the outcome of the controversy as to warrant [his or her] invocation of federal-court jurisdiction.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

  "The plaintiff 'bears the burden of establishing standing as of the time [he or she] brought th[e] lawsuit and maintaining it thereafter.'" *Id.* at 58. (first alteration by this Court; second by *Murthy*) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). The plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Lujan*, 504 U.S. at 561). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Ruhr*, 487 F. App'x at 195 (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks and alterations omitted)). "Where . . . the parties have taken discovery, the plaintiff cannot rest on 'mere allegations,' but must instead point to factual evidence." *Murthy*, 603 U.S. at 58 (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks omitted)).

  Additionally, "standing is not dispensed in gross." *Id.* at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). "That is, 'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Id.* (quoting *TransUnion*, 594 U.S. at 431). Thus, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

b.  Organizational Standing

"'[O]rganizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *OCA-Greater Hou. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).

Thus, for example, in *OCA-Greater Houston v. Texas*, a Chinese voting rights organization claimed as its injury-in-fact the "'additional time and effort spent explaining the Texas provisions at issue' to voters who had limited English proficiency because 'addressing the challenged provisions frustrate[d] and complicate[d] its routine community outreach activities.'" 867 F.3d at 610. The Fifth Circuit explained:

> The undisputed summary-judgment evidence established that OCA's primary mission is voter outreach and civic education, particularly "getting out the vote" among its members. Because a substantial portion of OCA's membership consists of people with limited English proficiency, Texas's voter interpreter restriction has deterred some of them from voting. In response, OCA calibrated its outreach efforts to spend extra time and money educating its members about these Texas provisions and how to avoid their negative effects. Specifically, OCA employees and volunteers must carefully explain to those it contacts, in the language they understand, that when they bring an interpreter to a Texas polling location, the interpreter must identify his or herself as an "assistor" rather than as an "interpreter" to avoid being turned away under Texas law like Das's son was. And OCA explains that these in-depth conversations take more time than merely explaining the requirements of the VRA, and therefore OCA must spend more time on each call (and reach fewer people in the same amount of time) because of Texas's law.

*Id.*

Defendants in that case relied on *NAACP v. City of Kyle, Tex.*, 626 F.3d 233 (5th Cir. 2010), where the Fifth Circuit found no organizational standing. *Id.* at 611. The Fifth Circuit rejected Defendant's position and explained:

The *City of Kyle* plaintiffs were dedicated lobbying groups who claimed their lobbying and litigation-related expenses as their injury. It is fundamental that no plaintiff may claim as injury the expense of preparing for litigation, for then the injury-in-fact requirement would pose no barrier. The key fact in *City of Kyle* was that every claimed "injury" either was undertaken to prepare for litigation (such as the commissioning of a $15,000 study on the impact of the ordinances—a study that the plaintiffs then relied on at trial to demonstrate disparate impact) or was no different from the plaintiffs' daily operations (such as the vice president's spending time reviewing ordinances).

Here, by contrast, OCA is not a lobbying group. It went out of its way to counteract the effect of Texas's allegedly unlawful voter-interpreter restriction—not with a view toward litigation, but toward mitigating its real-world impact on OCA's members and the public. For instance, it undertook to educate voters about Texas's assistor-versus-interpreter distinction to reduce the chance that other voters would be denied their choice of interpreter in the way that Das was—an undertaking that consumed its time and resources in a way they would not have been spent absent the Texas law. Hence, the Texas statutes at issue "perceptibly impaired" OCA's ability to "get out the vote" among its members.

*Id.* at 611–12 (quoting *Havens Realty*, 455 U.S. at 379). The appellate court also rejected

Defendant's attempt to disqualify all "prelitigation" expenses:

Every qualifying injury-in-fact will necessarily occur "prelitigation," and an expense can be incurred before litigation but still be *related* to the future litigation. The bar against claiming litigation expenses as injury is not one of temporal relation, but one of substantive relation. In *City of Kyle*, the expenses occurred prelitigation but were related to litigation. Here, the expenses occurred prelitigation and are unrelated to litigation. That is the critical distinction.

*Id.* at 612. The Fifth Circuit concluded its analysis:

To be sure, OCA's injury was not large. But the injury alleged as an Article III injury-in-fact need not be substantial; "it need not measure more than an 'identifiable trifle.'" [*Fowler*, 178 F.3d at 358.] This is because "the injury in fact requirement under Article III is qualitative, not quantitative, in nature." [*Id.* at 357–58.] Our remark in *City of Kyle* that those plaintiffs could have established standing by "identif[ying] any specific projects that the HBA had to put on hold or otherwise curtail in order to respond to the revised ordinances[,]" [*City of Kyle*, 626 F.3d at 238,] was not a heightening of the *Lujan* standard, but an example of how to satisfy it by pointing to a non-litigation-related expense. Indeed, the Supreme Court has commanded that, in determining whether an organization has organizational standing, "we conduct the same inquiry as in the case of an individual." [*Havens Realty*, 455 U.S. at 378.] So to the extent that Texas would read *City of Kyle* as imposing a higher burden on organizations seeking to establish standing, we must

43

disagree. We rather agree with the district court that OCA has satisfied its burden under *Lujan* to show an injury-in-fact.

*Id.* (third alteration in original).

Similarly, in *Greater New Orleans Fair Housing Action Center v. Kelly*, a sex-based housing discrimination case, the court found that an organization had adequately pled standing. 364 F. Supp. 3d 635, 640 (E.D. La. 2019). The Court stated preliminarily that

> [n]onprofit organizations can suffer an Article III injury when a defendant's actions frustrate their missions and force them to "divert significant resources to counteract the defendant's conduct." [*City of Kyle*, 626 F.3d at 238 (citing *Havens Realty*, 455 U.S. at 379); *OCA-Greater Hou.*, 867 F.3d at 612.] For instance, the Fifth Circuit has held that an organization devoted to promoting civic participation among Chinese and Asian Pacific Americans suffered an Article III injury when it diverted its resources to educate the community about how to avoid the alleged discriminatory effects of a Texas voting law. *OCA-Greater [Hou.]*, 867 F.3d at 612.

*Id.* at 646. In finding that the plaintiff had adequately alleged standing, the court explained:

> Here, plaintiff alleges that it has been injured because defendants have frustrated its mission of combating housing discrimination in the New Orleans community. Specifically, plaintiff alleges it has expended resources, including "staff time and organizational funds," to "engage in education and outreach activities to counteract the effects" of defendants' alleged discrimination. These activities allegedly include creating and circulating brochures and advertisements addressing sex discrimination and sexual harassment in housing, as well as making presentations on these topics to student groups. Plaintiff asserts that as a result of these expenditures, it has been forced to divert resources away from other planned projects and activities, including (1) other investigative initiatives; (2) recruitment of financial sponsors for its annual fair housing summit; and (3) development and publication of new fair housing educational materials. This diversion of resources has allegedly caused plaintiff to suffer decreased funding and a delay in providing its usual educational services to the community.
>
> These factual allegations are sufficient to plead an Article III injury, because plaintiff alleges that it has diverted its resources toward education and outreach activities to address the impact of defendants' alleged discriminatory practices. *See* [*OCA-Greater Hou.*, 867 F.3d at 610–12]; *Havens Realty* [], 455 U.S. at 379 [] (plaintiff sufficiently pleaded Article III injury by alleging it "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices"). Importantly, plaintiff specifically alleges that it undertook these activities to counteract the effects of defendants' alleged discrimination, and not to prepare for this litigation. *See OCA-Greater [Hou.]*, 867

F.3d at 611 ("It is fundamental that no plaintiff may claim as injury the expense of preparing for litigation, for then the injury-in-fact requirement would pose no barrier."). Plaintiff has also identified with sufficient particularity other projects it has had to put on hold or curtail in order to address the impact of defendants' alleged actions—*i.e.*, preparing for its annual fair housing summit and publishing new educational materials. *Cf. City of Kyle*, 626 F.3d at 238 (ruling that plaintiff lacked standing in part because at trial it failed to specify what other specific projects it had to put on hold to respond to defendant's alleged discriminatory ordinance). Finally, it is immaterial that this alleged injury may have amounted to only a minimal expenditure of plaintiff's resources, because an Article III injury "need not measure more than an identifiable trifle." *OCA-Greater* [*Hou.*], 867 F.3d at 612 (quoting [*Fowler*, 178 F.3d at 358]).

*Id.* at 646–47 (footnotes omitted).[3] The Court also distinguished another Fifth Circuit case by emphasizing that this decision was reached at the pleading phase:

> Because the case here is merely at the pleading stage, plaintiff need not prove that its efforts have led to a drain on its resources. Plaintiff need only allege facts demonstrating each element of standing. [*Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)]; *Lujan*, 504 U.S. at 561 [] (the plaintiff must establish each element of standing "with the manner and degree of evidence required at the successive stages of the litigation"). Plaintiff has met this requirement for each element of Article III standing.

*Id.* at 648.

Since the Court's previous ruling, the Supreme Court has clarified the diversion of resource standard for organizational standing.

---

[3] The court also noted:

> Plaintiff also alleges that it has been injured because of its expenditures on "witness interviews and testing" to "identify defendants' unlawful discrimination." [Doc. 1 at 18, ¶ 105]. These expenses qualify as an Article III injury to the extent they were undertaken solely to identify or confirm defendants' alleged discriminatory practices, and not to prepare for litigation. *See Havens Realty* [], 455 U.S. at 379; *OCA-Greater* [*Hou.*], 867 F.3d at 611; *City of Kyle*, 626 F.3d at 238 (plaintiff's expenditure of $15,000 for a study on the impact of defendant's allegedly discriminatory ordinance, which plaintiff then relied upon at trial to prove the ordinance's disparate impact, was not an Article III injury); *Fowler*, 178 F.3d at 358 (compilation of statistical evidence regarding the impact of an allegedly discriminatory voter registration law, when put together "in connection" with the lawsuit, was not an Article III injury). As already addressed, plaintiff has sufficiently pleaded a constitutional injury even without this allegation.

*Id.* at 647 n.87.

> Like an individual, an organization may not establish standing simply based on the "intensity of the litigant's interest" or because of strong opposition to the government's conduct, [*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 486 (1982)], "no matter how longstanding the interest and no matter how qualified the organization," *Sierra Club v. Morton*, 405 U.S. 727, 739 [ ] (1972). A plaintiff must show "far more than simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379 [ ]. The plaintiff associations cannot assert standing simply because they object to FDA's actions.

*Alliance*, 602 U.S. at 394. The Court added that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing that way." *Id.*

> The relevant question in *Havens* was whether a housing counseling organization, HOME, had standing to bring a claim under the Fair Housing Act against Havens Realty, which owned and operated apartment complexes. [*Havens*, 455 U.S. at 368.] Havens had provided HOME's black employees false information about apartment availability—a practice known as racial steering. [*Id.* at 366.] And when Havens gave HOME's employees false information about apartment availability, HOME sued Havens because Havens "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers." [*Id.* at 379.] In other words, Havens's actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer.

*Id.* at 395.

### 3. Analysis

Defendant asserts that Plaintiffs lack standing because this Court has previously held that the NVRA does not preempt § 18:177(A)(1)'s paperwork requirement. (Doc. 176-1 at 19–24 (citing Doc. 155 at 70).) Notably, Defendant's argument here implicates only Counts One, Two, and Five of the *FAC*. (*See* Doc. 168 at ¶¶ 108–40, 160–66.) Plaintiffs' other claims do not hinge on preemption. (*See* Doc. 168 at ¶¶ 141–59, 167–82.) But regardless, this Court's prior ruling does

not affect Plaintiffs' Article III standing. The Fifth Circuit has cautioned that a plaintiff's standing to challenge a law's constitutionality

> must not be confused with the apparent merit or lack of merit in his challenge. "Standing" is one element of the "case or controversy" limitation on federal court jurisdiction, and focuses primarily "on the party seeking to get his complaint before a federal court." [*Flast v. Cohen*, 392 U.S. 83, 99 (1968).] "The gist of the question of standing" is whether the plaintiff has alleged "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions. [*Baker v. Carr*, 369 U.S. 186, 204 (1962); *KVUE, Inc. v. Moore*, 709 F.2d 922, 927 (5th Cir. 1983).]

*Hill v. City of Houston*, 764 F.2d 1156, 1159 (1985) (emphasis added).

Thus, standing concerns whether a particular plaintiff "is a proper party *to request an adjudication of the particular issue*," not whether a particular plaintiff will succeed on the merits. *Id.* at 1159–60 (emphasis added). This Court's previous holding—that the NVRA does not preempt § 18:177(A)(1)'s paperwork requirement—relates to the merits of (some of) Plaintiffs' claims. To deny that Plaintiffs have standing to bring such claims on this basis would therefore be inappropriate. *See, e.g.*, *Farrakhan v. Gregoire*, 590 F.3d 989, 1000–01 (9th Cir.), *rev'd en banc on other grounds*, 623 F.3d 990 (9th Cir. 2010) (noting that the State inappropriately "attempt[ed] to import a merits question"—whether the plaintiffs could "prove a violation" of the Voting Rights Act—into the analysis of Article III standing). The implications of the prior ruling will be addressed in the Court's analysis of Defendants' Rule 12(b)(6) motion to dismiss the NVRA claim. *See* Section III.F.3, *infra*; *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) (noting that "the source of [a] plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing," addressed under Rule 12(b)(6)).

At this juncture, Plaintiffs need only establish Article III standing, meaning that they must demonstrate "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to

the challenged action; and redressable by a favorable ruling.'" *Murthy*, 603 U.S. at 57 (quoting *Clapper*, 568 U.S. at 409). Of course, Plaintiffs must still allege a plausible "line of causation" between Defendant's action(s) here and Plaintiffs' injury. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (citing *Allen v. Wright*, 468 U.S. 737, 757 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)); *see also Little v. KPMG LLP*, 575 F.3d 533, 540–41 (5th Cir. 2009) (deeming Plaintiff's alleged injury "too speculative" given the alleged "chain of causation"). But, as discussed below, Plaintiffs have plainly satisfied the requirements of Article III standing.

The Court previously found that PCEJ had "clearly alleged a diversion of resources due to the paperwork requirement." (Doc. 155 at 43.) Plaintiffs allege in the *FAC*:

> Power Coalition diverts significant resources from its other activities related to its core mission to assist voters with registering to vote after suspension. Power Coalition provides voter registration support and voter education to hundreds of thousands of Louisiana voters across the state. This includes running an "11-touch program" across a universe of about 600,000 voters during election cycles, aiming to engage with these voters eleven times each over the course of an election through a mix of text messages, door-knocking, calls, and other forms of outreach. The outreach is often conducted by community volunteers and hundreds of paid canvassers, who encounter individuals with felony convictions during their voter engagement work and are who are trained to discuss the paperwork requirement with impacted individuals. For eligible individuals on the suspended list, Power Coalition must divert significant resources to providing additional education and assistance about the paperwork requirement that it would not otherwise have to do. For example, phone bankers and canvassers must spend additional time speaking with the individual, sometimes up to twice or three times as long as a voter without a felony conviction. This means that the canvasser reaches fewer voters per shift and that PCEJ must spend additional resources to hit its outreach goals. Additionally, because of the challenges posed by the reinstatement process, Power Coalition does not always have the staff capacity to assist voters with completing the voter registration process. Absent the paperwork requirement, PCEJ would be able to reach additional voters, and resources expended on educating voters about the onerous reinstatement process would otherwise be spent on Power Coalition's engagement with more Louisiana voters, registering voters, and encouraging them to vote.

(Doc. 168 at ¶ 24.)

Construing the *FAC* "liberally," *see Little*, 575 F.3d at 540, Plaintiffs demonstrate that they, like the voting rights organization in *OCA-Greater Houston*, will likely go "out of [their] way to counteract the effect of [Louisiana's] allegedly unlawful [paperwork requirement]—not with a view toward litigation, but toward mitigating its real-world impact." *OCA-Greater Hou.*, 867 F.3d at 612; *see also Kelly*, 364 F. Supp. 3d at 647 (citing *OCA-Greater Hou.*, 867 F.3d at 611) ("Importantly, plaintiff specifically alleges that it undertook these activities to counteract the effects of defendants' alleged discrimination, and not to prepare for this litigation."); (Doc. 168 at ¶ 23 ("Power Coalition advances its mission with the support of a small staff, community volunteers, and partnerships with nonprofit, organizing, and advocacy organizations. Collectively, Power Coalition's network unites around an integrated civic engagement strategy to amplify the voices of those who have been historically marginalized, with a focus on Black Louisianans and communities of color. Power Coalition's work includes outreach to voters impacted by the criminal legal system in Louisiana, working with partners, including VOTE, to provide voter registration, education, and engagement to eligible individuals with prior felony convictions, most of whom are Black Louisianans.")).

As in *Havens Realty*, recently clarified in *Alliance*, PCEJ's "ability to provide" other services to its target communities is "perceptibly impaired" by the allegedly wrongful paperwork requirement, so "there can be no question that [it] has suffered injury in fact." *Havens Realty*, 455 U.S. at 379.

Plaintiffs have established this perceptible impairment for each of their claims. As to Counts One, Two, Five, and Six, PCEJ alleges:

> For eligible individuals on the suspended list, Power Coalition must divert significant resources to providing additional education and assistance about the paperwork requirement that it would not otherwise have to do. For example, phone

bankers and canvassers must spend additional time speaking with the individual,
sometimes up to twice or three times as log as a voter without a felony conviction.

(Doc. 168 at ¶ 24.) Counts One, Two, Five, and Six relate to how the paperwork requirement affects suspended voters. Therefore, PCEJ's efforts to educate them impairs their ability to reach and educate more voters about other issues.

As to Counts Three and Four, considering the allegations of the *FAC* as a whole, and drawing all reasonable inferences in Plaintiffs' favor, PCEJ has established standing. *See Haverkamp v. Linthicum*, 6 F.4th 662, 668–69 (5th Cir. 2021) ("On a motion to dismiss for lack of jurisdiction, all well-pleaded facts are taken as true and all reasonable inferences must be made in the plaintiff's favor.") PCEJ alleges that it works with "eligible individuals with prior felony convictions." (Doc. 168 at ¶ 23.) Counts Three and Four concern Defendant's lack of proper guidance to parish registrars, resulting in confusing and non-uniform application of the paperwork requirement. Plaintiffs discuss how eligible individuals are being required to comply with the paperwork requirement, even though it is not required for them. (*Id.* at ¶¶ 60–61.) It is reasonable to infer that the application of the paperwork requirement, as alleged by Plaintiffs, would result in PCEJ spending more time educating and working with potential voters throughout its 11-touch process.

Contrary to Defendant's arguments, PCEJ has not "spen[t] its way into standing simply by expending money to gather information and advocate against the defendant's action." (Doc. 181 at 8 (quoting *Alliance*, 602 U.S. at 394) (internal quotation marks omitted)).) Rather, like in *Havens Realty*, the paperwork requirement "directly interfered with [PJEJ's] core business activities." *Alliance*, 602 U.S. at 395. PCEJ is dedicated to "amplify[ing] the voices of those who have been historically marginalized, with a focus on Black Louisianans and communities of color." (Doc. 168 at ¶ 23.) It does this by engaging with the communities it seeks to serve and educating them

50

on voting requirements. (*Id.*) PCEJ must spend extra time to educate those affected by the paperwork requirement and, in doing so, may not reach as many people. (*Id.* at ¶ 24.)

As *OCA-Greater Houston* recognized, it is irrelevant whether Plaintiffs have identified in the *FAC* "specific projects that [they] had to put on hold or otherwise curtail," as that is "but an example of how to satisfy" the *Lujan* standard. *OCA-Greater Hou.*, 867 F.3d at 612 (citations omitted). As the Fifth Circuit said, "an Article III injury-in-fact need not be substantial; 'it need not measure more than an identifiable trifle.'" *Id.* (citations and internal quotations omitted).

Finally, as *Kelly* recognized, since this is "merely at the pleading stage, plaintiff need not *prove* that its efforts led to a drain on its resources. Plaintiff need only allege facts demonstrating each element of standing." *Kelly*, 364 F. Supp. 3d at 648 (citations omitted). Here, Plaintiffs' allegations with respect to PCEJ satisfy this standard. Plaintiffs adequately alleged a "perceptible impairment" of their mission to satisfy injury in fact. *See Deep South Ctr. For Environ. Justice v. EPA*, 138 F.4th 310, 318–19 (5th Cir. 2025). To the Court, the other remaining elements seem adequately alleged as well, since, again, these elements are not in dispute. Thus, the Court finds that PCEJ has standing.

Since, in multi-plaintiff cases, one plaintiff's having standing establishes standing for all, the Court finds that all Plaintiffs have adequately alleged organizational standing to survive Defendant's *MTD*. *See Town of Chester*, 581 U.S. at 439; *Horne v. Flores*, 557 U.S. 433, 446–47 (2009); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189 n.7 (2008); *see also* Aaron-Andrew P. Bruhl, *One Good Plaintiff Is Not Enough*, 67 DUKE L.J. 481 (2017). Therefore, the *MTD* with respect to this issue is denied.

### D. NVRA Notice

#### 1. *Parties' Arguments*

a. _MTD_ (Doc. 176)

Defendant argues that Plaintiffs lack standing to bring their NVRA claims alleged in the May 2024 Notice Letter because the letter was sent after suit was filed and therefore does not comply with the NVRA pre-suit notice requirement. (Doc. 176-1 at 26.) She looks to this Court's previous ruling, which held that the March 31, 2023 letter was sent fewer than 90 days _before this suit was filed_ on May 1, 2023. (_Id._ at 27 (citing Doc. 155 at 51).) Defendant says that any letter sent after this suit was filed does not constitute proper notice under the NVRA. (_Id._)

Next, Defendant says VOTE's NVRA claims should be dismissed, because it did not provide pre-suit notice. (_Id._) Again, Defendant asserts that the May 2024 letter should not be considered. (_Id._) She argues that this Court already dismissed VOTE's NVRA claims due to improper notice (as VOTE's first gave notice in the March 2023 letter), so VOTE does not have standing to bring this claim. (_Id._ at 27–28.)

Finally, Defendant contends that PCEJ and the League cannot bring any claims noticed for the first time in the May 2024 letter. (_Id._ at 29.) This Court previously held that PCEJ and the League had adequately provided notice only as to alleged violations of 52 U.S.C. §§ 20505(a)(1) and 20507(a)(1). (_Id._) Defendant avers that PCEJ and the League are limited to these claims, as the May 2024 letter was sent after suit was filed. (_Id._)

b. _Opposition_ (Doc. 180)

Plaintiffs respond that this Court granted Plaintiffs leave to remedy the notice defects, and even granted an extension of time in which to do so. (Doc. 180 at 29.) Plaintiffs argue that it is common to allow "parties to cure NVRA notice defects by amending their complaint." (_Id._ at 30 (citing _Nat'l Council of La Raza v. Cegavske_, 800 F.3d 1032, 1045 (9th Cir. 2015); _Diaz v. Sec'y of Fla._, No. 04-15539, 2005 WL 2402748, at *1 (11th Cir. Sept. 29, 2005); _Tenn. Conf. of NAACP_

*v. Lee*, 730 F. Supp. 3d 705 (M.D. Tenn. 2022); *League of Women Voters of Fla., Inc. v. Byrd*, No. 23-165, 2023 WL 11763040, at *5 (N.D. Fla. July 10, 2023); *Pub. Int. Legal Found., Inc. v. Bellows*, 588 F. Supp. 3d 124, 129 (D. Me. 2022); *Jud. Watch, Inc. v. Pennsylvania*, 524 F. Supp. 3d 399 (M.D. Pa. 2021); *Tex. League of United Latin Am. Citizens v. Whitley*, No. 19-00074, 2019 WL 793851 (W.D. Tex. Feb. 27, 2019); *Pub. Int. Legal Found., Inc. v. Bennett*, No. 18-00981, 2018 WL 2722331, at *5 (S.D. Tex. June 6, 2018); *Delgado v. Galvin*, No. 12-10872, 2014 WL 1004108, at *9 (D. Mass. Mar. 14, 2014)).)

Plaintiffs argue that this Court properly gave leave to amend, "because the purpose of an NVRA notice letter is not to erect procedural barriers or obstacles to NVRA lawsuits, rather it is to give the Defendant enough information to diagnose the problem. At that point it is the Defendant's responsibility to attempt to cure the violation." (*Id.* at 31 (quoting *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 795 (W.D. Tex. 2015) (cleaned up)).) Plaintiffs view their May 2024 notice letter as a cure to this Court's finding that they had failed to properly notice and state an NVRA claim. (*Id.*) In a footnote, Plaintiffs argue that "bring[ing] a civil action under 52 U.S.C. § 20510(b)(2) is not limited to the original complaint." (*Id.* at 23 n.4.) They cite to Fifth Circuit caselaw holding "that an amended complaint supersedes an original complaint, rendering the original complaint of no legal effect and the amended complaint as the operative pleading." (*Id.* (citing *King v. Dogan*¸ 31 F.3d 344, 346 (5th Cir. 1994)).) Therefore, notice was proper. (*Id.*)

### c.  *Reply* (Doc. 181)

Defendant reiterates that notice given after this suit was filed does not constitute proper notice under the NVRA. (Doc. 181 at 8.) She also says there is no Fifth Circuit caselaw that supports Plaintiffs' contention that a defect in NVRA notice may be cured by an amendment. (*Id.*)

## 2. *Applicable Law*

Under 52 U.S.C. § 20510(b),

(1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

(3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

"The apparent purpose of the notice provision is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation." *Ga. State Conf. of NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012) (citing *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997)). In relation to this purpose, "courts have found that an NVRA notice is sufficient if it 'sets forth the reasons for [the] conclusion' that a defendant failed to comply with the NVRA, and, when 'read as a whole, [it] makes it clear that [the plaintiff] is asserting a violation of the NVRA and plans to initiate litigation if its concerns are not addressed in a timely manner.'" *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1348 (N.D. Ga. 2016) (alterations in original) (quoting *Jud. Watch, Inc. v. King*, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012)). "[N]otice as to one potential NVRA violation is not the equivalent of notice as to all potential NVRA violations." *Bellitto v. Snipes*, 268 F. Supp. 3d 1328, 1334 (S.D. Fla. 2017). "Rather, a potential NVRA defendant must have notice of exactly what violation or violations have been alleged in order to have a meaningful opportunity to attempt complete compliance before facing litigation." *Id.*

The Fifth Circuit has held that notice is a prerequisite to filing an NVRA claim:

An aggrieved party "may provide written notice of the violation to the chief election official of the state involved." NVRA § 11(b)(1). Although notice is framed here as permissive rather than mandatory, other NVRA provisions indicate that notice is mandatory. For instance, the NVRA provides that "[i]f the violation is not corrected within 90 days after receipt of [the] notice . . . the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." *Id.* at § 11(b)(2). "No standing is therefore conferred if no proper notice is given, since the 90–day period never runs." [*Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1335.]

*Scott*, 771 F.3d at 835 (first alteration in original) (footnote omitted). In reaching this holding in *Scott*, the Fifth Circuit addressed the Sixth Circuit's decision in *Association of Community Organizations for Reform Now v. Miller*:

Scott admits that, although the NAACP provided Schedler with notice, he himself did not. But Scott maintains that notice is not necessary here because, as the NAACP had provided notice of the defendants' alleged non-compliance with the NVRA, no notice was required from him personally. Scott points to *Ass'n of Cmty. Orgs. for Reform Now ("ACORN") v. Miller*, 129 F.3d 833 (6th Cir.1997), which held that because ACORN had provided Michigan with proper NVRA notice, the individuals in the suit were not required to provide notice themselves. *Miller* noted that the purpose of the notice requirement was to "provide states . . . an opportunity to attempt compliance before facing litigation." *Id.* at 838. Because Michigan already had "clearly indicate[d] that [it] would continue to refuse to comply with the Act until forced to do so by judicial intervention," notice from the individual plaintiffs would have been "unnecessary" and "futile." *Id.*

We hold that Scott's failure to provide notice is fatal to his suit. He cannot piggyback on the NAACP's notice for several reasons. Most importantly, *Miller*'s exception to the NVRA's notice requirement is wholly devoid of textual support in the statute. No subsequent cases following *Miller* have addressed *Miller*'s complete lack of statutory authority. *See, e.g.*, [*Jud. Watch, Inc.*, 993 F. Supp. 2d at 922–23;] *Kemp*, 841 F. Supp. 2d at 1335.

*Id.* at 835–36 (first, second, and third alteration in original).

### 3.  Analysis

Defendant has identified no authority to support her contention that Plaintiffs cannot amend their *Complaint* to allege subsequent NVRA notice. Neither Plaintiffs nor Defendant have identified Fifth Circuit caselaw on this issue of amending a complaint to allege notice given after

a suit was filed, but more than 90 days before the amended complaint was filed. Plaintiffs' cited cases do not deal with this issue directly. However, interpretation of the NVRA notice provision indicates that Plaintiffs can amend their complaint to allege subsequent notice. The Court finds that Plaintiffs gave adequate notice of their NVRA claims.

First, the purpose of the NVRA's notice provision is to provide the state actor the opportunity to cure any potential violation before litigation ensues. *Kemp*, 841 F. Supp. 2d at 1335. Here, while litigation had already commenced before the May 2024 notice letter, the Court dismissed the improperly noticed claims without prejudice. (Doc. 155 at 86.) These improperly noticed claims were not pending during the time between the Court's ruling and when the *FAC* was filed. Plaintiffs sent Defendant notice of multiple NVRA violations on May 31, 2024. (Doc. 168-9 at 1–15.) Defendant had the opportunity to correct any violations during the 98 days between the notice and amended *FAC* and did not do so. Indeed, Defendant responded to the notice. (Doc. 168-10.) If Defendant had corrected the violations, there would have been no need for Plaintiffs to include those claims in the *FAC*, thus saving Defendant from litigation, at least as to those issues. The purposes of the NVRA notice requirement were furthered by dismissing the improperly noticed claims without prejudice and allowing subsequent notice.

If the Court were to follow Defendant's interpretation of the notice requirement, Plaintiffs would be required to file a separate lawsuit based on many of the same facts and overlapping facts and issues. This proposed application of the NVRA under the facts of this case would not further the purpose of the notice requirement.

Defendant did not challenge any other aspect of Plaintiffs' notice letter. The May 2024 letter was sent on May 31, 2024. (Doc. 168-9 at 2.) The *FAC* was filed on September 6, 2024. (Doc. 168.) More than ninety days had elapsed between these dates. Therefore, the Court finds that

Plaintiffs gave proper notice of their NVRA claims in the May 2024 letter, and the *MTD* will be denied on this issue.

### E. Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hamilton v. Dall. Cnty.*, 79 F.4th 494, 499 (5th Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co.*, 624 F.3d at 210 (quoting *Twombly*, 550 U.S. at 555). "In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* (citing *MySpace*, 528 F.3d at 418). The Court does "not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (citing *Iqbal*, 556 U.S. at 679).

The Court's "task, then, is 'to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Iqbal*, 556 U.S. at

678)). "[A] claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].'" *Calhoun v. City of Hou. Police Dep't*, 855 F. App'x 917, 919–20 (5th Cir. 2021) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

Additionally, "[i]n determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted). "Although a 'court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims,' . . . the court need not do so." *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir. 2020) (per curiam) (quoting *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014)); *see also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (using permissive language regarding a court's ability to rely on "documents incorporated into the complaint by reference").

### F. 12(b)(6): NVRA Claims

#### 1. *Parties' Arguments*

##### a. *MTD (Doc. 176)*

Defendant argues that Plaintiffs have again failed to allege valid NVRA claims. (Doc. 176-1 at 30.) She contends that the *FAC* contains "no new or different allegations concerning the reinstatement process itself but simply attempt to re-package [Plaintiffs'] allegations to this Court." (*Id.*)

### i. Count One

Defendant says Count One is based on the erroneous premise that the right to vote is automatically restored once a person is no longer under an order of imprisonment, and thus that person should not be required to present paperwork. (*Id.* at 31.) She argues that Plaintiffs continue to characterize the paperwork requirement as a voter registration requirement, not a voter restoration requirement. (*Id.*) Defendant says that this Court was correct in ruling that "those subject to § 18:177(A)(1) have suspended rather than cancelled registrations." (*Id.* (citing Doc. 155 at 69.) The Court determined that the registration and reinstatement processes were different and therefore found that § 18:177(A)(1) does not conflict with the NVRA. (*Id.* at 31–32.)

### ii. Count Two

Defendant reiterates the argument in Count One, saying that because this Court found that § 18:177(A)(1) does not conflict with the NVRA, Plaintiffs have failed to state a claim. (*Id.* at 32.)

### iii. Counts Three and Four

In response to Counts Three and Four, Defendant contends that she has "no control" over parish registrars. (*Id.* at 33.) She says that her duty to coordinate State responsibilities under the NVRA does not include ensuring that parish registrars comply with the NVRA. (*Id.*) "The Secretary of State's duties with respect to registrars and voter registration are to 'direct and assist' the registrars." (*Id.*)

Defendant asserts that she is not the parish registrars' employer and therefore "cannot be held responsible for their actions or inactions." (*Id.*) She explains that she has no authority over the appointment of registrars, cannot control the registrars' actions, and does not grant registrars their power. (*Id.*) Therefore, Defendant argues that she has not violated the NVRA based on parish registrars' actions. (*Id.* at 33–34.)

####    iv.    *Count Five*

Finally, Defendant again disputes Plaintiffs' claims that if "reinstatement is considered an eligibility criterion," not including the paperwork requirement on the voter registration form as an eligibility requirement violates the NVRA. (*Id.* at 34.) She argues that this Court's ruling that "the NVRA does not control Louisiana's reinstatement process" makes these claims meritless. (*Id.*)

####    b.    *Opposition* (Doc. 180)

Plaintiffs argue that Defendant misunderstands their NVRA claims. (Doc. 180 at 33.) They contend that Defendant's statements that there are no new allegations in the *FAC* conflict with her arguments on the *MTS*. (*Id.*) Plaintiffs say,

> Defendant has argued throughout the litigation that reinstatement cannot violate the NVRA because it is distinct from voter registration. [(Doc. 176-1 at 31.)] ("The reinstatement process is not the same as registration or re-registration; therefore, La. R.S. 18:177(A)(1) does not conflict with the NVRA."). Defendant also claims that her surface-level distinction is what led the Court to find that NVRA does not preempt reinstatement. [(*Id.* at 30–32.)] Neither is true.

(*Id.* at 33–34.)

Plaintiffs recognize that this Court held the paperwork requirement was within the scope of Louisiana's "power to determine the voting eligibility of those with felony convictions." (*Id.* at 34.) However, they say that the Court's ruling was not "that Defendant may create arbitrary distinctions between re-registration and 'reinstatement' to elide the requirements of the NVRA." (*Id.*) Plaintiffs argue that a state's power to limit the right of a person convicted of a felony to vote is controlled by the state constitution. (*Id.*) "Once the right to vote is restored, the state's differential treatment must end, and individuals may become lawfully registered like anyone else." (*Id.* (citing *Bush v. Gore*, 531 U.S. 98, 104–05 (2000)).) The Court ruled that the right to vote is not restored until the person complies with the paperwork requirement. (*Id.*)

Plaintiffs claim that although Defendant characterizes this process as reinstatement, it is fundamentally re-registration. (*Id.* at 34–35.) "Registration, under the NVRA, refers to the 'procedural method which an otherwise qualified voter must follow to exercise his or her right to vote.'" (*Id.* at 35 (quoting *Ga. State Conf. NAACP v. Georgia*, No. 17-1387, 2017 WL 9435558, at *3 (N.D. Ga. May 4, 2017)).) Plaintiffs argue that "[w]hatever action the state requires to become actively registered, such that a vote can actually be cast, *is registration*." (*Id.*) They argue that since a person covered by § 18:177(A)(1) is not qualified to vote and could not go to a voting location and cast a vote, then they are essentially unregistered under the NVRA. (*Id.* (citing *Am. C.R. Union v. Philadelphia City Comm'rs*, 872 F.3d 175, 183 (3d Cir. 2017) ("acknowledging that states are permitted to remove individuals with felony convictions from the rolls under the NVRA, even if those registrations are suspended by reason of felony conviction")).) Therefore, Plaintiffs say, the NVRA still applies to § 18:177(A)(1). (*Id.*)

### i.    *Counts One and Two*

Plaintiffs argue that Louisiana law and its constitution do not allow the disenfranchisement of those no longer under an order of imprisonment. (*Id.* at 36.) They insist that the paperwork requirement "cannot be a prerequisite to restoration [of voting rights] for people who cannot constitutionally be denied the right to vote." (*Id.*) Plaintiffs claim that this violates the NVRA as applied to individuals no longer under order of imprisonment, because § 18:177(A)(1) places an additional barrier to registration. (*Id.*) "In short, absent information establishing that an applicant who attests to their eligibility is actually ineligible, the registrant—including individuals no longer under an order of imprisonment—must be placed on the active voter rolls and cannot be required to provide additional documentary proof of eligibility." (*Id.* at 37.) Plaintiffs argue that any

information needed to determine whether a voter should be active is "readily available"; therefore, the paperwork requirement adds a barrier to registration. (*Id.* at 37–38.)

### ii.    *Counts Three and Four*

Plaintiffs assert that the paperwork requirement is confusing and has been misapplied by parish registrars. (*Id.* at 38.) Act 127 made it clear that new registrants need not comply with the paperwork requirement. (*Id.*) Because the paperwork requirement is still being applied to new registrants, Plaintiffs argue that Defendant has violated the NVRA. (*Id.*) Further, due to Defendant's confusing guidance, parish registrars across the state are not uniformly applying the paperwork requirement. (*Id.*) This likewise violates the NVRA. (*Id.*)

Plaintiffs say that Defendant is ultimately "responsible for ensuring the uniform application of the policies she promulgates." (*Id.* at 39 (citing 52 U.S.C. § 20509).) They argue that Defendant is responsible for the discriminatory actions taken by parish registrars when improperly implementing the paperwork requirement. (*Id.*)

### iii.    *Count Five*

Plaintiffs claim that Count Five is an alternative argument "that if reinstatement *is* an eligibility criterion, then Defendant has failed to properly specify as such on the state and federal voter registration forms." (*Id.* at 39–40.) The NVRA requires that voter eligibility requirements be specified on registration forms. (*Id.* at 40.) Even if Louisiana has the right to determine eligibility, it must make that requirement known to those registering to vote. (*Id.* (citing *Tenn. Conf. of NAACP*, 2024 WL 1685554, at *22).)

### c.    *Reply* (Doc. 181)

Defendant again argues that the *FAC* did not cure the deficiencies from the original *Complaint*. (Doc. 181 at 9.) She says, "Plaintiffs ignore this Court's ruling that 'the right to vote

of those subject to La. R.S. § 18:177(A)(1) is restored upon completion of the statute's paperwork requirement." (*Id.* (citing Doc. 155 at 69).) Finally, Defendant asserts that the parish registrars are responsible for the registration of voters. (*Id.* at 9–10.)

### 2. *Applicable Law*

As the United States Supreme Court explained in *Lassiter v. Northampton County Board of Elections*:

> The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, absent of course the discrimination which the Constitution condemns. Article I, s 2 of the Constitution in its provision for the election of members of the House of Representatives and the Seventeenth Amendment in its provision for the election of Senators provide that officials will be chosen "by the People." Each provision goes on to state that "the [e]lectors in each State shall [have] the [q]ualifications requisite for [e]lectors of the most numerous [b]ranch of the State [l]egislature[s]." So while the right of suffrage is established and guaranteed by the Constitution[,] it is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress acting pursuant to its constitutional powers, has imposed. While s 2 of the Fourteenth Amendment, which provides for apportionment of Representatives among the States according to their respective numbers counting the whole number of persons in each State (except Indians not taxed), speaks of "the right to vote," the right protected "refers to the right to vote as established by the laws and constitution of the state."
>
> We do not suggest that any standards which a State desires to adopt may be required of voters. But there is wide scope for exercise of its jurisdiction. Residence requirements, age, previous criminal record are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters.

360 U.S. 45, 50–51 (1959) (internal citations omitted).

To this end, the Court has long recognized that under Section Two of the Fourteenth Amendment, states can disenfranchise those with felony convictions. *See Richardson v. Ramirez*, 418 U.S. 24, 53–54 (1974); *see also Hunter v. Underwood*, 471 U.S. 222, 233 (1985). As the Court explained in *Richardson v. Ramirez*, felony disenfranchisement is not only evident in the text of Section Two itself but also through the intent of the framers. *Richardson*, 418 U.S. at 48, 54.

> Further light is shed on the understanding of those who framed and ratified the Fourteenth Amendment, and thus on the meaning of s 2, by the fact that at the time of the adoption of the Amendment, 29 States had provisions in their constitutions which prohibited, or authorized the legislature to prohibit, exercise of the franchise by persons convicted of felonies or infamous crimes.

*Id.* at 48 (footnote omitted).

### c.  Felony Disenfranchisement in Louisiana

#### i.  *Louisiana's Present Statutory Scheme*

The Louisiana Constitution provides that "[e]very person who is both a citizen of the state and of the United States, upon reaching eighteen years of age, shall have the right to register and vote, except that this right may be suspended for a person . . . who is under an order of imprisonment for conviction of a felony." La. Const. art. I, § 10(A). Thus, the Louisiana Constitution gives the Legislature the discretionary power to temporarily disenfranchise individuals who are "under an order of imprisonment for a conviction of a felony." *Id.* The Louisiana Legislature has exercised this discretionary power through La. R.S. § 18:102(A), which states in pertinent part:

§102. Ineligible persons

 A. No person shall be permitted to register or vote who is:

(1)(a) Under an order of imprisonment, as defined in R.S. 18:2, for conviction of a felony, except as provided in Subparagraph (b) of this Paragraph.

(b) Except as provided in Subparagraph (c) of this Paragraph, a person who is under an order of imprisonment for conviction of a felony and who has not been incarcerated pursuant to the order within the last five years shall not be ineligible to register or vote based on the order.

(c) Notwithstanding any other provision of law, no person shall be permitted to register or vote pursuant to this Section if he is convicted of a felony offense of election fraud or any other election offense pursuant to R.S. 18:1461.2 and he is under an order of imprisonment.

"Under an order of imprisonment" is defined as "a sentence of confinement, whether or not suspended, whether or not the subject of the order has been placed on probation, with or without supervision, and whether or not the subject of the order has been paroled." La. R.S. § 18:2(18).

Under La. R.S § 18:191, "[t]he registration of any person as provided in [Louisiana's Election Code] shall remain in effect for so long as the registration is not canceled for a cause and in the manner set forth in [the Election Code]." Section 18:176 discusses suspension and cancellation of registrations. Within this statute, the Louisiana Legislature distinguishes between registrations which are suspended and those which are cancelled. *Compare id.* § 18:176(A)(3)(b) (suspension of registration for felony convictions), *with id.* § 18:176(C) (cancelation of registration because of death). Section 18:176 suspends—but does not cancel—the registrations of those voters who are deemed ineligible to vote under § 18:102(A)(1) and who fail to appear in person and show cause within twenty-one days after mailing of notice. *Id.* § 18:176(A)(1)–(2).

§176. Suspension and cancellation of registration and challenge of unlawful registration on the basis of reports

A.(1) The registrar shall send a notice to each person listed on a report received pursuant to R.S. 18:171 or 171.1 and to any person the registrar has reason to believe is ineligible to register or vote pursuant to R.S. 18:102(A)(1). The notice shall be mailed first class, postage prepaid, to the address on file at the registrar's office.

(2) The notice shall state that the registrar has information that the registrant is under an order of imprisonment for conviction of a felony and that the conviction is for an election offense or the registrant has been incarcerated pursuant to the order within the last five years. The notice shall inform the person that he must appear in person at the office of the registrar of voters within twenty-one days after the date on which the notice was mailed to show cause why his registration should not be suspended.

(3)(a) If the registrant appears and shows cause within the twenty-one days, the registrar shall not suspend the registration.

(b) If the registrant fails to appear within the required twenty-one days, the registrar shall suspend the registration in the state voter registration

computer system and, if necessary, by drawing in red ink a line through the registrant's name on the precinct register and the duplicate precinct register. Such line shall be initialed by the registrar or employee of the registrar. The registrar shall note in the registrant's information on the state voter registration computer system and, if the original application is available in hard copy in the registrar's office, on the original application for registration that the registrar has been notified of an order of imprisonment for conviction of a felony which makes the registrant ineligible to register or vote pursuant to R.S. 18:102(A)(1), and he shall note also the date of the suspension and the date of the report, when applicable. If the original application is available in hard copy in the registrar's office, the registrar shall remove the original application from his file of eligible voters and shall place it in his suspension file. In addition, each person whose registration is suspended under this Subsection shall immediately be notified of the suspension and the reason therefor.

(4) A list of names and addresses of the notices sent under this Subsection and whether or not each registrant responded to such notice shall be maintained for a period of two years and shall be open to inspection and copying as provided in R.S. 18:154.

*Id.* § 18:176(A).

Once one's registration is suspended per § 18:176(A), to reinstate that registration, one must follow the protocol provided for in § 18:177(A)(1):

§177. Reinstatement of registration after suspension

A.(1) The registration of a person whose registration has been suspended by the registrar of voters pursuant to R.S. 18:176(A) shall be reinstated when the person appears in the office of the registrar and provides documentation from the appropriate correction official showing that such person is no longer under an order of imprisonment or, if the person is under such an order, that the person has not been incarcerated pursuant to the order within the last five years and the person is not under an order of imprisonment related to a felony conviction pursuant to election fraud or any other election offense pursuant to R.S. 18:1461.2.

### ii.    *Relevant Legislative History*

Section 18:102 was enacted in Act 697 of the 1976 legislative session and became effective January 1, 1978. *See* 1976 La. Acts 697. Section 18:177 was enacted in Act 1420 of the 1997 legislative session and became effective January 1, 1998. *See* 1997 La. Acts 1420. Both statutes

have been amended numerous times since their enactments. The following amendments are important to understanding Louisiana's current felon disenfranchisement statutory scheme.

In Act 636 of the 2018 legislative session, effective March 1, 2019, the Louisiana Legislature amended §§ 18:102 and 18:177 in the following ways:

§102. Ineligible persons

A. No person shall be permitted to register or vote who is:

(1)(a)  Under an order of imprisonment, as defined in R.S. 18:2(8), for conviction of a felony~~, or~~, except as provided in Subparagraph (b) of this Paragraph.

(b) Except as provided in Subparagraph (c) of this Paragraph, a person who is under an order of imprisonment for conviction of a felony and who has not been incarcerated pursuant to the order within the last five years shall not be ineligible to register or vote based on the order if the person submits documentation to the registrar of voters from the appropriate correction official showing that the person has not been incarcerated pursuant to the order within the last five years.

(c)  Notwithstanding any other provision of law, no person shall be permitted to register or vote pursuant to this Section if he is convicted of a felony offense of election fraud or any other election offense pursuant to R.S. 18:1461.2 and he is under an order of imprisonment.

§177.  Reinstatement of registration after suspension

A.(1)  The registration of a person whose registration has been suspended by the registrar of voters pursuant to R.S. ~~18:176 for conviction of a felony~~ 18:176(A) shall be reinstated when the person appears in the office of the registrar and provides documentation from the appropriate correction official showing that such person is no longer under an order of imprisonment or, if the person is under such an order, that the person has not been incarcerated pursuant to the order within the last five years and the person is not under an order of imprisonment related to a felony conviction pursuant to election fraud or any other election offense pursuant to R.S. 18:1461.2.

2018 La. Acts 636. Moreover, in Section 2 of Act 636, the Legislature stated the following:

Prior to the effective date of this Act, the secretary of state shall work with the Department of Public Safety and Corrections to develop a form or forms to allow a person who is or was under an order of imprisonment for conviction of a felony to meet the requirements of R.S. 18:102(A)(1) and 177(A) as amended by this Act.

*Id.*

In Act 127 of the 2021 legislative session, effective February 1, 2022, the Louisiana Legislature once again amended § 18:102, but not § 18:177. *See* 2021 La. Acts 127. In doing so, the Legislature struck § 18:102's requirement to submit paperwork:

§102.  Ineligible persons

A.  No person shall be permitted to register or vote who is:

(1)

$$*\qquad*\qquad*$$

(b)  Except as provided in Subparagraph (c) of this Paragraph, a person who is under an order of imprisonment for conviction of a felony and who has not been incarcerated pursuant to the order within the last five years shall not be ineligible to register or vote based on the order ~~if the person submits documentation to the registrar of voters from the appropriate correction official showing that the person has not been incarcerated pursuant to the order within the last five years~~.

*Id.*

Section 18:177 has not been amended since 2018 La. Acts 636. There have been no relevant amendments to § 18:102 since 2021 La. Acts 127.

### d.  The Election Clause and Preemption

"Under the Constitution's Election Clause, Congress may enact laws that preempt state election laws concerning federal elections." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 399 (5th Cir. 2013) (citing *Foster v. Love*, 522 U.S. 67, 69 (1997)). "When it does, the federal legislation renders any conflicting state laws inoperative." *Id.* (citing *Ex parte Siebold*, 100 U.S. 371, 384 (1879)). "'To this end, state election laws cannot "directly conflict" with federal election laws on the subject.'" *Id.* (quoting *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 896 (5th Cir. 2012) (citing *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000))); *see also Voting Integrity Project, Inc.*, 199 F.3d at 775 ("Thus, a state's discretion and flexibility in establishing

68

the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject.").

The United States District Court for the Southern District of Mississippi described this preemption standard when presented with the issue of whether the NVRA preempted Mississippi law:

> The Elections Clause of the U.S. Constitution provides that "the Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing [sic] Senators." U.S. Const. art. I, § 4, cl. 1. Congress has the power under the Elections Clause to enact laws that "preempt state election laws concerning federal elections." *Voting for Am.*, 732 F.3d at 399 (citing [*Foster*, 522 U.S. at 69]). State laws are "inoperative" if they "directly conflict with federal election laws on the subject." *Id.*; *see also Ex parte Siebold*, 100 U.S. [at 384] ("[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative. No clashing can possibly arise."). Because Congress's power to enact the NVRA derives from the Elections Clause, *see Voting for Am.*, 732 F.3d at 399, preemption analysis in this case is governed by that clause, not the Constitution's Supremacy Clause, *see* [*ITCA*, 570 U.S. at 8–16].
>
> There is no "presumption against preemption" in Elections Clause cases. *See id.* at [13]. Rather, "[w]hen Congress legislates with respect to the 'Times, Places and Manner' of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States." *Id.* at [14] (emphasis in original). The Supreme Court thus has noted that in construing whether State law conflicts with Federal legislation regarding elections, "the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id.*
>
> The Court also notes that legislation concerning the conduct of elections must be examined in light of the particular federal-state balance achieved in that arena. The Founders of the United States delegated substantial authority over Federal elections to the States. Congress has the authority to restrict, but has been cautious to circumscribe, the States' powers over the conduct of elections. *See, e.g.*, *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 [] (1986) (upholding, against a First Amendment challenge, defendant's rule permitting independent voters to vote in party primaries, but noting that "the Constitution grants to the States a broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives'"). A State's authority over its elections is particularly potent with regard to procedural regulations and rules to oversee and ensure the integrity

of elections, even to Federal office. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 [] (1995). Under the Elections Clause, "[t]he power of Congress over . . . congressional elections is paramount, and may be exercised at any time, and to any extent which it deems expedient[.]" [*ITCA*, 570 U.S. at 8–16]. That Congress *may* enact laws preempting conflicting State laws does not mean, however, that it necessarily intends to do so in the regular course or that its legislation in the field of elections should be read more broadly than Congress intended. *See Ex parte Siebold*, 100 U.S. [at 392].

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 729–731 (S.D. Miss. 2014) (footnotes omitted);

*see also id.* at 732 (footnote omitted) ("Resolution of the issue whether the NVRA preempts

Mississippi law in this case boils down to whether the NVRA mandates disclosure of unredacted

documents, thereby overriding voter registrants' privacy interests. If so, the NVRA would directly

conflict with Mississippi's Redaction Provisions, which preclude such disclosures, and the NVRA

would preempt Mississippi law. If the NVRA does not mandate universal disclosure, then the two

laws do not conflict, there is no preemption, and the Mississippi law requiring redaction of

birthdates controls.").

    The United States District Court for the Eastern District of Texas has utilized a similar

Election Clause preemption standard:

> The Elections Clause itself is a "default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." [*Foster*, 522 U.S. at 69] (citation omitted). The substantive scope of the Elections Clause is vast—the Supreme Court has found the "time, place, and manner" of federal elections to be "comprehensive words" that "provide a complete code for congressional elections" in order "to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 [] (1932). When there is no federal law that directly conflicts with state law regulating the time, place, and manner of federal elections, then state law controls by default. [*Voting for Am.*, 732 F.3d at 399]. If a federal law enacted under Congress's Elections Clause power directly conflicts with state law regulating the same, then the federal law controls and the analysis concludes. *Id.*; *see* [*ITCA*, 570 U.S. at 15] ("[T]here is no compelling reason not to read Elections Clause legislation simply to mean what it says.").

*Tex. Voters All. v. Dall. Cnty.*, 495 F. Supp. 3d 441, 467–68 (E.D. Tex. 2020).

e.  Relevant NVRA Provisions

The NVRA provides that "[e]ach State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission pursuant to section 20508(a)(2) of [the Act] for the registration of voters in elections for Federal office." 52 U.S.C. § 20505(a)(1). Under 52 U.S.C. § 20508(a)(2), "the Election Assistance Commission . . . in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office." Further, under 52 U.S.C. § 20507:

**(a) In general:**

In the administration of voter registration for elections for Federal office, each State shall—

(1) ensure that any eligible applicant is registered to vote in an election—

(A) in the case of registration with a motor vehicle application under section 20504 of this title, if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(B) in the case of registration by mail under section 20505 of this title, if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(C) in the case of registration at a voter registration agency, if the valid voter registration form of the applicant is accepted at the voter registration agency not later than the lesser of 30 days, or the period provided by State law, before the date of the election; and

(D) in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

\*       \*       \*

(5) inform applicants under sections 20504, 20505, and 20506 of this title of—
(A) voter eligibility requirements; and

(B) penalties provided by law for submission of a false voter registration

71

application;

\*        \*        \*

**(b) Confirmation of voter registration**

Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office—

> (1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.) [redesignated as 52 U.S.C. § 10301 et seq.][.]

Finally, under 52 U.S.C. § 20508:

**(b) Contents of mail voter registration form**

The mail voter registration form developed under subsection (a)(2)—

> (1) may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process

> (2) shall include a statement that—

> (A) specifies each eligibility requirement (including citizenship);

\*        \*        \*

> (3) may not include any requirement for notarization or other formal authentication[.]

### 3. *Analysis*

#### a. <u>Does the NVRA preempt La. R.S. § 18:177(A)(1)?</u>

This Court previously held that the NVRA did not preempt § 18:177(A)(1)'s paperwork requirement. (Doc. 155 at 68–70.) The parties have identified no intervening change in the law to undermine this ruling. Therefore, the Court reaches the same conclusion here:

> As the Supreme Court has made clear, Louisiana has the authority to set eligibility requirements for those with felony convictions. *See Richardson*, 418 U.S. at 54. Thus, the Court's analysis hinges on the following question: when are

disenfranchised felons, who were registered to vote prior to disenfranchisement, once again eligible to vote under Louisiana's felony disenfranchisement statutory scheme?

The parties dispute whether the right to vote for those subject to La. R.S. § 18:177(A)(1) is restored automatically or upon completion of the statute's paperwork requirement. However, an analysis of Louisiana's Election Code shows that the right to vote of those subject to La. R.S. § 18:177(A)(1) is restored upon completion of the statute's paperwork requirement.

Again, "[t]he registration of any person as provided in [Louisiana's Election Code] *shall remain in effect for so long as the registration is not canceled* for a cause and in the manner set forth in [the Election Code]" (La. R.S. § 18:191 (emphasis added)), and those subject to La. R.S. § 18:177(A)(1) have suspended rather than cancelled registrations (*id.* § 18:176(A)(3)(b)). Thus, such registrations are still "in effect," just in an inactive state, and since never cancelled, re-registering would create duplicate registrations. Therefore, Louisiana has developed a reinstatement process by which suspended registrations can become active, allowing those with reinstated registrations the eligibility to vote.

Given this, the Court finds that the Legislature has made a clear distinction between registration and reinstatement, and those subject to La. R.S. § 18:177(A)(1) are not eligible to vote until completing the statute's paperwork requirement. The Court recognizes that eligibility to vote is generally discussed in La. R.S. § 18:102(A)(1). However, as the Louisiana Supreme Court has stated:

> Where two statutes deal with the same subject matter, they should be harmonized if possible, as it is the duty of the courts, in the construction of statutes, to harmonize and reconcile laws. *LeBreton v. Rabito*, 97–2221 [] (La. 7/8/98)[;] 714 So. 2d 1226, 1229; *Chappuis v. Reggie*, [] 62 So. 2d 92, 95 (1952); La. Civ. Code art. 13. However, if there is a conflict, the statute specifically directed to the matter at issue must prevail as an exception to the statute more general in character. *LeBreton*, [] 714 So. 2d at 1229; *Kennedy v. Kennedy*, 96–0732 [] (La. 9/9/97)[;] 699 So. 2d 351, 358 (on rehearing).

*McGlothlin v. Christus St. Patrick Hosp.*, 2010-2775 (La. 7/1/11); 65 So. 3d 1218, 1228. *See also* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 183 (2012) ( "If there is a conflict between a general provision and a specific provision, the specific provision prevails."). Therefore, as the more specific provision on the subject matter, La. R.S. § 18:177(A)(1)'s paperwork requirement prevails when determining the voting eligibility of those who were registered to vote prior to disenfranchisement. [The Court also notes that in the 2023 legislative session, the Legislature had the opportunity to amend La. R.S. § 18:177(A) so that the burden of submitting

paperwork was taken off the individual but chose not to do so. *See* H.B. 396, Reg. Sess. (La. 2023) (unenacted).]

(Doc. 155 at 68–70.)

The Court found that, when taking Plaintiffs' allegations as true for purposes of Defendant's 12(b)(6) motion to dismiss, Plaintiffs had not stated a valid claim under the NVRA. (*Id.* at 70.) It held that § 18:177(A)(1)'s paperwork requirement was not in direct conflict with the NVRA, and thus was not preempted. (*Id.*) "Instead, La. R.S. § 18:177(A)(1) is an illustration of Louisiana acting pursuant [to] its long-recognized power to determine the voting eligibility of those with felony convictions, a power that is also acknowledged within the NVRA itself." (*Id.* (citing 52 U.S.C. § 20507(a)(3)(B) ("In the administration of voter registration for elections for Federal office, each State shall . . . provide that the name of a registrant may not be removed from the official list of eligible voters except . . . as provided by State law, by reason of criminal conviction . . . .")).) The Court therefore dismissed Plaintiffs NVRA claims. (*Id.*)

b.  Counts One and Two

Counts One and Two of the *FAC* hinge on the argument that registration and reinstatement are essentially the same. (*See* Doc. 168 at ¶¶ 112–16, 138–40.) Specifically, these counts allege that, because registration and reinstatement are the same, the paperwork requirement is in direct conflict with the NVRA, and thus the NVRA preempts § 18:177(A)(1). (Doc. 168 at ¶¶ 117–30); *see also Tex. Voters All.*, 495 F. Supp. 3d at 467–68 (discussing Elections Clause preemption and holding that, where there is a direct conflict, "federal law controls").

But these allegations are essentially the same as those made in the original complaint. (*See* Doc. 1 at ¶¶ 94–101.) As explained above, this Court has already held that there is "a clear distinction between registration and reinstatement." (Doc. 155 at 69.) The *FAC* contains nothing which undermines or otherwise alters this holding. Consequently, Plaintiffs cannot show a direct

74

conflict between the NVRA and § 18:177(A)(1)'s paperwork requirement. *See Tex. Voters All.*, 495 F. Supp. 3d at 467–68. Counts One and Two of the *FAC* must be dismissed.

c. Counts Three and Four

Counts Three and Four concern the application of the paperwork requirement by parish registrars. Count Three alleges that some registrars are requiring new registrants to comply with the paperwork requirement, violating Section 6 of the NVRA. (Doc. 168 at ¶¶ 143–46.) Count Four alleges that registrars are not uniformly applying the paperwork requirement, violating Section 8 of the NVRA. (*Id.* at ¶¶ 153–156.)

Defendant first argues that, because § 18:177(A)(1) is not preempted by the NVRA, there can be no NVRA violation. (Doc. 176-1 at 33.) But this misconstrues Plaintiffs' argument. If parish registrars are applying the paperwork requirement to new registrants, they are requiring additional paperwork for *registration*, not reinstatement. As discussed above, states are required to accept and use the federal form, which does not include paperwork establishing that the applicant is no longer under an order of imprisonment. 52 U.S.C. §§ 20505(a)(1); 20508(b); *see also ITCA*, 570 U.S. at 11–13. The application of the paperwork requirement to new registrants directly conflicts with the "accept and use" provision. *See* 52 U.S.C. § 20505(a)(1) ("Each State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission . . . ."); *ITCA*, 570 U.S. at 15 (explaining that the NVRA's "accept and use" provision "forbids States to demand that an applicant submit additional information beyond that required by the Federal Form"). Therefore, if registrars are requiring some new registrants to produce paperwork showing their eligibility, the NVRA is violated.

Additionally, Section 8 of the NVRA dictates that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current

voter registration roll for elections for Federal Office . . . shall be uniform [and] nondiscriminatory." 52 U.S.C. § 20507(b)(1). In Count Four, Plaintiffs allege that Defendant "is tasked with coordinating and enforcing state and federal election laws in Louisiana, including the [NVRA]." (Doc. 168 at ¶ 157.) Plaintiffs further allege that Defendant has enabled the inappropriate application of the paperwork requirement to some (but not all) new registrants, both by creating confusing policies and by refusing to enforce Section 8 of the NVRA (e.g., by dispelling confusion). (*Id.* at ¶¶ 143, 148–49, 155–56, 158.) If this is so, then Defendant has effectively violated Section 8 of the NVRA—namely, by tolerating, if not facilitating, disuniformity.

Defendant's central argument is that she is not responsible for "ensuring compliance with the NVRA by the parish registrars." (Doc. 176-1 at 33.) However, the Fifth Circuit has rejected this argument. In *Scott*, the Fifth Circuit said:

> The NVRA centralizes responsibility in the state and in the chief elections officer, who is the state's stand-in. For example, each state *must* designate a chief elections officer, who will receive complaints about all violations of the NVRA. *See* NVRA §§ 10, 11. Additionally, the NVRA speaks in terms of the responsibilities of "each state." *See, e.g., id.* at §§ 7(a)(1), 4(a). This choice of words reflects a policy choice that responsibility should be centralized rather than fragmented. *Cf. Harkless*, 545 F.3d at 452 ("[T]he entire Act ... speaks in terms of state responsibilities; what is noticeably missing is any mention of county, municipal, or other local authorities.").

*Scott*, 771 F.3d at 839.

In *Scott*, the plaintiff alleged that he was not provided with a voter registration form when he applied for food stamps at an office of the Department of Children and Family Services (DCFS), in violation of Section 7 of the NVRA. *Id.* at 833. He therefore sued Louisiana's then-Secretary of State, Tom Schedler. *Id.* at 834. On appeal, Schedler argued that, as Secretary of State, he "lack[ed] enforcement powers." *Id.* at 835. The Fifth Circuit disagreed. *Id.* at 839. Specifically, it held that

the NVRA centralizes "compliance responsibility" in the Secretary of State and that enforcement of the NVRA by the Secretary of State "must be ongoing." *Id.* The court also observed that Schedler's argument enabled "buck passing," insofar as it allowed suit against DCFS but not the Secretary of State. *Id.*

Notably, *Scott* repeatedly cites *United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008) with approval. *See Scott*, 771 F.3d at 839. In that case, the Eighth Circuit addressed whether a Secretary of State is responsible for failure to enforce the NVRA (*viz.*, 52 U.S.C. § 20507(a)(4)) if she has delegated enforcement to local election agencies. *Missouri*, 535 F.3d at 848–49. Ultimately, the court held that a state "may not delegate the responsibility to conduct a general program [of removal of ineligible voters from official lists] to a local official and thereby avoid responsibility if such a program is not reasonably conducted." *Id.* at 850.

The same logic applies here as applies in *Scott* and *Missouri*. Rather than force Plaintiffs to sue each parish registrar, the NVRA has centralized responsibility in one person: the state's chief election official. As Louisiana's Secretary of State—i.e., as Louisiana's chief election official—Defendant bears responsibility for ensuring that the NVRA is enforced. La. R.S. § 18:18(A)(1)–(6). If parish registrars are misapplying the paperwork requirement to new registrants, then they are violating the "accept and use" provision of the NVRA. *See ITCA*, 570 U.S. at 11–13. Relatedly, if parish registrars are not uniformly processing new registrants (e.g., by misapplying the paperwork requirement), then they are violating the NVRA. *See* 52 U.S.C. § 20507(b)(1). Defendant cannot delegate enforcement of the NVRA to the parish registrars and then deny responsibility when those same registrars fail to enforce the NVRA properly or otherwise run afoul of the federal statute. *See Missouri*, 535 F.3d at 850. Counts Three and Four will not be dismissed.

d.  Count Five

Count Five posits that, if reinstatement is deemed an "eligibility criterion for restoration of voting rights," then "Defendant's state registration form and [her] instructions for the federal [registration] form violate the NVRA," *viz.*, Sections 6, 8, and 9. (Doc. 168 at ¶¶ 161–64.) But this claim—much like the claims in Counts One and Two—relies on "reinstatement" being synonymous with "registration." For reasons discussed above, it is not. Count Five will therefore be dismissed.

## G.  12(b)(6): Equal Protection

### 1.  *Parties' Arguments*

#### a.  <u>MTD</u> (Doc. 176)

Defendant adopts her arguments as to Plaintiffs' equal protection claim from the original *Motion to Dismiss*. (Doc. 176-1 at 34–35.) In further support, she contends that Plaintiffs have not established prudential standing to bring third parties' equal protection claims. (*Id.* at 35.) She says that, in the *FAC*, Plaintiffs added "new claims on behalf of 'individuals whose previous registration is suspended and are currently in jail for a misdemeanor or pre-trial, [who] cannot meet the State's requirements for reinstatement.'" (*Id.* (quoting Doc. 168 at ¶ 178).) VOTE is the plaintiff that claims to work with incarcerated voters, and Defendant again argues that VOTE has not named any of its injured members. (*Id.*)

On the merits, Defendant asserts that the Court was correct in applying the *Anderson/Burdick* framework to the equal protection claim. (*Id.* at 35–36 (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992)).) She says that the Court should consider the burden placed on all voters, not a select sub-group. (*Id.* at 36.)

Defendant argues that the *FAC*'s new allegation regarding § 18:177's in-person requirement does not pass the *Anderson/Burdick* framework. (*Id.*) She contends that the group of individuals adversely affected by the in-person requirement—those who are detained pre-trial or serving time for a misdemeanor—is small. The burden "does not meet the severity threshold because it is limited to only . . . a small number of affected persons." (*Id.*) Defendant asserts that there is a sufficient interest in "preventing voter fraud and ensuring election integrity," which the in-person requirement furthers. (*Id.*)

Finally, Defendant says that the lack of uniform application of the paperwork requirement across parishes does not rise to an equal protection violation. (*Id.* at 37.) She argues that "[e]ven arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause." (*Id.* (quoting *Lindquist v. City of Pasadena*, 656 F. Supp. 2d 662, 703–04 (S.D. Tex. 2009), *aff'd,* 669 F.3d 225 (5th Cir. 2012)).) Defendant asserts that confusion amongst the registrars does not rise to the level of intentional discrimination. (*Id.*) Therefore, Plaintiffs have "failed to assert an equal protection claim against Defendant because the felony reinstatement procedure does not pose a severe burden on the right to vote but rather, is reasonable, nondiscriminatory, and justified by the state's interests." (*Id.*)

### b. *Opposition* (Doc. 180)

Plaintiffs argue that § 18:177(A)(1) "creates an impermissible classification between previously registered and newly registered voters, in violation of the Equal Protection Clause." (Doc. 180 at 40–41.) The new allegations regarding the in-person requirement and parish registrars are additional examples of how this classification harms voters with felony convictions and burdens their right to vote. (*Id.* at 41.)

79

Plaintiffs claim that they have third-party standing, because at least one of them has established an Article III injury, because at least one shows a close relationship to voters affected by the paperwork requirement, and because individuals would be deterred from bringing this suit on their own behalf. (*Id.* at 41–42.) Plaintiffs refer to their earlier arguments regarding Article III standing, saying that the impairment of their organizational missions is an Article III injury. (*Id.* at 42.) They also have close relationships to affected voters, as "each organization directly assists voters with prior felony convictions in determining whether they are eligible to vote and taking steps to register to vote if eligible." (*Id.*) Plaintiffs argue that "an individual with a prior felony conviction is significantly hindered in furthering their rights through public litigation." (*Id.*)

On the merits, Plaintiffs say that their claim centers on the difference in treatment between "prior-registered voters with past convictions seeking to become active registered voters [and] new registrants with past convictions." (*Id.* at 43 (internal quotation marks omitted).) The arbitrary treatment extends to the misapplication of the requirement by parish registrars. (*Id.*) Further, because the paperwork requirement must be completed in person, those eligible to vote but who are currently in jail (e.g., for misdemeanors) cannot comply. (*Id.*)

Plaintiffs argue that "states must ensure 'the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right' to vote." (*Id.* at 43–44 (quoting *Bush*, 531 U.S. at 105).) They allege that Defendant's "confusing policy" leads some parish registrars to misapply the paperwork requirement to new registrants. (*Id.* at 43.) Plaintiffs therefore claim that heightened scrutiny should apply, because individual registrants are treated differently "based on the parish of registration." (*Id.* at 44.)

If the *Anderson/Burdick* framework is properly applied, Plaintiffs say that the paperwork requirement will still be subject to heightened scrutiny. (*Id.*) Here, the burden on the right to vote

is severe and thus the regulation must be narrowly tailored to a compelling state interest. (*Id.* (quoting *Burdick*, 504 U.S. at 434).) Plaintiffs argue that the paperwork requirement is not narrowly tailored "because the information necessary to evaluate an individual's status is already available to Defendant." (*Id.* at 45.) They say that Defendant has failed to identify any government interest in requiring voters to produce information to which she already has access. (*Id.*)

Plaintiffs contend that Defendant has offered no authority in support of her argument that there must be intentional discrimination to give rise to an equal protection claim. (*Id.*) They argue that "a showing of 'purposeful discrimination' is not required to state a claim of burden on the right to vote under the Equal Protection Clause." (*Id.* (citing *Burdick*, 504 U.S. at 434).) In *Burdick*, the Supreme Court "subject[ed] even 'reasonable, nondiscriminatory' burdens on the right to vote to some level of scrutiny." (*Id.* (citing *Burdick*, 504 U.S. at 434).)

### 2. *Applicable Law*

#### a. Prudential Standing[4]

As the United States Supreme Court has explained:

> The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 [] (1975) (citing *Barrows v. Jackson*, 346 U.S. 249 [] (1953)) . . . . In addition to the immutable requirements of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." [*Valley Forge*, 454 U.S. at 474–75]. Like their constitutional counterparts, these "judicially self-imposed limits on the exercise of federal jurisdiction," *Allen v. Wright*, 468 U.S. 737, 751 [] (1984), are "founded in concern about the proper—and properly limited—role of the courts in a democratic society," *Warth*, [422 U.S.]

---

[4] Prudential standing is properly addressed on a Rule 12(b)(6) motion for failure to state a claim, as opposed to a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *See, e.g.*, *Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, No. 12-113, 2014 WL 272459, at *2 (N.D. Miss. Jan. 24, 2014), *aff'd*, 778 F.3d 502 (5th Cir. 2015) ("Unlike a dismissal for lack of constitutional [i.e., Article III] standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6)."). The Fifth Circuit has said that "prudential standing does not present a jurisdictional question, but 'a merits question: who, according to the governing substantive law, is entitled to enforce the right?'" *Abraugh v. Altimus*, 26 F.4th 298, 304 (5th Cir. 2022) (quoting *Norris v. Causey*, 869 F.3d 360, 366 (5th Cir. 2017)). A failure to prosecute an action "in the name of the real party in interest . . . is a failure of 'prudential' standing." *Id.* The court held that this inquiry is not jurisdictional, and "goes only to the validity of the cause of action." *Id.*

at 498 []; but unlike their constitutional counterparts, they can be modified or abrogated by Congress, [*see id.* at 501].

*Bennett v. Spear*, 520 U.S. 154, 162 (1997).

When bringing a claim on behalf of a third party, the Supreme Court has

recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute, [*Singleton v. Wulff*, 428 U.S. 106, 112 (1976)]; the litigant must have a close relation to the third party, *id.*[] at 113–[]14 []; and there must exist some hindrance to the third party's ability to protect his or her own interests. *Id.*[] at 115–[]16 []. *See also Craig v. Boren*, 429 U.S. 190 [] (1976).

*Powers v. Ohio*, 499 U.S. 400, 410–11 (1991); *see also Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014) (citing *Kowalski*, 543 U.S. at 129–30) ("The rule for third-party standing requires the named plaintiff to have suffered an injury in fact and to share a 'close' relationship with third-parties who face an obstacle inhibiting them from bringing the claim on their own behalf.").

Moreover, a finding of third-party standing as to one plaintiff satisfies standing as to all plaintiffs. *See, e.g.*, *Planned Parenthood of Greater Tex. Surgical Health Servs.*, 748 F.3d at 589 (citing *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981); *Allandale Neighborhood Ass'n v. Austin Transp. Study Pol'y Advisory Comm.*, 840 F.2d 258, 263 (5th Cir. 1988)) ("Because the physician-plaintiffs have third-party standing to assert the rights of their patients in this litigation, as well as standing to assert their own rights, we need not consider the issue of standing as it relates to the remaining plaintiffs." (footnote omitted)).

b. <u>Equal Protection</u>

As this Court has explained:

Although the Constitution explicitly empowers state legislatures to regulate the "Times, Places and Manner of holding Elections," [U.S. Const. art. I, § 4, cl. 1] and "[e]lection laws will invariably impose some burden upon individual voters,"

[*Burdick*, 504 U.S. at 433] state regulations may not *unduly* burden the right to vote. The Equal Protection Clause provides one restraint against any such undue burden. [*See McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969) ("[O]nce the States grant the franchise, they must not do so in a discriminatory manner").]

In *Burdick v. Takushi*, the United States Supreme Court instructs that

> [t]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions. [*Burdick*, 504 U.S. at 434.]

When cases fall somewhere between strict scrutiny and rational basis review, the *Anderson-Burdick*, [*Anderson*, 460 U.S. 780; *Burdick*, 504 U.S. 428] framework provides that "a more flexible standard applies." [*Burdick*, 504 U.S. 428 at 434. "The appropriate standard for evaluating a claim that a state law burdens the right to vote is set forth in *Anderson*." *Id.* at 438.] In these cases, featuring a moderate burden on the right to vote, the court must weigh that burden against " 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' " [*Id.* (quoting *Anderson*, 460 U.S. at 789).] If the State's interests outweigh the burden on Plaintiffs' right to vote, the voting restrictions survive the [e]qual [p]rotection challenge.

*Harding v. Edwards*, 487 F. Supp. 3d 498, 506 (M.D. La. 2020) (Dick, C.J.) (footnote citations added internally within text); *see also Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 235 (5th Cir. 2020) ("The *Anderson/Burdick* rubric requires us to examine two aspects of Texas's signature verification procedures: (1) whether the process poses a 'severe' or instead a 'reasonable, nondiscriminatory' restriction on the right to vote and (2) whether the state's interest justifies the restriction.").

### 3. *Analysis*

a. Prudential Standing

As discussed above, Plaintiffs adequately alleged that PCEJ satisfies Article III standing, namely that it suffered an injury in fact by showing that combating the mandates of § 18:177(A)(1)'s paperwork requirement is a perceptible impairment of its mission. Thus, PCEJ satisfied the first element of third-party standing set forth in *Powers*. *Powers*, 499 U.S. at 411.

Plaintiffs have also sufficiently alleged a close relationship with the third party, thus satisfying the second element in *Powers*. (*See, e.g.*, Doc. 168 at ¶ 24 ("Power Coalition provides voter registration support and voter education to hundreds of thousands of Louisiana voters across the state. This includes running an '11-touch program' across a universe of about 600,000 voters during election cycles, aiming to engage with these voters eleven times each over the course of an election through a mix of text messages, door-knocking, calls, and other forms of outreach. The outreach is often conducted by community volunteers and hundreds of paid canvassers, who encounter individuals with felony convictions during their voter engagement work and [who are] trained to discuss the paperwork requirement with impacted individuals.").)

As to the final *Powers* element, whether the third parties suffer a hindrance that prevents them from suing on their own behalf, *Powers*, 499 U.S. at 411, Plaintiff PCEJ has adequately alleged a hindrance. Plaintiffs allege in the *FAC* that an element of PCEJ's mission is "to amplify the voices of those who have been historically marginalized," including "voters impacted by the criminal legal system in Louisiana." (Doc. 168 at ¶ 23.) As this Court said in its previous ruling, "suits that involve a 'sensitive area of personal privacy' often deter third parties from bringing suit on their own behalf, as one's desire to protect their privacy would be compromised through the

publicity of a lawsuit." (Doc. 155 at 82 (citing *Carey v. Population Servs. Int'l*, 431 U.S. 678, 684 n.4 (1977)).)

> A lawsuit involving one's re-enfranchisement after a prior felony conviction is certainly an area of personal privacy that would deter individuals from bringing suit on their own behalf, especially when such individuals have historically been marginalized by way of disenfranchisement. Further, though felony convictions are part of the public record, these public records would not receive the same level of publicity that a lawsuit would.

(*Id.*) Therefore, the Court finds that the third party here suffers a hindrance to bringing the suit themselves, and the third *Powers* element is met.

All three *Powers* elements having been satisfied, the Court finds that PCEJ has established third-party standing. As such, VOTE and the League have third-party standing. *See Planned Parenthood of Greater Tex. Surgical Health Servs.*, 748 F.3d at 589. Therefore, the *MTD* will be denied on this ground.

### b. Equal Protection

The Court finds that Plaintiffs have adequately alleged an equal protection claim under the *Anderson/Burdick* framework. First, Plaintiffs have alleged a severe burden. When analyzing what constitutes a "severe" burden under this framework, the Fifth Circuit has found that burdens on the rights of small groups of voters generally do not qualify. *See Richardson*, 978 F.3d at 236. However, Plaintiffs do not allege a burden on a small group. Plaintiffs say in the *FAC* that they "estimate that thousands of otherwise eligible individuals have been unable to register to vote because of their difficulty or inability to provide the required paperwork." (Doc. 168 at ¶ 94.) Further, Plaintiffs have alleged that "Defendant has shifted the burden to individual suspended voters to prove their eligibility for registration using a narrow, confusing, and burdensome pathway to obtaining such paperwork." (*Id.* at ¶ 93.) Specifically, because "state law does not specify the appropriate corrections official from whom to obtain the required paperwork, . . . individuals must

guess as to how to obtain proof of eligibility." (*Id.* at ¶ 87.) The Court again finds that "[w]hen construing these allegations in a light most favorable to the Plaintiffs, . . . subjecting thousands to a cat-and-mouse document chase is a severe burden on one's right to vote." (Doc. 155 at 83.)

Because the Court finds that the burden is severe, it now must determine whether the paperwork requirement's burden is "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotations omitted). The Court finds that Plaintiffs have adequately alleged that the paperwork requirement "is not narrowly tailored to any potential state interest, as there are much more efficient and indisputably less restrictive means for parish registrar offices to receive such information." (Doc. 168 at ¶ 181.) For example:

> 63. To facilitate voter-roll maintenance, DPSC sends to the Defendant information regarding "any person currently under the custody or supervision of the Department of Public Safety and Corrections" who is currently under an order of imprisonment for a felony conviction and has been incarcerated pursuant to the order in the last five years, or anyone who has committed an election offense. La. R.S. 18:171. In turn, the Defendant is required to report that information to the parish registrars at least quarterly. La. R.S. 18:171(C)(4). Similar requirements apply to the U.S. Attorney for federal convictions. La. R.S. 18:171.1.

> 64. DPSC is also required under Louisiana law to provide to a parish registrar, upon request, "information . . . regarding a person who is under an order of imprisonment for conviction of a felony, including whether the person is under an order of imprisonment for conviction of a felony offense of election fraud or any other election offense . . . and whether the person has been incarcerated pursuant to the order within the last five years." La. R.S. 18:171(B)(2).

> 65. Likewise, sheriffs and district attorneys are required under Louisiana law to provide to a parish registrar, upon request, "information regarding a person convicted of a felony . . . including . . . whether the conviction resulted in an order of imprisonment pursuant to which the person is incarcerated." La. R.S. 18:171(B)(1).

> \*     \*     \*

> 176. The State already has access to all the information which it demands the voter to produce. Because Louisiana maintains records of an individual's order of imprisonment, and because the channels of communications and policies already exist to share information regarding when an individual becomes ineligible, the

State could readily communicate information to its agencies regarding when a voter with a felony conviction is eligible.

(*Id.* at ¶¶ 63–65, 176.)

Taking Plaintiffs' claims as true, as the Court must do here, the Court finds that Plaintiffs have adequately alleged a severe burden on the right to vote that is not narrowly tailored to meet a compelling state interest. Plaintiffs have alleged that the State already has access to the information it requires voters to produce. (*Id.*) Requiring individuals to provide this paperwork is not a narrowly tailored means. Therefore, Plaintiffs have satisfied the *Anderson/Burdick* framework and have stated an equal protection claim. The *MTD* will be denied on this ground.

### H.  12(b)(7): Failure to Join a Required Party

#### 1.  *Rule 12(b)(7) Standard*

Rule 19(a), entitled "Persons Required to Be Joined if Feasible," provides in relevant part:

> (1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties . . . .

Fed. R. Civ. P. 19(a)(1)(A). The Court notes that this rule is written in the imperative: A necessary party "*must* be joined." *Id.* (emphasis added). Rule 19(a)(1)(A)

> stresses the desirability of joining those persons in whose absence the court would be obliged to grant partial or "hollow" rather than complete relief to the parties before the court. The interests that are being furthered here are not only those of the parties, but also that of the public in avoiding repeated lawsuits on the same essential subject matter.

Fed. R. Civ. P. 19, Notes of Advisory Committee on Rules—1966 Amendment.

Rule 19(b) provides:

> When Joinder is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

    (A) protective provisions in the judgment;

    (B) shaping the relief; or

    (C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

The Fifth Circuit recognizes that "Rule 19 provides for the joinder of all parties whose presence in a lawsuit is required for the fair and complete resolution of the dispute at issue." *HS Res., Inc. v. Wingate*, 327 F.3d 432, 438 (5th Cir. 2003). A related provision, Rule 12(b)(7), allows for dismissal for "failure to join a party under Rule 19." *Id.* As the Fifth Circuit has stated:

> Rule 12(b)(7) analysis entails two inquiries under Rule 19. The court must first determine under Rule 19(a) whether a person should be joined to the lawsuit. If joinder is warranted, then the person will be brought into the lawsuit. But if such joinder would destroy the court's jurisdiction, then the court must determine under Rule 19(b) whether to press forward without the person or to dismiss the litigation.

*Id.* at 439. "The burden [on a Rule 12(b)(7) motion] is on the party raising the defense to show that the absentee is required to be joined under Rule 19. 7 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1609 (3d ed. 2025). Nevertheless:

> [W]hen an initial appraisal of the facts reveals the possibility that an unjoined party whose joinder is required under Rule 19 exists, the burden devolves on the party whose interests are adverse to the unjoined party to negate this conclusion and a failure to meet that burden will result in the joinder of the party or dismissal of the action.

*Id.* Ultimately, Rule 19 recognizes that, "[w]henever feasible, the person's materially interested in the subject of an action . . . should be joined as parties so that they may be heard and a complete disposition made." Fed. R. Civ. P. 19, Notes of Advisory Committee on Rules—1966 Amendment.

## 2. *Parties' Arguments*

### a. <u>*MTD*</u> (Doc. 176)

Defendant argues that Plaintiffs have failed to join an indispensable party—the parish registrars—under Federal Rule of Civil Procedure 19, "because in their absence, the [C]ourt cannot accord complete relief among existing parties." (Doc. 176-1 at 38.) Specifically, Defendant points to Counts Three and Four, which allege that Defendant's policy has created confusion, resulting in the misapplication of the paperwork requirement to some new registrants. (*Id.* at 38–39.) Count Three concerns parish registrars' misapplication of the paperwork requirement to new registrants. (*Id.* at 38.) Count Four alleges that, as a result, voter registration is disuniform across parishes. (*Id.* at 38–39.) Defendant argues that "the Secretary of State does not employ the registrars, nor is she responsible for ensuring their compliance with the law. Therefore, if the registrars are not joined, the [C]ourt cannot accord complete relief." (*Id.* at 39.) Defendant requests that the claims against her concerning actions of the parish registrars be dismissed. (*Id.*)

### b. <u>*Opposition*</u> (Doc. 180)

Plaintiffs respond that Defendant is the only necessary party here. (Doc. 180 at 45–46.) They argue that this Court *can* accord relief through Defendant, because Plaintiffs only request that Defendant issue and enforce proper guidance. (*Id.* at 46.) Plaintiffs say that "Defendant is specifically tasked with enforcing the provisions of the NVRA, and she must ensure compliance with the NVRA." (*Id.* at 47.) Their claims center around Defendant's policies and guidance, which, Plaintiffs allege, have confused the registrars. (*Id.*) "In other words, Defendant's actions gave rise to Plaintiffs' claims." (*Id.*) Therefore, the registrars are not necessary parties. (*Id.*)

Even if the Court finds that the registrars are necessary parties, Plaintiffs argue that "they are not indispensable to the litigation under Rule 19(b)." (*Id.*) They say there are multiple factors to consider under Rule 19(b):

> (1) prejudice to an absent party or others in the lawsuit from a judgment; (2) whether the shaping of relief can lessen prejudice to absent parties; (3) whether adequate relief can be given without participation of the party; and (4) whether the plaintiff has another effective forum if the suit is dismissed.

(*Id.* at 47–48 (quoting *HS Res.*, 327 F.3d at 439 (internal quotation marks omitted); Fed. R. Civ. P. 19(b)).)

According to Plaintiffs, there will be no prejudice if the registrars are omitted from this suit, as the registrars are bound to follow Defendant's directives. (*Id.* at 48.) Because registrar's roles are ministerial, they do not have the discretion in applying the paperwork requirement, thus are bound by Defendant's direction. (*Id.*) Further, if an injunction were entered against Defendant, it "would apply uniformly across the state." (*Id.*) Plaintiffs argue that they would have no adequate remedy if the Court dismissed this action for nonjoinder. (*Id.*) Therefore, Plaintiffs claim, the registrars are not indispensable parties. (*Id.*)

### c.  *Reply* (Doc. 181)

Defendant argues that she has given proper guidance to the registrars, and any claims that the registrars are not properly applying the paperwork requirement should not be asserted against her. (Doc. 181 at 10.) She says the registrars are necessary parties. (*Id.*)

### 3.  *Law and Analysis*

The NVRA itself does not provide guidance on necessary parties under Rule 19. *Martinez-Rivera*, 166 F. Supp. 3d at 792–93. But as the Fifth Circuit said in *Scott*:

> The NVRA centralizes responsibility in the state and in the chief elections officer, who is the state's stand-in. For example, each state *must* designate a chief elections officer, who will receive complaints about all violations of the NVRA. *See* NVRA

§§ 10, 11. Additionally, the NVRA speaks in terms of the responsibilities of "each state." *See, e.g., id.* at §§ 7(a)(1), 4(a). This choice of words reflects a policy choice that responsibility should be centralized rather than fragmented. *Cf. Harkless*, 545 F.3d at 452 ("[T]he entire Act ... speaks in terms of state responsibilities; what is noticeably missing is any mention of county, municipal, or other local authorities.").

*Scott*, 771 F.3d at 839. If the parish registrars are violating the NVRA, it is Defendant's responsibility—as the "chief elections officer" of the State of Louisiana—to ensure that the NVRA is enforced. *Id.*

The parish registrars' duties are "ministerial" and "subject to the direction of the secretary of state." La. R.S. §§ 18:58(A), 18:66(A). Among other things, Plaintiffs request that this Court (1) enjoin Defendant from enforcing the paperwork requirement against suspended voters (with their equal protection claim), or (2) at a minimum, order Defendant "to issue statewide guidance" that the paperwork requirement is not to be enforced against new registrants (in Counts 3 and 4). (Doc. 168 at 46.) In either case, the registrars would be bound to follow Defendant's lead. That is, if Defendant were enjoined from enforcing the paperwork requirement against suspended voters, then the registrars would have no independent authority to continue enforcing that same requirement. *See* La. R.S. § 18:58(A) ("[T]he registrar in each parish shall be responsible . . . for the administration and enforcement of the laws and the rules and regulations of the secretary of state relating to the registration of . . . voters."). Likewise, if Defendant were ordered to instruct the registrars to stop enforcing the paperwork requirement against new registrants, then the registrars would be compelled to stop. *Id.*

Therefore, the Court may afford complete relief to Plaintiffs without the parish registrars present. The parish registrars are not required parties under Federal Rule of Civil Procedure 19. The *MTD* will be denied on this ground.

## IV.    LEAVE TO AMEND

Plaintiffs do not seek in the alternative another opportunity to amend. Should they do so, the Court will deny such request.

Federal Rule of Civil Procedure 15(a) "requires a trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (cleaned up). However, "[l]eave to amend is in no way automatic." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (citing *Jones*, 427 F.3d at 994 (citation and internal quotation marks omitted)). The Court can deny a party's request for leave to amend if it has a "substantial reason" for doing so. *Id.* The Fifth Circuit has further described a district court's discretion on a motion to amend as follows:

> The district court is entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , and futility of the amendment." [*Jones*, 427 F.3d at 994] (citation omitted). "In light of the presumption in favor of allowing pleading amendments, courts of appeals routinely hold that a district court's failure to provide an adequate explanation to support its denial of leave to amend justifies reversal." *Mayeaux v. La. Health Serv. and Indent. Co.*, 376 F.3d 420, 426 (5th Cir. 2004) (citation omitted). However, when the justification for the denial is "readily apparent," a failure to explain "is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend." *Id.* (citation and internal quotation marks omitted).

*Id.*

In addition, the Fifth Circuit has made clear that "[d]enying a motion to amend is not an abuse of discretion if allowing an amendment would be futile." *Id.* (citing *Briggs v. Mississippi*,

331 F.3d 499, 508 (5th Cir. 2003)). An amendment is futile "if it would fail to survive a Rule 12(b)(6) motion." *Id.* (citing *Briggs*, 331 F.3d at 508).

Having carefully considered the matter, the Court will deny leave to amend should it be requested. First, as stated above, "repeated failures to cure deficiencies by amendments previously allowed" is a factor to consider when granting or denying leave to amend, as is undue delay. *Id.* (citation omitted). Here, Plaintiffs had the benefit of the Court's ruling on Defendant's original motion to dismiss; yet Plaintiffs failed to cure the deficiencies of the last complaint. Second, further amendment would be futile; through their failure to properly amend, Plaintiffs have shown that the NVRA simply does not preempt § 18:177(A)(1)'s paperwork requirement, because the paperwork requirement concerns reinstatement, not registration.

Consequently, Plaintiffs will not be given leave to amend, and Counts One, Two, and Five will be dismissed with prejudice. *See Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 679 (M.D. La. 2019) (deGravelles, J.) (denying leave to amend when plaintiff should have had notice of issue from court's ruling on original motion to dismiss, and when further amendment would be futile); *Skinner v. Ard*, 519 F. Supp. 3d 301, 321–22 (M.D. La. 2021) (deGravelles, J.) (same); *Martin v. Roy*, No. 20-339, 2022 WL 894599, at *13 (M.D. La. Mar. 25, 2022) (deGravelles, J.) (same).

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion to Strike and Motion to Dismiss Plaintiffs' First Amended Complaint* (Doc. 176) filed by defendant Nancy Landry, in her official capacity as Secretary of State of Louisiana is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the *Motion to Strike* is **DENIED**.

**IT IS FURTHER ORDERED** that the *Motion to Dismiss* is **GRANTED** as to Counts One, Two, and Five. These counts will be dismissed with prejudice.

**IT IS FURTHER ORDERED** that the *Motion to Dismiss* is **DENIED** in all other respects.

Signed in Baton Rouge, Louisiana, on October 21, 2025.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**