# Exhibit 6

## Dr. Burch's Rebuttal Report to Dr. Brunell's Report

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| VOICE of the EXPERIENCED, *on behalf of itself and its members*; POWER COALITION for EQUITY and JUSTICE, *on behalf of itself and its members*; *and* LEAGUE of WOMEN VOTERS of LOUISIANA, *on behalf of itself and its members*;<br><br>            Plaintiffs,<br>    v.<br><br>NANCY LANDRY, *in her official capacity as Secretary of State of Louisiana*,<br><br>            Defendant. | Civil No. 3:23-cv-00331-JWD-SDJ |

**REPLY TO DR. BRUNELL'S REPORT**

As part of my work in this matter, I was asked to respond to Dr. Brunell's rebuttal report dated March 23, 2026. This report responds only to Dr. Brunell's opinions in that report.

Out of the eight opinions that I offer in my report, Dr. Brunell disagrees with only the seventh:

> Among the population on community supervision with felony convictions as of January 2026 who were never on the suspended voter list, 15.8% were registered to vote as of November 14, 2025. Among the population on community supervision for felony convictions as of January 2026 who were currently or previously on the suspended voter list, only 5.9% were registered to vote. Again, based on estimates from other states, the expectation is that post-conviction registration among people who were registered to vote prior to their convictions would be much higher than that of people who were not registered prior to their convictions.

Dr. Brunell offers several methodological critiques primarily involving the accuracy of my counts of suspended voters, the lack of a multivariate analysis of voting, and my use of active voters rather than inactive voters to measure registration. Based on these arguments, Dr. Brunell asserts, without analysis or evidence, that there are multiple "sources of errors"[1] in my report and that my "data and analyses suffer from sufficient problems" such that they "cannot be relied upon by the court."[2] I also respond to several other of Dr. Brunell's opinions on voting after a felony conviction. I address each of Dr. Brunell's points below.

Dr. Brunell's Contention that I Miscount the Number of Suspended Voters

Dr. Brunell argues throughout his report that I am unable to accurately count the number of people who have ever been on the suspended voter list. Dr. Brunell's criticisms primarily refer to my attempt to account for past suspensions rather than my calculations of voter registration for people who are currently suspended, particularly my use of the Voting Rights Certificate (VRC) as a proxy for people who are not currently on the suspended list but may have been in the past. Dr. Brunell asserts—without evidence or conducting an independent analysis— that a different analytic strategy would have led to different conclusions. Dr. Brunell's concerns are unfounded: calculating registration among the smaller subset of the file for whom I have recent data on suspended status does not change my conclusions about the size of the gap between people subject the paperwork requirement and those who are not.

In my January 2026 report, I acknowledge the difficulty of determining the number of people who have made it off of a suspended voter list in the past in Footnote 52 and in further analyses contained in the appendix. For the analysis contained in the January report, in order to account for people who may have been suspended in the past, I marked all people who had been issued voter certificates, along with those that had been on past suspended voter lists, to create a

---

[1] Brunell Report, 14.
[2] Brunell Report, 19.

1

new category called "ever suspended," which incorporates people who were (1) on the current suspended voter list, (2) on a past suspended voter list, and/or (3) issued a voter certificate.  In the appendix to the January report, I also explored the effects of counting even more people in the ever-suspended category in order to account for people who may have reinstated their voter registration using means other than a VRC, showing that doing so did not eliminate the large registration gap between people who had been suspended and people who had not been.

In setting up the analysis in this way, my goal was to account for the **maximum** number of people who could possibly have made it off the suspended voter list—my analysis is overly-inclusive *on purpose*.  I demonstrate that, *at most*, 2,488 people on the Probation and Parole list could have made it off the suspended voter list (and perhaps back onto the voter rolls) using a Voting Rights Certificate.  Because I also know, based on my analysis of people who were on a past suspended voter list but not on the most recent list, that about half were issued a VRC, then it is likely that at most another 2,488 people could have made it off the suspended list (and possibly onto the voter rolls) using other documentation.  The analyses contained in the main body and the appendix of the report are designed to show an upper bound, or ceiling, for the registration rate among the people subject to the documentation requirement.

Although Dr. Brunell claims that my methodology misses a large number of people who could have been on the suspended list in the past prior to 2023, which is the date of the earliest suspended list that I was able to check, he is incorrect.  Again, I calculate the maximum registration rate we could possibly see among the "ever suspended" group.  Dr. Brunell argues that I should check only differences in registration among people convicted after Act 127 was passed.  However, these concerns also are misplaced, particularly because 1) most of the people currently on community supervision have relatively recent conviction dates already and 2) my previous method of estimating the maximum number of people who were no longer on the suspended list favors the *Secretary of State's* case, not the plaintiffs'.  As I show below, taking into account Dr. Brunell's concerns--and even taking his advice to look only at people convicted more recently--does nothing to change my overall conclusion about the large registration gap between people who were on the suspended list and those who were not.

*Examining Registration among the Cohort Convicted After June, 2023*

I compared the most recent version of the list of people on probation or parole in Louisiana as of January 7, 2026 that I analyzed in my January 27, 2026 report with previous versions of the suspended voter lists provided to me earlier for this case.  Based on my analysis of the field "ConvictionDate" from the P&P file, 72.6 percent of people on community supervision that are currently eligible to vote in Louisiana were convicted after June 29, 2023, the date of the earliest files that I received to analyze for this case (20,319 people). Using the same methodology as in my January report, I find that of the group currently on community supervision who were convicted after late June of 2023, 5,478 are on the most recent suspended

2

list, while an additional 51 were on a past suspended list[3] but are no longer matched to the current suspended list. As Figure 1 (below) shows, the gap in voter registration between the 5,529 people who were on a suspended list after June 2023 and the 14,790 people who were not is consistent with what I calculated for the overall sample.

As noted in Figure 1, only 4.7% of eligible people who were on any suspended voter list after June 2023 were registered as of November 2025 (the date of the most recent voter file that I received), compared with 16.8% of people who were not on any of the suspended lists that I was provided. As a reminder, as I show in Figure 2 of my original report, the difference between the registration rate of people I was able to match to the most recent suspended list (3.8%) and the people I estimated to have not been on the list in the past (15.8%) is quite large.[4] The 12.1-percentage-point registration gap that I calculate among people convicted after 2023 is very close to the 12-point registration gap that I calculated among the entire community supervision population.

---

[3] "October 2024 Suspended List.xlsx" "Suspended List June 2025.xlsx" and/or "Suspended List.xlsx" (uploaded to me in July 2023).

[4] Again, the presence of some people on both the current suspended voter list and the voter registration list may be due to the different dates of the P&P list and the voter registration list.

*Figure 1 Results of Voter Registration Analysis of Community Supervision Population as of January 7, 2026;* Analysis limited to people convicted on or after June 29, 2023.



*Dr. Brunell's Insistence on Comparing Pre- and Post-2022 Reinstatements*

Further, in claiming that my analysis of ever-suspended voters was incorrect, Dr. Brunell argues that I should have compared reinstatements before and after the implementation of Act 127, when Louisiana law changed to require the VRC only for people on the suspended list, rather than for anyone with a disqualifying felony conviction. However, given the questions regarding the timing and speed of compliance with the 2022 changes in the law, it would not be possible to conduct the analysis Dr. Brunell suggests. Dr. Brunell's argument ignores the fact that in many parishes, even after the law changed in 2022, people with felony convictions still may have been required to submit paperwork to vote even if they should not have been. Moreover, to the extent that people who were not required to submit documentation in order to register to vote had to do so anyway, voter registration would be lower in the never-suspended group than it otherwise should be, artificially dampening the size of the already-large gap in registration that I document here and in my January report. Therefore, conducting the analysis Dr. Brunell suggests would likely lead to even larger registration gaps between the never- and ever-suspended groups.

4

<u>Dr. Brunell's Claim that I Should Have Used Multivariate Models</u>

Dr. Brunell argues that I should have used a regression analysis because "there could be other intervening variables that explain" the difference in registration rates between suspended voters and the remaining eligible population.[5] Dr. Brunell speculates about, but does not actually provide evidence for, potentially confounding factors that he claims could bias my results. Dr. Brunell's claims are misleading because he ignores the evidence from prior research that shows that such models do not really change the relationship between voter registration and felony status once prior voting habits are accounted for in multivariate models.[6] In fact, the demands placed on previously registered voters by the state in this case affect prior registration, which is the most consistent predictor of registration after a felony conviction.

Moreover, my findings account for the effects of race, age, and gender on the relationship between suspended status and registration in Table 3 in my January report. I report voter registration by suspended status and race, age, gender, and days since conviction for the population convicted after June 2023 in Table 1, below. What those tables show is that, consistent with previous research, for every characteristic listed in the table, the gaps in registration in every category are of similar magnitude and direction to what we see for the whole group. Replicating those tables here for the part of the group convicted after 2023 shows the same pattern as I showed for the whole sample in my original report; again, there is no evidence that regression analyses would close the registration gap between the never- and ever-suspended groups. Further, as we see below in Table 1, the gaps persist even when looking within groups based on days since conviction.[7] There is no evidence of an intervening variable[8]

---

[5] Brunell Report, 12.

[6] Gerber, Alan S., Gregory A. Huber, Marc Meredith, Daniel R. Biggers, and David J. Hendry. "Can incarcerated felons be (Re) integrated into the political system? Results from a field experiment." *American Journal of Political Science* 59, no. 4 (2015): 912-926. Gerber, Alan S., Gregory A. Huber, Marc Meredith, Daniel R. Biggers, and David J. Hendry. "Does incarceration reduce voting? Evidence about the political consequences of spending time in prison." *The Journal of Politics* 79, no. 4 (2017): 1130-1146. Morris, Kevin. "Welcome Home—Now vote! Voting rights restoration and postsupervision participation." *Social Science Quarterly* 102, no. 1 (2021): 140-153.

[7] Similarly, because we are looking at a smaller group of recent convictions, people with the most severe crimes are likely still on the ineligible list.

[8] For multivariate analysis to erase the registration gap between people who were suspended and those who were not, a variable would need to 1) have a large correlation with the key causal variable of interest (being on suspended list) 2) be highly correlated with the dependent variable (registering to vote) and (3) be causally prior to both the dependent and independent variable. See King, Gary, Robert O. Keohane, and Sidney Verba. *Designing social inquiry: Scientific inference in qualitative research*. Princeton University Press, 2021. I was provided an additional file with more information, "P&P Population as of 1.7.2026 updated 3.16.2026.xlsx." The correlations between registration and age, days since conviction, violent crime, drug crime,

that would wipe out a registration gap of this size: big corresponding gaps exist among all the subgroups in the table. None of the variation in the size of the differences in registration by race, age, gender, or days since conviction are large enough, nor are the proportions of any group large enough, to eliminate the large registration gap between people who had been on a suspended list and those who had not. It is clear, based on the evidence, that conducting a multivariate regression analysis would not affect my conclusions.

*Table 1: Voter Registration Rates among Community Supervision Population as of January 7, 2026 who were convicted after June 29, 2023, by Selected Characteristics.*

| Characteristic | Not Matched to Any Suspended List | Matched to a Suspended List | Total |
|---|---|---|---|
| Female | 19.0% | 2.9% | 15.6% |
| | N=4094 | N=1099 | N=5193 |
| Male | 15.9% | 5.1% | 12.8% |
| | N=10696 | N=4430 | N=15126 |
| Black | 18.2% | 5.7% | 14.6% |
| | N=7657 | N=3180 | N=10837 |
| White | 15.4% | 3.3% | 12.4% |
| | N=6908 | N=2330 | N=9238 |
| Age 18-30 | 13.7% | 4.1% | 12.7% |
| | N=5781 | N=687 | N=6468 |
| Age 31-44 | 17.0% | 4.2% | 12.8% |
| | N=5618 | N=2855 | N=8473 |
| Age 45-64 | 20.2% | 5.5% | 14.6% |
| | N=3069 | N=1861 | N=4930 |
| Age 65+ | 33.2% | 8.7% | 26.3% |
| | N=322 | N=126 | N=448 |
| 0-180 Days Since Conviction | 18.0% | 7.4% | 15.3% |
| | N=3869 | N=1330 | N=5199 |
| 181-365 Days Since Conviction | 17.1% | 4.1% | 13.6% |
| | N=3893 | N=1418 | N=5311 |

---

property crime, and imprisonment among the people convicted June 2023 and later are close to zero (Pearson's R=0.053, -0.036, 0.005, -0.012, -0.013, and 0.037, respectively), meaning that these factors fail to satisfy the second criterion and thus do not need to be considered in a multivariate regression analysis.

6

| 366-730 Days Since Conviction | 16.4% | 3.6% | 12.8% |
|---|---|---|---|
| | N=5492 | N=2133 | N=7625 |
| 730+ Days Since Conviction | 14.5% | 4.2% | 11.4% |
| | N=1536 | N=648 | N=2184 |
| Total | 16.8% | 4.7% | 13.5% |
| | N=14790 | N=5529 | N=20319 |

Dr. Brunell's Concerns about Inactive Voters

Dr. Brunell argues on page 17 of his report that my "analysis missed potentially over 400,000 inactive voters" since I restricted my analysis to active voters.  However, the most likely outcome of matching only to active voter registrations is to make registration in the never-suspended group appear lower while having only a minimal effect on the ever-suspended group because *suspended voters do not appear on the inactive list*.[9] Only 29 formerly suspended people have been reinstated but not matched to an active voter entry; even adding all 29 of these people as inactive voters still would raise the registration rate in the ever suspended group by 0.5 percentage points (from 4.7% to 5.2%).   Even if no people on the never-suspended list were matched to the inactive list, including those 29 extra voters within the ever-suspended list would do little to close the registration gap between the ever- and never-suspended groups.  Moreover, since it is more likely that people on the never-suspended list would be matched to an entry for an inactive voter (since more than 29 of them could appear on that list), most likely effect of including inactive voters would be to further widen the gap between suspended and not-suspended voters, a result that would help the plaintiff's argument, not the Secretary of State's. I should also note that matching individuals to the inactive voter list using the city of residence may not be possible given the fact that people are moved to the inactive list when their address cannot be verified.[10]

Dr. Brunell's Concern that Some of the People in the "Never Suspended" Category Registered Pre-Conviction

Dr. Brunell argues that I should have excluded registrations that happened pre-conviction among the "never suspended" group and focus only on registrations that took place after a person was convicted of a crime, because some people in the never suspended group "could have gotten registered to vote before their felony conviction."[11]  This is a strange claim, because everyone on

---

[9] Deposition of Sherri Wharton Hadskey, Commissioner of Elections for the Louisiana Secretary of State's Office.  Page 26, lines 18-21

[10] Deposition of Sherri Wharton Hadskey, Commissioner of Elections for the Louisiana Secretary of State's Office.  Page 25, lines 5-13.

[11] Brunell Report, 17.

the suspended list included in my registration analysis was also registered to vote before their conviction and is eligible to register now.  Losing one's voting rights in the past does not trigger the paperwork requirement; even people who lost the right to vote in the past are able to register to vote online (or otherwise) without providing additional paperwork if they are not on the suspended voter list.  The "never suspended" group that I analyze is actually a better comparison to the suspended group than the one Dr. Brunell suggests -- Dr. Brunell's suggestion would make registration in the never-suspended group appear artificially low since he would eliminate all of the higher-propensity voters from that group.

<u>Dr. Brunell Claims that the Documentation Requirement Causes "Very Small Differences in Sheer Numbers of People"</u>

Dr. Brunell tries to minimize the scope and scale of the affected group at several points in his report.  First, he argues on page 14 that only 1,096 people would need to register in order to make the never- and ever-suspended groups equal.  Second, on pages 18-19 of his report he cites some political science studies to argue that turnout among people with felony convictions is too low to affect elections.  Dr. Brunell makes a similar point on page 7, writing, "finding relatively low registration and participation rates for felons is not the exception, but the rule."

With respect to Dr. Brunell's contention that only 1,096 people are affected, first, I argue that the number of people we would expect to register in the suspended voter group should be, not just equal to, but *higher* than that in the group that was not suspended, given that this group is comprised of higher-propensity voters than the never-suspended group.  We should think of 1,096 as a floor to the estimate of the number of people affected, not the ceiling.  Moreover, the affected population is larger than the number of people who currently are serving a sentence under community supervision and also includes people who have completed supervision altogether, making it clear that the overall size of the affected population is greater than 1,096 people. For instance, the suspended voter list that I received contains 161,217 entries; I matched only a small fraction of the current probation and parole population to the list.

Second, in an ideal world, the actual number of people deterred from voting because of this documentation requirement would be zero, so a finding that hundreds of voters are discouraged under this regime should be viewed by that comparison.  For example, 1,096 people affected by the additional paperwork requirement is larger than the verified cases of voter fraud in recent elections, yet states have implemented numerous measures to deter voter fraud.[12]  Moreover, there are always close elections—for instance, last year, a Louisiana mayoral election was

---

[12] https://www.brookings.edu/articles/how-widespread-is-election-fraud-in-the-united-states-not-very/

decided by 10 votes, further underscoring that deterrence of even small numbers of voters can have significant impacts.[13]

Finally, as an attempt to undermine my finding that people subjected to the documentation requirement vote at lower rates than those who are not, Dr. Brunell argues that people with felony convictions vote less often than similar people who do not have a conviction, yet this argument is a red herring.[14]  This fact does not mean that no one with a felony conviction participates in elections.  As I show in Table 1 in my January report, which examines voter registration in states with automatic restoration, many people with felony convictions continue to participate in elections even with a felony conviction.

<u>Dr. Brunell's Contention that Voter Turnout is a Superior Metric</u>

Dr. Brunell argues that it is better to focus on voter turnout rather than voter registration because 1) "many people who are registered to vote do not choose to vote in every election"[15] and 2) when looking at voter turnout only among already-registered voters, "never-suspended" registrants vote at much lower rates than "ever-suspended" registrants do."[16]  Dr. Brunell's arguments are misleading for a number of reasons.

First, it is appropriate to focus on registration rather than turnout in this case because the policy at issue affects voter registration.  While turnout may be a downstream consequence of registration, it is proper to calculate effects on the most direct consequence of the policy. Moreover, voter registration is itself important for many reasons; for instance, get-out-the-vote campaigns often use lists of registered voters to target their efforts.

Second, political scientists typically discuss turnout among registered voters only in very limited circumstances.  For instance, in one of the most influential articles on the estimation of voter turnout, "The Myth of the Vanishing Voter," McDonald and Popkin argue that calculating voter turnout as a percentage of registered voters as Dr. Brunell recommends is uncommon and misleading:

> Who is an eligible voter? Who should be included in the denominator? Is an eligible voter a registered citizen, a citizen who could register, any citizen at all, or any person in the country who could be made eligible to vote? **We do not believe that there is a good argument for including only the registered, but all other possibilities have proponents.**

---

[13] Barras, AnaClare and Theresa Schmidt.  2025.  "Recount of Votes for DeRidder Mayor Confirms Harris as Winner."  Available online https://www.kplctv.com/2025/05/08/recount-votes-deridder-mayor-confirms-harris-winner/.  Accessed 6 Apr 2026.
[14] Brunell Report, 7.
[15] Brunell Report, 17.
[16] Brunell Report, 18.

> **Although registration figures are widely used for the denominator in Europe, few in the United States defend studies of turnout based on registered voters.** Turnout based on registration is used in Europe because registration is synonymous with eligibility: It is generally done by the government or required by law (Powell 1986, 21). **There is widespread agreement that such a restricted definition of eligibility gives a misleading picture of the turnout rate.** [17]

Further, Endersby and Krieckhaus write, "If registration and voting are correlated, however, then the ratio of voters to registered voters is a biased measure of citizen's motivation to vote."[18] As a result, very few studies of U.S. voter turnout estimate turnout as a percentage of registered voters.[19]

On page 18 of his report, Dr. Brunell makes the point that "People who want to vote largely register on their own and then they vote. Registering habitual non-voters does not increase voting turnout rates." Dr. Brunell is making my point for me—the people on the suspended voter list are the opposite of "habitual non-voters." Their efforts to register before their convictions indicate that they are the "people who want to vote" who "largely register on their own and then they vote."[20] They are higher-propensity voters than the people who are not on the suspended list. That is why it is so notable that their post-conviction registration is *lower* than that of the people who do not have to go through reinstatement. Even Dr. Brunell's analysis of turnout among the registered underscores the point that the people on the suspended list are higher-propensity voters: once they are able to overcome the additional requirements of registration imposed on them by the state, they turn out at higher rates than people who did not have to reinstate their voter registration.[21] The operative point for this analysis is "once they are able to overcome the additional requirements," because so few people on community supervision do so.

Dr. Brunell Argues that Louisiana's VRC Requirement Is Not That Costly

In response to my evidence that participation in a wide variety of programs, including elections, is affected by administrative barriers such as informational costs, compliance costs, and psychological costs, Dr. Brunell addresses only compliance costs for a few select programs and ignores the wider body of research I discuss in my report. Dr. Brunell dismisses the effects

---

[17] McDonald, Michael P., and Samuel L. Popkin. "The myth of the vanishing voter." *American Political Science Review* 95, no. 4 (2001): 963-974; p.964.

[18] Endersby, James W., and Jonathan T. Krieckhaus. "Turnout around the globe: The influence of electoral institutions on national voter participation, 1972–2000." *Electoral Studies* 27, no. 4 (2008): 601-610; p. 602.

[19] Geys, Benny. "Explaining voter turnout: A review of aggregate-level research." *Electoral studies* 25, no. 4 (2006): 637-663.

[20] Brunell Report, 18.

[21] Brunell Report, 18.

of in-person and paperwork requirements for food stamps (now SNAP) and Medicaid uptake as different from those required by Louisiana because, as he characterizes it, registration is a one-time act. He writes, "However, the programs that she refers to – food stamps and Medicaid – are all ongoing benefit programs with repeated compliance demands. Voter registration and reinstatement is a one-time act, which makes the analogy less appropriate."[22]

I disagree with his argument for at least two reasons: First, people may need to complete multiple, in-person visits first to obtain and then to submit reinstatement paperwork; it may not be just a "one-time act." Second, as I outline in my report, while high costs can have a dramatic effect on benefit uptake, studies have shown that even costs that are less onerous can affect participation. I discuss a wider variety of costs and programs than just "food stamps and Medicaid" as Dr. Brunell suggests.

First, Dr. Brunell attempts to minimize the steps required to reinstate voter registration in Louisiana. On pp. 7-8 of his report, he writes:

> Methods of obtaining the VRC include text message, mail, fax, email, google chat or any other method of communicating with the probation and parole office (See Deposition of Renee Delouche, pg. 29-31 and 51-52). Ms. Delouche testified that individuals seeking to obtain the VRC can send a text to the district probation and parole office verifying their identity and receive the VRC (Id). Ms. Delouche also testified that an individual can obtain the VRC by placing a call to the probation and parole office and requesting the VRC be mailed to them if they provide their DOC number and if their address is the one currently on file (Id).

Dr. Brunell mischaracterizes the process of reinstating voter registration. Even if one could receive and submit the VRC or documents electronically because of COVID-19 accommodations,[23] currently, parishes accept only original copies of the VRC or other documentation for verification of voter eligibility. They will not accept a text message or email printout. These original documents still must be provided to the parish registrar in person.[24] As Dr. Brunell notes, some people may be able to have the original documents mailed to them if their address is up-to-date, but others may need another trip in addition to the visit to the registrar in order to obtain verification from corrections officers in person. In contrast, people who do not have voter registrations in suspended status can register online, which, according to the state, "is easy using the GeauxVote Online Registration System."[25]

---

[22] Brunell Report, 7.
[23] "Felons-COVID-19." Email From Lani Durio to Melanie Smith. March 31, 2020.
[24] "Felons-COVID-19." Email From Lani Durio to Melanie Smith. March 31, 2020.
[25] Louisiana Secretary of State. "Register to Vote." Available online https://www.sos.la.gov/ElectionsAndVoting/RegisterToVote/Pages/default.aspx. Accessed 7 Apr 2026.

11

Second, Dr. Brunell attempts to minimize the costs of reinstating voter registration relative to the costs imposed to participate in other programs. Dr. Brunell writes that "food stamps and Medicaid" are not like voter registration because they are "ongoing benefit programs with repeated compliance demands." Generally speaking, voter registration requires repeated compliance demands to maintain access to the benefit as well. Voters must update their registrations if they move, and must either vote within a certain time period or actively receive mail at their registered address to stay on the rolls.

Dr. Brunell ignores the broader evidence of the effects of costs of registering and voting that I discuss in my January report. For instance, in Footnote 29, I highlight research showing that more restrictive administrative burdens involved with registering can decrease voting and research that shows how "experiencing administrative burdens such as living far away from polling places, changing polling place, and other disruptions, and other seemingly small problems can measurably decrease the likelihood of voting under certain circumstances." Dr. Brunell does not dispute, or even engage with, this literature.

Dr. Brunell also ignores the informational costs that I highlight in my report. In particular, I write, "The reinstatement requirements in Louisiana, in which people have to complete additional steps based on whether they were registered in the past, add another layer of complexity that potential voters must navigate."[26] Moreover, evidence that parishes are requiring VRCs or other paperwork even for people who are not on the suspended list highlights how confusion may impose costs even on people who are not supposed to be subject to the policy.

With respect to compliance costs, I reference research on the administrative costs of programs such as food stamps, Medicaid, Social Security, and the State Childrens' Health Insurance Program to make the point that the costs of higher paperwork burdens and in-person visits can deter people even from claiming benefits related to necessities such as food and medicine for themselves and their children. The presence of measurable effects of administrative burdens even in these cases speaks to the power of these incentives to structure behavior.

Dr. Brunell makes a similar argument with respect to the effects of implementing the application requirement for voting in Iowa. I reference Meredith and Morse's research on Iowa, the full citation for which is in Footnote 3, to make the point that administrative burdens, in this case an application requirement, can reduce voting participation after a felony conviction. Dr. Brunell argues on page 6 of his report that Iowa is not comparable to Louisiana because "unlike Iowa, Louisiana is not a lifetime disenfranchisement state;" however, during the relevant period for that study, Iowa also did not function as a lifetime disenfranchisement state because of an executive order of the governor. That executive order made Iowa more like an automatic restoration state. The argument of the authors is that re-introducing the application, which consisted of writing a letter to the governor, reduced registration by 12 percentage points.

---

[26] Burch January Report, 10.

Dr. Brunell also argues that the VRC serves as notification of eligibility comparable to that provided in Iowa.  This argument fundamentally misunderstands the nature of the VRC.  To the extent that the VRC is provided "when a person has completed their sentence,"[27] it is important to note that the people on community supervision that I analyze in my report have not completed their sentence.

The overall point from my original report is that the scholarly literature consistently shows that imposing costs to participate in programs, even those designed to provide benefits essential to well-being such as health care and food, can decrease program uptake.  The findings that I present here and in my original report regarding the detrimental effects of Louisiana's unequal application of the reinstatement requirement are consistent with past research.

<u>Dr. Brunell's Claim that Louisiana's Process is "Far Less Burdensome" than Those of Other States</u>

Dr. Brunell argues that Louisiana's policy on voting after a felony conviction compares favorably with other states.  On page 11, he writes:

> Louisiana is not the only state that disallows voting by certain individuals convicted of a felony. Moreover, as seen in Figure 2, Louisiana is not near the top of the scale when it comes to the overall percentage of felons who are unable to vote. Many states have far more felons who are unable to vote. Moreover, among the states that required additional steps for re-enfranchisement, some require a pardon or special dispensation from the Governor of the state. The steps to re-enfranchisement in Louisiana are far less burdensome than these other states.

Dr. Brunell is correct that there are a handful of states that require more steps to vote after a felony conviction.  However, Dr. Brunell's discussion ignores the vast majority of states that allow a larger proportion of people to vote after a felony conviction.  Dr. Brunell's chart on disenfranchisement rates is from 2010 and many states have lowered the barriers to rights restoration since then, so using Dr. Brunell's chart tells us little about Louisiana today.  However, looking at data from 2024 below in Figure 2, Louisiana still is worse than 35 other states in terms of the percentage of voting eligible population that is barred from voting.[28]  Moreover, Louisiana's process for voting after a felony conviction is confusing: different rules for registration based on prior registration or type of sentence coupled with bans for people based on time since incarceration also make it difficult for voters to determine their own eligibility.  Moreover, Louisiana is the only state, to my knowledge, that imposes additional requirements

---

[27] Brunell Report, 7.

[28] Uggen, Christopher, Ryan Larson, Sarah Shannon, Robert Stewart, and Molly Hauf.  2024. "Locked Out 2024: Four Million Denied Voting Rights Due to a Felony Conviction."  Available online https://www.sentencingproject.org/reports/locked-out-2024-four-million-denied-voting-rights-due-to-a-felony-conviction/.  Accessed 7 Apr 2026.

13

just because someone has registered to vote before.  The states that impose additional steps that are highlighted on pages 9-11 in Dr. Brunell's report do so because of criminal history or crime severity, not because of prior voting history.

*Figure 2: Felony Disenfranchisement Rates by State, 2024.  Source: Uggen, Christopher, Ryan Larson, Sarah Shannon, Robert Stewart, and Molly Hauf.  2024. "Locked Out 2024: Four Million Denied Voting Rights Due to a Felony Conviction."*



## Conclusion

Dr. Brunell asserts, without any analysis to back up his claims, that my report suffers from errors that render it unreliable.  Through further analysis presented here, I have shown that his concerns are unwarranted: even after analyzing more recent convictions, examining even more potentially confounding factors, and accounting for suspended voters using only past suspended lists, my conclusion stands that there is a large participation gap between people required to reinstate their registrations and those who are not.  Moreover, not only are each of the choices that I made theoretically and methodologically sound, but also the direction of any potential bias from those choices would tilt toward making my estimates of the gap smaller and

14

more conservative rather than inflating the gap.  Dr. Brunell's attempts to minimize the importance of the participation gap also fall short.


Dated April 22, 2026

*Frani Burch*