# Exhibit 8

**Deposition of Dr. Brunell**



## Transcript of Thomas L. Brunell, Ph.D.

**Date:** April 8, 2026
**Case:** Voice of the Experienced, et al. -v- Landry

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

## Page 1

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA

- - - - - - - - - - - - x

VOICE OF THE :

EXPERIENCED, et al., :

    Plaintiffs, : Civil No.

  v. : 3:23-cv-00331-JWD-SDJ

NANCY LANDRY, in her :

official capacity as :

Secretary of State of :

Louisiana, :

    Defendant. :

- - - - - - - - - - - - x

Deposition of THOMAS L. BRUNELL, PHD.

Conducted Remotely

Wednesday, April 8, 2026

10:34 a.m.

Job No.: 627513

Pages: 1 - 183

Reported By: Angela Collura

## Page 2

Deposition of THOMAS L. BRUNELL, PhD., held virtually

Pursuant to notice, before Angela Collura, Notary Public in and for the Commonwealth of Virginia.

## Page 3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

    VALENCIA RICHARDSON, ESQUIRE

    SAMANTHA PERLMAN, ESQUIRE

    ARIANNA KHAN, ESQUIRE

    ALICE HULING, ESQUIRE

    ELLEN BOETTCHER, ESQUIRE

    CAMPAIGN LEGAL CENTER

    Suite 400

    1101 14th Street, NW

    Washington, D.C. 20005

    202.736.2200

ON BEHALF OF THE DEFENDANT:

    MARY ANN WHITE, ESQUIRE

    CAROLINE TOMENY, ESQUIRE

    SHOWS, CALI & WALSH, LLP

    628 St. Louis Street

    Baton Rouge, Louisiana 70802

    225.346.1461

## Page 4

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF DEFENDANT:

    CELIA CANGELOSI, ESQUIRE

    LAW OFFICE OF CELIA CANGELOSI

    7914 Wrenwood Boulevard

    Suite A

    Baton Rouge, Louisiana  70809

    225.231.1453

C O N T E N T S

EXAMINATION OF THOMAS L. BRUNELL, PhD.        PAGE

By Ms. Richardson                      7, 180

By Ms. White                              173

E X H I B I T S

(Retained by counsel.)

DEPOSITION EXHIBITS                        PAGE

Exhibit 1    P&P Population                  15

Exhibit 2    Burch Expert Report            23

Exhibit 3    Brunell Expert Report          23

Exhibit 4    CV                             23

Exhibit 5    Declaration for Tracy Babineaux    27

Exhibit 6    Declaration of Bradley Harris      28

Exhibit 7    Renee Delouche Deposition          29

Exhibit 8    Melanie Gueho Deposition           29

Exhibit 9    Computer Code                   31

Exhibit 10   Computer Code                   31

Exhibit 11   Computer Code                   32

Exhibit 12   PL69313 – Document K            72

Exhibit 13   February 2026 Procedures        48

Exhibit 14   May 2023 Felony Procedures      50

E X H I B I T S   C O N T I N U E D

Exhibit 15   SOS002007– Document O           54

Exhibit 16   Meredith and Morose 2015        76

Exhibit 17   Voting Restoration              95

Exhibit 18   Alabama Law                     96

Exhibit 19   Mississippi Attorney
             General Opinions                104

Exhibit 20   Civil Rights Restoration
             Executive Order                 106

Exhibit 21   7-13-105 Certificate of
             Restoration of Rights           106

Exhibit 22   P&P Population as of 1.7.26      130

Exhibit 23   Sherri Wharton Hadskey Deposition 161

P R O C E E D I N G S

Whereupon,

THOMAS L. BRUNELL, PhD.,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

MS. RICHARDSON:

Q Good morning, Dr. Brunell. My name is Valencia Richardson, I'm counsel for Plaintiffs in this case. How are you doing this morning? Are we all set?

**A I'm doing just fine. How are you doing, Ms. Richardson, nice to meet you.**

Q Nice to meet you. And so you've already sworn yourself in, but would you mind just stating your name for the record?

**A Thomas Brunell.**

Q Okay. And you've been deposed before, I assume?

**A Yes.**

Q Okay. How many times?

**A I would say 15 to 20 times, I would think.**

Q That sounds about right, just based on your resume. And so you -- you're pretty seasoned at this, but I always find it helpful just to go through the ground rules anyway, just to make sure we're on the same page. So you know the court reporter is just taking down your testimony, and she'll need verbal answers, especially in this -- in context, where we aren't able to read each other quite as well, and so if you just -- just a reminder that like Uh-huhs and Uh-uhs are really hard to read on the transcript. And I'll try to remind you as well, and same thing it's easy to just accidently speak over each other, but since we're in this Zoom context it's -- the transcript will not read that at all. So if we'll -- we'll both try not to do that and speak over each other.

Breaks, let me know if you need a break. I guess since we started half an hour late, I was going to just try to get as much as I could through until lunch, but if you need a break, just let me know.

And then, as you know, the attorneys will object from time to time and then just, you know, let the objection happen and then answer the question right after that.

All right. So Dr. Brunell, do you understand you are under oath today?

A Yes.

Q And is there any reason why you can't give complete testimony today?

A No.

Q Okay. Is anyone else in the room with you?

A My dog is back there, but that's it.

Q Well, you know, he can be a guest. What about any documents besides the ones that you have, the exhibits that they sent you?

A Over here on my desk kind of at arm's length is all my tax stuff and that's really it.

Q Oh, okay. Anything else that would be relevant to this deposition?

A No.

Q Okay. And then you have your phone on you?

A My phone is sitting here on my desk.

Q Okay. Just let me know if you need to take a call or anything, we'll take a break. But just -- I would just ask you not to look at your phone during the deposition, since we're virtual, if you don't mind. And then, anything open on your computer.

A Right now, the only thing I have open actually let me close that, I have the Zoom and then I have the folder with all the stuff with all the exhibits and then I have a PDF reader, Adobe.

Q Okay. And just ask, if you don't mind, just refraining from communicating with folks about the deposition while you're testifying?

A Okay.

Q And then, Dr. Brunell, when were you first contacted about this case?

A It was mid-February.

Q Okay. Who contacted you?

A Mary Ann and Celia contacted me.

Q Okay. Other than Mary Ann and Celia, are there any other attorneys you've spoken with about the case?

A Caroline has been on some calls. I don't know for sure if she is an attorney, but I think she is.

Q Okay. And so what was the scope -- and Caroline is an attorney, yeah. But yes, what is the scope of your assignment in this case, as told to you by the attorneys?

A They told me briefly about what the case involved, and then they said, specifically, that there was an expert report written by Professor Burch that they wanted me to address.

Q Okay. And that assignment ever changed or evolved?

A No, not broadly, you know, the specifics you know kind of came and went, but broadly, that's what it was.

Q Okay. That makes sense. And so did you perform any work outside the scope of your assignment?

A No, I don't believe so.

Q Okay. And so other than responding to Dr. Burch's report, are you offering any other opinions in this case?

A I think everything is related to what Professor Burch has said.

Q Were you asked to look at any documents in particular, in preparation for your report?

A Of course they sent me Professor Burch's report. They sent me -- Professor Burch testified several years ago, maybe at a preliminary injunction hearing for this case, they sent me that. They sent me some excerpts of the law from Louisiana, if I remember correctly. There may have been some other documents here and there that they've sent me, but I can't recall at the moment. And we both sent each other, kind of, some literature, some scholarship in this general area. Sometimes they sent me some papers, sometimes I sent them some papers.

Q And was this just over the course? Or you can just give me the time period when you were sharing -- exchanging documents?

A Yeah. It was just over the last whatever, you know, 6 weeks that we've been working on this case.

Q Were you provided any facts or data by counsel?

A Well, I think I got most of the data from the Plaintiffs, all the stuff that Dr. Burch used. And then we did make some requests for additional data that I was given.

Q And that's -- well, actually, we'll get to those -- that data in a minute, so I'll skip that for now. What about the declarations that were underlying in your report?

A I'm sorry, what do you mean specifically? I'm sorry.

Q So the declaration of Tracy Babineaux and the declaration of Bradley Harris?

A Oh, yes, I was given those as well.

Q Was it your idea? Did you -- how did those declaration come to be?

A No, that was the attorneys were working on that, but sometimes we were talking about things that had come up and then they might add something, well, this will be useful if this declaration from this person said this. But it was -- they were not my idea.

Q Was there any data that you considered that didn't end up in your report?

A Yes, I think there was. I think at one point I was going to try to do some analysis, like I talked about doing multivariate analysis to see if there were other variables that would affect the likelihood of registering, and I think we requested some data, but I don't -- that never made it into the report.

Q Why didn't that make it into the report?

A We were talking about this yesterday actually, and I was trying to remember whether -- I think what happened is I decided that there were you know, kind of the problems we found associated with the data were significant enough that doing this additional analysis didn't make sense. I don't remember if I did the analysis, I think at point in conversations with Mary Ann and Celia, we decided this might be a useful approach. They got the data. The data was delivered to me, but I don't know if I ever even used it at all. I don't recall using it.

Q Oh, I'm sorry, I almost spoke over you like I told you I wouldn't. So were you finished with that sentence?

A Yes.

Q Yes. I was just going to ask you, do you recall which data that was?

A That was, like, additional data on, like, length of sentence, the specific crime. I think I asked for, like, how long the person lived in their current residence, but that -- the -- certainly, the Department of Corrections didn't have that, so that wasn't included. So it was -- it was data like that.

Q Okay. I'm just going to pull up Document Y -- well, I'll share my screen on it, and then I think Ellen will put it in the Zoom chat for the court reporter.

Is this the document you're referring to?

A Yes, I think this is it.

Q This is the original title on it, if that

helps, P&P population as of 1/7/26, updated 3/16/2026.

A I think that that is it.

Q Okay. I'll just mark this as Exhibit 1.

(BRUNELL Deposition Exhibit 1 was marked for identification.)

Q Okay.

MS. WHITE: I'm so sorry Valencia, this is Mary Ann White. What document was that?

MS. RICHARDSON: That was document Y.

MS. WHITE: Y. Thank you.

Q Okay. And so you said, just now, that it didn't make sense to use that data. Could you explain more about what you meant there?

A And this is like my recollection is not perfect on this, you know, I don't know if we had moved on to other grounds, other grounds that we were thought were more fertile with respect to this or -- so I'm kind of trying to put together vague memories. But the -- kind of the focus of the report became the various problems associated with the data that Dr. Burch used, and at that point, you know, how much -- how much additional analyses should I do using these data right, if I'm saying that they are reliable? Do you -- do you know what I mean? So that's kind of what I think may have happened, but I don't recall for sure. I don't know if I ever did any analyses with it or not.

Q Okay. That makes sense. Was there any other data you considered that you didn't ultimately use?

A I don't believe so, I don't recall any other specific data.

Q Was there any data that you requested but weren't able to get?

A Other than, you know, wanting the data on where -- how long every person on the list had lived at the current address, which is probably an impossible dataset to get. I can't -- I don't recall any other requests that I made that we -- that were not fulfilled.

Q You just mentioned earlier that you asked for length of time at the current -- at current residence; is that right?

A Correct.

Q And you weren't able to obtain that?

A That's right.

Q Okay. Do you know why?

A I don't know where those -- who would have

those data. And the data that we were requesting was all from the DOC and I don't think they keep records of -- I think that would be a tough dataset to get, honestly, for anybody, you know, how long has this person lived at this particular address, right? So you've got to -- have to know where they live, and then also when they moved in, that sort of stuff, so that's a big ask.

Q Is there anything else that you considered that could have been helpful that you weren't able to get?

A Not that I can recall at the moment.

Q Have you spoken to anyone at the Louisiana Secretary of State's office?

A I'm not sure. I know we talked to some Department of Corrections people on one call, there may have been -- does Caroline work for the Secretary of State's office?

Q No. So she wouldn't be one of those, someone who works in the office?

A I don't recall. So I would -- if I had to guess, I would say no.

Q Okay.

A But I don't remember.

Q Who at DOC did you speak with?

A Oh, I would have to -- I would have to ask Mary Ann to tell you that. It was a -- it was a, woman, that I don't recall her name.

Q Do you -- does -- let me remember her name as well, does Melanie Gueho, does that sound familiar?

A I think -- I think she may have been on the call. I think so.

Q Does Renee DeLouche sound familiar?

A Maybe.

Q Okay. Does Jonathon Vining sound familiar?

A I don't think I ever spoke with John.

Q Oh, okay. So it's just Melanie is the one that sounds familiar to you?

A I think so, yes. And there may have been two women on it, so maybe it was -- maybe it was also Renee on the call.

Q Okay. Do you have a retainer for your work on the case?

A A financial retainer?

Q Yes, a retainer for your services on this case?

A No.

Q Okay. Any sort of agreement with your work on this case?

A Yeah, there is a written agreement. Oh, yeah, I'm sorry, I thought you meant, you know, like a retainer, like you give money to a lawyer. There is a written agreement.

Q Yes. And how much are you being paid for per hour for your work on this case?

A 600.

Q Is that your standard rate?

A The rate varies. At the -- I would say at the moment it is my standard rate, but I -- sometimes I've charged less in the past, I've charged more in the past, so it's not always the same.

Q Under what circumstances would you charge less?

A Well, I worked on a case recently where the lawyer indicated that the state didn't want to pay as much as I wanted, and so we kind of negotiated a slightly lower rate. But -- and when things are really busy, like during redistricting, I usually charge more because there's so much work I can't take it all, and so I usually raise my rates during that short period of time.

Q During the redistricting cycle. Yeah, it definitely gets busy during the redistricting cycle.

A It really does.

Q I can say that as a redistricting lawyer, so that's very true.

So about how much time have you spent working on this case to date?

A I think somewhere in the neighborhood of 60 hours, I think is a good estimate.

Q Okay. And how much time was that preparing your report?

A Virtually all of it, I mean, in turn, kind of encompassing doing research, looking at data, right? I -- I include that all with the reports. So the report, as you know, was finished relatively recently, so there has been some time preparing for the deposition, but the majority of that time was spent on the report.

Q How much of that time was spent doing any independent data analysis for this report?

A What do you mean by independent?

Q So outside of responding -- to -- outside of rather, analyzing Dr. Burch's data?

A Oh, most of it, almost all of it has been -- other than the part that I included in my

report where I used the voting records for 2024, all the rest of it is looking at data related to what Dr. Burch has done.

Q Okay. And how much time was spent preparing for today's deposition?

A We had a couple meetings, me and Mary Ann and Celia, those were 2, 3 hours each. And then I did a little bit of preparation on my own, so I don't know, say 6, 7 hours preparing.

Q Did you have help from anyone in preparing your expert report?

A I mean, I interacted with Mary Ann and Celia, so they helped me. But other than that, no.

Q Okay. Did you have help in obtaining any of the data you used in your report?

A All the data was given to me by -- I didn't get any data that I recall independently, so it was all given to me either through the Plaintiffs or through Mary Ann and Celia.

Q Did the attorneys review a draft of this report?

A Oh, yes.

Q Did you send a draft of your report to anyone else besides the attorneys?

A No.

Q Okay. Have you talked to anyone else besides the attorneys about your work on this case? Sorry, specifically on this case?

A Other than, you know, with my son or my fiance, just mentioning that I'm working on a case in Louisiana.

Q We won't count them.

A But that's it.

Q Certainly, yeah, kids and a -- kids and wives get a pass.

Which other expert -- scratch that.

Let's actually just pull up the reports.

MS. RICHARDSON: Can we pull up Document A?

Q Okay. So Dr. Brunell, do you see it on your screen?

A I do.

Q Are you familiar with this document?

A Yes.

Q This is the expert report of Dr. Tracy Burch?

A Correct.

Q And this is the expert report you're responding to?

A That's right.

Q Okay. We'll be referring to this throughout the deposition, but for now I'll just mark that as Exhibit 2.

(BRUNELL Deposition Exhibit 2 was marked for identification.)

Q And then we'll pull up Document B.

Okay. And then Dr. Brunell, do you see this document?

A Yes.

Q This is your response to Dr. Burch's report?

A It is.

Q Okay. And we'll also be looking at this throughout the deposition, but for now we'll mark that as Exhibit 3.

(BRUNELL Deposition Exhibit 3 was marked for identification.)

Q And then a few more things. Document C. And, Dr. Brunell, is this your CV that you sent along with your report?

A Yes.

Q Okay. We'll mark that as Exhibit 4, but stay on this document for now.

(BRUNELL Deposition Exhibit 4 was marked for identification.)

Q Are there -- have you been involved in any additional litigations since you prepared this CV?

A I was -- let me look to see at the bottom where I list.

Q We can scroll down for you.

A Okay. Yes, if you could scroll down, I think it's at the very bottom of it. Yes, I think that this includes everything.

Q Okay. This is up-to-date, as of today?

A Yes, it is.

Q Okay. And then any additional publications?

A No, unfortunately.

Q Okay. So this is also up-to-date, as of today?

A I believe it is.

Q Okay. Any -- on your resume, is there any expert analysis related to data analysis on your resume?

A On all the cases that I worked on or --

Q Just generally speaking.

A My research too?

Q Yes.

A Yes, almost virtually all of my research

involves analyzing data. There are some, there are a few that don't involve that, but almost all of my research involves the statistical analysis of various data sets, as well as most of my, if not all of my work as an expert witness.

Q Okay. Anything related to voting with a felony conviction on your resume?

A No, I don't believe I've ever done any research on that.

Q Have you ever served as an expert on that topic?

A I have not.

MS. RICHARDSON: We can pull this down for now.

Q Do you have any research background in the voting behavior for people with felony convictions?

A I mean, I've done voting behavior, but I haven't analyzed just people with felony convictions, no.

Q What about voter registration for people with felony convictions.

A Not that group specifically, no.

Q Or voting rights restoration after a felony conviction?

A No.

Q Is there anything about voter registration generally, on your resume?

A Not that I can recall off the top of my head. I mean, I study elections, so obviously, registration -- elections and voting, so registration is a part of that. But I don't know if I've ever done research just specifically looking at whether, or why, or why not somebody is registered or not.

Q What about just voter registration patterns, generally?

A I mean, I think it's sort of related to some of my work. I did -- I wrote a paper that's kind of similar in some ways to one of the papers that Dr. Burch wrote, or I looked at -- we tried to estimate what would happen in an election if everybody voted. And so that -- we were -- we used people that were registered and voted, and then people that were registered and didn't vote, and then people that were not registered at all, and tried to estimate what would happen if there was compulsory voting, for instance. So that's related to it, but not specifically isolating down to what I think really what your question was

about.

Q Do you know the name of that report? Or do you recall it, rather?

A I think it's called: What Would Happen If We Had an Election and Everybody Voted. I think that's the title of it.

Q Okay. Very easy to remember. Yeah. Okay.

MS. RICHARDSON: Let's pull up Document D.

Q Dr. Brunell, is this one of the declarations you were referring to earlier?

A Yes, it looks correct.

Q And this is a declaration you relied on in your report?

A I believe so, yes.

Q Okay. Let's mark that as Exhibit 5.

(BRUNELL Deposition Exhibit 5 was marked for identification.)

Q And I'll also come back to this from time to time. And you didn't request this?

A No, I did not.

Q Okay. Did you have any input in drafting the declaration?

A None.

MS. RICHARDSON: Okay. Let's pull up Document E.

Q And is this the other declaration you referred to earlier, the declaration of Bradley Harris?

A Yes.

Q And you relied on this declaration in your report as well?

A Yes.

Q Okay. And mark that as Exhibit 6.

(BRUNELL Deposition Exhibit 6 was marked for identification.)

Q And so, you didn't request this one either?

A No.

Q Did you have any input in drafting the declaration?

A No.

Q Okay. All right. Let's go to -- just do some housekeeping, so let's go to Document F. Okay. And Dr. Brunell, do you recognize this document?

A I believe I've seen this, yes.

Q Is this the -- so this the deposition of Ms. DeLouche. Do you -- you relied on this document in your report; is that right?

29

A I believe I cited to it, yes.

Q Okay. Let's mark this as Exhibit 7.

(BRUNELL Deposition Exhibit 7 was marked for identification.)

MS. RICHARDSON: Let's pull up Document G.

Q Okay. Is this -- do you recognize this document, Dr. Brunell?

A Yes.

Q And this is the deposition of Ms. Gueho that you relied on in your report?

A Yes.

Q Let's mark that as Exhibit 8.

(BRUNELL Deposition Exhibit 8 was marked for identification.)

MS. RICHARDSON: And then, this next set, I think the reason why we had so much trouble downloading, Document H.

So, yeah, looks good Ellen. Thank you, because we'll go to I next.

But do you recognize this, Dr. Brunell?

A Yes, this is a dataset. It looks like it's about voter registration.

Q Yeah. I think the title of this document is registration as of 2024, 1105 did vote.

Does that sound right?

30

A Yeah, it does.

Q Okay. Is this a document that you relied on in your report?

A Yes, I use these data.

Q Okay. And then if you actually go to I, as well, it has this -- so if you switch over tabs to I. Actually, I just have a question for you about this. I think they have the same -- they were produced to us, they have the same title, but Document H says -- has like a (1) in it. So are these different documents, do you know, are the same? It says it -- it also says registration as of 2024, 1105 did vote. But Document H also says did vote, but with a (1)?

A So based upon -- since, obviously, I can't tell for sure, but based upon my experience with data, it sounds like the data were kind of downloaded twice to the same computer and then the computer -- when the computer sees two files with the same name --

Q Yeah.

A It will sometimes put a 1 in parentheses, like that's the second version. So presumably, they're the same exact file.

Q Okay. Did you -- so this is just -- just

31

I'm just basing it off the title, these are just the folks who voted in the 2024 general election?

A No, it's registration and whether they voted or not. Like the last variable -- well, there's a variable at the very end, which is hard to tell where the end is, but it says yes or no. So we can tell whether they voted or didn't vote in the 2024 general election.

Q Okay. And that was actually my real question. And for this, you could tell who both voted and did not vote from these files?

A Yes.

Q Okay. So I just wanted to make sure just for my purposes, there's no difference between these two, so far you can tell?

A As best as I can tell, no.

Q Okay. Let's mark H as 9. I'm sorry, yeah, mark H as Exhibit 9. And I as Exhibit 10.

(BRUNELL Deposition Exhibits 9 & 10 were marked for identification.)

MS. RICHARDSON: And then let's go to Document J.

Q Dr. Brunell, can you tell us what this document is?

A This was the code, the computer code that

32

I used to run the analysis on the dataset we just looked at.

Q Oh, I see, so this was only for -- this was only for the -- the one analysis you did outside of analyzing Dr. Burch's analysis?

A Yes, I believe that's right.

Q Okay. And when you looked at Dr. Burch's analysis, you relied on her code?

A In part, we got some of the code and she gave some instructions, but I don't know -- I don't know if I was ever given all of the code, like all the matching code, but I, you know, I was sort of able to figure out what was going on.

Q Okay. We'll mark this as Exhibit 11.

(BRUNELL Deposition Exhibit 11 was marked for identification.)

Q All right. Let's pull those down.

Dr. Brunell, who is eligible to vote with a felony conviction in Louisiana?

A Who -- who is eligible to vote? If they are -- have not been incarcerated for the last 5 years, they are eligible.

Q What about individuals who are on probation and parole?

A If you're on probation and parole and you

**33**

haven't been incarcerated for 5 years, then you're eligible.

Q What if you're on probation or parole and you get off of probation and parole for less than 5 years, within less than 5 years?

A Then you're also eligible.

Q Okay. Describe your understanding of the requirements for people with felony conviction to register to vote?

A So if the -- there's a key difference about whether or not they were registered before they were incarcerated. So if they were not registered before they were incarcerated and they finished their sentence and they're now eligible, they can register to vote the old -- like anybody else does. However, if they were registered to vote before they were incarcerated, then during the time that they're ineligible -- during this -- when they go to prison, their registration is -- they're still registered to vote, but their registration is suspended and it must be reinstated when they're eligible again, and that's done by providing documentation like a voting rights certificate to the Registrar of Voters.

Q And what is your understanding of that

**34**

documentation you just mentioned, required of those individuals?

A The VRC?

Q That's what -- so the VRC, the voting rights certificate?

A Yes.

Q Is there any other documentation that you can provide?

A Yes, I believe you can provide other documentation that the Registrar will accept, that isn't from the DOC, that isn't a VRC, that will allow them to become reinstated.

Q And so just walk me through your understanding of what happens if an individual with a felony conviction submits a voter registration application? So different than what the law is, what your understanding of the law is. Walk me through what your understanding of the -- of the steps that occur after an individual with a felony conviction submits a voter registration application?

A So for everybody, or do you mean just specifically those that have been suspended?

Q I'm referring to everyone.

A Okay.

**35**

Q Everyone with a felony conviction.

A Everyone with a felony conviction. So if they are -- so the -- I mean, I think my answer is the same. I don't know what kind of answer you want in terms of processes, but if they were never -- if their voter registration was not suspended, and then they're eligible to register to vote, they can register like any other person, online, in person, and I don't think there's anything else that happens during that particular -- in that process. But if their registration was suspended, then they have to provide documentation to the Registrar of Voters to be reinstated and then they can register to vote -- I mean, then they get -- they are registered, then their registration is reinstated.

Q Okay. Can people in prison register to vote in Louisiana?

A Well, they'll be ineligible, so I don't -- yeah, technically I don't know, like could somebody who's ineligible to vote register and then have it automatically suspended. I'm not sure. I would -- I'm just hazarding a guess, but I would say no.

Q Okay. Could people in jail register to

**36**

vote in Louisiana?

A I would think if they're eligible that -- do you mean are there official -- does the state provide them with registration forms, is that kind of the question or are the --

Q No, I mean are they eligible?

A I would think if they're eligible, they could -- if they could get the proper forms or get connected to the Internet, that they may be eligible to vote. I mean, may be eligible to register.

Q Okay. And can you describe more of your understanding about the in-person requirements for people who are registering to vote with a felony conviction?

A So they -- so if their registration is suspended, they need to bring documentation in person to the Registrar of Voters, to show that they are -- that their voter registration should be reinstated.

Q Okay. Let's pull up your report, so that's Document B, or Exhibit 3, and go to page 7.

MS. RICHARDSON: I don't -- Ellen, I don't know if it's going to correspond with the PDF, so it's the internal document page. Yeah. Fabulous.

---

37

Q So at the end of the -- right there, you were in the right spot, the last paragraph you say: However, the documentation of eligibility, the VRC, may be obtained from the preparation of parole as provided to all felons under custody of Departments of Public Safety and Corrections qualification closure.

Do you see that?

A Yes.

Q Okay. What's the basis of your statement in that report, or in this paragraph?

A It's about the declaration of Babineaux.

Q Okay. And what do you understand completion of sentence to mean in Louisiana?

A They're no longer on probation or parole.

Q Okay.

MS. RICHARDSON: Can we pull up the Babineaux declaration, so that's going to be Exhibit 5 or Document D. So go down to Paragraph 32.

Q Is this what you're referring to, Paragraph 32, at the time of case closure?

A Yes.

Q Okay. So where does -- and then -- I'm sorry, I'm going to flip back to your report

---

38

really briefly in that same area, it says -- I think go down to the top of page 8. I can't see it, but it says you refer to it as an automatic acquisition of the necessary documentation.

Do you recall that?

A That sounds like something that might be in there, yes, I don't see it, but...

Q Yes, it's in there somewhere, it's just hard -- oh, there it goes, right there, this is an automatic -- on page 7, this is an automatic acquisition of the necessary documentation?

A Right.

Q And so is that what you're refer -- your support of that is in Document D, Exhibit 5 that Paragraph 32 of the Babineaux declaration?

A That's the citation, yes.

Q Yeah. Where does that say that this is an automatic acquisition of the necessary documentation? Or in other words, you know what implies that this is given automatically?

A Can we go back to the Babineaux?

Q Yes.

A So I think part A at the time of the case closure, a VRC is generated and provided to the convicted felons.

---

39

Q Are you -- which part you are saying implies that that process is automatic?

A 32.

Q For the voter? Okay. If you believe that -- so that individuals received the VRC automatically, when do you think that started?

A Like when did the state start providing the VRC automatically?

Q Yes.

A I would think, let's see, reinstated was 97. I'm trying to remember when -- I think the VRCs started in 2019, I think.

Q Yes, I can say that it did. The VRC was started in 2019.

A Okay. So I would, I guess since 2019 and that's actually what it says in this.

Q Okay. And so where -- so Ms. Babineaux's declaration doesn't say that the individual has to request the VRC upon completion of sentence before it is generated, right?

A That's right, it does not say that.

Q Couldn't that 32A be read to mean that the request is required before it is generated?

A I don't think so. I mean, at the time of the case closure entered into CAJUN, a DSPC data

---

40

management system, at the completion of the sentence, a VRC is generated and provided to the convicted felons. It sounds like when the case is over, it's automatically generated.

Q But it could also mean that an individual needed to request it and it will be generated?

A I mean, part B says some convicted felons may request to receive a VRC, so they can request it, but my --

Q Before their sentence is complete, but not upon -- it doesn't say upon completion in 32B?

A It does say before their sentence is complete.

Q And what about individuals who are incarcerated in jail?

A I didn't -- we didn't really talk too much about the distinction between jail -- people in jail and people in prison. So -- but I think most of the stuff we referred to, required them being in prison, which I think would be distinct from being in jail.

Q Certainly.

MS. RICHARDSON: Can we pull up Document K? Oh, sorry, K as in kite. Okay. I'll -- this is a one-page, one or two pages. So if you scroll

41

down to the -- I'll just put the Bates number on the record. This is PL69313, and can you go back up?

Q So this is an e-mail from the Parole and Probation office in New Orleans.

Do you see that?

A I do.

Q Yeah, and it says: We -- do you see it says: We don't -- I'm sorry -- I'm sorry your screen is small, I couldn't see the -- I couldn't see you --

MS. WHITE: Okay. I want to make an objection. Can you hear me?

MS. RICHARDSON: You broke up for a second, so you might want to repeat your objection.

MS. WHITE: Okay. I want to make an objection as to this document. He has no personal knowledge of this document. He's not listed on this document, and he's testified that this -- any issues related to jail or prison, and voting registration were not within the scope of his report. You can answer if you can, Dr. Brunell.

Q Yes. Answer if you can. And then it says we do not create VRC letters on incarcerated

42

individuals.

Do you see where it says that?

A I see that.

Q Okay. And then we'll pull this down. And then -- or you can leave it up for now, and then we'll -- it doesn't matter.

So I'll jump back to that -- was all voter registration for people with felony convictions within the scope of your report or responding to Dr. Burch's -- in responding to Dr. Burch's report?

A I'm sorry, can you repeat that one more time?

Q Absolutely. And I kind of mumbled at the end, so I apologize.

I said, in responding to Dr. Burch's report, was -- did the scope of your report include vote -- all voting for people -- voter registration for people with prior felony convictions?

A I'm not sure. I mean, it sounds like it would be, but I'm not quite sure.

Q Okay. And so as we saw -- did you understand that document we just saw to mean -- or you tell me what you understand it to mean.

43

A That a registrar was responding to a question about whether VRCs are provided to incarcerated individuals, and she replied that they aren't.

Q Okay. So for incarcerated individuals who need the VRC, it can't serve as automatic acquisition; is that right?

MS. WHITE: Same objection as before.

MS. RICHARDSON: I'm sorry, Mary Ann, I don't think we heard it.

MS. WHITE: Okay. I apologize. Same objection as before.

A Could you repeat the question, Ms. Richardson, please?

Q Absolutely. So as to incarcerated individuals, the VRC can't be automatically required -- acquired?

A So incarcerated means in jail, rather than in prison?

Q In jail.

A Okay. I mean, that's what the REGISTRAR indicated.

Q Okay. Are there individuals who become eligible before or after they complete their sentence? So basically, an individual who remains

44

under an order of imprisonment but hasn't been incarcerated in the last 5 years?

A So the -- if they haven't -- my understanding is if they have not been imprisoned in the past 5 years, but they are -- and if they -- they can be on parole and probation still, they are eligible once again.

Q And so is it your understanding that kind of person would receive the VRC, even though they are still under an order of imprisonment?

A I think going back to the declaration -- I'd have to go back -- I think the declaration says that the sentence has to be -- I can't -- I'd have to go back to the exhibit we looked at.

Q And so let's go to -- back to your report at page 7.

MS. RICHARDSON: Okay. I think go up -- sorry, no, go down. Go up. And go up again. Go up again. Here we go. Thank you. So actually, go to the bottom of page 6 so we can get that sentence.

Q So this is referring to the Meredith and Morse report from 2015. It says: Meredith and Morse contend that felons who are provided notification of their eligibility to register at

45

high rates than those who do not receive such notification. In Louisiana, the VRC serves as such a notification.

A Correct.

Q So how does a VRC serve as notification to people who don't receive it automatically?

A Well, you'd have to receive the VRC in order for it to be a notification.

Q So by definition, if you have to request it, it's not notification?

A Well, it's a notification once you get it. But if you -- if -- it would no longer be automatic.

Q But it doesn't -- if you have to know ahead of time that you need the VRC, then the VRC itself can't serve as notification, right?

A The VRC is a notification that they are eligible to be -- to either register or to be reinstated. But if you don't get the VRC, then you haven't received a notification.

Q Yes. Right. So the VRC can't serve as notification that you need the VRC if you have to request the VRC?

A Yes, it would be -- so presumably, if you're requesting a VRC, you already know that you need it in order to get registered. So then, yes, I agree with that distinction.

Q And so, do you know how individuals who don't receive notification that they need the VRC, find out that they need the VRC?

A I mean, there could be, you know, maybe not infinitely many ways, but there could be lots of ways.

Q Okay. Do you know if it's explained to them by any corrections official?

A I don't know if that's explained to them.

Q Do you know if it's explained to them by any state official?

A I'm not sure.

Q Okay. So then -- yet again, you know, people who need the VRC on their own accord, or by definition they're just not notified that they need the VRC by the VRC itself?

A Correct.

MS. RICHARDSON: Okay. Let's go down to the bottom of page 7.

Q Okay. So after this automatic acquisition discussion, it says: The VRC is also provided to any eligible felon upon request, and methods include text message, mail, fax, e-mail, Google

47

Chat, or any other method of communicating. Is that right?

A Yes.

Q And then you --

MS. RICHARDSON: Okay. Let's pull up Document L.

Q This is Document L. And so have you seen this document before, Dr. Brunell?

A I don't believe I have.

Q Okay. So if we will -- this is dated February 23rd, 2026.

MS. RICHARDSON: If you go down to page 2, Ellen.

Q So I'll just represent, this is the document titled felony procedures from February 23rd, 2026.

MS. RICHARD: Can we go to SLS 025074?

MS. WHITE: I'm going to object --

MS. RICHARDSON: You broke up again.

MS. WHITE: This is Mary Ann White, I'm going to object to any questions about this document. He's testified that he's never seen this document.

Answer any questions you can, subject to that objection.

MS. RICHARDSON: Okay.

Q So on 2A, does it state that you must appear in person with that documentation from an appropriate corrections official?

A Yes.

Q Okay. Then can you -- and then if you look down further at 2B, it lists acceptable forms of documentation?

A I see that.

Q The VRC and then other documentation signed by a corrections official, judge, a court official or appropriate Government official?

A Yes.

Q Okay.

MS. RICHARDSON: And then we can pull this down -- or just keep the tab open, I guess, but I'll mark it as Exhibit 13.

(BRUNELL Deposition Exhibit 13 was marked for identification.)

MS. RICHARDSON: And then let's go to Document M.

Q All right. Same thing. Are you familiar with this document?

A No.

49

Q Okay. I'll represent that this is the felon procedures again, but this is from May 2023. So you see it says revised May 12th, 2023?

A I do see that.

Q Let's go to 4276.

MS. WHITE: This is Mary Ann White again, I have the same objections as I did for the previous document.

MS. RICHARDSON: Okay. We're at the right page, Ellen, if you go up.

Q Okay. So those first two paragraphs say the same thing, right, the person is required to appear in person at your office. And then the second paragraph, with acceptable form of documentation, includes, but it's not limited to the VRC and other documentation.

A Yup.

Q Okay. And then I'll just -- in the -- in your report you cite the Delouche deposition for support of that -- your statement about the methods of communication?

A Yes, I believe that's right.

Q Yeah. And that deposition was taken in May 2024, so I'll just represent to you that the -- these were the felony procedures as of that

50

deposition.

MS. RICHARDSON: Let's pull that down. And go to document -- I'm sorry, if I haven't already, let's mark that as Exhibit 14.

(BRUNELL Deposition Exhibit 14 was marked for identification.)

MS. RICHARDSON: And then let's go to Document O. And let's scroll down to SS -- SLS002009.

Q Okay. So actually, before I do that, just to show you the e-mail signature line.

MS. RICHARDSON: Can we go to the top again? Or right here actually, right here.

Q So on the from line it's Connor Judkin who works for the Secretary of State's office, and then responding to an inquiry from the Iberville Registrar of Voters.

MS. RICHARDSON: And so if we go down -- back to that part on 2009. Go -- and then I'll wait, because I think Mary Ann is about to have the same objection as she did before.

MS. WHITE: Thank you, Valencia. I do. I have the same objection included on this document. He hasn't been asked if he even is -- has ever seen this document. So I object to any questions

51

about the document. And objection to counsel testifying to it.

BY MS. RICHARDSON:

Q Have you seen this document before?

A No, I don't believe I have.

Q Okay. So do you see this -- I'll just allow you to read these bullet points for a moment and then let me know when you're ready for me to ask questions about it.

A Okay. I've read them.

MS. RICHARDSON: And then go -- I believe up. Let me make sure I've covered everything. There we go.

Q That first bullet point.

A Okay.

Q Okay. So this is saying here -- is -- what do you understand that first bullet point to be saying?

A That some VRCs were delivered via the mail, and the person was asking what they should -- what should they do with them. And they've been given advice to return the letters to the center's addresses.

Q So the VRC couldn't be accepted by mail?

A That's what it says, although there is

52

some -- it says you can't accept them by mail, and then it says the documentation can only be provided by mail, facsimile, or commercial carrier. So I don't know what that means.

Q Oh, if one of the provisions applies in LARS18176?

A Oh, is that for handicap people; is that what that is?

Q Yes.

A Okay. So yes, it says we can't accept these -- you can't accept VRCs by mail, send them back and let them know that they must be delivered in person.

Q Okay.

MS. RICHARDSON: All right. We can pull that down.

Q So your report discusses communication to -- methods of obtaining the VRC including text message, mail, fax, e-mail. But both of the procedures state that you must appear in person with the VRC; is that right? The felony procedures that I showed you from May 2023 and February 2026?

A Yes.

MS. WHITE: Mary Ann White. I'm going to

**53**

object to the form of the question and to the relevance as it relates to the expert report that is being pointed out at the bottom of page 7 referring to methods of obtaining the VRC versus methods of providing the VRC.

Q You can answer my question.

A Yes. That's what I was going to say. So in my report, I'm talking about how requests can be made to obtain a VRC, not how you can deliver a VRC to the Registrar of Voters.

Q So -- but you need the -- you need to deliver the VRC in person, right?

A Yes, but you don't need to be in person to request a VRC.

Q But the -- so walk me through that. So if you're obtaining the VRC via e-mail and you can't use -- but you have to appear in person, how does that work?

A So you request a VRC via e-mail, then it's delivered to them, maybe via e-mail or maybe via mail, and then that person takes the VRC and appears in person at the registrar.

Q And really quickly, I don't think I marked Document O, it should be 15, I believe, as Exhibit 15.

**54**

(BRUNELL Deposition Exhibit 15 was marked for identification.)

Q But if you need the original VRC, what purpose is obtaining the VRC over e-mail?

A No, what -- the important --

MS. WHITE: Mary Ann White. Sorry, I'm going to make an objection as to relevance and not within the scope of his report.

Q You can answer.

A So in my report, the point that I'm making there is just that these are the various ways that a felon can request a VRC, right? It has nothing to do -- so VRCs are given automatically, and then if somebody if needs another one, if they've lost that one, they can request it using various methods, including telephonic, e-mail, that sort of thing. Then they get the new VRC, and now they have to deliver that in person. So it's easy to request it not in person, but once they get it, they have to appear in person to deliver it to the registrar.

Q So -- okay. So let's say I text my probation officer and ask, you know, I need the VRC and I still have to go and get it; don't I?

A I don't know if the VRC -- sorry.

**55**

MS. WHITE: Same objection as before.

A I don't know if it's delivered by mail. I don't know if they have to go to the -- to their parole officer directly to get it, or if it can be delivered electronically to them.

Q Did you know that voter registrants are required to provide the original VRC to the registrar?

A Or other acceptable forms of documentation.

Q But, nevertheless, the original copy?

A Yes, I believe that's right.

Q Okay. So then how would -- so if you have to obtain the original copy in any event, then requesting it via e-mail or text message serves what point?

A It's easier to --

THE WITNESS: Sorry, Mary Ann.

MS. WHITE: I have the same objection to relevance. Not within the scope of the report.

Q You may answer.

A The point in the report is that it's easy to request a VRC.

Q But doesn't speak about the additional costs therefrom, after the -- after the request is

**56**

made?

A I mean, you do have to deliver it in person still.

Q Okay.

MS. RICHARDSON: And then can we actually pull up the Delouche transcript, that is Document F, Exhibit 7. Let's go to page 29 of the -- oh it's a condensed transcript, so it's not going to be -- yeah.

Q So I think it starts at 29. Yes, is this the testimony you cite to in your report?

A I don't recall specifically.

Q Okay.

MS. RICHARDSON: We can go back to your report.

Q Yes. See it says on the bottom see deposition of Renee Delouche page 29 to 31 and 51 to 52?

A Yes.

MS. RICHARDSON: Okay. Let's go back to the --

Q So this is the part that you -- page 29 starts where you started to cite to her report?

A Correct.

Q And so line 29-13, it says: Unless they

can verify who they are; is that right?

A That's what it says.

Q So she didn't testify that anyone could obtain a VRC through those methods of e-mail, text et cetera; is that right?

A They say that they have to be verified.

Q So if you can't verify who they are, you have -- you can't use those methods?

A I think that's implied.

Q Okay.

A At least with text messages.

MS. RICHARDSON: And then if we go down to 30 -- line 30-18.

Q So you see it, well, unless they have the address on record.

So similarly, could it only be mailed if their address hasn't changed and they know their DOC number?

MS. WHITE: Mary Ann White. I'm just going to make an objection to asking him questions about someone else's testimony. The testimony of the transcript speaks for itself.

Answer if you can.

A She says unless they have the address on record. And then does she also say -- could you scroll up to 31?

Q Yes, we can.

A I assume that you also need a DOC number, it's not quite clear to me if you need both. But yeah, they have to verify your address.

Q Okay. In obtaining a VRC through methods other than text or e-mail, did you consider the cost of that?

A No.

Q Okay. Let's go to your report. And let's go to page 18.

MS. RICHARDSON: Right here, thank you Ellen, at political science research section.

Q And so, here on 18, talking about registration rates for Maine and Vermont -- sorry, or rather registration and turnout.

Are people in Louisiana -- we discussed earlier, people in Louisiana prisons aren't eligible to vote, right?

A Correct.

Q Okay. And so why would -- why would they be likely voters if they are not eligible to vote?

A I don't understand your question.

Q So I guess -- and I'll just step back a little bit, what do you mean -- what -- what

relationship does this paragraph have with Louisiana voting, since Louisiana individuals in prison can't register or vote?

A This is more about responding to Professor Burch's report right, so this is showing that turnout rates in these two states that have the most lenient treatment of felons with respect to voting, turnout is very low.

Q But Dr. Burch doesn't describe turnout in her report; does she?

A She concentrates on voter registration.

Q Okay. So this paragraph doesn't have any relevance to voter registration?

A Well, you have to be registered to vote in order to vote. So, kind of one of my arguments, one of my critiques of Professor Burch's report is voter registration is only interesting -- it's more interesting with respect to turnout, right? Because the only reason you register to vote is so that you can vote. So I mentioned quite a few times in my report, there's a big difference between registering to vote and actually voting.

So I think ultimately, what we should be interested in is voting, and obviously registration is a necessary condition to vote.

Q Well, a question about that. I do -- yeah, I do recall you saying that in your report about focusing on voting. Why do we not focus on voter registration, in a case about voter registration?

A That was a good question. So from my perspective, right, voter registration, voter registration is important, but the reason why we are interested in voter registration is because you need to be registered in order to vote. So ultimately, I think the question is about voting right, and I understand that you -- this case is about voter registration. But I think, ultimately it's -- the picture is slightly bigger than that and we should also consider turnout rates, the rate at which people actually vote.

Q But in analyzing costs of registration, isn't registry or barriers to registration, isn't the cost of registration the relevant question?

A I mean, I think that's kind of more of a like a legal question, like from my perspective, ultimately, right being interested -- I'm trying to think of a good analogy, but I can't. Being -- voter registration is only interesting because you need to register in order to vote. So looking at

it in isolation from a political science right, from my perspective, makes less sense. I understand right, from your perspective, this has -- this case has nothing to do with voting. This is we sort of stop at voter registration. I understand that. But I think ultimately, we should -- we should be looking at voting as well.

Q Okay.

MS. RICHARDSON: Let's turn to page 6 of your report.

MS. WHITE: Valencia, I just want to say, are we getting to kind of a stopping point, we've been going for about a -- almost an hour and a half now, just to have like a little break.

MS. RICHARDSON: Sure. I was trying to -- or can we go off the record really quickly, just so this doesn't eat my time.

(A discussion was held off the record.)

BY MS. RICHARDSON:

Q All right. So back to basics. So at the top of page 6, you discuss this formula; is that right?

A Yes.

Q Okay. Can you just describe what you're describing here about the -- about the equation?

A Sure. So this is a -- an equation that a social scientist came up with some time ago, trying to build a model, a simple model of what makes somebody turn out to vote. And it is -- and Professor Burch kind of addresses this in her thing, talking about the costs, right? The costs of voting, which include registering to vote is one of the costs, but not the only cost. So this is the probability -- so R is what we're interested in, that's the probability of voting. And there are benefits to voting, that's the B term. There are costs to voting, that's represented by C. And then D, is what's called duty term, D-U-T-Y. And then the P term, which you multiply, P is multiplied by B, is the probability of a voter's vote being pivotal, which means that without this vote, the election would have been different.

Okay. So what I'm trying to respond to with what Professor Burch did, was she was talking about the costs of voting, right. We understand that the cost of voting are -- the higher the costs, the less likely somebody is to vote. But I don't think that that's it. The -- it's not that straightforward, right? So the real reason,

according to this theory, that people aren't voting is because the probability of being a pivotal voter is exceedingly low. So that minimizes the benefits. So kind of regardless, the costs can be relatively small, somebody's still not going to vote because the benefits are multiplied by this extremely low probability.

So initially, the equation didn't have the duty term, and so basically, the predict -- the, model predicted that nobody should vote. Like, if you're a rational person, if you're making this cost benefit calculation, nobody should bother to vote because any cost isn't worth bearing, because the benefits are going to be tiny, right? So the cost would always outweigh the benefits. So this was kind of a revised version, right, to fit the world better, right, because obviously people do vote. So this was a way to try to describe the world better, and so they added a term that it's not just the cost and the benefits, it's also the sense of that voting is a duty. So it -- so it's not just costs. And in fact, there's quite a bit of research in political science that shows reducing costs makes it easier for voters to vote, but it doesn't really increase the number of

people who then choose to vote. It doesn't -- it doesn't suddenly transform non-voters into voters, it just makes it easier for people who would otherwise already vote, to vote. So like mail-in balloting, for instance, you know, the Motor Voter Law, right, registered millions of new people, but had virtually no impact on turnout.

So that's kind of what I was -- that's the point I was making.

Q And this is going back to our previous discussion about voter turnout with voter registration; am I understanding that right?

A Yes.

Q Okay. And so a couple of questions there, you cite here, you know, the NVRA example, the Motor Voter Bill, right, led to increased registration. Is registration not its own end?

A I don't -- it doesn't serve any purpose than allowing somebody to vote, so that's ultimately what we're interested in. And there is -- there is a difference between registering and voting, and so I don't know, -- you know, legally, maybe there is a reason to be interested in registration. But kind of intellectually, I see less reason to be interested, that's not to say

there's no reason, but ultimately, registering to vote is to allow somebody to vote, so that's kind of, in my mind, is the real -- that's the real end.

Q But the -- so the Downs theory, though, do I under -- I'm just, from my own understanding, the Downs theory functionally says the same thing as it pertains to voting, right, before you add the Duty element, there's no reason to vote, because there -- of the probable chance that your vote will actually count; isn't that right?

A That's correct.

Q And so it's only until you add the extra element of Duty, that your reason for voting actually makes sense; is that right?

A Right. Makes for a rational person.

Q So I guess, would that not be the same case for voter registration?

A They're certainly related, right, if you're looking at voting, then the act of registering would be counted as a cost. If you were looking at registering, right, then the registration -- the cost of registering would still be a cost. But yeah, it would be -- you could think of it in the same way, right? 'Cause

ultimately, right, we're interested in voting.

Q Yeah. But there -- but as you -- you note, so if I understand the Downs' equation right, there are -- there's an extrinsic value to voting outside of whether or not your vote will count, right?

A Correct.

Q And so would there not also be an extrinsic value -- extrinsic value to voter registration outside of whether or not you actually vote?

A Oh, I think that's a tougher question. I don't want to say yes or no, I could imagine we could kind of make something up saying that, you know this gives -- the act of registering to vote gives somebody some feeling of efficacy, something like that. But I think, ultimately, registering to vote is interesting only because it's needed in order to vote.

Q Okay. When we're talking about the costs, are we -- did you respond to the cost about fear of prosecution?

A I'm sorry, did I respond to the cost of the fear of prosecution?

Q Yes, for, you know, due to miss -- you

know, not understanding the law and voter registration of the felony conviction?

A Professor Burch mentions that, I don't think that appears in my report anywhere.

Q And did you respond to the costs associated with the lack of information, similar to the lack of prosecution of the -- or your prosecution and the lack of information about what the law is in your eligibility?

A No. I didn't respond to that specifically.

Q Did you respond to other, sort of, intimidation costs for voter registration?

A Not specifically.

Q Okay. So think in the same paragraph, the last sentence actually, Professor Burch only focuses on the costs, but there are more -- there's more to consider from a political science perspective. So to the extent that this idea does apply to voter registration, does it follow that barriers to voter registration can cause some people not to register to vote?

A I think that's a truism, right? I think that you can't say no to that.

Q And what about people who cannot pay those costs, would that create a barrier to

registration?

A Well, I would want some more specifics on that one, like -- because I know you don't mean financially, right? Although you could, right? You're talking more ephemeral, right? 'Cause the costs usually are not directly financial, right? It's the cost of going to get registered, it's the cost of, do you have to take off work in order to go to the poles, this sort of thing. So the -- so whether you can pay them or not, I think it's more like are you willing to pay them, right, because if you are intimidated to go, because you don't trust the state, right? What -- you may be intimidated to walk into a Government agency in order to register to vote, because you just don't want to interact with any part of the Government. And so it's not that you can't afford it, you might be making the decision that, hey, I don't want to, but. It's not that you that -- it's not that they can't bear the burden, they're deciding they don't want to bear the cost.

Q And actually, so you and I are on the same page about the types of costs, yeah, I was speaking about the more ephemeral cost, as you stated. So, but what about sort of the cost of

69

appearing in person at the office of the registrar for example, as you quoted, may or may not be a direct financial cost, but it is a cost and what if you have a job and cannot go to the office of the registrar during business hours, isn't that a cost you cannot pay?

A Yeah. The all, you know, does -- you know, what are the hours of the registrar, you know, or if somebody works 8 to 5 Monday through Friday, every Monday through Friday and the registrar is only open Monday through Friday 8 to 5, then that person is going to face a tougher time. You know, they'd have to go during their lunch hour or they'd have to take some of their PTO -- use some of their PTO to go down to the registrar. So you can do it, but for a person like that, it's much more -- it is more difficult because of the overlap of hours of availability and the hours they work.

Q Okay. You only can do it if you overcome the cost, which you mentioned PTO of loss pay, you know, lost PTO, lost work hours?

A Yes, you know, there -- I mean, there could be -- there's other ways, presumably, you know, maybe you could -- maybe somebody could

70

trade shifts with somebody, I don't know, right? So there are ways to do it presumably. But for some people, it's going to be more difficult than for other people.

MS. RICHARDSON: Let's go all the way back down to page 17. Can we go, I think, up. I'm having a hard time. Having a hard time because I'm not looking at my highlighted copy. It's actually page 18, Ellen, right above the political science section.

Q Just through this line of question about turnout and registration rates, it says: While Professor Burch's report indicates that eligible and never suspended people register at higher rates than eligible ever suspended people, never suspended registrants vote at much lower rates than ever suspended registrants do.

Did I read that right?

A I believe you did.

Q Okay. And so just mapping this conclusion onto the cost theory that we've been discussing, wouldn't this mean that the most motivated people overcome the barriers to registration?

A I think you can interpret it different ways, right? I think the main point for me is

71

again, ultimately, we're interested in the rate at which people vote. So the main point that I'm trying to make here is the gap that Professor Burch shows in voter registration between ever suspended and never suspended is, I think it's about 10 percent, if memory serves correctly. What I'm showing here is that -- well, if we take it to the next step, which presumably, we should be interested in, which is the rate at which people vote, it flips, right, and the percent of people that were never suspended vote at lower rates than ever suspended registrants do. And there could be lots of different explanations for this, including never -- it's easier for never suspended people to get registered. That's one of the reasons why, you know, there's registration fairs. There's groups that help them get registered to vote, and so the gap is bigger for registration, in part, because it's easier and there's people helping these individuals get registered. And -- but then when we look at voting, right, that gap is less interesting because of the rates at which they vote.

Q So, but this could also be interpreted as, so as we -- as you just stated, never suspended

72

people register at higher rates, right?

A Correct.

Q But ever suspended people vote at higher rates, right?

A Correct.

Q So despite having lower registration rates, ever suspended people will nonetheless vote at higher rates?

A Yes.

MS. RICHARDSON: Let's go back to page 7. I apologize for bouncing around -- actually, you know what? This is a good stopping point. Let's go off the record.

(A recess was taken.)

BY MS. RICHARDSON:

Q Back on the record. Before I get started, I just need to mark Document K as Exhibit 12 to this deposition.

(BRUNELL Deposition Exhibit 12 was marked for identification and attached to the transcript.)

MS. RICHARDSON: And then let's pull back up your report, and go back, I think we left off at page 7.

BY MS. RICHARDSON:

73

Q Okay. And so when we talked -- the part of your report on page 7 that discusses the Michael and Morse -- the -- I'm sorry, Meredith and Morse report, right here, okay. So we're in this paragraph and just have questions about that, so the last sentence about -- in this paragraph, it says: Thus, finding relatively low registration and participation rates for felons is not -- is the exception, not the rule.

Is that right? Is that right?

A Yeah. I think you might have -- I think you might have mixed it up. So let me just say it.

Q Yeah.

A The relatively low registration and participation rates for felons is not the exception, but the rule.

Q Oh, I -- yeah. I think I accidentally said the exception. So thank you.

A Yup.

Q So doesn't the Michael [sic] and Morse report also conclude that notification can increase participation for people with felony convictions?

A Yes.

74

Q Okay. And it also, you know, in particular says that many eligible people with felony convictions are just -- are De Facto disenfranchised, I think the term is, because they're misinformed about their voting rights?

A That sounds -- that sounds like something that was in the article, yes.

Q Okay. Do you -- do you want to see it, just to -- or is it --

A I mean, I suppose we should put it up just to be careful. Why not.

Q Yes, absolutely.

MS. RICHARDSON: Document W.

Q And so Dr. Brunell, is this the Meredith and Morse report?

A Yes, that's one of them, yes.

Q That's one of the -- that's the report we're discussing?

A Yes.

MS. RICHARDSON: And then let's go down to page 39.

Q Right here on this, the electoral consequences of De Facto Disenfranchisement and the paragraph before it, I should say as well. So my question was this, this -- the Meredith report

75

says basically, in particular, you know De Facto Disenfranchisement find this information -- also there, you know, it also exists?

A Yes, it can reduce registration and turnout.

Q Yeah. And does -- could that explain why some people with felony convictions might vote at different rates than other people with felony convictions as well?

A The fact that they've been misinformed?

Q Yeah.

A I suppose that could be a factor, sure.

Q Sure. And then just comparing, you know the Meredith and Morse statement -- your statement in the report, rather, about the low registration for felons, is the -- is not the exception, but the rule. Does that sort of comparison between -- that's a comp -- is that a comparison between people with felony convictions and the larger population?

A Yes.

Q Okay. And then does that explain the different registration rates between some people with felony convictions versus other people with felony convictions?

76

A It might. It might.

Q How so?

A I mean, if -- you know, we don't -- this is all just sort of speculative hypothetical, right? So is it possible for some people to be misinformed about whether they're eligible for re-infranchisement or not, could that cause them to not register and/or not vote? Certainly, it's plausible.

Q Okay. And so going back to your report, back to that page 7. And let me, before we finish, or before I start again, mark Document W as Exhibit 16.

(BRUNELL Deposition Exhibit 16 was marked for identification.)

Q So, this statement, low registration, is not the exception, but the rule. Why is this conclusion relevant to understanding why suspended voters may register at lower rates than people whose registrations weren't -- who are new registrants?

A I think it -- I mean, both are registered to the extent that the data are complete and correct. Both are registered at relatively low rates and participated as low rate as well. So

**77**

the distinction between, right, the Meredith and Morse has nothing to do with the distinction between ever suspended and never suspended, it's just sort of generally, we would expect low levels of both voter registration and voting participation.

Q Okay. And so in fact, you know, we just discussed that ever suspended registrants apparently vote at higher rates than never suspended; is that right?

A Correct.

Q Okay. So are you providing any independent opinion on those varying rates within the population of people with felony convictions?

A Are you talking about just the -- I'm not quite sure I understand your question, I'm sorry.

Q No, no, no. And thank you for asking me for a clarification at any time that I'm not clear, that's helpful for me as well.

Are you offering any sort of independent opinion on your own, and so -- any opinion of your own about the differential rates between people -- among people with felony convictions, based on prior registration?

A Just what I've included and analyzed in

**78**

the report.

Q Okay. And then staying here --

MS. RICHARDSON: Oh, let's jump all the way back to page 17, actually.

Q Under the section of Registering to Vote is Not the Same as Voting, that second sentence: One can imagine that the difference in registration and reinstatement rates between suspended and not suspended in the state is because there are many opportunities to register to vote, and those that have been suspended, are already registered.

Did I read that right?

A Yes.

Q Yeah. If they're already registered, then why would the registration rate be lower for suspended voters?

A Well, I mean, this is like -- if we're being sort of precise, all suspended -- all suspended people are technically registered to vote, right? They are -- they were registered before as -- they're still registered.

Q Fair enough.

A Yeah, but it's suspended. So, but I know what you're saying, like what -- why are they not

**79**

reinstated, right?

Q Why are they -- the rate at which they become active voters is lower, yeah.

A Right. Right. I mean, I think the -- I think the registration rates -- well, the reinstatement rates and the participation rates for those kind of match other ones. And it is, -- it's interesting that the never suspended, the never suspended group, the people that never had their registration suspended, are registered at higher rates. And so here, I think -- I'm talking about, you know, there are lots of opportunities and groups trying to help those people get registered, and so that can kind of help explain why their registration rates are higher than the reinstatement rates.

Q And there are fewer opportunities for individuals who need to seek reinstatement?

A Right.

Q Okay. And so then jumping back down to that, we talked a little, like, quite a bit on page 18, about the -- your analysis of the turnout rate for never suspended versus ever suspended. Does this mean that ever suspended registrants are higher propensity voters?

**80**

A Compared to never suspended?

Q Yes. Thank you. Yes, compared to never suspended, are ever suspended registrants higher propensity voters?

A Yes.

Q And so, would you agree that the never suspended registrants are more likely to become registered again, all things being equal?

A So they -- they -- I don't think that's necessarily the case, right? So it's not that they're getting registered, they're getting reinstated at different rates than the never suspended are at getting registered for the first time.

Q Yes. Then I'll restate, so would you agree that ever suspended registrants are more likely to become active voters than never suspended registrants?

A Yes, that's what these data show.

Q Okay. And so given the difference in registration and turnout rates, doesn't this mean that only the, you know, higher propensity voters are going to register to vote, or become an active voter if we're being, you know, in line with what we were saying earlier?

81

A No, I mean, I think there are lots of different reasons why people will register. Not everybody that gets registered to vote is interested in voting or votes, right? So, you know the reasons why the never suspended are registered at higher levels, is, in part, because it's easier to do, right? They don't have to show up in person and provide a VRC, but that doesn't mean they're going to vote, right, that's kind of the main point is that registration is a little bit interesting on its own. But ultimately, you'll register to vote, so that you can vote.

And so when we look at the difference -- so if we think about people that were never suspended, right, so they go to prison, they were never registered to vote, they come out, and then they register to vote. So somebody could have helped them get registered, they could have gone to a fair -- you know, trying to -- groups trying to help ex-felons get registered to vote. But they never had any intention of voting. They never had any interest in the voting, and lots of them don't vote, right? Whereas the ever suspended were registered ahead of time, and then they get reinstated and then they participate.

82

Q Okay. Yeah. And so, I understand that, your point there, I'm just saying, wouldn't that follow then that, you know, the fact that ever suspended registrants have a higher rate of turnout, but a lower rate of registration mean that only the most -- and establishing that they're -- that ever suspended are higher propensity, wouldn't that mean that only the higher -- most motivated folks are going to register to vote, or are going to be able to register to vote, or become an active voter?

A So, and you're talking about just among the ever suspended?

Q Yes.

A Yeah. So the people that do vote, right, are more likely -- we could assume that they're more inclined to vote than other people that didn't get reinstated.

Q Yes.

A Yeah, I mean, I think that's, you know, a reasonable generic description of what's going on here, you know, the more -- the more interested you are in voting, right, the higher that --

Q The more likely you're able to overcome insurmountable barriers?

83

A Well, I don't know if I'd call them insurmountable, the more likely you are to pay the relatively small costs of getting reinstated.

Q All right.

MS. RICHARDSON: Let's go to 7. Let's go down to compliance costs again. I believe it's 7.

Q There's a discussion about Medicaid and food stamps that I'm looking for.

A Yeah, it's up a little bit. There it is.

Q There we go. Thank you. Thank you. Go thank you. Like I said, I don't have my highlighted version in front of me, so I'm a little lost. So about this discussion of Medicaid and food stamps, so what's the basis of your description here?

A Well, Professor Burch referred to these in her report, and she used food stamps and Medicaid as two examples of where, I believe she found that compliance costs that -- having to do, right, having to overcome some administrative barrier would have an affect on participating in that program. And so my point here is just that these are ongoing benefit programs with oftentimes repeated compliance demands. And so voter registration in turn and reinstatement is slightly

84

different, in that it's, you just have to do it once, right, you only have to bring your VRC in once, you're reinstated, and that's it. You don't have to continue to bring in a VRC. So I think the comparison of registering to vote and then participating in food stamps and Medicaid is not perfect.

Q What are the repeated compliance demands of Medicaid?

A I'm not familiar with exactly everything that you have to do, but I think there are -- you have to -- you might have to continue to show financial need for these programs, eligibility for these programs. That -- that's my understanding.

Q And what are the repeated compliance demands of food stamps?

A The same thing.

Q Okay. If you know, is that true of, you know, certain eligibility criteria, like citizenship?

A You mean like becoming a naturalized citizen?

Q Or proving that you are a citizen, you only need to do that once, right?

A In order to --

85

Q Receive benefits generally, so like Medicaid or food stamps?

A I would assume so, yes. I don't know specifically, but I would assume that once you demonstrate that you're a citizen, that they hopefully, wouldn't ask you to do that again.

Q And then, you know -- so wouldn't -- isn't obtaining the VRC and then submitting it to the registrar repeated compliance?

A No. You only have to do it once.

Q But you have to take multiple steps?

A Well, you just have to take -- I mean, I guess if you count like, I suppose it depends on what you would count as a step.

Q Each -- so well, that's a great question actually, what would you count as a step?

A I would say, you know, taking the VRC down to the Registrar of Voters, that's one step, that's what you have to do.

Q So the task of obtaining the VRC is not a step to you?

A It's given to them once they're eligible for it, so it's given to them automatically. And then their -- sorry.

Q For the folks for whom it's not given?

86

A Then obtaining it would be an additional step.

Q And then, you know, are you aware that you know, if you move within the state of Louisiana, you have to submit a new voter registration form?

A I think that's true of every state.

Q So isn't that a repeated compliance demand for voter registration?

A Well, if you move a lot, right, I suppose it's conditional on how often you move, right? If -- I've lived in the same place for 15 years, so I just had to register once. But next time I move, I will have to re-register.

Q Okay. All right.

MS. RICHARDSON: Let's go down to -- well, first let's start -- yeah, down at comparison to other state laws.

Q So what -- can you just describe to me the purpose of this comparison to other states?

A Sure. I just wanted to give the court some information about the -- how the various states deal with the issue, the public policy, of restoring felons voting rights, and to give them some -- a broader context, and to put Louisiana sort of, in situ with the other 50 states.

87

Q And what citations did you use to support your conclusions of each state you analyzed?

A I searched for information on the Web and then included footnotes from various places.

Q I think I saw on one of the -- a couple of the footnotes that you cited the voting rights lab; is that right?

A That sounds correct.

Q Okay. And it says here on page 8 that you also cited the NCSL, the National Conference of State Legislatures?

A Yes.

Q Okay.

A Yes.

Q And did you double-check the accuracy of those sources before you cited to them?

A No. And in fact, like with the Louisiana -- if we can -- can you scroll down, so I can see the map, please?

Q Absolutely.

A So Louisiana on this map is shaded, I'll call that yellow, I guess, the NCSL classified Louisiana as auto restored after sentence complete. And you know, obviously, that's not completely correct, that's not where I would --

88

since we all here know that if their voter registration is suspended, you have to -- you get a VRC, you take that to the Registrar of Voters, so I would not call that auto restored. But for people that were not suspended, technically, it is auto restored. So, you know, there -- I think there could be -- you know, like any, kind of, I'll call this a model, right? They've classified all 50 states into just 4 groups, and so in order for this -- to make a map like this useful, right, you need as few as groups as possible. So if they kind of created a new group for Louisiana, which I think maybe you and I would agree that maybe they should, then the map itself kind of becomes less useful, right? So I think they decided, you know well, this is the --we're just going to conclude that Louisiana belongs in here. But --so to your point, your question was, did I confirm all of this, every 50 states that they're in the correct category. I didn't. You know, I do know that Maine and Vermont were never lose the vote. You could vote in prison, based upon other stuff that I've read. But I have not confirmed the veracity of all of these categorizations.

Q Okay.

MS. RICHARDSON: Can we jump back up to 6, page 6. Sorry.

Q So this isn't in the comparison of state section, but you discuss Iowa in this -- on this section, right? I believe further up --or?

A It's in the middle there.

Q Yeah, it's in the middle there. So you're discussing Iowa and you're discussing -- you mention that quote, unlike Iowa, Louisiana is not a lifetime disenfranchisement state.

What -- what's your understanding of a lifetime disenfranchisement state?

A We had this discussion a couple of times, me and Mary Ann and Celia, and my interpretation is that if you're -- if you are classified as lifetime disenfranchisement, then you, in this current state, are not able to vote for the rest of your life.

Q And there's no means for you to become reregistered, or I'm sorry, to become eligible?

A I think -- I think what -- the way that the term gets used -- this is why we had -- that we had various discussions on this, I think the way the term gets used is people with lifetime disenfranchisements can be re-enfranchised, but it usually requires something like a pardon for the crime from the governor, so it's possible, that you can be re-enfranchised, even though it says it's a lifetime disenfranchisement.

Q Okay. And then on -- so why is the fact that Iowa, you know, just taking your statement at face value, that Iowa is a lifetime disenfranchisement state. Why is that relevant to Louisiana -- yeah, why is that relevant to Louisiana?

A Because it's -- they're not a lifetime disenfranchisement state, so once, if you're -- if you've never been suspended, once you're eligible to be -- to register to vote, you can go down and complete your voting registration at any time after that point.

Q Why is that relevant to the analysis overall here about Iowa's application process?

A It's just showing that Louisiana, it -- Louisiana is different from Iowa.

Q So, in this paragraph, you discuss submitting an application for approval to the governor; is that right?

A Yes.

Q Why is this submission of an application to the governor different than submitting a VRC to a registrar, from the voters perspective?

A Because it's -- it's much easier, right? I think we could agree that it -- it's much easier to get your suspended voter registration restated in Louisiana than submitting an application for approval to the governor.

Q Why?

A Because you're not relying on the executive of the state to approve it, right, it depends on who's the governor at the time, are they more lenient, less lenient? How long does it take, right? In Louisiana, you're completing your sentence, you're handed the VRC, you can drive that down to the Registrar of Voters, hand it to them, and your registration is reinstated. And so I think it's a tougher job in Iowa than it is in Louisiana.

Q Well, so, I think you're referencing, you know, the governor's discretion post-submission of application, right?

A Yes.

Q So I'm asking prior, like to submission of the application, what is the difference for the voter to have to submit an application to the governor, versus submit a VRC to the registrar, notwithstanding what happens with the application post-op?

A Well, I mean, it's the -- when you submit an application, you are not reinstated, right? You have to wait to see what happens after. Whereas in Louisiana, when you submit a VRC, then your registration is reinstated.

Q You have to wait for your voter registration card, don't you?

A Yes, I assume you would, but that's not -- it's different from what's happening in Iowa.

Q For the voter? How so?

A Well, it's automatic in Louisiana, like if you are eligible to be reinstated, and you have a VRC, then you're going to be reinstated, right? There's not some process by which somebody's determining, should this person be reinstated or not, you're just reinstated.

Q Yeah, I guess what we're kind of -- yeah, what I'm kind of wondering is, the -- not the process undertaken by the -- on the administrative side, but for the voter, why is it different?

A Because you're guaranteed to be reinstated in Louisiana, whereas in Iowa, that's not

necessarily the case.

Q Okay. Did you know that -- or --

MS. RICHARDSON: Can we go to page 10, actually. At the bottom.

Q And here, you're referencing the -- an executive order in Iowa?

A Yes.

Q And that executive order is from 2020?

A I believe that's right.

Q Yeah. And so this executive order says -- or here you say that it restores voting rights for individual upon completion of parole for all crimes, except for those homicide or other related crimes under the executive order?

A Yes.

Q Isn't that automatic?

A Well, the -- it -- from my recollection, you know, this depends on the governor of the state -- I think it's changed several times, kind of going back and forth between more restrictive and less restrictive, depending on whether you had a Republican governor in office or a Democratic governor in office, and in Louisiana, it doesn't matter who the governor is.

MS. RICHARDSON: Yeah. Let me share my screen really fast.

Q You see it on the screen?

A I do.

Q Is this the executive order?

A Yes, it looks like that's it.

Q Okay. And then it says on part 4 ongoing restoration and so it says such restoration shall be effective immediately upon discharge. Is that right?

A That's what it says, yes.

Q Okay. And so as to the -- again, on the face of the executive order, the restoration happens immediately, right?

A Like I said, I think that this -- they've gone back and forth on this policy depending on the partisanship of the governor.

Q But this order is still in place?

A At the moment it is, yes.

Q Okay. And insofar that the restorations are effective immediately upon application or immediately -- actually, I'm sorry, it says immediately upon the discharge of person sentenced.

How is that different than Louisiana's process?

A I think with the current executive in office that it is more -- it is similar to the VRC process in Louisiana, but if -- when there's another governor in Iowa, this can change.

MS. RICHARDSON: I'm going to mark this as Exhibit 17, this is-- I just pulled this up on the website, so I'll have to send it -- it's not my document list.

But, Ellen, if you don't mind putting the PDF in the chat for the court reporter.

(BRUNELL Deposition Exhibit 17 was marked for identification.)

MS. RICHARDSON: And then once you do that, Ellen, can you pull back up Dr. Brunell's report? So let's go back up to the page 9 the Alabama description?

Q So Dr. Brunell, before I ask you about Alabama, just a quick bit about Iowa.

In terms of applying to the governor versus submitting a VRC, you said, you know, it's under the current administration it's probably the same, does that also mean the work on the voter is going to be very similar?

A The -- in terms of going from being just a registered to being a voter?

Q In terms of submitting a document to the relevant administration official?

A I'm sorry, could you repeat it?

Q Sure. Wouldn't the, you know, the work undertaken by the voter be the same submitting an application versus submitting the VRC?

A Yeah, assuming that all else is equal, which it sounds like it might be then they're very similar to one another, but...

Q Okay. Let's now go to Alabama.

So this is your description of Alabama's re-enfranchisement scheme?

A Yes.

MS. RICHARDSON: Can we open up Document Q?

Q Okay. And so this is -- I believe you cited to the Alabama law; is this it?

A It appears to be the Alabama code.

MS. RICHARDSON: Okay. Before I forget, let's mark this as Exhibit 18.

(BRUNELL Deposition Exhibit 18 was marked for identification.)

Q Okay. And so here it discusses -- this is 30 -- you know, Code 36A and all cases; what is your understanding of 15.22.36(a)?

**A** It says in all cases except treason and impeachment, and in cases in which a sentence of death is opposed and not commuted as is provided by law, the Board of Pardons and Paroles, after conviction, and not otherwise, may grant pardons and paroles and remit fines and forfeitures.

MS. RICHARDSON: Okay. And then can we go down to 15-22-36.1(g). The statutes in the Alabama code are very long.

**Q** All right. G, so this is -- just give you a moment to read it, but my question will be, does this talk about who isn't eligible to apply for a CERV -- and CERV, for the record, is a Certificate of Eligibility to Register to Vote?

**A** Yes, it's saying who is not eligible by crime.

**Q** Okay. And so those people who are not eligible to receive the CERV, are able to get a pardon?

**A** I believe that's correct. That's the -- their only route to reenfranchisement.

MS. RICHARDSON: Okay. And then let's go down to Alabama code 17331.

**Q** This is the code just basically outlining who can get a CERV?

**A** It sounds like it, yes.

MS. WHITE: Valencia, I'm sorry, this is Mary Ann White, I'm -- we may have missed it, but what do you mean by the term CERV?

MS. RICHARDSON: Oh, I said at the beginning, it's Certificate of Eligibility to Register to Vote.

MS. WHITE: Okay. Thank you. Thanks for the clarification.

MS. RICHARDSON: No worries.

BY MS. RICHARDSON:

**Q** So did you know that the only the people who are convicted in that list in Code 15-22-36.1(g) need a pardon, right?

**A** Yeah, the more serious crimes.

**Q** Yeah. Everyone else who are convicted of crimes of moral turpitude can get a CERV, right?

**A** Yes.

**Q** And then if you're not convicted of a crime on that list or a crime of moral turpitude, you're not disenfranchised, right?

**A** You're reenfranchised.

**Q** Or you're never disenfranchised, is what I'm asking, so if you're someone who isn't convicted of a crime of moral turpitude, if you're not convicted of one of the other harder crimes that require a pardon, if there is any other type of crime, you're not disenfranchised, right, or never disenfranchised really?

**A** I don't know if that's true. Like, you mean like, when they're -- well, but they can't vote while they're in prison, but are you saying they're registered while they're in prison?

**Q** I'm saying -- well, yeah. I'm actually saying they can vote and vote from prison, but I'm asking if you knew that?

**A** I didn't think that that was true.

**Q** And in Alabama after someone becomes eligible to vote, no matter what crime they're convicted of, is there a separate process for registration based on whether an individual has previously registered?

**A** I don't believe there is, no.

**Q** Okay.

MS. RICHARDSON: Let's go to page 10.

**Q** Let's talk about Delaware. Delaware, you said certain felonies disqualify convicts permanently; is that right?

**A** Yes.

**Q** Did you know that you -- you can become eligible after you've pardoned of those crimes?

**A** Yeah, that kind of goes back to our discussion of what it means for a lifetime disenfranchisement, it seems to -- that there's always this exclusion that if a governor -- if an executive pardons your crime, then you can become eligible again.

**Q** Okay. And then in Delaware after someone becomes eligible, no matter what crime they commit, is there a separate process for registration based on whether an individual is previously registered?

**A** I don't believe that there is.

**Q** Okay. Let's go to Mississippi. So Mississippi is a -- just became a very interesting state on this issue. So Mississippi, you listed the crimes you think that disenfranchise people, right, under the Mississippi constitution?

**A** Yes.

**Q** Did you know that that list has changed over time?

**A** I would not be surprised.

MS. RICHARDSON: Yeah. We can pull up Document S.

Q So here's a Mississippi attorney general opinion from 2009.

MS. RICHARDSON: We'll go down.

Q And I'll let -- it's really short. So actually if you want to, like, take a look.

A Yeah. Could you scroll back up?

Q Absolutely.

A Yeah, right here, response. Yeah. That's perfect. Okay.

Q Okay.

MS. RICHARDSON: And then go down to the you know, here in the conclusion.

MS. WHITE: This is Mary Ann White, just as he's looking, I'll make an objection to this document. It's an attorney general opinion, my objection is it's not law, but whatever questions you have, he can answer subject to that objection.

A Yeah, it's an -- they have an interesting group of crimes listed there.

Q Yeah, it's a very interesting state in that way.

Did you know that the -- so Mississippi, through it's attorney general opinion added, I think 10 additional crimes that are disenfranchising?

A I'm sorry, did you ask whether I was aware of that?

Q Yes.

A Oh. No, I wasn't specifically aware of that.

Q Yeah. And did you know that the list of disenfranchising crimes in Mississippi only applies to federal -- or I'm sorry, in state crimes?

A No.

Q So people who are convicted of any federal crime or any out of state crime are eligible.

A Really?

Q And never lose their right to vote.

A Even like -- even a murderer?

Q If it's a federal.

A So if they committed murder in Louisiana and moved to Mississippi, they would be eligible?

Q Yeah.

A That's interesting.

Q And so in Mississippi, after someone becomes eligible to vote is there a separate process for registration, based on whether an individual is previously registered?

A I don't believe that there is.

Q All right. Let's go to Kentucky, on page 11 of your report.

A I'm going to have to look up what timber larceny is, that sounds like an interesting one.

Q I think it's when you steal someone's trees.

A Okay. That's what I would have guessed, but...

Q Yeah. I think because Mississippi's law was based on, you know, the crimes that were most serious in the 1900s, basically.

A Oh, okay. When that was rampant.

Q Exactly. So let's go to Kentucky. So yes, here you say that individuals convicted of bribery, treason, or violent offense, voting rights are restored at the end of probation or parole.

And then you say, these exclusions do not apply to those convicted in other states or by a federal court.

This was from an executive order by Governor Beshear, right?

A Yes.

Q In 2019?

A I believe that's right.

Q Yeah.

MS. RICHARDSON: Can we pull up the executive order on Document T? And if I hadn't already, I meant to mark Document S as Exhibit 19.

(BRUNELL Deposition Exhibit 19 was marked for identification.)

Q So is this the executive order?

A Yes.

Q So where is that in the executive order that mentions out of state or federal crimes?

A Keep going. Keep going. I assume that that that comes from the first -- the numbered -- item number 1 says that the civil rights hereby expressly limits it to the right to vote and the right to hold public office denied by judgment of conviction and any prior conviction are hereby restored to all offenders convicted of crimes under Kentucky state law.

Q Yeah. And I think if you go to Paragraph 2.

MS. RICHARDSON: Can we scroll down.

Q It really -- it only -- it doesn't mention out of state or federal crimes at all, does it?

A Those do not.

Q And then I think on Paragraph 4

105

specifically says that people convicted of federal or out of state crimes have to go through a different process.

A Under federal law, under -- may still make an application for -- under the -- yes, so there's a different process.

Q So people with -- and then on your report says: It excludes those individuals with a pending felony charge; is that right?

A Yes.

Q Okay. But I think it is -- that's only at the time of release from probation or parole, right, under this order?

A I guess it would be, because since it's automatic, there'd be no time to commit an additional crime. So yeah, it would only be if there were additional pending charges when they're released from whatever charge they were currently incarcerated for.

Q And in Kentucky, no matter -- you know, whatever -- whatever crime you've been convicted of, after someone becomes eligible, is there a separate process for registration, based on whether an individual was previously registered?

A No, I don't believe there is.

106

Q Okay. Let's go back to your report on page 11. Talk about Wyoming.

So another very interesting state. So you said Wyoming restores voting rights for some felony convictions at the end of probation and parole. Excludes violent felonies.

MS. RICHARDSON: Can we pull up Document U and take a look at the Wyoming law. And if I haven't already, Document T should be Exhibit 20.

(BRUNELL Deposition Exhibit 20 was marked for identification.)

Q Okay. So is this the Wyoming disenfranchisement scheme?

A Yes.

Q Okay. Let's mark, before I forget again, Document U as Exhibit 21.

(BRUNELL Deposition Exhibit 21 was marked for identification.)

Q Let's see. So here the certificate -- the certificate that is mentioned here, the certificate of restoration of voting rights, if you go down to Section CI, the part -- just C generally, it tells you who receives the certificate, right?

A It looks like it, yes.

107

Q Yeah. So it only applies to people with both a single in-state felony conviction after January 1st, 2010; is that right?

A We have to get back to C.

Q Yeah, C1 -- or CI?

A You are at C, sorry.

Q Yeah, CI.

A I don't -- in CI, I don't see where it's only one.

Q Yeah, it says: A non-violent felony arising out of the same occurrence or related course of events?

A Oh, is that -- that's what that means?

Q Yeah, so a felony.

A Okay. A felony. Okay. It doesn't say it in English.

Q Yeah. Lots of state laws have that flaw.

And then, you know, people -- so that means that people with out of state, federal or in-state convictions before that January 1st, 2010 date, this process doesn't apply to them. They have to apply to the Department of Corrections for, I think -- I think C2 says a discretion -- yeah, a discretionary certificate restoring their voting rights?

108

A Yes.

Q Did you know that people with violent convictions or multiple convictions can only be restored by the governor of Wyoming?

A Yes.

Q And then in Wyoming after you become eligible, no matter what crime you've been convicted of, is there a separate process for registration based on previous registration?

A There is not.

Q Go back to your report. Let's go to page 11.

MS. RICHARDSON: Go up Ellen.

Q It says the last paragraph, Louisiana is not the only state that disallows voting by certain individuals convicted of a felony. But do any other states create a separate process for becoming an active voter for people who are otherwise eligible to vote under state law?

A I did some research on this, and I can't say definitively, but I could not find any other state that had something similar to what Louisiana has.

Q Specifically, for people who were previously registered?

109

A Correct.

MS. RICHARDSON: Yeah. Let's go down figure 2 of page 12.

Q So this is a table you obtained -- or can you just describe what this table is doing?

A Yes. This is just a graph based upon data from one of the articles that I think was cited. I think. I recognize the names anyway for the source, so it's just a graph of the percent of voting age population, disenfranchisement due to felony conviction.

Q And Louisiana is 12th from the bottom?

A Yes.

Q And this is of 2010?

A Yes.

Q And, you know, Louisiana changed its law after 2010, right?

A It definitely did.

Q Yeah. Twice, in fact, right?

A Yes.

Q Yeah. And then did that increase the number -- did both of those occasions increase the number of people who are eligible to register?

A Yes.

Q Okay. Have other states changed their law

110

since 2010?

A Oh, I don't know for sure. If I had to guess, I would say yes.

Q Yes. Yeah. We just discussed Alabama's law changed in 2017, right?

A Yes.

Q I'd also submit to you that Alabama changed again in 2024. Yeah. Then Wyoming, we just noted, changed its law in 2010. Yeah. And then that executive order in Iowa was in 2020, right?

A Yes.

Q And then the Kentucky executive order 2019?

A Correct.

Q Yeah. And let me just zoom in, if you don't mind, on the table itself.

I think just by my count, I think -- did you know in -- that Georgia changed its law after 2010?

A I wasn't aware of that specifically.

Q And Tennessee as well?

A I believe it.

Q Alabama, I believe we just discussed. Virginia changed its law after 2010?

111

A Okay.

Q Yeah. What about -- we just discussed Kentucky and Mississippi.

What about Florida, very famously changed its law after 2010.

A Yes, I was aware of that one. Yes.

Q Yeah. I think that one most people are aware of.

A Yeah.

Q So those are all those -- I think the majority of the states that are situated worse than Louisiana have since changed their laws since this graph.

A Okay.

Q Yeah.

A It would be nice to have up-to-date data, but...

Q And so is this chart in figure 2, accurate as of today, if the laws have changed in most of the states listed?

A I would guess that things are probably similar, but the data are 16 years old, and as we just discussed, there have been changes, so some of these proportions, percentages, could very well have changed.

112

Q Okay. And does this chart analyze the number of people disenfranchised by law?

A This is the proportion of all voting age population in the state that is disenfranchised for felony convictions.

Q Does it tell you who -- which of these voters are eligible and not registered, the chart?

A It does not.

Q So -- and even on the basis that you just noted, the percentage disenfranchised based on population, Louisiana is 12th from the bottom?

A Yes.

Q Okay. And then let's go back to your report on page 11. The last sentence of this paragraph the steps to reenfranchisement in Louisiana are far less burdensome than these other states.

Are you offering that as a legal conclusion?

A No, I'm not a lawyer, and I'm just making comparisons to other states, and there are states in which it is more difficult to get reenfranchised than Louisiana.

Q Okay. And so what's the relevant to -- of the statement to your analysis then?

A Again, I think this is useful information to the court that, you know, the states try different things, they have different policies, there's a wide variety of policies and, you know, this is kind of useful, because when states see a particular public policy work in another state, they can, you know, borrow that policy. And if they see things that don't work, they -- they can presumably avoid those public policies, so this is just another example of that, that there is a wide variety of approaches to felon disenfranchisement re-enfranchisement across the country.

Q And so you're -- your statement about far less burdensome, on what are you basing that comparison?

A Some of the things that are in the paragraph right above this, right, violent felons in Wyoming need to have their voting rights restored by the governor, that's more burdensome.

Q For those individuals with violent felonies, but not for the rest of the population with other felonies?

A Right. They would be -- those would be similar, but for violent felons.

Q Similar or better, right, depending on the application process?

A For some of the states, it might be slightly easier.

Q Yeah. What about in Alabama for those who -- or Alabama, I believe Mississippi we discussed, you know, certain populations of the -- of people with felony convictions never lose their right to vote, it would you know, definitionally would be easier for them to register, right?

A Yeah, but not for the population for the violent crimes, much more difficult.

Q Let's see. And then those who need to apply for a CERV, it would be at least similar in Alabama?

A Yeah.

MS. RICHARDSON: Okay. Let's go off the record.

(A recess was taken.)

MS. RICHARDSON:

Q Let's go back to page 12 of your report and welcome back, Dr. Brunell.

Okay. And so I remember at the very beginning of this deposition, you discussed the lack of multi -- your opinion about the lack of multi-variant model; is that right?

A Yes.

Q Is that -- is this section and can you explain it a little more for me?

A Sure. So in standard, sort of, social scientific studies, we -- since we aren't operating in a lab where they can control, like, treatment, since we're operating outside of a laboratory environment, that means that we often have to take into account other variables that might be affecting our dependent variables.

So in this case, the dependent variable is registration rights, right, and Professor Burch demonstrates that those people that were suspended are reinstated at lower rates than people who were never suspended and are now registered. So the point here is that there could be a whole host of other explanatory factors that can -- we can imagine affect this differential and turnout. And so this relationship could be spurious to the ever suspended, never suspended, and the only way we would know that is if we did a multi-variant analysis.

Q Okay. And did you undertake this analysis yourself?

A We discussed this at the start when we were talking about that one dataset. Like at one point I wanted to try to do this, but I never did. So, the short answer is no.

Q Okay. Absent that analysis, are you able to opine about whether it is more likely than not that any of these variables are contributory or significant?

A No, you would have to do the analysis.

Q Okay.

MS. RICHARDSON: Can we switch over to the Birch report that's Document A, Exhibit 2, and page 21. Okay. The top of page 21, this table.

Q Dr. Brunell, isn't this a multi-variant analysis?

A In -- the way you would want to do it is to include -- so you would want to check for statistical significance, and you would do that by using a model -- a different model. Right here she just breaks down the different groups, right, so she uses gender, age, and then two racial categories. And then whether they were never suspended, ever suspended, and then she has the percentages in there.

So we don't know whether in a multi-variant analysis, right, and these aren't,

117

right, race, gender, and age group aren't the only things that we would probably want to include in this model. So we don't know if there are statistically significant differences between these or not. Controlling for all the other variables at the same time.

Q I guess, you know, help me understand why -- or let me step back.

So just answering the baseline question, not the question of whether you think this multi-variant analysis is sufficient, just isn't this a multi-variant analysis? It's got multiple variables.

A In a very limited sense, but usually when we talk about a multi-variant analysis, like we're running one statistical model with all the variables on the right-hand side of the equation. So that's kind of what I was getting after.

Q So I guess then, and I will just confess, other than the -- you know, I got an A minus in stats in college, but that -- you know, so I think I'm okay at this, but you're definitely better, and -- so if you just help me out a little bit, you said all the variables are at the right.

A Yeah.

118

Q So are the variables not here never suspended, ever suspended, total and then for example the first variable in the multi-varied analysis is black, then it's white, of those voters?

A So this is more like subsetting the data out. And it does subset it out by other variables, so I'm not going to say that there aren't other variables here. But what I really meant is that you would want to run like some sort of regression analysis, okay, so -- and the dependent variable, the variable we're interested in, is the rate at which people are registered. Okay. And depend -- and so like let's imagine we're doing this at the individual level, so our unit of analysis are individual people. Okay. And so we would have whether they're registered or not to vote, that's the dependent variable, it's 0 or a 1, right, and so this is like, we would call this like a logit model, L-O-G-I-T, and that's when you have a dependent variable that just takes on two values.

And then I said on the right-hand side, so imagine -- or we have an equation, right, so Y is our dependent variable, and that's whether you

119

registered or not, is equal to a whole bunch of, in statistical terms, betas, B-E-T-A, the Greek letter. And those are slope coefficients. And those would be -- there would be a different slope coefficient for every single variable.

So one variable would be -- and you could imagine there could 20 or 30 variables that we use as explanatory variables. And so one would be, were they ever suspended or never suspended. That would be -- that's kind of the critical one that we're most interested in. And then after that, we could have racial categories, we could have gender, we could have ages, we could have how long they've lived at their current house, we could have -- we could have all sorts of things that we think -- or even things that we know affect the likelihood of being registered to vote. And then when you run this model, basically you're looking at the partial correlation for each variable. So it's like what proportion of the variance in the dependent variable does this independent variable explain, controlling for all of our other independent variables at the same time. Right. So that's very distinct from what Professor Burch has done here.

120

Q I guess how so, because doesn't previous to this analysis, she, by definition, has to do -- run the -- never -- she has to run that single Y variable, whether or not someone is registered, and then based on never suspended, on ever suspended. So previous to then, right here in this table 3, she would have -- then she would have controlled for black, white, female, male, and age.

A Well, she's not controlling for them all at the same time. Right?

Q I see.

A Yeah. That's the critical thing is that --

Q That's your -- that's your criticism, is that it's not controlled all -- for all at the same time?

A And there could be other variables that would affect the likelihood of being registered to vote.

Q Okay. And so on those other variables, are those the ones you described in your report on page 12? We can go back to it.

A Yeah, without looking at it.

Q Yeah. We can go back to it.

**A** Yeah, so I list several that could be the case. But like I said, there could be -- there could be lots of other things, you know, are they employed, do they belong to a union, right, they're -- are they married? Are they religious, right? These things all could -- and I'm not saying they -- we've all -- we've demonstrated that all those things have affected this in the past, but we could depend on previous literature to see, well, what have other people shown are important factors that affect the likelihood of being registered to vote or not, and include those.

**Q** Yeah. And so let's --

MS. RICHARDSON: And poor Ellen, will you please switch back to the Burch report, page 18?

**Q** And so under the table with respect to voter registration, blah, blah, blah. And so she says based on my review of the extant literature. And so, isn't that what you're discussing, those -- the variables that might be accounted for we can rely on the relevant literature to understand whether those variables are relevant?

**A** Yes.

**Q** Okay. And so -- and then just as a general matter, wouldn't the fact that someone is previously registered already built in some of the variables that you've mentioned?

**A** Yes.

**Q** So go back to your report? Yeah. And so just, you know, we've been discussing this a lot about the propensity of ever suspended voters by virtue of them already being registered. Wouldn't that fact -- wouldn't some of those other factors be already -- those -- some of those assumptions about -- that you were mentioning, already be built in the fact that they are previously registered and --

**A** I mean, they could be. But we -- that doesn't mean we don't include them in the analysis.

**Q** But if you know because you looked at previous literature about people who have registered to vote before getting a felony conviction, you sort of know that those variables -- what -- again, based on looking at the previous literature, then that would already have been accounted for; is that right?

**A** I think what Professor Burch was saying in her report was in her reading of the literature, she would expect that people who were registered to vote before they went to prison, would register at higher rates after coming out of prison than people with who were not registered to vote before going to prison. So I think it was a very specific point.

**Q** Yes. Yes. But the previous literature builds in those reasons, right -- or if they -- to the extent that they're relevant, rather, I should say. Right? That the -- like, the length of the sentence type of crime.

**A** No, we can't just dismiss everything else because it's built in -- because it's not -- it's not built in, you know, we've got to -- we have to include them in the model, because any of these things could be -- and sometimes there's even things that people haven't yet discovered that really affect these variables, right, so there might be yet undiscovered factors that we could measure that would affect the likelihood of being registered to vote.

**Q** So you're saying we can't rely on the knowledge we have?

**A** No, we can, but that doesn't mean we know everything yet, right? Like that's --

**Q** And then how would any of those sort of variables that you've listed here on page 12 change the different rate of registration amongst similarly situated populations of people with felony convictions?

**A** It wouldn't change it, but what we would find out in a multi-varied setting is whether the distinction between never suspended and ever suspended is still statistically significant, right? That's the kind of critical thing, right? Or is -- or are those differences between those two groups, if they're explained by other variables, right, rather than this distinction, then we would conclude, well, this distinction between never suspended and ever suspended isn't relevant.

**Q** Okay.

**A** Even though the percentages remain the same.

**Q** If the percentages remain the same then I guess -- yeah, I guess I'm a little lost. If the -- the percentages remain the same -- yeah.

**A** Think about it this way, it's like the other variables are explaining the vary -- the same -- the amount of variance that the other

variables are explaining are -- could overlap with the distinction between never suspended and ever suspended, and that could -- that could be the reason why we have this difference. And so that's the utility of the multi-variant thing, is that we could show, is this variable significance -- statistically significant even in the face of controlling for these other variables, or is it not.

Q But it doesn't take away from the ultimate conclusion that ever suspended registrants are active -- have become active voters at a lower rate than never suspended registrants?

A In this case, it would just be about registration. So yeah, the gap is -- the gap is still there. But it's like, what are the variables that are explained, the differences in voter registration? Is it really the never suspended, ever suspended, or is it a bunch of other things.

Q Okay. But the gap is still there?

A The gap remains.

MS. RICHARDSON: Okay. And then let's go to page 13. And the -- I want to get to the part -- yeah, this exact part, thank you, Ellen, the part where we're talking about the difference in the time periods for the VRC.

Q So can you just -- yeah, expound a little more on the basis of this critique?

A Yes, this paragraph?

Q Yeah.

A So what I'm trying to say here, is that the -- since Louisiana changed this law several times, it kind of sets up nicely for a closer causal connection, right? So between 2019 and 2022, all felons had to present a VRC, whether they're first time registrants or suspended registrants. And after 2022, it's only people with suspended registration.

So what I'm trying to say is that if we looked at the gap, right, the registration gap, in those 3 years, 2019 to 2022, if it really is only the VRC step that is producing all of this; the lower registration, then we should have similar rates of registration among both groups during this 3-year period, and then afterwards, right -- and then we should see the gap. Right. And then we would be able to more -- Professor Burch, I think would be able to better credibly argue that, look, this is -- the VRC step is the cause for

this gap, because it wasn't here when both people needed the VRC, but now only one group needs it and one group doesn't, and now we see a registration gap. Did I explain that?

Q You did. You did. And I have a few questions about that. I think -- the first I would ask is the VRC list, the list of the folks who received a VRC, is -- that was ultimately matched against the parole and probation list, right?

A Professor Burch matched it, yes.

Q Yes. I'm referring to Dr. Burch's analysis, she ultimately matched that against the parole and probation list, so the list of folks who are currently under community supervision in the State of Louisiana as of the date of that list?

A Yes.

Q Right? And so then would have found individuals on that list who needed the VRC?

A Right.

Q Or who received the VRC, rather?

A Who received it, yes.

Q Yes. On the parole and probation list, wouldn't the majority of those people be recent probationers or parolees, so after the 2022 date?

A Well, we don't - I mean, since probation and parole is -- you know, happens after you get out of prison, and then for a set period of time presumably, there's a lot of overlap there, but we don't know for sure. We don't know -- and I think that Professor Burch, you know, assumed that receiving a VRC meant that you were -- that your registration was suspended, and that I don't think is the case. I think everybody received a VRC whether they needed it or not.

Q Well, I'll get back to that, that's another one of my questions in a moment. So I'll get back to that in a second, but just talking about the conviction date. Yeah, can't we just look at the P&P list to see when folks were convicted?

A Yeah, I mean -- and this is kind of -- this is one of the problems is that the timeline does matter, and so I agree with you that the P&P list, these are recent people that have been released from prison recently, but we don't -- right, the -- there's no -- there's never any limitation in the analysis to specific dates, right? So when did the person -- when was the

person convicted of a crime? When did they receive the VRC? You know, when did they -- and when did they register to vote, right?

So we don't -- so I think it's possible that some of the people that are registered to vote in the never suspended group, could have been registered to vote before they were convicted of a crime, but then they were never sent to prison, they were -- directly on probation, and so their registration was never suspended. So like that -- all the timing matters, so for everybody in the never suspended group, we need to know exactly when they registered to vote, because she's assuming they all registered when they got out of prison, but we don't know if that's actually true.

Q So stepping back just a little more, with the VRC list -- so now we're back to the VRC list.

A Okay.

Q Wouldn't anyone matched from the P&P list and the VRC list, be someone who was -- who became eligible in the last 5 years, just by definition of the eligibility criteria?

A Can you repeat it, I'm sorry.

Q Absolutely. To become eligible to vote in Louisiana, as you know, you have to have completed your sentence within the last 5 years.

A Right.

Q That's the shorthand of that. So which -- wouldn't anyone matched to the current parole and probation list, to the VRC list, have received that VRC necessarily within the last 5 years or most -- at least most people on the P&P list?

MS. WHITE: I'm going to object to form, it mischaracterizes the list.

Answer if you can.

A Generally, I think what you're saying is correct, but we don't know for sure, right, we don't know what proportion of the data this is true for, are there exceptions, is that true for everybody.

Q Okay. Well, we can -- let's -- let me share my screen.

MS. RICHARDSON: Oh, someone else is sharing. Ellen, I have to kick you off.

Q This is -- okay, Document X, so is this the parole and probation list as of 1/7/2026?

A That's what it looks like, yes.

Q Yeah. The one that Dr. Burch has cited in her report?

A Yes.

Q That you're responding to.

Okay. Let's mark that as Exhibit 22.

(BRUNELL Deposition Exhibit 22 was marked for identification.)

Q So it says here conviction date, right?

A Yes.

Q And let me -- I'm on my large monitor, so let me know if zooming in would be helpful.

A It would be a little but, yeah, maybe one more.

Q One more?

A Okay. I can see that pretty well.

Q Okay good.

So that's conviction date, right? So let me just sort this, I think that's, you know, the conviction date -- and the conviction date is described as, like, year, month, date --

A Yes.

Q -- is that right?

Yeah. So. Okay. So I'm just going to, like, quickly look to 2020 -- you said February 1st, 2022, so someone who's convicted before then. The last -- you know, let's see February 3rd, February 1st, January 31st, 2022, so that is what the count there, 9,853 folks?

A Yes.

Q And it looks like there are 45,994 folks?

A Total, yes.

Q About 10,000 out of 40 -- that's like less than a quarter, right, of the folks on that list?

A Yes, that is less than a quarter.

Q It's about -- yeah. So let's -- again so like over 75 percent at least of the folks who are on the P&P list were convicted after that date, right?

A Correct.

Q All right. And -- okay. Then just a couple more questions on the points you just made. So Dr. Burch is assessing the -- or what is your understanding first, of what Dr. Burch is assessing with respect to the VRC requirement?

A The main point of her report, in my opinion, is that the people who have to take -- since the change in law in 2022, the people that have to take the extra step of taking the VRC to the registrar, those are people whose registration has been suspended, or are reinstated at lower rates than people that never were suspended and then were registered to vote. So that gap between never -- using her terminology, between never

**133**

suspended and ever suspended is the main point in her argument.

Q Does she mention that she's controlling for the law change in her report?

A I don't recall.

Q Okay. We can pull it up real quick just so we are on the same page.

MS. RICHARDSON: Pull up page 3 of the Burch report.

Q Okay. So on her opinions offered, does she mention that she's assessing -- or let's start actually at the scope of her report and then go down to the opinions offered, and I'll let you read it first, but I'll just ask you, is she mentioning that she's assessing whether the barrier, you know, the relevance to the barrier after the 2022 law change?

A No, I don't think she says that.

Q Is she assessing the barrier over all of the documentation requirement?

A I suppose that's one way to put it, yes.

Q Okay. So if Dr. Burch is assessing the burden over all of the documentation requirement, why does it matter that she included individuals before the law change?

**134**

A Well, it's a -- I have specific critiques in my report. So for instance, like I mentioned before the suspended -- well, I hadn't mentioned this before. So, like, she has -- I think she matches to four different suspended lists, but none of those four are, like, comprehensive lists of people that were -- that were suspended, so we don't know the extent to which there are people who had suspended registration that were not on any those lists, that they've since gotten it reinstated already.

Another thing in terms of the timing is are there any individuals who were registered to vote, convicted of a crime, not imprisoned, put on probation, and then remained registered the whole time and still are registered. Like, in her analysis, those people would be counted as having been registered to vote after they got -- after their sentence, after -- because they were never suspended, right. So she assumes that people that were never suspended, registered to vote post -- after the end of their term, after the end of their probation and parole. Right. But that isn't necessarily the case, so there's a -- there's a lot of moving parts in the data, and

**135**

that's kind of what I tried to outline in my report. So that's sort of specifically why I think the time matters.

Q I guess, can you help me just understand why any of that matters if the ultimate opinion is whether an individual who doesn't need to become an active voter with the paperwork, registers at a rate different than someone who does?

A Because the data could be wrong, right, that's the problem. If people are being counted as registered to vote and never suspended, right, she's assuming that they registered after, right, and not before. So the -- those people should be excluded from the analysis.

Q But why, though, like so why -- assuming, you know, taking your statement at face value, why should those folks be excluded? If the -- at the end of the day, they had to get the paperwork or not, you know, like why is that -- why is that relevant?

A Well, they're being counted, so by the logic of the -- what she's done, right, never suspended people means that -- of course she doesn't know. She can't -- she can't really say never suspended, because she doesn't have -- she

**136**

never has a comprehensive list of all people that have been suspended. So there's probably people that are listed as not suspended and were suspended and have been reinstated.

And secondly, by the logic of her argument, if you were never suspended, that means that you weren't registered to vote before you went to prison, right, and then you got registered after you came out. But there could be people in this dataset that were registered to vote before they were convicted of their crime, they were never sent to prison, and therefore never had their voter registration suspended and then -- so they continued to have registration, in her model those people are counted as new registrants because they were never suspended, but they aren't new registrants --

Q But they --

A They could have been --

Q Again, though, isn't the point that they had -- that they could register to vote like anybody else?

A They could have been registered 20 years before they were convicted of the crime.

Q And then -- so -- and then again after

137

their conviction, had -- got to register to vote like anybody else?

A No, they were never not registered, right, because they never went to prison, they just were put on probation.

Q And so again, weren't required to provide documentation?

A Correct.

Q Okay. Give me one second.

MS. RICHARDSON: Okay. So can we go to page 17 of Dr. Burch's report?

Q So where in this paragraph that starts with the remaining, so do you see where she said -- where this sentence that says I use the term never suspended?

A Yes.

Q Where in, like, her definition of never suspended, does she account for those -- that she wouldn't use -- that she does for never suspended voters?

A She is assuming that people -- right, the whole logic of the report is, let's compare registration rates of people that -- who were never suspended, and these people are only people who were not registered before they went to

138

prison, right, because if you were registered before you went to prison, then you were suspended.

Q But -- I'm sorry to interrupt you, she doesn't say that, though, does she? She doesn't say she's presuming that those folks were registered before they were convicted, does she?

A That only make -- that has to be the logic of the -- that's implied, I think clearly implied by what she's done here. Because she's ultimately comparing the never suspended -- the registration rates for never suspended and ever suspended. And so she did not exclude people who were registered before they were convicted of a crime, but never suspended.

Q It's clearly implied because why?

A Well, because she -- so if -- in her report she says the never suspended people are -- were never on the suspended list, right. So first of all, she doesn't have a comprehensive list of all suspensions, so she's probably missing some people there. Second --

Q I believe she says not matched to any suspended list; is that right? Not never on any suspended list, isn't that different?

139

A Yeah, I don't think she ever claims that she has -- that she has complete data. I mean, you know, she starts with -- I mean, in reality we should be looking at all ex-felons in the State of Louisiana, that may not be possible in the data, so she starts with the P&P list, which is a very small fraction of all ex-felons in Louisiana. And she does say that she matched it to the suspended list, so she doesn't say -- so I think what you're saying is she's admitting that there are errors in these data, that there are people who were suspended, but I can't find on any of the four lists that I have. So I'm assuming that they were never suspended, but that's -- but that could be wrong, right, this is going to introduce errors into the data.

Q Assuming, you know, she does say that it's only -- she's matching to the parole and probation list, right, wouldn't that then represent the floor of people who were either not required or required to receive the documentation?

A I think that's what she says, but I don't know -- I don't know what she'd mean by that.

Q That would have to be -- that it would have to -- my understanding and, you know, and so

140

I have a question to you about that, wouldn't that be the minimum number of people who needed to provide the documentation?

A Yes. So there's a whole chunk of people, ex-felons in Louisiana that we don't have any data for, and so we don't know, is this subset a random sample of the larger group, or is it unrepresentative and therefore we can't rely on it, right, we don't know whether that's the case or not. So it's a subset of the data, and that limits our ability to -- can we generalize to everybody, right, in the State of Louisiana based upon the subset.

Q But we do know -- oh, I'm so sorry, can you finish your sentence?

A I was just going to say, it's not clear that we can make that generalization.

Q But we do know that of the subset, this is the number?

A Well, taking into account there could be other errors introduced into the data, but yes.

Q This is the number representing a conservative estimate of who needed the paperwork?

A I don't know if I would agree with the conservative part, because again, there's like --

141

getting all the timing right -- this is a -- this is a difficult task, right. This is -- like time really matters here, you know, when are they convicted, when did they register? Did they get a VRC before their conviction date, some people it seems like they did, what does that mean. Right? So there's a lot of, kind of getting our ducks in a row in terms of how -- when all of these specific things happened matters, so that she can make these types of conclusions.

Q And then about -- what your -- about the VRC list, doesn't the VRC list represent everyone who received a VRC at the moment the list was generated?

A Yes.

Q Same with the suspended lists, right, it's every suspended list -- every individual who was suspended at the moment the list was generated?

A At that moment, yes.

Q Okay. So why would you need to -- oh, and then we already discussed, you know, the P&P list is everyone under community supervision the moment the list was generated?

A Yes.

Q So if someone, you know, was suspended 20

142

years ago, you know, let's say I registered in 2000, but then I got convicted of a felony in 2005, and then, kind of doesn't matter when I became eligible, but the point is that I'm still in the suspended list because I never sought reinstatement?

A That's true, for that example.

Q Yes. Yeah. And so the -- I'm still on the suspended list 20 years later, because notwithstanding, when I became eligible, I just haven't sought reinstatement, right? And so I would be still be on the June 2024 list, for example?

A I believe that's correct, yes.

Q Okay. But then let's say, you know, I'm suspended -- actually, I believe that list was January 2024, but the same logic applies, right?

A Yes.

Q Okay. So let's say I was suspended as of 2023 and became eligible and registered in 2023 before the generation of the January 2024 suspended list, I shouldn't show up on the January 2024 list, correct?

A I believe that's right.

Q Okay. And that's because I sought

143

reinstatement and became an active voter; is that right?

A Yes, you've been reinstated, your registration has been reinstated.

Q So if I'm an active voter why would I show up in the never suspended category at all? Like, in the -- and by Dr. Burch's definition of never suspended, like, why would I even be relevant to the never suspended group?

A Well, because you were suspended at one point.

Q But so -- so then I would be moved to the ever suspended group?

A Well, so I think that's a question for the analyst, right, for what you're trying to show. But she only matches to, you know, specific snapshots in time for suspended. And there's people that come on -- go on and go off these lists, so she's probably missed people that were, in fact, suspended and she thinks they were not suspended ever.

Q Did you under -- so referencing that analysis about the 2022 onward, did you undertake that analysis yourself?

A No.

144

Q Why not?

A Lack of time. I mean, I think that fixing all -- like, getting all of these -- getting the dataset into a position in which I kind of addresses all the critiques in my report, would take a significant amount of time and work. I wish that I -- honestly I wish that I could have, I do. I mean, my report would be better if I could say, hey, look here, I fixed a mistake that Professor Burch made and our results are totally different. But there simply wasn't enough time.

Q Can you find what you would characterize as a mistake, just so I understand?

A So all the things kind of I've talked about, right, so there are people -- there's people in the dataset whose -- the date their VRC was issued is before their latest conviction date. So I don't know what -- so what's going on with those people, like, they got a VRC, and then they committed another crime and were convicted of it, and so where does that put them. So now presumably, they are no -- that VRC is no longer valid, right.

The things I talked about before, where people could have been registered for the last 20

145

years, but didn't go to prison, so then they did not, in fact, register after they finished their sentence, they were registered before, but the registration was never suspended. So I think these are all contributing to errors in the dataset.

Q Okay. But like we said earlier, the gap still exists?

A Yeah. I mean, again, assuming these errors could affect the gap, but the gap is still there.

MS. RICHARDSON: Okay. Okay. Let's go down to the report on 14, page 14, the Brunell report, not the Burch report.

Q Okay. So I want to first ask you about the terms like restored population and released individuals. Right.

MS. RICHARDSON: If you go back to the Burch report on page, I believe, 14. Let me double-check, yup.

Q That's when she's mentioning released individuals, right?

A Yeah. At the very bottom of your screen, like, the second to last --

Q Yeah. The released individuals who do not

146

appear on the eligible list. And then page 3 of the report in the opinions offered section, she -- that bullet point in Louisiana, that's where she's referring to the restored population?

A Yes.

Q So those terms, released individual on page 14, it's just defining the restored population, right, or the population of eligible individuals who are on the parole/probation list?

A Yes. So I mean, so this is really -- the reason why I included this, is that at the very start of this process when I first started having discussions with Celia and Mary Ann, you know, we had Professor Burch's terminology and then the state obviously uses a different terminology, and so we kept getting mixed up, right, and so we -- so that's why -- that's why I included that is that the restored population or released individuals is not -- that the State of Louisiana doesn't talk about people that way with respect to what -- with respect to voter registration stuff, so that's all I'm really saying there.

Q They use the terms ineligible, eligible, and suspended, for example?

A That's right.

147

Q So -- but isn't -- there's no term for eligible individual who's present on the parole and probation list, right?

A I guess it would just be that they're eligible, but --

Q Yes.

A It's possible, right. So this isn't like a major critique, it was just I'm trying to keep all this stuff straight in my head, and so she chose to use some terms, which are fine, but the State of Louisiana doesn't use them, that's really the only thing.

Q Yeah. Okay.

A Yeah.

Q I was just trying to get clarification on my end.

A Yeah, sure.

Q Report on -- let's go back to your report on page 14 then.

Okay. And so then later you -- if you go down, I think you discuss the 1,096 people?

A I think that's above all this.

Q I think it's above all this too. Sorry. I was looking at the wrong section.

A It's right here.

148

Q Right here.

A Yes.

Q Okay. And I just want to make sure I read this correctly before I ask you questions about it, 'cause I would hate to ask questions that are just based on my misunderstanding.

A Sure.

Q So you here say that the number of -- let me see the exact term. On figure 2 of the Dr. Burch report said that the -- what page is this? 14.

Oh yeah, she reports that the ever suspended group is comprised of 11,070 people, of which 5.9 are registered to vote. And so you're saying that there are 653 people in this set that are registered to vote in the ever suspended group?

A Correct.

Q And then the -- for the never suspended group comprises 15,886 people of which 15.8 are registered, which is 2668 people in this set?

A Yes.

Q Okay. And so this is where I want to make sure I understand correctly, for the difference between these groups to be nullified and you mean

149

just like putting them in the same, like, register -- like rate of registration, essentially?

A That's correct.

Q Okay. Then that would have to -- the difference between those people -- the difference, essentially, would be you need to get 1,096 people registered in order to --

A Yes.

Q Okay.

A Yes.

Q Okay. Great. Then I understand correctly. Okay. Good.

So Dr. Burch's list, as we've been discussing pretty much all day, only includes the matches for people on -- like, when I say currently, I mean of the time of the list, right, we're on the same page with that?

A Yes.

Q Yeah. So on probation and parole, who are currently on probation or parole, right, that's what the list is ultimately asking, is who on -- who on community supervision?

A Yes, that's what she started. That's the main dataset.

Q That's the main dataset, yeah. And so

150

wouldn't - again, wouldn't this 1,096 number represent the minimum number of people who need to be registered?

A Well, it would be -- that would be the number of people to exactly equalize the percentages, the voter registration percentages. So if those -- if another 1,096 people who were suspended, registered to vote, those -- there would be no gap at all. It would be exactly equal. That's the point.

Q Of that population, but there -- as you discussed earlier, there are folks, you know, who would not be on parole or probation, for example who then either need to be registered or don't need to be registered, and so this would be -- this would not be including those people?

A Right, because they're not on P&P.

Q On P&P, right. And so this would be on the low end of people who need to be registered with felony convictions overall?

A Yes.

Q So if all of the 1,096 people are eligible, shouldn't they all be registered to vote if they choose to? This is just -- this is more -- this is more of a fundamental question than

151

a...

A So -- well -- so again, technically all the suspended people are technically registered to vote, but their registration is in suspension, and so they can -- this is the number of people who have taken the extra step of getting the VRC, taking it to the Registrar of Voters. So is your question should everybody be registered to vote?

Q Should everybody be an active -- be on the active voter roles if they choose to. And so shouldn't this number -- yeah, of -- including 1,096 who are not?

A Are you talking about like is this is like a -- like in terms of like good -- I feel like this is, like, a good Government. Like, do I personally believe that everybody who wants to be registered should be registered to vote?

Q Yeah. Just as -- yeah, or as a matter of political science, shouldn't everyone be registered with -- shouldn't everyone be registered who chooses -- or should everyone be an active voter who chooses to be an active voter?

A I mean, you know, controlling for things that the number of people that we decide to exclude from voting --

152

Q Yes.

A -- usually crimes, but yes, everybody who wants to be a voter and is eligible to vote, we would -- we would like to see them -- we would like to see them registered.

Q And so shouldn't this differential be a little closer to 0 than it is?

A You know, I -- it's a -- you know, the gap is really interesting, and it -- I'm not entirely sure, A, if I trust the data, like we've talked about before. B, whether it's really the VRC step that totally explains this gap, right, could it explain some of the gap, maybe. Could it explain all of the gap, that's unclear.

So, you know, do I -- do I personally wish that more of them were unsuspended? Of course, you know, if people want to vote, I would like to see them -- as a personal matter, I would like to see them get registered and vote. But that's sort of neither here nor there.

Q Does the number of individuals matter when you're talking about an individual's burden?

A So I mean, I think that the point still stands that, you know, ultimately the gap that Professor Burch has identified, we're talking

153

about a difference of just over 1,000 people, that's kind of the main point that I'm trying to make. You know, burden -- you know, individual burdens are -- can be different and they are in Louisiana, right, if you're -- if your -- if your registration is suspended, you do have to take the extra step of taking the VRC to the Registrar of Voters. So if that's the way Louisiana wants to -- chooses to run its elections, you know, that's for whatever reason, right, I don't -- I'm not entirely -- you know, I'm not privy to the reasons behind this distinction, but if that's how they want to run it, that's -- I don't think that's terribly burdensome to have to take a piece of paper down to the Registrar of Voters.

Q Put it another way, if I, you know, Valencia, let's say I have a felony conviction and have to seek reinstatement because I registered to vote before my felony conviction, whether I was one of two -- 1,096 or 1,000,096, it doesn't matter to me, right?

A Yeah. You probably don't -- aren't super interested in how many other people are in the same situation.

Q Matters that I had to do it?

154

A Yeah, I would agree with that.

MS. RICHARDSON: Let's go down to 15.

Q It says so here, can you -- the Ms. -- not the quote, the other one, about -- it appears that Professor Dr. Burch treats the population or something.

MS. RICHARDSON: Right there. Thank you, Ellen.

Q As having been suspended at some point; where are you getting that from?

A On -- somewhere in her report she talks about matching -- when she's talking about matching data, when she talks about matching the data, in my understanding of what she's done, if they were matched to the VRC list, then she's assuming that they needed a VRC. Meaning, that they were suspended, that the registration was suspended. I can't tell you where it is exactly off the top of my head.

Q Where does she say in her report that anyone who received the VRC needed it?

A She doesn't say that specifically, but she says if they received a VRC, then she was counting them as having been suspended.

Q So she does not say that the population

155

who received a VRC as having -- is someone who has been suspended at some point?

A I don't remember exactly what she says, but she says that if they match the VRC list, then she put them in the suspended group, something to that effect.

Q Okay. We can look at the report at page 17, the Burch report. Sorry if I'm looking down, it's because I'm looking down at the various reports surrounding me right now.

So this is back into those definitions of never and ever, right? And it says here everyone in the ever suspended group was either issued a voter certificate or was matched to either the most recent or an earlier suspended list.

It does not say that she is treating the population as having been suspended at some point, right?

A Wait, can you point me to exactly what she says?

Q Right here.

MS. RICHARDSON: Ellen, could -- I don't have control, do you see it where it says everyone in the ever suspended group? This exact sentence.

A Right. So she says that she classifies

156

people as ever suspended, if one of two things was true, right, 'cause she says or. So either they were issued a voter certificate, and that means that they were suspended, or they were matched to one of the suspended lists that she was given.

So my reading of that, my plain reading of that indicates that she is assuming that people who -- everybody who received a voter certificate, received it for a reason, and that reason was that they were suspended. Because she classifies them as suspended. If they received a VRC, even if they weren't on any suspended list.

Q But you don't recall seeing anywhere in her report where she says that she's assuming that everyone who received a VRC was for a reason?

A I don't -- I'm sorry, can you repeat that again? I kind of got lost in my brain there.

Q Oh, no worries. I do that all the time.

So I said, you don't recall anywhere in her report where she says that she is assuming that someone received the VRC for a reason?

A No, she never says that explicitly, but that's my -- I'm inferring from this -- from this sentence that that's what she's done. She doesn't say that explicitly.

157

Q Let's go back to your report at page 16, the part about inactive voters. Right here. Inactive voters are not included in that voter registration file, even though inactive voters are still able to vote.

Why would she needed to have included inactive voters?

A Well, because they are -- because they are the same as being registered -- they're still registered to vote, right, it's just that the state has come -- has presumably sent them a piece of mail that was returned to them and the registrar thinks that they may have moved or whatever, and so they're flagged as inactive. So they're the same -- and they're exactly the same as voters, because they can vote, so they should be included in her analysis as well.

Q Under what circumstance would a suspended voter be on the inactive list?

A So I think -- so you get on the inactive list -- I don't know all of the ways that the state does it, but the -- I know that if the -- if a piece of election related mail is sent to your house and it comes back as undeliverable, then the registrar has some reason to believe that

158

that person no longer lives at that address and they flag their -- they tell them, hey, you have -- then they'll send them another piece of mail saying you have 21 days to come down to make sure that you are still an active voter at this address, and if you don't, then we're going to move your registration -- your voter status as inactive.

But like I said, inactive voters can vote, and so they -- these people -- and some are -- and they're registered, so they should have also been included in the analysis. So she -- she -- by not having inactive voters in there, she's excluding some people that could have gone into either or both of these categories of ever suspended or never suspended.

Q One moment.

MS. RICHARDSON: Let's go to Document N.

Q Okay. So Dr. Brunell, this is a deposition transcript from the deposition of the Secretary of State's office.

MS. RICHARDSON: And Ellen, turn to like -- it's transcript page 26, but it's PDF 8, I think.

Q So if you look at page 26, line 14, the

159

question was is there any circumstances where a voter whose registration has been suspended could be inactive -- on the inactive list.

Do you see that?

A Yes.

Q And the answer is if they're suspended, they're not on the inactive, supplemental, or inactive list --

A Okay.

Q -- is that right?

So a suspended voter cannot be inactive, right?

A If they're currently suspended, yes. That's what it sounds like.

Q What -- so are you saying a previously suspended voter could be inactive?

A Yes, I think that it's possible that they were suspended, reinstated, and then for some reason became inactive.

Q So why would -- so that person would have then shown up on the active list?

A At some point.

Q Before they became inactive?

A In my hypothetical, yes, they would have been active and then inactive.

160

Q So there's no circumstance where a suspended -- a currently suspended voter would be able to show up on the inactive list?

A According to this testimony, that's correct.

Q So why would you need the inactive list to understand whether a suspended voter --

A Well, like I said --

Q -- is currently active?

A Well, that's only half the thing, right, there are people that are not suspended that could be on the inactive list. So we're interested in those people too. And it's possible, I think, theoretically for them to have been suspended, then active, then inactive. So we just want to make sure -- we're just trying to -- in order to make -- to draw conclusions, we want to make sure the data are as accurate as possible.

Q Why wouldn't a person who was previously registered, then became active, then inactive, be a duplicate entry on the active, inactive list?

A Why would they be duplicate?

Q Why wouldn't they be? Because I guess following your logic, it sounds like they would be, because they're active and then inactive, they

161

would be on the -- so again, so why would the inactive list matter in that circumstance?

A I mean, I think here again the -- kind of the main point is like timing of all these things is really important in these data. And I think that's one of the things that we're missing, is we have to get all the order of events in the right order and then classify people as ever suspended, never suspended, whatever else, because when things happen in order matters, right, so is it possible for somebody to be suspended, reinstated, then active, and then inactive, I mean theoretically, I -- that sounds very plausible to me. That sounds like it that could happen.

So they wouldn't be inactive and active at the same time, they were suspended, reinstated on a particular date, they're suspended for some period of time, reinstated on a particular date, now they're active, there's a piece of mail that goes to their thing, comes back up to their house, comes back undeliverable. Registrar says this person may not live there anymore, and then after 21 days, puts them on the inactive list, right. So it's like there's these little discrete chunks of time where they fit into different groups.

162

Q Why would -- so but as to suspended voters, again, the inactive list would then be completely irrelevant, right?

A It sounds like you cannot be -- if you're suspended, you're never inactive, because you're suspended.

MS. ROBINSON: Can we mark Document N as Exhibit 23?

(BRUNELL Deposition Exhibit 23 was marked for identification.)

MS. ROBINSON: And just in case I didn't do it, Document X is supposed to be Exhibit 22.

Q With respect to inactive voters, this part of your report, did you undertake that analysis yourself?

A No.

Q Okay. Why not?

A Again time, time constraints.

MS. RICHARDSON: Okay. Let's go to page 17 of your report, and we're barreling towards, like, the end of my questions.

Q So is this -- earlier you discussed your opinion about registration dates, is this what you're referring --

A Yes.

163

Q -- to? This paragraph? Professor Burch also did not look at the registration dates on page 17?

A Yes.

Q Okay. There's a line here that says there could be people in the never suspended group who never lost eligibility to vote, because they were never under an order of imprisonment.

Did I read that correctly?

A Yes.

Q If they never lost their eligibility to vote, wouldn't they by definition be never suspended?

A Oh, I think that should say ever suspended. Wait. No. No. No. So hang on. Right. So again, this goes to the -- it matters when they registered to vote. So I think the logic of Professor Burch's argument is that never suspended people registered after -- after they're eligible, after the felony conviction, but in fact, there could be people who were eligible and registered the whole time because they never went to prison, but they're on the P&P list.

Q Where -- does Dr. Burch ever say that her analysis involves -- and I -- I don't want to

164

misquote you, but what -- the last thing you just said about post conviction?

A Hang on. My dog is about to start barking. Chip, please. Let me open the door.

Q No worries.

A No, she doesn't say this, but the never suspended group means -- you're only never suspended in her analysis if you were not registered to vote before you went to prison, right? And then for those people it's easier to get registered, because they don't have to use the VRC, and that's the one -- one of the main comparisons that she uses. But these people could -- there could be people in the thing that were registered beforehand that have been registered for 30 years, convicted of a crime, didn't go to prison, they're on the P&P list, so they're in her dataset, and then she assumes that after they finished their sentence or whatever, that they were registered to vote at that point, right?

And because that's what never suspended means, they were not registered to vote before they went to prison. But what if you never went to prison? That's kind of the point I'm making here. So those people probably should be taken

165

out of the analysis, because what I think she wants to compare are just people who went to prison, were not registered to vote, to people who went to prison who were registered to vote, right? That's the key distinction between these two groups, and whether or not they have to use the VRC or not.

Q But so that's your understanding, she doesn't say any of this?

A Again, I think -- I'm inferring it, but I think that makes sense for her analysis, yes.

Q So -- okay. So on page 17 of the report the quote is, I used the term never suspended to refer to the people who are not matched to any of the suspended list that I was provided, and who have not been issued a voter certificate.

None of that even mentions pre or post-conviction, right?

A Right.

Q Okay.

A But the -- like, the key distinction in your lawsuit, as far as I understand it, is the VRC -- the step of taking the VRC is burdensome and that's the single and only cause for this gap in registration. But there are -- so people that

166

were registered before they were convicted should not be included, because people are either -- so it's all -- in my mind, this is all post-conviction analysis, and so it's either you just had to register online because you weren't registered before you went to prison, or you had to take the additional step of taking a VRC because you were registered before. Right?

So it has to be post-conviction actions, right, because we know suspended -- becoming reinstated has to happen after conviction, right? And if there are people who were registered to vote before conviction, then I don't think they belong in that group of never suspended.

Q Does any of this matter if -- does this -- does all of this only matter, your understanding, if all parties are following the law, as you understand it, after 2022?

A You're going to have to restate that one. I'm not sure I know what that means.

Q So as you -- can you describe your understanding of the law after 2022?

A With respect to --

MS. WHITE: Asked and answered.

MS. RICHARDSON: I'm laying a foundation

167

for a question, unless you want -- and you complained earlier that I testified, so let's --

Q But you can answer.

A Okay. So you want me to describe post-2022?

Q Yeah.

A Okay. So people who were registered to vote before their conviction, have their registration suspended, and when they get out, they have to take -- they have to take the VRC, the voting rights certificate or some other documentation to the Registrar of Voters in order to have the registration unsuspended.

And people who were not -- did not have the -- were not -- were never registered to vote before imprisonment, do not have to take this extra step, and when their sentence is over, and they're eligible, they can register just like any other person online, you know, at a registration drive, et cetera.

Q And then what's your understanding of the law between 2019 and 2022?

A That the VRC was required both for reinstatement and for first time registrants.

Q So if there were election officials still

168

following the 2019 law in 2026, how is that -- does any of what you're saying about pre and post-conviction, is any of that relevant?

In other words, if election officials are requiring the VRC, or other documentation, for all voters with felony convictions, regardless of whether they were registered before, does this -- what effect does that have on this part of the analysis?

A I would have to think about that a little bit. I'm not quite sure. So I mean, I'm kind of surprised, I don't know if this is -- you know, I know that in -- maybe it was in Professor Burch's report they talked about, you know, a survey of registrars and they were given the wrong information. I don't know if that's related to that, but I'm not quite sure, like, what to do with, you know -- faced with -- you know, if registrars aren't following the law the way they're supposed to, I'm not -- I might -- I think I'd have to give that a little bit of thought before I answered it.

Because it's a very -- I mean, it's super hypothetical. I don't know -- are you saying everybody across the state is doing this and none

169

of this matters? You know, then it would -- you know, I'm not sure what to do with that kind of information.

Q And what about your section about using the 2019 to 2022 VRC list -- or list the folks who are -- have the VRC from 2019 to 2022, if there are registrars, for example, who haven't changed their behavior at all, what effect would that have on that part of your analysis?

A Yeah, in that specific one, if they're -- if they're requiring everybody to still bring a VRC first time registrants and suspended voters, then the gap would be smaller post-2022 if the underlying theory that this extra step is the cause for the gap. Does that make sense? So it would -- it would affect it, we would expect the gap to be smaller, because both -- anybody -- both ever suspended still have to use the VRC.

Q I guess, why wouldn't the difference be the same if the -- if the conditions haven't changed?

A Well, because I mean, so the theory I think that from Professor Burch's report is that the -- having to take the VRC to the registrar is an additional burden, and that's causing fewer

170

people to reinstate their voter registration. And that's the main cause of this gap between people that were never were suspended and people that were suspended. So if -- you know, my argument in the 2019 to 2022 thing is that both ever and never were treated the same, they all needed the VRC. After 2022, only people that were suspended needed it.

And so in between 2019 and 2022, if it really is the VRC that's causing it and that's the only thing that's causing it, which of course that's never true, there are always other factors, then voter registration rate should be the same for this 3 year period. And after 2022, we should see a market increase in the people that were not suspended, because they no longer have this additional cost to bear and it's easier for them to get registered, and so they get registered.

Q But we're distinguishing not between -- we're distinguishing between the people who needed the documentation versus people who didn't, right, in order to become an active voter?

A In which period?

Q Generally.

A Yes. That's what Professor Burch is just

171

looking at people who were suspended versus not suspended. She doesn't break it down into these time periods.

Q No, I mean, but then -- but in defining suspended and not suspended for the purposes of this analysis, didn't she say that suspended was, did you need the paperwork, and not suspended, you did not need the paperwork?

A I believe so, yes.

Q So isn't the distinction, did you need the paperwork or did you not need the paperwork?

A For Burch? Yes.

Q Yes. For Dr. Burch's analysis?

A Yes.

Q Isn't that the distinction?

A Yes.

Q And if that is the distinction, if none of the conditions changed between 2019 and 2026, then that time -- then what difference does it make to exclude 2019 and 2022?

A Well, that would mean that the additional step of requiring -- the need to have the paperwork has no effect, because it can't, because it's constant, right? So if post-2022, the registrars -- the various registrars across the

172

state are ignoring the law and still requiring everybody to bring the VRC, then there should be no gap. Well, there's no -- any bit of the gap is not explained by the VRC, because during this time period, according to this hypothetical, everybody needs a VRC.

Q No. Yes. And so the difference is who needed it and who didn't at that point, and if we're saying that still some people need it and some people don't, but who is required to get it is the same? So that -- maybe that's the clarification; who is required to get it, is the constant?

A But the first part of the hypothetical is what if people are not acting according to the new law, that they're still acting according to 2019, which means that everybody needs it; isn't that true?

Q That is -- so let me step back. Yeah. People who -- so yes, after 2021, people who -- if we're saying this, that people after 2022, I'm sorry, there are people who didn't need the VRC by law, but then some people are -- but then -- yes, but the -- but if in practice, who needed the paperwork did not always change, then that gap is

-- then the -- but you still need the VRC, then the question is still rate of who needed the VRC versus rate of who did not need the VCR?

A But the hypothetical says that everybody needs the VRC.

Q Okay. We'll move on.

A Okay.

MS. RICHARDSON: Let me see something. I might be done, so can we go off the record?

(A recess was taken.)

MS. RICHARDSON: Professor, I have no further questions for you.

THE WITNESS: Yay.

MS. WHITE: Well, I have some questions for you, Dr. Brunell. So sorry, it's just a few, though.

THE WITNESS: No worries.

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MS. WHITE:

Q This is Mary Ann White. I represent the Secretary of State in this matter. Over the course of the day -- or over the course of the deposition, there were a number of discussions about ever suspended and never suspended groups; do you recall that?

A I do.

Q Now, when you were discussing these groups, were you referencing these as your own groups, or as Dr. Burch's groups?

A Dr. Burch's.

Q Okay. And you did not come up with these groups yourself, correct?

A That's right.

Q Okay. And would you say that is it a correct statement that you disagree with the numbers that Dr. Burch arrived at for those groups?

A Yes.

Q Okay. You also -- there was a discussion about the gap between those two groups, and I think you said at one point the gap remains even if you conduct the multi-variant model; do you remember that?

A I do.

Q Okay. When you made that statement, was that assuming that Dr. Burch's numbers with those groups were correct?

A Yes, it was.

Q There's also been a lot of discussions today about the terms reinstatement and registration; do you know what the difference between those two is in Louisiana, under Louisiana law?

A I believe so.

Q Okay. So can you just -- can you just explain that?

A Sure. So registration means you're registered to vote, and you can be an active registrant, you can also be an inactive registrant, this is the same -- I mean, it just means you're registered to vote, so that you're able to vote. And then reinstatement is the process of becoming -- of having your registration unsuspended. So reinstatement is only for people -- it's a term only used for people whose voter registration was suspended, and then bringing the VRC or other similar documentation to the registrar, has it -- gets it reinstated.

Q Okay. So as you understand registration is something you do the first time you register to vote?

A Yes.

Q Okay. All right. You were shown a number of different state's laws today. Correct if I'm wrong, but you weren't necessarily interpreting those state's law by reviewing those statutes that you were shown just today; is that correct?

A That's true.

Q Going back to the gap between Dr. Burch's ever suspended and never suspended group, would you agree that that -- if the errors that you've pointed out were fixed, that gap could be the same, it could be greater, it could be lesser, there could be no gap, it could go either way, is that what you -- is that your testimony today?

A Yes, we don't know -- if we fixed all these errors, we don't know what the gap would be.

Q You were asked to look at page 17 of your report, I don't know if you have that in front of you?

A I can bring it up.

Q Okay. This was kind of towards the end of the questioning today.

A Okay. I'm there.

Q We looked at that paragraph above registering to vote is not the same as voting?

A Yes.

Q Looked specifically at the statement where you said: There could be people in the never suspended group who never lost eligibility to vote

177

because they were -- they never were under an order of imprisonment.

And you were asked a number of questions about that; do you remember that?

A Yes.

Q Okay. So these -- okay. So the people that you're talking about in this never suspended group who never lost eligibility to vote, these were people -- this could be people who had been registered before their conviction; is that correct?

A That's right.

Q Okay. All right. And so -- well, I think you said that in the next line: Those people could have gotten registered to vote before their felony conviction.

And then you say: In that case, their registration date would have been pre-conviction, not post-conviction.

So I want to talk about the difference between pre and post. And I mean, what is your understanding of -- first of all, your understanding of -- what is your understanding of what Professor Burch's report was about, was it about pre-conviction voting or post-conviction

178

voting?

A I think it's about post-conviction registration.

Q Okay. Was it also about the reinstatement?

A Yes. So yes, reinstatement for those that were suspended, and then first time registration for those that were not.

Q Was there anything in Dr. Burch's report that led you to believe that she was interested or had analyzed anything to do with the registration rates of felons before they became felons, so before they were convicted of their felony?

A No, there's nothing in her report that would lead me to believe that that was true.

Q Okay. And so that's what led you to infer that the data and analysis should be looking -- and that she looked at, was strictly those who register or reinstate after their felony conviction; is that correct?

A Yes.

Q Okay. And do you agree that post-conviction, or registration, or reinstatement is what should be analyzed in this case, not pre-conviction registration?

179

MS. RICHARDSON: Object to the extent that it calls for a legal conclusion. But sorry, you can -- you can answer your question.

A Yes.

Q Okay. Yeah. Because before felony conviction, you're not -- you're not a convicted felon, correct?

A That's true.

Q Okay. Sorry, sometimes we have to ask these obvious questions.

So I want to look at -- you were asked about the VRC list, you made a statement in your report. I don't have the statement exactly, you know, word for word, something to the effect that Dr. Burch considered those on the VRC list to be suspended, to have been suspended either, you know, now or at some point in time.

And you were asked if there -- you know, where is that in her report and you were shown some pages of her report, but I want to look at her report on page 15, and I don't have the sharing capabilities.

MS. WHITE: I don't know if Ellen or whoever has it could bring that up for us.

MS. RICHARDSON: Ellen, could you pull up

180

it for us, page 15 of the Burch report.

MS. WHITE: It's Exhibit 2 to this deposition.

MS. BOETTCHER: Yes, one second.

MS. WHITE: Okay. Thank you. Under determining voter registration status, if you don't mind, yeah. Thank you.

Q So that first full paragraph there, I just want to direct your attention to the second to last sentence that begins with this process assumes.

Do you see that there?

A I do.

Q Okay. It says: This process assumes that people who have been issued a voter certificate were on the suspended voter list at some point since obtaining a voter certificate allows people to reinstate their registration and removes them from the suspended voter list.

Is that where you got at least part of your understanding of Dr. Burch's analysis with respect to the VRC list, including those who had been on the suspended list?

A Yes.

Q Okay. And also, I think we looked at

another page of her report where you said that you infer that on that page as well, we talked about that earlier, is that -- is that also both of those together --

A Yes.

Q -- correct statement?

A They both indicate the same thing.

MS. WHITE: All right. That's all the questions I have.

MS. RICHARDSON: I just have one more question for you, Dr. Brunell, since we're -- and keep this page open.

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MS. RICHARDSON:

Q That sentence that was just read out, Footnote 52, as it says: This step also accounts for people who may not have been on the suspended voter list, but who mistakenly believed that they needed to provide additional paperwork. I also account for people who might have been reinstated using paperwork other than a voter certificate.

Is that -- did I read that correctly?

A Yes, you did.

MS. RICHARDSON: All right. Thank you so much. No further questions.

(Off the record at 4:07 p.m.)

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Angela Collura, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of April, 2026.

My commission expires December 31st, 2029.

*Angela Collura*

Angela Collura

| A | | | |
|---|---|---|---|
| **ability** | **accuracy** | 133:12, 142:16 | **after** |
| 140:11 | 87:15 | **add** | 8:23, 25:24, |
| **able** | **accurate** | 13:5, 65:8, | 34:19, 43:24, |
| 8:6, 16:11, | 111:18, 160:18 | 65:13 | 46:22, 55:25, |
| 16:22, 17:10, | **acquired** | **added** | 87:23, 90:16, |
| 32:13, 82:10, | 43:17 | 63:19, 101:23 | 92:6, 97:4, |
| 82:24, 89:17, | **acquisition** | **additional** | 99:13, 100:1, |
| 97:18, 116:4, | 38:4, 38:11, | 12:15, 13:24, | 100:8, 102:21, |
| 126:23, 126:24, | 38:18, 43:7, | 14:12, 15:23, | 105:22, 107:2, |
| 157:5, 160:3, | 46:22 | 24:3, 24:12, | 108:6, 109:17, |
| 175:12 | **across** | 55:24, 86:1, | 110:19, 110:25, |
| **above** | 113:12, 168:25, | 101:24, 105:16, | 111:5, 117:18, |
| 70:9, 113:17, | 171:25 | 105:17, 166:7, | 119:11, 123:3, |
| 147:22, 147:23, | **act** | 169:25, 170:17, | 126:13, 128:1, |
| 176:20 | 65:20, 66:15 | 171:21, 181:19 | 128:3, 132:9, |
| **absent** | **acting** | **address** | 133:17, 134:18, |
| 116:4 | 172:15, 172:16 | 11:1, 16:14, | 134:19, 134:22, |
| **absolutely** | **actions** | 17:6, 57:15, | 135:12, 136:9, |
| 42:14, 43:15, | 166:9 | 57:17, 57:24, | 136:25, 145:2, |
| 74:12, 87:20, | **active** | 58:5, 158:1, | 161:22, 163:19, |
| 101:7, 129:24 | 79:3, 80:17, | 158:6 | 163:20, 164:18, |
| **accept** | 80:23, 82:11, | **addresses** | 166:11, 166:18, |
| 34:10, 52:1, | 108:18, 125:12, | 51:23, 62:5, | 166:22, 170:7, |
| 52:10, 52:11 | 135:7, 143:1, | 144:5 | 170:14, 172:20, |
| **acceptable** | 143:5, 151:9, | **administration** | 172:21, 178:19 |
| 48:8, 49:14, | 151:10, 151:22, | 95:21, 96:2 | **afterwards** |
| 55:9 | 158:5, 159:21, | **administrative** | 126:21 |
| **accepted** | 159:25, 160:9, | 83:20, 92:22 | **again** |
| 51:24 | 160:15, 160:20, | **admitting** | 33:22, 44:7, |
| **accidentally** | 160:21, 160:25, | 139:10 | 44:18, 44:19, |
| 73:18 | 161:12, 161:15, | **adobe** | 46:15, 47:20, |
| **accidently** | 161:19, 170:22, | 10:3 | 49:2, 49:6, |
| 8:11 | 175:8 | **advice** | 50:13, 71:1, |
| **accord** | **actually** | 51:22 | 76:12, 80:8, |
| 46:16 | 10:1, 12:17, | **affect** | 83:6, 85:6, |
| **according** | 13:20, 22:13, | 13:14, 83:21, | 94:11, 100:7, |
| 63:1, 160:4, | 30:5, 30:7, | 115:18, 119:16, | 106:15, 110:8, |
| 172:5, 172:15, | 31:9, 39:16, | 120:19, 121:11, | 113:1, 122:21, |
| 172:16 | 44:19, 50:10, | 123:18, 123:20, | 132:7, 136:20, |
| **account** | 50:13, 56:5, | 145:10, 169:16 | 136:25, 137:6, |
| 115:9, 137:18, | 59:22, 60:16, | **affected** | 140:25, 145:9, |
| 140:20, 181:20 | 65:11, 65:15, | 121:8 | 150:1, 151:2, |
| **accounted** | 66:11, 67:15, | **affecting** | 156:17, 161:1, |
| 121:21, 122:23 | 68:22, 70:9, | 115:10 | 161:3, 162:2, |
| **accounts** | 72:11, 78:4, | **affirmed** | 162:18, 163:16, |
| 181:16 | 85:16, 93:4, | 7:4 | 165:10 |
|  | 94:21, 99:9, | **afford** | **against** |
|  | 101:5, 129:15, | 68:17 | 127:9, 127:13 |

**age**
109:10, 112:3, 116:20, 117:1, 120:9
**agency**
68:14
**ages**
119:13
**ago**
11:20, 62:2, 142:1
**agree**
46:2, 80:6, 80:16, 88:13, 91:4, 128:20, 140:24, 154:1, 176:6, 178:22
**agreement**
18:25, 19:2, 19:5
**ahead**
45:15, 81:24
**al**
1:5
**alabama**
6:5, 95:16, 95:18, 96:10, 96:17, 96:18, 97:9, 97:23, 99:13, 110:7, 110:24, 114:4, 114:5, 114:14
**alabama's**
96:11, 110:4
**alice**
3:6
**allow**
34:12, 51:7, 65:2
**allowing**
64:19
**allows**
180:17
**almost**
14:6, 20:24, 24:25, 25:2, 61:13
**along**
23:21

**already**
7:15, 45:25, 50:4, 64:4, 78:12, 78:15, 104:4, 106:9, 122:2, 122:8, 122:10, 122:11, 122:22, 134:11, 141:21
**also**
17:7, 18:18, 23:14, 24:15, 27:19, 30:12, 30:13, 33:6, 40:5, 46:23, 57:25, 58:3, 60:15, 63:20, 66:8, 71:24, 73:22, 74:1, 75:2, 75:3, 87:10, 95:22, 110:7, 158:11, 163:2, 174:14, 174:24, 175:9, 178:4, 180:25, 181:3, 181:16, 181:19
**although**
51:25, 68:4
**always**
8:1, 19:13, 63:15, 100:5, 170:12, 172:25
**among**
77:23, 82:12, 126:20
**amongst**
124:3
**amount**
124:25, 144:6
**analogy**
60:23
**analyses**
15:24, 16:3
**analysis**
13:12, 13:13, 13:24, 13:25, 20:20, 24:19,

25:3, 32:1, 32:4, 32:5, 32:8, 79:22, 90:17, 112:25, 115:22, 115:23, 116:4, 116:8, 116:14, 116:25, 117:11, 117:12, 117:15, 118:4, 118:11, 118:16, 120:2, 122:16, 127:13, 128:24, 134:17, 135:14, 143:23, 143:24, 157:17, 158:12, 162:14, 163:25, 164:8, 165:1, 165:11, 166:4, 168:9, 169:9, 171:6, 171:13, 178:17, 180:21
**analyst**
143:15
**analyze**
112:1
**analyzed**
25:19, 77:25, 87:2, 178:11, 178:24
**analyzing**
20:23, 25:1, 32:5, 60:17
**angela**
1:25, 2:8, 183:2, 183:20
**ann**
3:15, 10:12, 10:13, 14:1, 15:9, 18:2, 21:6, 21:12, 21:20, 43:9, 47:21, 49:6, 50:20, 52:25, 54:6, 55:18, 57:19, 89:14, 98:3, 101:13, 146:13, 173:20
**another**
54:14, 95:4,

96:9, 106:3, 113:6, 113:10, 128:13, 134:12, 144:20, 150:7, 153:16, 158:3, 181:1
**answer**
8:22, 35:3, 35:4, 41:23, 41:24, 47:25, 53:6, 54:9, 55:21, 57:23, 101:17, 116:3, 130:10, 159:6, 167:3, 179:3
**answered**
166:24, 168:22
**answering**
117:9
**answers**
8:5
**any**
9:2, 9:9, 10:14, 11:8, 11:12, 11:16, 12:11, 13:9, 16:3, 16:5, 16:8, 16:10, 16:16, 18:25, 20:19, 21:15, 21:18, 24:2, 24:12, 24:18, 25:8, 25:15, 27:22, 28:15, 34:7, 35:8, 41:20, 46:10, 46:13, 46:24, 47:1, 47:22, 47:25, 50:25, 55:14, 59:12, 63:13, 64:18, 68:16, 77:12, 77:18, 77:20, 77:21, 81:21, 81:22, 88:7, 90:15, 99:2, 102:11, 102:12, 104:16, 108:17,

108:21, 116:6,
123:15, 124:1,
128:23, 134:10,
134:13, 135:5,
138:23, 138:24,
139:12, 140:5,
156:12, 159:1,
165:9, 165:14,
166:15, 167:18,
168:2, 168:3,
172:3, 183:10

**anybody**
17:4, 33:15,
136:22, 137:2,
169:17

**anymore**
161:22

**anyone**
9:5, 17:13,
21:10, 21:25,
22:2, 57:3,
129:19, 130:4,
154:21

**anything**
9:13, 9:20,
9:23, 17:9,
25:6, 26:2,
35:9, 178:9,
178:11

**anyway**
8:2, 109:8

**anywhere**
67:4, 156:13,
156:19

**apologize**
42:15, 43:11,
72:11

**apparently**
77:9

**appear**
48:4, 49:13,
52:20, 53:17,
54:20, 146:1

**appearing**
69:1

**appears**
53:22, 67:4,
96:18, 154:4

**application**
34:16, 34:21,
90:18, 90:22,
90:25, 91:6,
91:21, 91:24,
91:25, 92:2,
92:5, 94:20,
96:6, 105:5,
114:1

**applies**
52:5, 102:8,
107:1, 142:17

**apply**
67:19, 97:12,
103:19, 107:21,
107:22, 114:13

**applying**
95:19

**approach**
14:2

**approaches**
113:11

**appropriate**
48:5, 48:13

**approval**
90:22, 91:7

**approve**
91:10

**april**
1:17, 183:14

**area**
12:2, 38:1

**aren't**
8:6, 43:4,
58:18, 63:1,
115:5, 116:25,
117:1, 118:9,
136:16, 153:22,
168:19

**argue**
126:24

**argument**
133:2, 136:6,
163:18, 170:4

**arguments**
59:15

**arianna**
3:5

**arising**
107:11

**arm's**
9:11

**around**
72:11

**arrived**
174:11

**article**
74:7

**articles**
109:7

**asked**
11:16, 14:14,
16:18, 50:24,
166:24, 176:13,
177:3, 179:11,
179:18

**asking**
51:20, 57:20,
77:17, 91:23,
98:24, 99:11,
149:21

**assessing**
132:14, 132:16,
133:11, 133:15,
133:19, 133:22

**assignment**
10:21, 11:2,
11:9

**associated**
13:22, 15:21,
67:6

**assume**
7:20, 58:3,
82:16, 85:3,
85:4, 92:11,
104:11

**assumed**
128:7

**assumes**
134:20, 164:18,
180:11, 180:14

**assuming**
96:7, 129:14,
135:12, 135:15,
137:21, 139:13,
139:17, 145:9,

154:16, 156:7,
156:14, 156:20,
174:21

**assumptions**
122:10

**attached**
72:20

**attention**
180:9

**attorney**
6:6, 10:17,
10:20, 101:1,
101:15, 101:23

**attorneys**
8:20, 10:14,
10:22, 13:3,
21:21, 21:25,
22:3

**auto**
87:23, 88:4,
88:6

**automatic**
38:3, 38:10,
38:18, 39:2,
43:6, 45:13,
46:22, 92:14,
93:16, 105:15

**automatically**
35:22, 38:20,
39:6, 39:8,
40:4, 43:16,
45:6, 54:13,
85:23

**availability**
69:18

**avoid**
113:9

**aware**
86:3, 102:1,
102:4, 110:21,
111:6, 111:8

**away**
125:10

**B**

**b-e-t-a**
119:2

**babineaux**
5:16, 12:23,

37:12, 37:18, 38:15, 38:21

**babineaux's**
39:17

**back**
9:7, 27:19, 37:25, 38:21, 41:2, 42:7, 44:11, 44:12, 44:14, 44:15, 50:19, 52:12, 56:14, 56:20, 58:24, 61:20, 64:10, 70:5, 72:10, 72:16, 72:22, 72:23, 76:10, 76:11, 78:4, 79:20, 89:1, 93:20, 94:15, 95:14, 95:15, 100:2, 101:6, 106:1, 107:4, 108:11, 112:13, 114:20, 114:21, 117:8, 120:23, 120:25, 121:16, 122:5, 128:12, 128:14, 129:16, 129:17, 145:18, 147:18, 155:11, 157:1, 157:24, 161:20, 161:21, 172:19, 176:4

**background**
25:15

**balloting**
64:5

**barking**
164:4

**barreling**
162:20

**barrier**
67:25, 83:20, 133:16, 133:19

**barriers**
60:18, 67:20, 70:23, 82:25

**based**
7:24, 30:15, 30:16, 77:23, 88:22, 99:16, 100:11, 102:23, 103:10, 105:23, 108:9, 109:6, 112:10, 120:5, 121:19, 122:21, 140:12, 148:6

**baseline**
117:9

**basically**
43:25, 63:9, 75:1, 97:24, 103:11, 119:18

**basics**
61:20

**basing**
31:1, 113:14

**basis**
37:10, 83:14, 112:9, 126:4

**bates**
41:1

**baton**
3:19, 4:7

**bear**
68:20, 68:21, 170:17

**bearing**
63:13

**became**
15:21, 100:15, 129:20, 142:4, 142:10, 142:20, 143:1, 159:19, 159:23, 160:20, 178:12

**because**
19:22, 29:19, 50:20, 59:19, 60:9, 60:24, 63:2, 63:6, 63:13, 63:17, 65:10, 66:18, 68:3, 68:11, 68:12, 68:15,

69:18, 70:7, 71:19, 71:23, 74:4, 78:10, 81:6, 90:11, 91:3, 91:9, 92:24, 103:9, 105:14, 113:5, 120:1, 122:17, 123:13, 123:15, 127:1, 129:13, 134:19, 135:9, 135:25, 136:16, 137:4, 138:1, 138:10, 138:16, 138:17, 140:25, 142:5, 142:9, 142:25, 143:10, 150:17, 153:18, 155:9, 156:10, 157:8, 157:16, 160:23, 160:25, 161:9, 162:5, 163:7, 163:22, 164:11, 164:21, 165:1, 166:2, 166:5, 166:8, 166:10, 168:23, 169:17, 169:22, 170:16, 171:23, 172:4, 177:1, 179:5

**become**
34:12, 43:23, 79:3, 80:7, 80:17, 80:23, 82:11, 89:19, 89:20, 99:25, 100:6, 108:6, 125:12, 129:24, 135:6, 170:22

**becomes**
88:14, 99:13, 100:9, 102:22, 105:22

**becoming**
84:21, 108:18, 166:10, 175:13

**been**
7:19, 10:16,

11:24, 12:9, 17:10, 17:17, 18:7, 18:16, 20:16, 20:24, 24:2, 32:21, 33:1, 34:23, 44:1, 44:4, 50:24, 51:22, 61:13, 62:18, 70:21, 75:10, 78:11, 90:13, 105:21, 108:7, 111:23, 122:6, 122:22, 128:21, 129:6, 132:22, 134:18, 136:2, 136:4, 136:19, 136:23, 143:3, 143:4, 144:25, 149:13, 154:9, 154:24, 155:2, 155:17, 158:11, 159:2, 159:25, 160:14, 164:15, 165:16, 174:24, 177:9, 177:18, 179:16, 180:15, 180:23, 181:17, 181:20

**before**
2:8, 7:19, 33:11, 33:13, 33:17, 39:19, 39:23, 40:10, 40:12, 43:8, 43:12, 43:24, 47:8, 50:10, 50:21, 51:4, 55:1, 65:8, 72:16, 74:24, 76:11, 76:12, 78:22, 87:16, 95:17, 96:19, 106:15, 107:20, 122:19, 123:2, 123:4, 129:7, 131:22, 133:25, 134:3, 134:4,

135:13, 136:7,
136:10, 136:24,
137:25, 138:2,
138:7, 138:14,
141:5, 142:21,
144:17, 144:24,
145:3, 148:4,
152:11, 153:19,
159:23, 164:9,
164:22, 166:1,
166:6, 166:8,
166:13, 167:8,
167:16, 168:7,
168:22, 177:10,
177:15, 178:12,
178:13, 179:5,
183:2

**beforehand**
164:15
**beginning**
98:6, 114:23
**begins**
180:10
**behalf**
3:2, 3:14, 4:2
**behavior**
25:16, 25:18,
169:8
**behind**
153:12
**being**
7:4, 19:6,
40:19, 40:21,
53:3, 60:22,
60:23, 62:16,
63:2, 78:19,
80:8, 80:24,
95:24, 95:25,
119:17, 120:19,
121:12, 122:8,
123:20, 135:10,
135:21, 157:9
**believe**
11:10, 16:8,
24:17, 25:8,
27:15, 28:22,
29:1, 32:6,
34:9, 39:4,

47:10, 49:22,
51:5, 51:11,
53:24, 55:12,
70:19, 83:6,
83:18, 89:5,
93:9, 96:16,
97:20, 99:18,
100:13, 102:25,
103:25, 105:25,
110:23, 110:24,
114:5, 138:23,
142:14, 142:16,
142:24, 145:19,
151:16, 157:25,
171:9, 175:4,
178:10, 178:15
**believed**
181:18
**belong**
121:4, 166:14
**belongs**
88:17
**benefit**
63:12, 83:23
**benefits**
62:11, 63:4,
63:6, 63:14,
63:15, 63:20,
85:1
**beshear**
103:22
**besides**
9:9, 21:25,
22:3
**best**
31:16
**betas**
119:2
**better**
63:17, 63:19,
113:25, 117:22,
126:24, 144:8
**between**
31:14, 40:17,
59:22, 64:21,
71:4, 75:17,
75:18, 75:23,
77:1, 77:3,

77:22, 78:8,
93:20, 117:4,
124:8, 124:11,
124:15, 125:2,
126:10, 132:24,
132:25, 148:25,
149:5, 165:5,
167:22, 170:2,
170:9, 170:19,
170:20, 171:18,
174:15, 175:2,
176:4, 177:21
**big**
17:8, 59:21
**bigger**
60:14, 71:18
**bill**
64:16
**birch**
116:11
**bit**
21:8, 58:25,
63:22, 79:21,
81:11, 83:9,
95:18, 117:23,
168:11, 168:21,
172:3
**black**
118:4, 120:8
**blah**
121:18
**board**
97:4
**boettcher**
3:7, 180:4
**borrow**
113:7
**both**
8:14, 12:1,
31:10, 52:19,
58:4, 76:22,
76:24, 77:5,
107:2, 109:22,
126:20, 127:1,
158:15, 167:23,
169:17, 170:5,
181:3, 181:7
**bother**
63:12

**bottom**
24:4, 24:8,
44:20, 46:21,
53:3, 56:16,
93:4, 109:12,
112:11, 145:23
**boulevard**
4:5
**bouncing**
72:11
**bradley**
5:17, 12:24,
28:3
**brain**
156:17
**break**
8:15, 8:18,
9:20, 61:14,
171:2
**breaks**
8:15, 116:19
**bribery**
103:15
**briefly**
10:23, 38:1
**bring**
36:17, 84:2,
84:4, 169:11,
172:2, 176:16,
179:24
**bringing**
175:16
**broader**
86:24
**broadly**
11:4, 11:5
**broke**
41:14, 47:20
**brunell**
1:15, 2:1, 5:2,
5:14, 7:3, 7:9,
7:18, 8:24,
10:8, 15:5,
22:16, 23:5,
23:8, 23:17,
23:20, 23:25,
27:10, 27:17,
28:10, 28:20,

29:3, 29:7, 29:13, 29:20, 31:19, 31:23, 32:15, 32:18, 41:23, 47:9, 48:19, 50:5, 54:1, 72:19, 74:14, 76:14, 95:11, 95:17, 96:21, 104:5, 106:10, 106:17, 114:21, 116:13, 131:3, 145:13, 158:19, 162:9, 173:15, 181:11

**brunell's**
95:14

**build**
62:3

**builds**
123:8

**built**
122:2, 122:12, 123:13, 123:14

**bullet**
51:7, 51:14, 51:17, 146:3

**bunch**
119:1, 125:19

**burch**
5:13, 11:1, 11:15, 11:19, 12:14, 15:22, 21:3, 22:22, 26:16, 59:9, 62:5, 62:20, 67:3, 67:15, 71:4, 83:16, 115:12, 119:24, 121:16, 122:24, 126:23, 127:11, 128:7, 130:23, 132:14, 132:15, 133:9, 133:22, 144:10, 145:14, 145:19, 148:10, 152:25, 154:5, 155:8, 163:1,

163:24, 170:25, 171:12, 174:11, 179:15, 180:1

**burch's**
11:12, 11:18, 20:23, 23:11, 32:5, 32:7, 42:10, 42:16, 59:5, 59:16, 70:13, 127:12, 137:11, 143:7, 146:14, 149:13, 163:18, 168:13, 169:23, 171:13, 174:4, 174:5, 174:21, 176:4, 177:24, 178:9, 180:21

**burden**
68:20, 133:23, 152:22, 153:3, 169:25

**burdens**
153:4

**burdensome**
112:16, 113:14, 113:19, 153:14, 165:23

**business**
69:5

**busy**
19:21, 20:1

### C

**c1**
107:5

**c2**
107:23

**cajun**
39:25

**calculation**
63:12

**cali**
3:17

**call**
9:20, 17:16, 18:8, 18:18, 83:1, 87:22,

88:4, 88:8, 118:19

**called**
27:4, 62:13

**calls**
10:16, 179:2

**came**
11:5, 62:2, 136:9

**campaign**
3:8

**can't**
9:2, 11:25, 16:15, 19:23, 30:15, 38:2, 43:6, 43:16, 44:13, 45:16, 45:21, 52:1, 52:10, 52:11, 53:16, 57:7, 57:8, 59:3, 60:23, 67:23, 68:17, 68:20, 99:6, 108:20, 123:12, 123:22, 128:15, 135:24, 139:12, 140:8, 154:18, 171:23

**cangelosi**
4:3, 4:4

**cannot**
67:24, 69:4, 69:6, 159:11, 162:4

**capabilities**
179:22

**capacity**
1:9

**card**
92:10

**careful**
74:11

**caroline**
3:16, 10:16, 10:20, 17:17

**carrier**
52:4

**case**
7:11, 10:9,

10:15, 10:21, 10:23, 11:13, 11:21, 12:10, 18:20, 18:23, 19:1, 19:7, 19:17, 20:7, 22:4, 22:6, 37:22, 38:23, 39:25, 40:3, 60:4, 60:12, 61:4, 65:18, 80:10, 93:1, 115:11, 121:2, 125:14, 128:10, 134:24, 140:9, 162:11, 177:17, 178:24, 183:11

**cases**
24:21, 96:24, 97:1, 97:2

**categories**
116:21, 119:12, 158:15

**categorizations**
88:24

**category**
88:20, 143:6

**causal**
126:10

**cause**
65:25, 67:20, 68:5, 76:7, 126:25, 148:5, 156:2, 165:24, 169:15, 170:2

**causing**
169:25, 170:10, 170:11

**celia**
4:3, 4:4, 10:12, 10:13, 14:1, 21:7, 21:13, 21:20, 89:14, 146:13

**center**
3:8

**center's**
51:23

**certain**
84:19, 99:22, 108:16, 114:6
**certainly**
14:16, 22:10, 40:22, 65:19, 76:8
**certificate**
6:10, 33:24, 34:5, 97:13, 98:6, 106:19, 106:20, 106:21, 106:24, 107:24, 155:14, 156:3, 156:8, 165:16, 167:11, 180:15, 180:17, 181:21, 183:1
**certify**
183:4
**cerv**
97:13, 97:18, 97:25, 98:4, 98:17, 114:13
**cetera**
57:5, 167:20
**chance**
65:10
**change**
95:4, 124:3, 124:6, 132:19, 133:4, 133:17, 133:25, 172:25
**changed**
11:2, 57:17, 93:19, 100:21, 109:16, 109:25, 110:5, 110:8, 110:9, 110:19, 110:25, 111:4, 111:12, 111:19, 111:25, 126:8, 169:7, 169:21, 171:18
**changes**
111:23
**characterize**
144:12

**charge**
19:15, 19:22, 105:9, 105:18
**charged**
19:12, 19:13
**charges**
105:17
**chart**
111:18, 112:1, 112:7
**chat**
14:21, 47:1, 95:10
**check**
116:16
**chip**
164:4
**choose**
64:1, 150:24, 151:10
**chooses**
151:21, 151:22, 153:9
**chose**
147:10
**chunk**
140:4
**chunks**
161:24
**ci**
106:22, 107:5, 107:7, 107:8
**circumstance**
157:18, 160:1, 161:2
**circumstances**
19:15, 159:1
**citation**
38:16
**citations**
87:1
**cite**
49:19, 56:11, 56:23, 64:15
**cited**
29:1, 87:6, 87:10, 87:16, 96:17, 109:7,

130:23
**citizen**
84:22, 84:23, 85:5
**citizenship**
84:20
**civil**
1:6, 6:8, 104:13
**claims**
139:1
**clarification**
77:18, 98:9, 147:15, 172:12
**classified**
87:22, 88:8, 89:15
**classifies**
155:25, 156:10
**classify**
161:8
**clear**
58:4, 77:19, 140:16
**clearly**
138:9, 138:16
**close**
10:1
**closer**
126:9, 152:7
**closure**
37:7, 37:22, 38:24, 39:25
**code**
5:20, 5:21, 5:22, 31:25, 32:8, 32:9, 32:11, 32:12, 96:18, 96:24, 97:9, 97:23, 97:24, 98:13
**coefficient**
119:5
**coefficients**
119:3
**college**
117:21
**collura**
1:25, 2:8,

183:2, 183:20
**come**
13:2, 13:5, 27:19, 81:16, 143:18, 157:11, 158:4, 174:6
**comes**
104:12, 157:24, 161:20, 161:21
**coming**
123:3
**commercial**
52:3
**commission**
183:15
**commit**
100:10, 105:15
**committed**
102:17, 144:20
**commonwealth**
2:9
**communicating**
10:5, 47:1
**communication**
49:21, 52:17
**community**
127:15, 141:22, 149:22
**commuted**
97:3
**comp**
75:18
**compare**
137:22, 165:2
**compared**
80:1, 80:2
**comparing**
75:13, 138:11
**comparison**
75:17, 75:18, 84:5, 86:16, 86:19, 89:3, 113:15
**comparisons**
112:21, 164:13
**complained**
167:2
**complete**
9:3, 40:10,

40:13, 43:24,
76:23, 87:24,
90:15, 139:2
**completed**
129:25
**completely**
87:25, 162:3
**completing**
91:13
**completion**
37:14, 39:19,
40:1, 40:11,
93:12
**compliance**
83:6, 83:19,
83:24, 84:8,
84:15, 85:9,
86:7
**comprehensive**
134:6, 136:1,
138:20
**comprised**
148:13
**comprises**
148:20
**compulsory**
26:23
**computer**
5:20, 5:21,
5:22, 9:24,
30:18, 30:19,
31:25
**concentrates**
59:11
**conclude**
73:22, 88:16,
124:14
**conclusion**
70:20, 76:18,
101:12, 112:19,
125:11, 179:2
**conclusions**
87:2, 141:10,
160:17
**condensed**
56:8
**condition**
59:25

**conditional**
86:10
**conditions**
169:20, 171:18
**conduct**
174:17
**conducted**
1:16
**conference**
87:10
**confess**
117:19
**confirm**
88:18
**confirmed**
88:23
**connected**
36:9
**connection**
126:10
**connor**
50:14
**consequences**
74:23
**conservative**
140:23, 140:25
**consider**
58:7, 60:15,
67:17
**considered**
13:9, 16:6,
17:9, 179:15
**constant**
171:24, 172:13
**constitution**
100:19
**constraints**
162:18
**contacted**
10:9, 10:11,
10:12
**contend**
44:24
**context**
8:6, 8:12,
86:24
**continue**
84:4, 84:12

**continued**
136:14
**contributing**
145:5
**contributory**
116:6
**control**
115:6, 155:23
**controlled**
120:8, 120:16
**controlling**
117:5, 119:22,
120:10, 125:8,
133:3, 151:23
**conversations**
14:1
**convicted**
38:25, 40:3,
40:7, 98:13,
98:16, 98:19,
98:25, 99:1,
99:15, 102:11,
103:14, 103:19,
104:17, 105:1,
105:21, 108:8,
108:16, 128:17,
129:1, 129:7,
131:22, 132:9,
134:14, 136:11,
136:24, 138:7,
138:14, 141:4,
142:2, 144:20,
164:16, 166:1,
178:13, 179:6
**conviction**
25:7, 25:25,
32:19, 33:8,
34:15, 34:20,
35:1, 35:2,
36:15, 67:2,
97:5, 104:16,
107:2, 109:11,
122:20, 128:15,
131:5, 131:14,
131:16, 137:1,
141:5, 144:17,
153:17, 153:19,
163:20, 164:2,

166:11, 166:13,
167:8, 177:10,
177:16, 178:20,
179:6
**convictions**
25:17, 25:20,
25:22, 42:8,
42:20, 73:24,
74:3, 75:7,
75:9, 75:19,
75:24, 75:25,
77:14, 77:23,
106:5, 107:20,
108:3, 112:5,
114:7, 124:5,
150:20, 168:6
**convicts**
99:23
**copy**
55:11, 55:14,
70:8
**correct**
16:21, 22:23,
27:12, 45:4,
46:19, 56:24,
58:20, 65:12,
66:7, 72:2,
72:5, 76:24,
77:11, 87:8,
87:25, 88:19,
97:20, 109:1,
110:15, 130:12,
132:11, 137:8,
142:14, 142:23,
148:18, 149:3,
160:5, 174:7,
174:10, 174:22,
175:24, 176:2,
177:11, 178:20,
179:7, 181:6,
183:5
**corrections**
14:16, 17:16,
37:6, 46:10,
48:5, 48:12,
107:22
**correctly**
11:23, 71:6,

148:4, 148:24,
149:12, 163:9,
181:22

**correlation**
119:19

**correspond**
36:24

**cost**
58:8, 60:19,
62:8, 62:22,
63:12, 63:13,
63:15, 63:20,
65:21, 65:23,
65:24, 66:21,
66:23, 68:7,
68:8, 68:21,
68:24, 68:25,
69:3, 69:6,
69:21, 70:21,
170:17

**costs**
55:25, 60:17,
62:6, 62:8,
62:12, 62:21,
62:23, 63:5,
63:22, 63:24,
66:20, 67:5,
67:12, 67:16,
67:25, 68:6,
68:23, 83:3,
83:6, 83:19

**could**
8:17, 15:13,
17:10, 24:7,
31:10, 35:20,
35:25, 36:8,
40:5, 43:13,
46:6, 46:7,
57:3, 57:16,
57:25, 65:25,
66:13, 66:14,
68:4, 69:24,
69:25, 71:13,
71:24, 75:6,
75:12, 76:7,
81:17, 81:18,
82:16, 88:7,
88:22, 91:4,

96:3, 101:6,
108:21, 111:24,
115:16, 115:19,
119:6, 119:7,
119:12, 119:13,
119:14, 119:15,
120:18, 121:1,
121:2, 121:3,
121:6, 121:9,
122:14, 123:16,
123:19, 125:1,
125:3, 125:6,
129:6, 135:9,
136:9, 136:19,
136:21, 136:23,
139:14, 140:20,
144:7, 144:9,
144:25, 145:10,
152:12, 152:13,
155:22, 158:14,
159:2, 159:16,
160:11, 161:14,
163:6, 163:21,
164:13, 164:14,
176:7, 176:8,
176:9, 176:24,
177:9, 177:15,
179:24, 179:25

**couldn't**
39:22, 41:10,
51:24

**counsel**
5:10, 7:7,
7:10, 12:12,
51:1, 173:18,
181:13, 183:9

**count**
22:8, 65:11,
66:6, 85:13,
85:14, 85:16,
110:18, 131:25

**counted**
65:21, 134:17,
135:10, 135:21,
136:15

**counting**
154:23

**country**
113:12

**couple**
21:6, 64:14,
87:5, 89:13,
132:13

**course**
11:18, 12:5,
107:12, 135:23,
152:16, 170:11,
173:22

**court**
1:1, 8:3,
14:22, 48:12,
86:20, 95:10,
103:20, 113:2

**covered**
51:12

**create**
41:25, 67:25,
108:17

**created**
88:12

**credibly**
126:24

**crime**
14:13, 90:2,
97:16, 98:20,
98:25, 99:3,
99:14, 100:6,
100:9, 102:12,
105:16, 105:21,
108:7, 123:11,
129:1, 129:8,
134:14, 136:11,
136:24, 138:14,
144:20, 164:16

**crimes**
93:13, 93:14,
98:15, 98:17,
99:1, 100:1,
100:17, 101:19,
101:24, 102:7,
102:9, 103:10,
104:10, 104:17,
104:23, 105:2,
114:11, 152:2

**criteria**
84:19, 129:22

**critical**
119:10, 120:13,

124:10

**criticism**
120:15

**critique**
126:4, 147:8

**critiques**
59:16, 134:1,
144:5

**current**
14:15, 16:14,
16:19, 89:17,
95:1, 95:21,
119:14, 130:4

**currently**
105:18, 127:15,
149:16, 149:20,
159:13, 160:2,
160:9

**custody**
37:5

**cv**
5:15, 23:20,
24:3

**cycle**
19:25, 20:2

**D**

**d-u-t-y**
62:14

**data**
12:11, 12:13,
12:16, 12:18,
13:9, 13:16,
13:23, 14:3,
14:11, 14:12,
14:18, 15:13,
15:22, 15:24,
16:6, 16:9,
16:10, 16:12,
17:1, 20:13,
20:20, 20:23,
21:2, 21:16,
21:17, 21:18,
24:19, 25:1,
25:4, 30:4,
30:17, 39:25,
76:23, 80:19,
109:6, 111:16,

111:22, 118:6,
130:13, 134:25,
135:9, 139:2,
139:5, 139:11,
139:16, 140:5,
140:10, 140:21,
152:10, 154:13,
154:14, 160:18,
161:5, 178:17
**dataset**
16:15, 17:4,
29:21, 32:1,
116:1, 136:10,
144:4, 144:16,
145:6, 149:24,
149:25, 164:18
**date**
20:7, 107:21,
127:16, 128:1,
128:15, 131:5,
131:14, 131:16,
131:17, 132:9,
141:5, 144:16,
144:17, 161:17,
161:18, 177:18
**dated**
47:11
**dates**
128:24, 162:23,
163:2
**day**
135:18, 149:14,
173:22, 183:14
**days**
158:4, 161:23
**de**
74:3, 74:23,
75:1
**deal**
86:22
**death**
97:3
**december**
183:15
**decide**
151:24
**decided**
13:21, 14:2,

88:15
**deciding**
68:20
**decision**
68:18
**declaration**
5:16, 5:17,
12:23, 12:24,
13:2, 13:7,
27:13, 27:23,
28:2, 28:3,
28:6, 28:16,
37:12, 37:18,
38:15, 39:18,
44:11, 44:12
**declarations**
12:19, 27:11
**defendant**
1:12, 3:14,
4:2, 173:18
**defining**
146:7, 171:4
**definitely**
20:1, 109:18,
117:22
**definition**
45:9, 46:17,
120:2, 129:21,
137:17, 143:7,
163:12
**definitionally**
114:8
**definitions**
155:11
**definitively**
108:21
**delaware**
99:21, 99:22,
100:8
**deliver**
53:9, 53:12,
54:18, 54:20,
56:2
**delivered**
14:3, 51:19,
52:12, 53:20,
55:2, 55:5
**delouche**
5:18, 18:9,

28:24, 49:19,
56:6, 56:17
**demand**
86:7
**demands**
83:24, 84:8,
84:16
**democratic**
93:22
**demonstrate**
85:5
**demonstrated**
121:7
**demonstrates**
115:13
**denied**
104:15
**department**
14:16, 17:16,
107:22
**departments**
37:6
**depend**
118:14, 121:9
**dependent**
115:10, 115:11,
118:12, 118:18,
118:21, 118:25,
119:21
**depending**
93:21, 94:15,
113:25
**depends**
85:13, 91:11,
93:18
**deposed**
7:19
**deposition**
1:15, 2:1,
5:11, 5:18,
5:19, 6:13,
9:14, 9:22,
10:6, 15:5,
20:17, 21:5,
23:3, 23:5,
23:15, 23:17,
23:25, 27:17,
28:10, 28:23,

29:3, 29:9,
29:13, 31:19,
32:15, 48:19,
49:19, 49:23,
50:1, 50:5,
54:1, 56:17,
72:18, 72:19,
76:14, 95:11,
96:21, 104:5,
106:10, 106:17,
114:23, 131:3,
158:20, 162:9,
173:23, 180:3,
183:3
**describe**
33:7, 36:12,
59:9, 61:24,
63:18, 86:18,
109:5, 166:21,
167:4
**described**
120:22, 131:17
**describing**
61:25
**description**
82:21, 83:15,
95:16, 96:11
**desk**
9:11, 9:18
**despite**
72:6
**determining**
92:18, 180:6
**difference**
31:14, 33:10,
59:21, 64:21,
78:7, 80:20,
81:13, 91:24,
125:4, 126:1,
148:24, 149:5,
153:1, 169:19,
171:19, 172:7,
175:1, 177:20
**differences**
117:4, 124:11,
125:17
**different**
30:11, 34:16,

62:18, 70:24, 71:13, 75:8, 75:23, 80:12, 81:2, 84:1, 90:20, 91:1, 92:12, 92:23, 94:24, 105:3, 105:6, 113:3, 116:18, 116:19, 119:4, 124:3, 134:5, 135:8, 138:25, 144:11, 146:15, 153:4, 161:25, 175:24

**differential**
77:22, 115:18, 152:6

**difficult**
69:17, 70:3, 112:22, 114:11, 141:2

**direct**
69:3, 180:9

**direction**
183:8

**directly**
55:4, 68:6, 129:9

**disagree**
174:10

**disallows**
108:15

**discharge**
94:8, 94:22

**discovered**
123:17

**discrete**
161:24

**discretion**
91:20, 107:23

**discretionary**
107:24

**discuss**
61:21, 89:4, 90:21, 147:21

**discussed**
58:17, 77:8, 110:4, 110:24,

111:2, 111:23, 114:5, 114:23, 115:25, 141:21, 150:12, 162:22

**discusses**
52:17, 73:2, 96:23

**discussing**
70:21, 74:18, 89:8, 121:20, 122:6, 149:14, 174:2

**discussion**
46:23, 61:18, 64:11, 83:7, 83:13, 89:13, 100:3, 174:14

**discussions**
89:23, 146:13, 173:23, 174:24

**disenfranchise**
100:18

**disenfranchised**
74:4, 98:21, 98:23, 99:3, 99:4, 112:2, 112:4, 112:10

**disenfranchiseme-**
**nt**
74:23, 75:2, 89:10, 89:12, 89:16, 90:4, 90:8, 90:12, 100:4, 106:13, 109:10, 113:11

**disenfranchiseme-**
**nts**
89:25

**disenfranchising**
101:25, 102:7

**dismiss**
123:12

**disqualify**
99:23

**distinct**
40:20, 119:24

**distinction**
40:17, 46:2,

77:1, 77:2, 124:8, 124:13, 124:14, 125:2, 153:12, 165:5, 165:21, 171:10, 171:15, 171:17

**distinguishing**
170:19, 170:20

**district**
1:1, 1:2

**doc**
17:2, 17:25, 34:11, 57:18, 58:3

**document**
5:23, 6:2, 14:19, 14:23, 15:9, 15:10, 22:14, 22:19, 23:7, 23:9, 23:19, 23:24, 27:9, 28:1, 28:19, 28:21, 28:25, 29:5, 29:7, 29:17, 29:23, 30:2, 30:10, 30:13, 31:22, 31:24, 36:22, 36:25, 37:19, 38:14, 40:23, 41:18, 41:19, 41:20, 42:24, 47:6, 47:7, 47:8, 47:16, 47:23, 47:24, 48:22, 48:24, 49:8, 50:3, 50:8, 50:23, 50:25, 51:1, 51:4, 53:24, 56:6, 72:17, 74:13, 76:12, 95:8, 96:1, 96:14, 100:25, 101:15, 104:3, 104:4, 106:7, 106:9, 106:16, 116:11,

130:20, 158:18, 162:7, 162:12

**documentation**
33:23, 34:1, 34:7, 34:10, 35:12, 36:17, 37:3, 38:4, 38:11, 38:19, 48:4, 48:9, 48:11, 49:15, 49:16, 52:2, 55:10, 133:20, 133:23, 137:7, 139:21, 140:3, 167:12, 168:5, 170:21, 175:17

**documents**
9:9, 11:16, 11:24, 12:7, 30:11

**dog**
9:7, 164:3

**doing**
7:11, 7:13, 13:13, 13:23, 20:13, 20:19, 109:5, 118:15, 168:25

**done**
21:3, 25:8, 25:18, 26:8, 33:23, 119:25, 135:22, 138:10, 154:14, 156:24, 173:9

**door**
164:4

**double-check**
87:15, 145:20

**down**
8:4, 24:6, 24:7, 25:13, 26:24, 32:17, 37:19, 38:2, 41:1, 42:4, 44:18, 46:20, 47:13, 48:8, 48:17, 50:2,

50:8, 50:18,
52:16, 57:12,
69:15, 70:6,
74:20, 79:20,
83:6, 85:17,
86:15, 86:16,
87:18, 90:14,
91:15, 97:8,
97:23, 101:3,
101:11, 104:21,
106:22, 109:2,
116:19, 133:13,
145:13, 147:21,
153:15, 154:2,
155:8, 155:9,
158:4, 171:2
**downloaded**
30:18
**downloading**
29:17
**downs**
65:5, 65:7,
66:3
**dr**
7:9, 8:24,
10:8, 11:11,
12:14, 15:22,
20:23, 21:3,
22:16, 22:21,
23:8, 23:11,
23:20, 26:16,
27:10, 28:20,
29:7, 29:20,
31:23, 32:5,
32:7, 32:18,
41:23, 42:10,
42:16, 47:9,
59:9, 74:14,
95:14, 95:17,
114:21, 116:13,
127:12, 130:23,
132:14, 132:15,
133:22, 137:11,
143:7, 148:9,
149:13, 154:5,
158:19, 163:24,
171:13, 173:15,
174:4, 174:5,

174:11, 174:21,
176:4, 178:9,
179:15, 180:21,
181:11
**draft**
21:21, 21:24
**drafting**
27:22, 28:15
**draw**
160:17
**drive**
91:14, 167:20
**dspc**
39:25
**ducks**
141:7
**due**
66:25, 109:10
**duly**
7:4
**duplicate**
160:21, 160:22
**during**
9:22, 19:21,
19:24, 19:25,
20:1, 33:17,
33:18, 35:10,
69:5, 69:13,
126:20, 172:4
**duty**
62:14, 63:9,
63:21, 65:9,
65:14

**E**

**e-mail**
41:4, 46:25,
50:11, 52:19,
53:16, 53:19,
53:20, 54:4,
54:16, 55:15,
57:4, 58:7
**each**
8:6, 8:11,
8:14, 12:1,
21:7, 85:15,
87:2, 119:19
**earlier**
16:18, 27:11,

28:3, 58:18,
80:25, 145:7,
150:12, 155:15,
162:22, 167:2,
181:3
**easier**
55:17, 63:24,
64:3, 71:14,
71:19, 81:7,
91:3, 91:4,
114:3, 114:9,
164:10, 170:17
**easy**
8:10, 27:7,
54:18, 55:22
**eat**
61:17
**effect**
155:6, 168:8,
169:8, 171:23,
179:14
**effective**
94:8, 94:20
**efficacy**
66:16
**either**
21:19, 28:13,
45:18, 139:20,
150:14, 155:13,
155:14, 156:2,
158:14, 166:2,
166:4, 176:9,
179:16
**election**
26:17, 27:5,
31:2, 31:8,
62:17, 157:23,
167:25, 168:4
**elections**
26:5, 26:6,
153:9
**electoral**
74:22
**electronically**
55:5
**element**
65:9, 65:14
**eligibility**
37:3, 44:25,

67:9, 84:13,
84:19, 97:14,
98:6, 129:22,
163:7, 163:11,
176:25, 177:8
**eligible**
32:18, 32:20,
32:22, 33:2,
33:6, 33:14,
33:22, 35:7,
36:2, 36:6,
36:7, 36:10,
43:24, 44:7,
45:18, 46:24,
58:19, 58:22,
70:13, 70:15,
74:2, 76:6,
85:22, 89:20,
90:13, 92:15,
97:12, 97:15,
97:18, 99:14,
100:1, 100:7,
100:9, 102:12,
102:18, 102:22,
105:22, 108:7,
108:19, 109:23,
112:7, 129:21,
129:24, 142:4,
142:10, 142:20,
146:1, 146:8,
146:23, 147:2,
147:5, 150:23,
152:3, 163:20,
163:21, 167:18
**ellen**
3:7, 14:21,
29:18, 36:23,
47:14, 49:10,
58:13, 70:9,
95:9, 95:14,
108:13, 121:15,
125:25, 130:19,
154:8, 155:22,
158:22, 179:23,
179:25
**else**
9:5, 9:13,
17:9, 21:25,

22:2, 33:16, 35:9, 96:7, 98:16, 123:12, 130:18, 136:22, 137:2, 161:9

**else's**
57:21

**employed**
121:4, 183:10

**encompassing**
20:13

**end**
13:10, 31:5, 31:6, 37:1, 42:15, 64:17, 65:4, 103:16, 106:5, 134:22, 135:18, 147:16, 150:19, 162:21, 176:17

**english**
107:16

**enough**
13:23, 78:23, 144:11

**entered**
39:25

**entirely**
152:9, 153:11

**entry**
160:21

**environment**
115:8

**ephemeral**
68:5, 68:24

**equal**
80:8, 96:7, 119:1, 150:10

**equalize**
150:5

**equation**
61:25, 62:1, 63:8, 66:3, 117:17, 118:24

**errors**
139:10, 139:15, 140:21, 145:5, 145:10, 176:6,

176:12

**especially**
8:5

**esquire**
3:3, 3:4, 3:5, 3:6, 3:7, 3:15, 3:16, 4:3

**essentially**
149:2, 149:6

**establishing**
82:6

**estimate**
20:9, 26:17, 26:22, 140:23

**et**
1:5, 57:5, 167:20

**even**
14:4, 44:9, 50:24, 90:3, 102:15, 112:9, 119:16, 123:16, 124:18, 125:7, 143:8, 156:11, 157:4, 165:17, 174:16

**event**
55:14

**events**
107:12, 161:7

**ever**
11:2, 14:4, 16:3, 18:13, 25:8, 25:10, 26:8, 32:11, 50:24, 70:15, 70:17, 71:4, 71:12, 72:3, 72:7, 77:3, 77:8, 79:23, 79:24, 80:3, 80:16, 81:23, 82:3, 82:7, 82:13, 115:19, 116:22, 118:2, 119:9, 120:5, 122:7, 124:8, 124:15, 125:2,

125:11, 125:19, 133:1, 138:12, 139:1, 143:13, 143:21, 148:12, 148:16, 155:12, 155:13, 155:24, 156:1, 158:15, 161:8, 163:14, 163:24, 169:18, 170:5, 173:24, 176:5

**every**
16:13, 69:10, 86:6, 88:19, 119:5, 141:17

**everybody**
26:18, 27:5, 34:22, 81:3, 128:10, 129:11, 130:15, 140:12, 151:8, 151:9, 151:16, 152:2, 156:8, 168:25, 169:11, 172:2, 172:5, 172:17, 173:4

**everyone**
34:24, 35:1, 35:2, 98:16, 141:12, 141:22, 151:19, 151:20, 151:21, 155:12, 155:23, 156:15

**everything**
11:14, 24:9, 51:12, 84:10, 123:12, 123:25

**evolved**
11:3

**ex-felons**
81:20, 139:4, 139:7, 140:5

**exact**
30:24, 125:25, 148:9, 155:24

**exactly**
84:10, 103:13, 129:12, 150:5,

150:9, 154:18, 155:3, 155:19, 157:15, 179:13

**examination**
5:2, 7:7, 173:18, 181:13

**examined**
7:6

**example**
64:15, 69:2, 113:10, 118:3, 142:7, 142:13, 146:24, 150:13, 169:7

**examples**
83:18

**exceedingly**
63:3

**except**
93:13, 97:1

**exception**
73:9, 73:17, 73:19, 75:16, 76:17

**exceptions**
130:14

**excerpts**
11:22

**exchanging**
12:7

**exclude**
138:13, 151:25, 171:20

**excluded**
135:14, 135:17

**excludes**
105:8, 106:6

**excluding**
158:13

**exclusion**
100:5

**exclusions**
103:18

**executive**
6:9, 91:10, 93:6, 93:8, 93:10, 93:14, 94:4, 94:12,

95:1, 100:6,
103:21, 104:3,
104:7, 104:9,
110:10, 110:13
**exhibit**
5:12, 5:13,
5:14, 5:15,
5:16, 5:17,
5:18, 5:19,
5:20, 5:21,
5:22, 5:23,
5:24, 5:25, 6:2,
6:3, 6:4, 6:5,
6:6, 6:8, 6:10,
6:12, 6:13,
15:4, 15:5,
23:4, 23:5,
23:16, 23:17,
23:23, 23:25,
27:16, 27:17,
28:9, 28:10,
29:2, 29:3,
29:12, 29:13,
31:18, 32:14,
32:15, 36:22,
37:19, 38:14,
44:14, 48:18,
48:19, 50:4,
50:5, 53:24,
54:1, 56:7,
72:17, 72:19,
76:13, 76:14,
95:6, 95:11,
96:20, 96:21,
104:4, 104:5,
106:9, 106:10,
106:16, 106:17,
116:11, 131:2,
131:3, 162:8,
162:9, 162:12,
180:2
**exhibits**
5:11, 9:10,
10:3, 31:19
**exists**
75:3, 145:8
**expect**
77:4, 123:1,

169:16
**experience**
30:16
**experienced**
1:5
**expert**
5:13, 5:14,
10:25, 21:11,
22:12, 22:21,
22:24, 24:19,
25:5, 25:10,
53:2
**expires**
183:15
**explain**
15:14, 75:6,
75:22, 79:14,
115:3, 119:22,
127:4, 152:13,
175:6
**explained**
46:9, 46:11,
46:12, 124:12,
125:17, 172:4
**explaining**
124:24, 125:1
**explains**
152:12
**explanations**
71:13
**explanatory**
115:17, 119:8
**explicitly**
156:22, 156:25
**expound**
126:3
**expressly**
104:14
**extant**
121:19
**extent**
67:18, 76:23,
123:9, 134:8,
179:1
**extra**
65:13, 132:20,
151:6, 153:7,
167:17, 169:14

**extremely**
63:7
**extrinsic**
66:4, 66:9

**F**

**fabulous**
36:25
**face**
69:12, 90:7,
94:12, 125:7,
135:16
**faced**
168:18
**facsimile**
52:3
**fact**
63:22, 75:10,
77:7, 82:3,
87:17, 90:5,
109:19, 122:1,
122:9, 122:12,
143:20, 145:2,
163:21
**facto**
74:3, 74:23,
75:1
**factor**
75:12
**factors**
115:17, 121:11,
122:9, 123:19,
170:12
**facts**
12:11
**fair**
78:23, 81:19
**fairs**
71:17
**familiar**
18:6, 18:9,
18:12, 18:15,
22:19, 48:23,
84:10
**famously**
111:4
**far**
31:15, 112:16,

113:13, 165:22
**fast**
94:1
**fax**
46:25, 52:19
**fear**
66:21, 66:24
**february**
5:24, 47:12,
47:16, 52:23,
131:21, 131:23,
131:24
**federal**
102:8, 102:11,
102:16, 103:20,
104:10, 104:23,
105:1, 105:4,
107:19
**feel**
151:14
**feeling**
66:16
**felon**
46:24, 49:2,
54:12, 113:11,
179:7
**felonies**
99:22, 106:6,
113:21, 113:22
**felons**
37:5, 38:25,
40:3, 40:7,
44:24, 59:7,
73:8, 73:16,
75:16, 86:23,
113:17, 113:24,
126:11, 178:12
**felony**
5:25, 25:7,
25:16, 25:19,
25:22, 25:25,
32:19, 33:8,
34:15, 34:20,
35:1, 35:2,
36:14, 42:8,
42:19, 47:16,
49:25, 52:21,
67:2, 73:23,

**74:3, 75:7,**
75:8, 75:19,
75:24, 75:25,
77:14, 77:23,
105:9, 106:5,
107:2, 107:10,
107:14, 107:15,
108:16, 109:11,
112:5, 114:7,
122:19, 124:5,
142:2, 150:20,
153:17, 153:19,
163:20, 168:6,
177:16, 178:13,
178:19, 179:5

**female**
120:8

**fertile**
15:18

**few**
23:19, 25:2,
59:20, 88:11,
127:5, 173:15

**fewer**
79:17, 169:25

**fiance**
22:6

**figure**
32:13, 109:3,
111:18, 148:9

**file**
30:24, 157:4

**files**
30:19, 31:11

**financial**
18:21, 68:6,
69:3, 84:13,
183:11

**financially**
68:4

**find**
8:1, 46:5,
75:2, 108:21,
124:7, 139:12,
144:12

**finding**
73:7

**fine**
7:13, 147:10

**fines**
97:6

**finish**
76:12, 140:15

**finished**
14:7, 20:15,
33:14, 145:2,
164:19

**first**
7:4, 10:8,
49:11, 51:14,
51:17, 80:13,
86:16, 104:12,
118:3, 126:12,
127:6, 132:15,
133:14, 138:19,
145:15, 146:12,
167:24, 169:12,
172:14, 175:20,
177:22, 178:7,
180:8

**fit**
63:16, 161:25

**fixed**
144:9, 176:7,
176:11

**fixing**
144:2

**flag**
158:2

**flagged**
157:14

**flaw**
107:17

**flip**
37:25

**flips**
71:10

**floor**
139:20

**florida**
111:4

**focus**
15:20, 60:3

**focuses**
67:16

**focusing**
60:3

**folder**
10:2

**folks**
10:5, 31:2,
82:9, 85:25,
127:7, 127:14,
128:16, 131:25,
132:2, 132:5,
132:8, 135:17,
138:6, 150:12,
169:5

**follow**
67:19, 82:3

**following**
160:24, 166:17,
168:1, 168:19

**follows**
7:6

**food**
83:8, 83:14,
83:17, 84:6,
84:16, 85:2

**footnote**
181:16

**footnotes**
87:4, 87:6

**foregoing**
183:3, 183:4

**forfeitures**
97:6

**forget**
96:19, 106:15

**form**
49:14, 53:1,
86:5, 130:8

**forms**
36:4, 36:8,
48:8, 55:9

**formula**
61:21

**forth**
93:20, 94:15

**found**
13:22, 83:18,
127:19

**foundation**
166:25

**four**
134:5, 134:6,

139:12

**fraction**
139:7

**friday**
69:10, 69:11

**front**
83:12, 176:14

**fulfilled**
16:17

**full**
180:8

**functionally**
65:7

**fundamental**
150:25

**further**
48:8, 89:5,
173:12, 181:25

G

**gap**
71:3, 71:18,
71:22, 125:15,
125:21, 125:22,
126:16, 126:22,
127:1, 127:4,
132:24, 145:7,
145:10, 150:9,
152:8, 152:12,
152:13, 152:14,
152:24, 165:24,
169:13, 169:15,
169:17, 170:2,
172:3, 172:25,
174:15, 174:16,
176:4, 176:7,
176:9, 176:12

**gave**
32:10

**gender**
116:20, 117:1,
119:13

**general**
6:7, 12:2,
31:2, 31:8,
101:1, 101:15,
101:23, 122:1

**generalization**
140:17

**generalize**
140:11
**generally**
24:22, 26:3,
26:12, 77:4,
85:1, 106:23,
130:11, 170:24
**generated**
38:24, 39:20,
39:23, 40:2,
40:4, 40:6,
141:14, 141:18,
141:23
**generation**
142:21
**generic**
82:21
**georgia**
110:19
**getting**
61:12, 80:11,
80:13, 83:3,
117:18, 122:19,
141:1, 141:7,
144:3, 146:16,
151:6, 154:10
**give**
9:2, 12:6,
19:4, 86:20,
86:23, 97:10,
137:9, 168:21
**given**
12:16, 12:25,
21:17, 21:19,
32:11, 38:20,
51:22, 54:13,
80:20, 85:22,
85:23, 85:25,
156:5, 168:15,
183:5
**gives**
66:15, 66:16
**go**
8:1, 28:18,
28:19, 29:19,
30:5, 31:21,
33:19, 36:22,
37:19, 38:2,

38:21, 41:2,
44:12, 44:14,
44:15, 44:17,
44:18, 44:19,
44:20, 46:20,
47:13, 47:18,
48:21, 49:5,
49:10, 50:3,
50:7, 50:12,
50:18, 50:19,
51:11, 51:13,
54:24, 55:3,
56:7, 56:14,
56:20, 57:12,
58:10, 58:11,
61:16, 68:9,
68:12, 69:4,
69:13, 69:15,
70:5, 70:6,
72:10, 72:13,
72:23, 74:20,
81:15, 83:5,
83:10, 86:15,
90:14, 93:3,
95:15, 96:10,
97:7, 97:22,
99:20, 100:14,
101:3, 101:11,
103:1, 103:13,
104:19, 105:2,
106:1, 106:22,
108:11, 108:13,
109:2, 112:13,
114:16, 114:20,
120:23, 120:25,
122:5, 125:23,
133:12, 137:10,
143:18, 145:1,
145:12, 145:18,
147:18, 147:20,
154:2, 157:1,
158:18, 162:19,
164:16, 173:9,
176:9
**goes**
38:9, 100:2,
161:20, 163:16
**going**
8:17, 13:12,

14:10, 14:19,
32:13, 36:24,
37:18, 37:25,
44:11, 47:19,
47:22, 52:25,
53:7, 54:7,
56:8, 57:20,
61:13, 63:6,
63:14, 64:10,
68:7, 69:12,
70:3, 76:10,
80:23, 81:9,
82:9, 82:10,
82:21, 88:16,
92:16, 93:20,
95:5, 95:23,
95:24, 103:3,
104:11, 118:8,
123:5, 130:8,
131:20, 139:15,
140:16, 144:18,
158:6, 166:19,
176:4
**gone**
81:18, 94:15,
158:14
**good**
7:9, 20:9,
29:18, 60:6,
60:23, 72:12,
131:13, 149:12,
151:14, 151:15
**google**
46:25
**gotten**
134:10, 177:15
**government**
48:13, 68:14,
68:16, 151:15
**governor**
90:2, 90:23,
91:1, 91:7,
91:11, 92:1,
93:18, 93:22,
93:23, 93:24,
94:16, 95:4,
95:19, 100:5,
103:22, 108:4,

113:19
**governor's**
91:20
**grant**
97:5
**graph**
109:6, 109:9,
111:13
**great**
85:15, 149:11
**greater**
176:8
**greek**
119:2
**ground**
8:2
**grounds**
15:17
**group**
25:23, 79:9,
88:12, 101:19,
117:1, 127:2,
127:3, 129:6,
129:12, 140:7,
143:9, 143:13,
148:13, 148:17,
148:20, 155:5,
155:13, 155:24,
163:6, 164:7,
166:14, 176:5,
176:25, 177:8
**groups**
71:17, 79:13,
81:19, 88:9,
88:11, 116:19,
124:12, 126:20,
148:25, 161:25,
165:6, 173:24,
174:3, 174:4,
174:7, 174:12,
174:15, 174:22
**guaranteed**
92:24
**gueho**
5:19, 18:5,
29:9
**guess**
8:16, 17:22,

35:23, 39:15,
48:17, 58:24,
65:17, 85:13,
87:22, 92:20,
105:14, 110:3,
111:21, 117:7,
117:19, 120:1,
124:21, 135:4,
147:4, 160:23,
169:19
**guessed**
103:7
**guest**
9:8

**H**

**hadskey**
6:13
**half**
8:16, 61:14,
160:10
**hand**
91:15, 183:14
**handed**
91:14
**handicap**
52:7
**hang**
163:15, 164:3
**happen**
8:22, 26:17,
26:22, 27:4,
161:10, 161:14,
166:11
**happened**
13:21, 16:2,
141:9
**happening**
92:12
**happens**
34:14, 35:10,
92:2, 92:6,
94:13, 128:3
**hard**
8:9, 31:5,
38:9, 70:7
**harder**
99:1

**harris**
5:17, 12:24,
28:4
**hate**
148:5
**hazarding**
35:23
**head**
26:5, 147:9,
154:19
**hear**
41:13
**heard**
43:10
**hearing**
11:21
**held**
2:1, 61:18
**help**
21:10, 21:15,
71:17, 79:13,
79:14, 81:20,
117:7, 117:23,
135:4
**helped**
21:13, 81:18
**helpful**
8:1, 17:10,
77:19, 131:8
**helping**
71:20
**helps**
15:1
**here**
9:11, 9:18,
11:24, 44:19,
50:13, 51:16,
58:12, 58:14,
61:25, 64:15,
71:3, 71:7,
73:4, 74:22,
78:2, 79:11,
82:22, 83:15,
83:22, 87:9,
88:1, 88:17,
90:18, 93:5,
93:11, 96:23,
101:8, 101:12,

103:14, 106:19,
106:20, 115:16,
116:18, 118:1,
118:9, 119:25,
120:6, 124:2,
126:7, 127:1,
131:5, 138:10,
141:3, 144:9,
147:25, 148:1,
148:8, 152:20,
154:3, 155:12,
155:21, 157:2,
161:3, 163:5,
164:25
**here's**
101:1
**hereby**
104:13, 104:16,
183:3
**hereunto**
183:13
**hey**
68:18, 144:9,
158:2
**high**
45:1
**higher**
62:22, 70:14,
72:1, 72:3,
72:8, 77:9,
79:11, 79:15,
79:25, 80:3,
80:22, 81:6,
82:4, 82:7,
82:9, 82:23,
123:3
**highlighted**
70:8, 83:12
**hold**
104:15
**homicide**
93:13
**honestly**
17:4, 144:7
**hopefully**
85:6
**host**
115:16

**hour**
8:16, 19:7,
61:13, 69:14
**hours**
20:9, 21:7,
21:9, 69:5,
69:8, 69:18,
69:19, 69:22
**house**
119:14, 157:24,
161:20
**housekeeping**
28:19
**however**
33:16, 37:3
**huling**
3:6
**hypothetical**
76:4, 159:24,
168:24, 172:5,
172:14, 173:4

**I**

**iberville**
50:16
**idea**
13:1, 13:8,
67:18
**identification**
15:6, 23:6,
23:18, 24:1,
27:18, 28:11,
29:4, 29:14,
31:20, 32:16,
48:20, 50:6,
54:2, 72:20,
76:15, 95:12,
96:22, 104:6,
106:11, 106:18,
131:4, 162:10
**identified**
152:25
**ignoring**
172:1
**imagine**
66:13, 78:7,
115:18, 118:14,
118:24, 119:7

**immediately**
94:8, 94:13, 94:20, 94:21, 94:22
**impact**
64:7
**impeachment**
97:2
**implied**
57:9, 138:9, 138:16
**implies**
38:20, 39:2
**important**
54:5, 60:8, 121:11, 161:5
**impossible**
16:15
**imprisoned**
44:4, 134:14
**imprisonment**
44:1, 44:10, 163:8, 167:16, 177:2
**in-person**
36:13
**in-state**
107:2, 107:20
**inactive**
157:2, 157:3, 157:4, 157:7, 157:14, 157:19, 157:20, 158:8, 158:9, 158:13, 159:3, 159:7, 159:8, 159:11, 159:16, 159:19, 159:23, 159:25, 160:3, 160:6, 160:12, 160:15, 160:20, 160:21, 160:25, 161:2, 161:12, 161:15, 161:23, 162:2, 162:5, 162:13, 175:9
**incarcerated**
32:21, 33:1,

33:12, 33:13, 33:17, 40:15, 41:25, 43:3, 43:5, 43:15, 43:18, 44:2, 105:19
**inclined**
82:17
**include**
20:14, 42:18, 46:25, 62:7, 116:16, 117:2, 121:12, 122:15, 123:15
**included**
14:17, 20:25, 50:23, 77:25, 87:4, 133:24, 146:11, 146:17, 157:3, 157:6, 157:17, 158:12, 166:2
**includes**
24:9, 49:15, 149:14
**including**
52:18, 54:16, 71:14, 150:16, 151:11, 180:22
**increase**
63:25, 73:23, 109:21, 109:22, 170:15
**increased**
64:16
**independent**
20:20, 20:21, 77:13, 77:20, 119:21, 119:23
**independently**
21:18
**indicate**
181:7
**indicated**
19:18, 43:22
**indicates**
70:13, 156:7
**individual**
34:14, 34:19,

39:18, 40:5, 43:25, 93:12, 99:16, 100:11, 102:24, 105:24, 118:15, 118:16, 135:6, 141:17, 146:6, 147:2, 153:3
**individual's**
152:22
**individuals**
32:23, 34:2, 39:5, 40:14, 42:1, 43:3, 43:5, 43:16, 43:23, 46:3, 59:2, 71:20, 79:18, 103:14, 105:8, 108:16, 113:20, 127:20, 133:24, 134:13, 145:17, 145:22, 145:25, 146:9, 146:19, 152:21
**ineligible**
33:18, 35:19, 35:21, 146:23
**infer**
178:16, 181:2
**inferring**
156:23, 165:10
**infinitely**
46:7
**information**
67:6, 67:8, 75:2, 86:21, 87:3, 113:1, 168:16, 169:3
**initially**
63:8
**injunction**
11:21
**input**
27:22, 28:15
**inquiry**
50:16
**indicates**
70:13, 156:7
**insofar**
94:19

**instance**
26:23, 64:5, 134:2
**instructions**
32:10
**insurmountable**
82:25, 83:2
**intellectually**
64:24
**intention**
81:21
**interact**
68:16
**interacted**
21:12
**interest**
81:22, 183:11
**interested**
59:24, 60:9, 60:22, 62:10, 64:20, 64:23, 64:25, 66:1, 71:1, 71:9, 81:4, 82:22, 118:12, 119:11, 153:23, 160:12, 178:10
**interesting**
59:17, 59:18, 60:24, 66:18, 71:22, 79:8, 81:11, 100:16, 101:18, 101:20, 102:20, 103:4, 106:3, 152:9
**internal**
36:25
**internet**
36:9
**interpret**
70:24
**interpretation**
89:14
**interpreted**
71:24
**interpreting**
175:25
**interrupt**
138:4

**intimidated**
68:12, 68:14
**intimidation**
67:12
**introduce**
139:15
**introduced**
140:21
**involve**
25:2
**involved**
10:24, 24:2
**involves**
25:1, 25:3,
163:25
**iowa**
89:4, 89:8,
89:9, 90:6,
90:7, 90:20,
91:17, 92:12,
92:25, 93:6,
95:4, 95:18,
110:10
**iowa's**
90:18
**irrelevant**
162:3
**is-**
95:6
**isolating**
26:24
**isolation**
61:1
**issue**
86:22, 100:16
**issued**
144:17, 155:13,
156:3, 165:16,
180:15
**issues**
41:21
**item**
104:13
**itself**
45:16, 46:18,
57:22, 88:14,
110:17

**J**

**jail**
35:25, 40:15,

40:17, 40:18,
40:21, 41:21,
43:18, 43:20
**january**
107:3, 107:20,
131:24, 142:17,
142:21, 142:22
**job**
1:23, 69:4,
91:17
**john**
18:13
**jonathon**
18:11
**judge**
48:12
**judgment**
104:15
**judkin**
50:14
**jump**
42:7, 78:3,
89:1
**jumping**
79:20
**june**
142:12

**K**

**keep**
17:2, 48:17,
104:11, 147:8,
181:12
**kentucky**
103:1, 103:13,
104:18, 105:20,
110:13, 111:3
**kept**
146:16
**key**
33:10, 165:5,
165:21
**khan**
3:5
**kick**
130:19
**kids**
22:10

**kind**
9:11, 11:5,
12:1, 13:22,
15:19, 15:20,
16:1, 19:19,
20:12, 26:15,
30:17, 35:4,
36:4, 42:14,
44:8, 59:15,
60:20, 61:12,
62:5, 63:4,
63:16, 64:8,
64:24, 65:2,
66:14, 79:7,
79:14, 81:9,
88:7, 88:12,
88:14, 92:20,
92:21, 93:19,
100:2, 113:5,
117:18, 119:10,
124:10, 126:9,
128:18, 135:1,
141:7, 142:3,
144:4, 144:14,
153:2, 156:17,
161:3, 164:24,
168:11, 169:2,
176:17
**kite**
40:24
**knew**
99:11
**knowledge**
41:19, 123:23

**L**

**l-o-g-i-t**
118:20
**lab**
87:7, 115:6
**laboratory**
115:8
**lack**
67:6, 67:7,
67:8, 114:24,
144:2
**landry**
1:8

**larceny**
103:4
**large**
131:7
**larger**
75:19, 140:7
**lars**
52:6
**last**
12:8, 31:4,
32:21, 37:2,
44:2, 67:15,
73:6, 108:14,
112:14, 129:21,
130:1, 130:6,
131:23, 144:25,
145:24, 164:1,
180:10
**late**
8:16
**later**
142:9, 147:20
**latest**
144:17
**law**
4:4, 6:5,
11:22, 34:17,
64:6, 67:1,
67:9, 96:17,
97:4, 101:16,
103:9, 104:18,
105:4, 106:8,
108:19, 109:16,
109:25, 110:5,
110:9, 110:19,
110:25, 111:5,
112:2, 126:8,
132:19, 133:4,
133:17, 133:25,
166:17, 166:22,
167:22, 168:1,
168:19, 172:1,
172:16, 172:23,
175:3, 176:1
**laws**
86:17, 107:17,
111:12, 111:19,
175:24

**lawsuit**
165:22
**lawyer**
19:4, 19:18,
20:4, 112:20
**laying**
166:25
**lead**
178:15
**least**
57:11, 114:13,
130:7, 132:8,
180:20
**leave**
42:5
**led**
64:16, 178:10,
178:16
**left**
72:23
**legal**
3:8, 60:21,
112:18, 179:2
**legally**
64:22
**legislatures**
87:11
**length**
9:12, 14:13,
16:19, 123:10
**lenient**
59:7, 91:12
**less**
19:12, 19:16,
33:4, 33:5,
61:2, 62:23,
64:25, 71:22,
88:14, 91:12,
93:21, 112:16,
113:14, 132:4,
132:6
**lesser**
176:8
**let's**
22:13, 27:9,
27:16, 27:25,
28:18, 28:19,
29:2, 29:5,

29:12, 31:17,
31:21, 32:17,
36:21, 39:10,
44:15, 46:20,
47:5, 48:21,
49:5, 50:2,
50:4, 50:7,
50:8, 54:22,
56:7, 56:20,
58:10, 61:9,
70:5, 72:10,
72:12, 72:22,
74:20, 78:3,
83:5, 86:15,
86:16, 95:15,
96:10, 96:20,
97:22, 99:20,
99:21, 100:14,
103:1, 103:13,
106:1, 106:15,
106:19, 108:11,
109:2, 112:13,
114:12, 114:16,
114:20, 118:14,
121:14, 125:23,
130:16, 131:2,
131:23, 132:7,
133:11, 137:22,
142:1, 142:15,
142:19, 145:12,
147:18, 153:17,
154:2, 157:1,
158:18, 162:19,
167:2
**letter**
119:3
**letters**
41:25, 51:22
**level**
118:15
**levels**
77:4, 81:6
**life**
89:18
**lifetime**
89:10, 89:12,
89:16, 89:24,
90:4, 90:7,

90:11, 100:3
**likelihood**
13:15, 119:17,
120:19, 121:11,
123:20
**likely**
58:22, 62:23,
80:7, 80:17,
82:16, 82:24,
83:2, 116:5
**limitation**
128:24
**limited**
49:15, 117:14
**limits**
104:14, 140:11
**line**
50:11, 50:14,
56:25, 57:13,
70:11, 80:24,
158:25, 163:5,
177:14
**list**
16:13, 24:5,
95:8, 98:13,
98:20, 100:21,
102:6, 121:1,
127:7, 127:9,
127:14, 127:17,
127:20, 127:24,
128:16, 128:21,
129:17, 129:19,
129:20, 130:5,
130:7, 130:9,
130:21, 132:5,
132:9, 136:1,
138:19, 138:20,
138:24, 138:25,
139:6, 139:9,
139:19, 141:12,
141:13, 141:17,
141:18, 141:21,
141:23, 142:5,
142:9, 142:12,
142:16, 142:22,
142:23, 146:1,
146:9, 147:3,
149:13, 149:16,

149:21, 154:15,
155:4, 155:15,
156:12, 157:19,
157:21, 159:3,
159:8, 159:21,
160:3, 160:6,
160:12, 160:21,
161:2, 161:23,
162:2, 163:23,
164:17, 165:15,
169:5, 179:12,
179:15, 180:16,
180:19, 180:22,
180:23, 181:18
**listed**
41:19, 100:17,
101:19, 111:20,
124:2, 136:3
**lists**
48:8, 134:5,
134:6, 134:10,
139:13, 141:16,
143:19, 156:5
**literature**
12:2, 121:9,
121:19, 121:22,
122:18, 122:22,
122:25, 123:7
**litigations**
24:3
**little**
21:8, 58:25,
61:14, 79:21,
81:10, 83:9,
83:13, 115:3,
117:23, 124:21,
126:3, 129:16,
131:9, 152:7,
161:24, 168:10,
168:21
**live**
17:7, 161:22
**lived**
14:14, 16:14,
17:5, 86:11,
119:14
**lives**
158:1

**llp**
3:17
**logic**
135:22, 136:5,
137:22, 138:8,
142:17, 160:24,
163:18
**logit**
118:20
**long**
14:14, 16:13,
17:5, 91:12,
97:9, 119:13
**longer**
37:15, 45:12,
144:22, 158:1,
170:16
**look**
9:21, 11:16,
24:4, 48:8,
71:21, 81:13,
101:5, 103:3,
106:8, 126:25,
128:16, 131:21,
144:9, 155:7,
158:25, 163:2,
176:13, 179:11,
179:20
**looked**
26:16, 32:2,
32:7, 44:14,
122:17, 126:16,
176:20, 176:23,
178:18, 180:25
**looking**
20:13, 21:2,
23:14, 26:9,
60:25, 61:7,
65:20, 65:22,
70:8, 83:8,
101:14, 119:18,
120:24, 122:21,
139:4, 147:24,
155:8, 155:9,
171:1, 178:17
**looks**
27:12, 29:18,
29:21, 94:5,

106:25, 130:22,
132:2
**lose**
88:21, 102:14,
114:7
**loss**
69:21
**lost**
54:14, 69:22,
83:13, 124:21,
156:17, 163:7,
163:11, 176:25,
177:8
**lot**
86:9, 122:6,
128:5, 134:25,
141:7, 174:24
**lots**
46:7, 71:13,
79:12, 81:1,
81:22, 107:17,
121:3
**louis**
3:18
**louisiana**
1:2, 1:11,
3:19, 4:7,
11:23, 17:13,
22:7, 32:19,
35:18, 36:1,
37:14, 45:2,
58:17, 58:18,
59:2, 86:4,
86:24, 87:17,
87:21, 87:23,
88:12, 88:17,
89:9, 90:9,
90:10, 90:19,
90:20, 91:6,
91:13, 91:18,
92:7, 92:14,
92:25, 93:23,
95:3, 102:17,
108:14, 108:22,
109:12, 109:16,
111:12, 112:11,
112:16, 112:23,
126:8, 127:16,

129:25, 139:5,
139:7, 140:5,
140:12, 146:3,
146:19, 147:11,
153:5, 153:8,
175:2
**louisiana's**
94:24
**low**
59:8, 63:3,
63:7, 73:7,
73:15, 75:15,
76:16, 76:24,
76:25, 77:4,
150:19
**lower**
19:20, 70:16,
71:11, 72:6,
76:19, 78:16,
79:3, 82:5,
115:14, 125:12,
126:19, 132:22
**lunch**
8:18, 69:14

**M**

**made**
13:17, 16:16,
53:9, 56:1,
132:13, 144:10,
174:20, 179:12
**mail**
46:25, 51:20,
51:24, 52:1,
52:3, 52:11,
52:19, 53:21,
55:2, 157:12,
157:23, 158:4,
161:19
**mail-in**
64:4
**mailed**
57:16
**main**
70:25, 71:2,
81:10, 132:17,
133:1, 149:24,
149:25, 153:2,

161:4, 164:12,
170:2
**maine**
58:15, 88:21
**major**
147:8
**majority**
20:17, 111:11,
127:25
**make**
8:2, 12:15,
13:18, 13:24,
15:13, 31:13,
41:12, 41:17,
51:12, 54:7,
57:20, 66:14,
71:3, 88:10,
101:14, 105:4,
138:8, 140:17,
141:10, 148:3,
148:23, 153:3,
158:4, 160:16,
160:17, 169:15,
171:19
**makes**
11:7, 16:5,
61:2, 62:4,
63:24, 64:3,
65:15, 65:16,
165:11
**making**
54:10, 63:11,
64:9, 68:18,
112:20, 164:24
**male**
120:8
**management**
40:1
**many**
7:22, 46:7,
74:2, 78:10,
153:23
**map**
87:19, 87:21,
88:10, 88:14
**mapping**
70:20
**mark**
15:4, 23:4,

23:15, 23:23,
27:16, 28:9,
29:2, 29:12,
31:17, 31:18,
32:14, 48:18,
50:4, 72:17,
76:12, 95:5,
96:20, 104:4,
106:15, 131:2,
162:7

**marked**
15:5, 23:5,
23:17, 23:25,
27:17, 28:10,
29:3, 29:13,
31:20, 32:15,
48:19, 50:5,
53:23, 54:1,
72:19, 76:14,
95:11, 96:21,
104:5, 106:10,
106:17, 131:3,
162:9

**market**
170:15

**married**
121:5

**mary**
3:15, 10:12,
10:13, 14:1,
15:9, 18:2,
21:6, 21:12,
21:20, 43:9,
47:21, 49:6,
50:20, 52:25,
54:6, 55:18,
57:19, 89:14,
98:3, 101:13,
146:13, 173:20

**match**
79:7, 155:4

**matched**
127:9, 127:11,
127:13, 129:19,
130:4, 138:23,
139:8, 154:15,
155:14, 156:4,
165:14

**matches**
134:5, 143:16,
149:15

**matching**
32:12, 139:18,
154:12, 154:13

**matter**
42:6, 93:24,
99:14, 100:9,
105:20, 108:7,
122:1, 128:20,
133:24, 142:3,
151:18, 152:18,
152:21, 153:21,
161:2, 166:15,
166:16, 173:21

**matters**
129:11, 135:3,
135:5, 141:3,
141:9, 153:25,
161:10, 163:16,
169:1

**maybe**
11:20, 18:10,
18:17, 46:6,
53:20, 64:23,
69:25, 88:13,
131:9, 152:13,
168:13, 172:11

**mean**
12:21, 16:1,
20:12, 20:21,
21:12, 25:18,
26:5, 26:13,
34:22, 35:3,
35:14, 36:3,
36:6, 36:10,
37:14, 39:22,
39:24, 40:5,
40:7, 42:21,
42:24, 42:25,
43:21, 46:6,
56:2, 58:25,
60:20, 68:3,
69:23, 70:22,
74:10, 76:3,
76:22, 78:18,
79:4, 79:24,

80:21, 81:1,
81:9, 82:5,
82:8, 82:20,
84:21, 85:12,
92:4, 95:22,
98:4, 99:6,
122:14, 122:15,
123:24, 128:2,
128:18, 139:2,
139:3, 139:23,
141:6, 144:2,
144:8, 145:9,
146:10, 148:25,
149:16, 151:23,
152:23, 161:3,
161:12, 168:11,
168:23, 169:22,
171:4, 171:21,
175:10, 177:21

**meaning**
154:16

**means**
43:18, 52:4,
62:17, 89:19,
100:3, 107:13,
107:19, 115:8,
135:23, 136:6,
156:3, 164:7,
164:22, 166:20,
172:17, 175:7,
175:11

**meant**
15:14, 19:3,
104:4, 118:10,
128:8

**measure**
123:20

**medicaid**
83:7, 83:13,
83:17, 84:6,
84:9, 85:2

**meet**
7:14, 7:15

**meetings**
21:6

**melanie**
5:19, 18:5,
18:14

**memories**
15:20

**memory**
71:6

**mention**
89:9, 104:22,
133:3, 133:11

**mentioned**
16:18, 34:1,
59:20, 69:21,
106:20, 122:3,
134:2, 134:3

**mentioning**
22:6, 122:11,
133:15, 145:21

**mentions**
67:3, 104:10,
165:17

**meredith**
6:3, 44:22,
44:23, 73:3,
74:14, 74:25,
75:14, 77:1

**message**
46:25, 52:19,
55:15

**messages**
57:11

**method**
47:1

**methods**
46:24, 49:21,
52:18, 53:4,
53:5, 54:16,
57:4, 57:8, 58:6

**michael**
73:3, 73:21

**mid-february**
10:10

**middle**
1:2, 89:6, 89:7

**might**
13:5, 14:2,
38:6, 41:15,
68:18, 73:11,
73:12, 75:7,
76:1, 84:12,
96:8, 114:2,

115:10, 121:21,
123:19, 168:20,
173:9, 181:20
**millions**
64:6
**mind**
7:16, 9:23,
10:4, 65:3,
95:9, 110:17,
166:3, 180:7
**minimizes**
63:4
**minimum**
140:2, 150:2
**minus**
117:20
**minute**
12:18
**mischaracterizes**
130:9
**misinformed**
74:5, 75:10,
76:6
**misquote**
164:1
**miss**
66:25
**missed**
98:3, 143:19
**missing**
138:21, 161:6
**mississippi**
6:6, 100:14,
100:15, 100:16,
100:19, 101:1,
101:22, 102:7,
102:18, 102:21,
111:3, 114:5
**mississippi's**
103:9
**mistake**
144:9, 144:13
**mistakenly**
181:18
**misunderstanding**
148:6
**mixed**
73:12, 146:16

**model**
62:3, 63:10,
88:8, 114:25,
116:18, 117:3,
117:16, 118:20,
119:18, 123:15,
136:14, 174:17
**moment**
11:25, 17:12,
19:11, 51:7,
94:18, 97:11,
128:13, 141:13,
141:18, 141:19,
141:22, 158:17
**monday**
69:9, 69:10,
69:11
**money**
19:4
**monitor**
131:7
**month**
131:17
**moral**
98:17, 98:20,
98:25
**more**
15:14, 15:18,
19:13, 19:22,
23:19, 36:12,
42:12, 59:4,
59:18, 60:20,
67:16, 67:17,
68:2, 68:5,
68:10, 68:24,
69:17, 70:3,
80:7, 80:16,
82:16, 82:17,
82:22, 82:24,
83:2, 91:12,
93:20, 95:2,
98:15, 112:22,
113:19, 114:11,
115:3, 116:5,
118:6, 126:4,
126:23, 129:16,
131:10, 131:11,
132:13, 150:24,

150:25, 152:16,
181:10
**morning**
7:9, 7:11
**morose**
6:3
**morse**
44:23, 44:24,
73:3, 73:4,
73:21, 74:15,
75:14, 77:2
**most**
12:13, 20:24,
25:4, 40:18,
59:7, 70:22,
82:6, 82:9,
103:10, 111:7,
111:19, 119:11,
130:7, 155:15
**motivated**
70:22, 82:9
**motor**
64:5, 64:16
**move**
86:4, 86:9,
86:10, 86:12,
158:7, 173:6
**moved**
15:17, 17:7,
102:18, 143:12,
157:13
**moving**
134:25
**much**
8:17, 15:23,
19:6, 19:19,
19:22, 20:6,
20:10, 20:19,
21:4, 29:16,
40:16, 69:17,
70:16, 91:3,
91:4, 114:11,
149:14, 181:25
**multi**
114:24
**multi-variant**
114:25, 115:21,
116:13, 116:25,

117:11, 117:12,
117:15, 125:5,
174:17
**multi-varied**
118:3, 124:7
**multiple**
85:11, 108:3,
117:12
**multiplied**
62:15, 63:7
**multiply**
62:15
**multivariate**
13:13
**mumbled**
42:14
**murder**
102:17
**murderer**
102:15
**must**
33:21, 48:3,
52:12, 52:20

**N**

**name**
7:9, 7:17,
18:3, 18:4,
27:2, 30:20
**names**
109:8
**nancy**
1:8
**national**
87:10
**naturalized**
84:21
**ncsl**
87:10, 87:22
**necessarily**
80:10, 93:1,
130:6, 134:24,
175:25
**necessary**
38:4, 38:11,
38:18, 59:25
**need**
8:5, 8:15,

8:18, 9:19,
36:17, 43:6,
45:15, 45:22,
46:1, 46:4,
46:5, 46:16,
46:18, 53:11,
53:13, 54:3,
54:23, 58:3,
58:4, 60:10,
60:25, 72:17,
79:18, 84:13,
84:24, 88:11,
98:14, 113:18,
114:12, 129:12,
135:6, 141:20,
149:6, 150:2,
150:14, 150:15,
150:19, 160:6,
171:7, 171:8,
171:10, 171:11,
171:22, 172:9,
172:22, 173:1,
173:3

**needed**
40:6, 66:18,
127:2, 127:20,
128:11, 140:2,
140:23, 154:16,
154:21, 157:6,
170:6, 170:7,
170:20, 172:8,
172:24, 173:2,
181:19

**needs**
54:14, 127:2,
172:6, 172:17,
173:5

**negotiated**
19:20

**neighborhood**
20:8

**neither**
152:20, 183:9

**nevertheless**
55:11

**new**
41:5, 54:17,
64:6, 76:20,

86:5, 88:12,
136:15, 136:17,
172:15

**next**
29:15, 29:19,
71:8, 86:12,
177:14

**nice**
7:14, 7:15,
111:16

**nicely**
126:9

**nobody**
63:10, 63:12

**non-violent**
107:10

**non-voters**
64:2

**none**
27:24, 134:6,
165:17, 168:25,
171:17

**nonetheless**
72:7

**notary**
2:9

**note**
66:3

**noted**
110:9, 112:10

**nothing**
7:5, 54:12,
61:4, 77:2,
178:14

**notice**
2:8

**notification**
44:25, 45:2,
45:3, 45:5,
45:8, 45:10,
45:11, 45:16,
45:17, 45:20,
45:22, 46:4,
73:22

**notified**
46:17

**notwithstanding**
92:2, 142:10

**nullified**
148:25

**number**
41:1, 57:18,
58:3, 63:25,
104:13, 109:22,
109:23, 112:2,
140:2, 140:19,
140:22, 148:8,
150:1, 150:2,
150:5, 151:5,
151:11, 151:24,
152:21, 173:23,
175:23, 177:3

**numbered**
104:12

**numbers**
174:11, 174:21

**nvra**
64:15

**nw**
3:10

O

**oath**
8:25

**object**
8:21, 47:19,
47:22, 50:25,
53:1, 130:8,
179:1

**objection**
8:22, 41:13,
41:16, 41:18,
43:8, 43:12,
48:1, 50:21,
50:23, 51:1,
54:7, 55:1,
55:19, 57:20,
101:14, 101:16,
101:17

**objections**
49:7

**obtain**
16:22, 53:9,
55:14, 57:4

**obtained**
37:4, 109:4

**obtaining**
21:15, 52:18,
53:4, 53:16,
54:4, 58:6,
85:8, 85:20,
86:1, 180:17

**obvious**
179:10

**obviously**
26:5, 30:15,
59:24, 63:17,
87:24, 146:15

**occasions**
109:22

**occur**
34:19

**occurrence**
107:11

**offenders**
104:17

**offense**
103:15

**offered**
133:10, 133:13,
146:2

**offering**
11:12, 77:20,
112:18

**office**
4:4, 17:14,
17:18, 17:20,
41:5, 49:13,
50:15, 69:1,
69:4, 93:22,
93:23, 95:2,
104:15, 158:21

**officer**
54:23, 55:4,
183:2

**official**
1:9, 36:3,
46:10, 46:13,
48:5, 48:12,
48:13, 96:2

**officials**
167:25, 168:4

**often**
86:10, 115:8

**oftentimes**
83:23
**oh**
9:13, 12:25,
14:6, 18:1,
18:14, 19:2,
20:24, 21:23,
32:3, 38:9,
40:24, 52:5,
52:7, 56:7,
66:12, 73:18,
78:3, 98:5,
102:4, 103:12,
107:13, 110:2,
130:18, 140:14,
141:20, 148:12,
156:18, 163:14
**old**
33:15, 111:22
**once**
44:7, 45:11,
54:19, 84:2,
84:3, 84:24,
85:4, 85:10,
85:22, 86:12,
90:12, 90:13,
95:13
**one**
13:11, 17:16,
17:19, 18:14,
26:15, 27:10,
28:12, 32:4,
40:25, 42:12,
52:5, 54:14,
54:15, 59:15,
59:16, 62:8,
68:3, 71:15,
74:16, 74:17,
78:7, 85:18,
87:5, 96:9,
99:1, 103:4,
107:9, 109:7,
111:6, 111:7,
116:1, 117:16,
119:6, 119:8,
119:10, 127:2,
127:3, 128:13,
128:19, 130:23,

131:9, 131:11,
133:21, 137:9,
143:10, 153:20,
154:4, 156:1,
156:5, 158:17,
161:6, 164:12,
166:19, 169:10,
174:16, 180:4,
181:10
**one-page**
40:25
**ones**
9:9, 79:7,
120:22
**ongoing**
83:23, 94:6
**online**
35:8, 166:5,
167:19
**only**
9:25, 32:3,
32:4, 52:2,
57:16, 59:17,
59:19, 60:24,
62:8, 65:13,
66:18, 67:15,
69:11, 69:20,
80:22, 82:6,
82:8, 84:2,
84:24, 85:10,
97:21, 98:12,
102:7, 104:22,
105:11, 105:16,
107:1, 107:9,
108:3, 108:15,
115:20, 117:1,
126:13, 126:17,
127:2, 137:24,
138:8, 139:18,
143:16, 147:12,
149:14, 160:10,
164:7, 165:24,
166:16, 170:7,
170:11, 175:14,
175:15
**onward**
143:23
**open**
9:23, 9:25,

48:17, 69:11,
96:14, 164:4,
181:12
**operating**
115:6, 115:7
**opine**
116:5
**opinion**
77:13, 77:21,
101:2, 101:15,
101:23, 114:24,
132:18, 135:5,
162:23
**opinions**
6:7, 11:13,
133:10, 133:13,
146:2
**opportunities**
78:10, 79:12,
79:17
**opposed**
97:3
**order**
6:9, 44:1,
44:10, 45:8,
46:1, 59:15,
60:10, 60:25,
66:19, 68:8,
68:15, 84:25,
88:9, 93:6,
93:8, 93:10,
93:14, 94:4,
94:12, 94:17,
103:21, 104:3,
104:7, 104:9,
105:13, 110:10,
110:13, 149:7,
160:16, 161:7,
161:8, 161:10,
163:8, 167:12,
170:22, 177:2
**original**
14:25, 54:3,
55:7, 55:11,
55:14
**orleans**
41:5
**other**
8:7, 8:11,

8:14, 10:13,
10:14, 11:11,
11:12, 11:24,
12:1, 13:14,
15:17, 16:6,
16:9, 16:12,
16:16, 20:25,
21:13, 22:5,
22:12, 28:2,
34:7, 34:9,
35:8, 38:19,
47:1, 48:11,
49:16, 55:9,
58:7, 67:11,
69:24, 70:4,
75:8, 75:24,
79:7, 82:17,
86:17, 86:19,
86:25, 88:22,
93:13, 99:1,
99:2, 103:19,
108:17, 108:21,
109:25, 112:16,
112:21, 113:22,
115:9, 115:17,
117:5, 117:20,
118:7, 118:9,
119:22, 120:18,
120:21, 121:3,
121:10, 122:9,
124:12, 124:24,
124:25, 125:8,
125:20, 140:21,
153:23, 154:4,
167:11, 167:19,
168:4, 168:5,
170:12, 175:17,
181:21
**otherwise**
64:4, 97:5,
108:19, 183:12
**out**
32:13, 46:5,
53:3, 62:4,
81:16, 102:12,
104:10, 104:23,
105:2, 107:11,
107:19, 117:23,

118:7, 123:3,
124:7, 128:4,
129:14, 132:4,
136:9, 165:1,
167:9, 176:7,
181:15

**outcome**
183:12

**outline**
135:1

**outlining**
97:24

**outside**
11:8, 20:22,
32:5, 66:5,
66:10, 115:7

**outweigh**
63:15

**over**
8:11, 8:14,
9:11, 12:5,
12:8, 14:6,
30:6, 40:4,
54:4, 100:22,
116:10, 132:8,
133:19, 133:23,
153:1, 167:17,
173:21, 173:22

**overall**
90:18, 150:20

**overcome**
69:20, 70:23,
82:24, 83:20

**overlap**
69:18, 125:1,
128:5

**own**
21:8, 46:16,
64:17, 65:6,
77:21, 77:22,
81:11, 174:3

**P**

**p&p**
5:12, 6:12,
15:1, 128:16,
128:20, 129:19,
130:7, 132:9,

139:6, 141:21,
150:17, 150:18,
163:23, 164:17

**page**
5:2, 5:11, 8:3,
36:22, 36:25,
38:2, 38:10,
44:16, 44:20,
46:21, 47:13,
49:10, 53:3,
56:7, 56:17,
56:22, 58:11,
61:9, 61:21,
68:23, 70:6,
70:9, 72:10,
72:24, 73:2,
74:21, 76:11,
78:4, 79:22,
87:9, 89:2,
93:3, 95:15,
99:20, 103:1,
106:2, 108:11,
109:3, 112:14,
114:20, 116:12,
120:23, 121:16,
124:2, 125:24,
133:7, 133:8,
137:11, 145:13,
145:19, 146:1,
146:7, 147:19,
148:10, 149:17,
155:7, 157:1,
158:23, 158:25,
162:19, 163:3,
165:12, 176:13,
179:21, 180:1,
181:1, 181:2,
181:12

**pages**
1:24, 40:25,
179:20

**paid**
19:6

**paper**
26:14, 153:15

**papers**
12:3, 12:4,
26:15

**paperwork**
135:7, 135:18,
140:23, 171:7,
171:8, 171:11,
171:23, 172:25,
181:19, 181:21

**paragraph**
37:2, 37:11,
37:19, 37:22,
38:15, 49:14,
59:1, 59:12,
67:14, 73:5,
73:6, 74:24,
90:21, 104:19,
104:25, 108:14,
112:15, 113:17,
126:5, 137:12,
163:1, 176:20,
180:8

**paragraphs**
49:11

**pardon**
90:1, 97:19,
98:14, 99:2

**pardoned**
100:1

**pardons**
97:4, 97:5,
100:6

**parentheses**
30:22

**parole**
32:24, 32:25,
33:3, 33:4,
37:5, 37:15,
41:4, 44:6,
55:4, 93:12,
103:17, 105:12,
106:6, 127:9,
127:14, 127:24,
128:3, 130:4,
130:21, 134:23,
139:18, 146:9,
147:2, 149:19,
149:20, 150:13

**parolees**
128:1

**paroles**
97:4, 97:6

**part**
20:25, 26:7,
32:9, 38:23,
39:1, 40:7,
50:19, 56:22,
68:16, 71:19,
73:1, 81:6,
94:6, 106:22,
125:24, 125:25,
126:1, 140:25,
157:2, 162:13,
168:8, 169:9,
172:14, 180:20

**partial**
119:19

**participate**
81:25

**participated**
76:25

**participating**
83:21, 84:6

**participation**
73:8, 73:16,
73:23, 77:6,
79:6

**particular**
11:17, 17:5,
35:10, 74:2,
75:1, 113:6,
161:17, 161:18

**parties**
166:17, 183:10

**partisanship**
94:16

**parts**
134:25

**pass**
22:11

**past**
19:12, 19:13,
44:5, 121:9

**patterns**
26:12

**pay**
19:19, 67:24,
68:10, 68:11,
69:6, 69:21,
83:2

**pdf**
10:3, 36:24, 95:10, 158:23
**pending**
105:9, 105:17
**percent**
71:6, 71:10, 109:9, 132:8
**percentage**
112:10
**percentages**
111:24, 116:23, 124:18, 124:20, 124:22, 150:6
**perfect**
15:16, 84:7, 101:9
**perform**
11:8
**period**
12:6, 19:24, 126:21, 128:4, 161:18, 170:14, 170:23, 172:5
**periods**
126:2, 171:3
**perlman**
3:4
**permanently**
99:23
**person**
13:7, 14:14, 16:13, 17:5, 35:8, 35:9, 36:18, 44:9, 48:4, 49:12, 49:13, 51:20, 52:13, 52:20, 53:12, 53:13, 53:17, 53:21, 53:22, 54:18, 54:19, 54:20, 56:3, 63:11, 65:16, 69:1, 69:12, 69:16, 81:8, 92:18, 94:22, 128:25, 129:1, 158:1,

159:20, 160:19, 161:22, 167:19
**personal**
41:18, 152:18
**personally**
151:16, 152:15
**perspective**
60:7, 60:21, 61:2, 61:3, 67:18, 91:2
**pertains**
65:8
**phd**
1:15, 2:1, 5:2, 7:3
**phone**
9:16, 9:18, 9:22
**picture**
60:14
**piece**
153:14, 157:11, 157:23, 158:3, 161:19
**pivotal**
62:16, 63:3
**pl**
5:23, 41:2
**place**
86:11, 94:17
**places**
87:4
**plain**
156:6
**plaintiff**
7:7
**plaintiffs**
1:6, 3:2, 7:10, 12:14, 21:20, 181:13
**plausible**
76:9, 161:13
**please**
43:14, 87:19, 121:16, 164:4
**point**
13:12, 14:1, 15:23, 51:14,

51:17, 54:10, 55:16, 55:22, 61:12, 64:9, 70:25, 71:2, 72:12, 81:10, 82:2, 83:22, 88:18, 90:16, 115:16, 116:2, 123:6, 132:17, 133:1, 136:20, 142:4, 143:11, 146:3, 150:10, 152:23, 153:2, 154:9, 155:2, 155:17, 155:19, 159:22, 161:4, 164:20, 164:24, 172:8, 174:16, 179:17, 180:16
**pointed**
53:3, 176:7
**points**
51:7, 132:13
**poles**
68:9
**policies**
113:3, 113:4, 113:9
**policy**
86:22, 94:15, 113:6, 113:7
**political**
58:13, 61:1, 63:23, 67:17, 70:9, 151:19
**poor**
121:15
**population**
5:12, 6:12, 15:1, 75:20, 77:14, 109:10, 112:4, 112:11, 113:21, 114:10, 145:16, 146:4, 146:8, 146:18, 150:11, 154:5, 154:25, 155:17
**populations**
114:6, 124:4

**position**
144:4
**possible**
76:5, 88:11, 90:2, 129:4, 139:5, 147:7, 159:17, 160:13, 160:18, 161:11
**post**
134:21, 164:2, 167:5, 169:13, 171:24, 177:21
**post-conviction**
165:18, 166:4, 166:9, 168:3, 177:19, 177:25, 178:2, 178:23
**post-op**
92:3
**post-submission**
91:20
**practice**
172:24
**pre**
165:17, 168:2, 177:21
**pre-conviction**
177:18, 177:25, 178:25
**precise**
78:19
**predict**
63:9
**predicted**
63:10
**preliminary**
11:20
**preparation**
11:17, 21:8, 37:4
**prepared**
24:3
**preparing**
20:11, 20:17, 21:5, 21:9, 21:10
**present**
126:11, 147:2

| | | | |
|---|---|---|---|
| **presumably** 30:23, 45:24, 69:24, 70:2, 71:8, 113:9, 128:5, 144:22, 157:11 | **probability** 62:9, 62:10, 62:16, 63:2, 63:7 | 114:1, 146:12, 175:13, 180:10, 180:14 | 137:6, 140:3, 181:19 |
| **presuming** 138:6 | **probable** 65:10 | **processes** 35:5 | **provided** 12:11, 37:5, 38:24, 40:2, 43:2, 44:24, 46:23, 52:3, 97:3, 165:15 |
| **pretty** 7:25, 131:12, 149:14 | **probably** 16:14, 95:21, 111:21, 117:2, 136:2, 138:21, 143:19, 153:22, 164:25 | **produced** 30:9 | |
| | | **producing** 126:18 | **providing** 33:23, 39:7, 53:5, 77:12 |
| **previous** 49:8, 64:10, 108:9, 120:1, 120:6, 121:9, 122:18, 122:21, 123:7 | | **professor** 10:25, 11:15, 11:18, 11:19, 59:4, 59:16, 62:5, 62:20, 67:3, 67:15, 70:13, 71:3, 83:16, 115:12, 119:24, 122:24, 126:23, 127:11, 128:7, 144:10, 146:14, 152:25, 154:5, 163:1, 163:18, 168:13, 169:23, 170:25, 173:11, 177:24 | **proving** 84:23 |
| | **probation** 32:24, 32:25, 33:3, 33:4, 37:15, 41:5, 44:6, 54:23, 103:16, 105:12, 106:5, 127:9, 127:14, 127:24, 128:2, 129:9, 130:5, 130:21, 134:15, 134:23, 137:5, 139:18, 146:9, 147:3, 149:19, 149:20, 150:13 | | **provisions** 52:5 |
| **previously** 99:17, 100:12, 102:24, 105:24, 108:25, 122:2, 122:12, 159:15, 160:19 | | | **pto** 69:15, 69:21, 69:22 |
| | | | **public** 2:9, 37:6, 86:22, 104:15, 113:6, 113:9, 183:1 |
| **prior** 42:19, 77:24, 91:23, 104:16 | | | |
| | | | **publications** 24:13 |
| **prison** 33:19, 35:17, 40:18, 40:20, 41:21, 43:19, 59:3, 81:15, 88:22, 99:7, 99:8, 99:10, 123:2, 123:3, 123:5, 128:4, 128:22, 129:8, 129:15, 136:8, 136:12, 137:4, 138:1, 138:2, 145:1, 163:23, 164:9, 164:17, 164:23, 164:24, 165:3, 165:4, 166:6 | **probationers** 128:1 | **program** 83:22 | **pull** 14:19, 22:13, 22:14, 23:7, 25:13, 27:9, 27:25, 29:5, 32:17, 36:21, 37:17, 40:23, 42:4, 47:5, 48:16, 50:2, 52:15, 56:6, 72:22, 95:14, 100:24, 104:2, 106:7, 133:6, 133:8, 179:25 |
| | **problem** 135:10 | **programs** 83:23, 84:13, 84:14 | |
| | **problems** 13:22, 15:21, 128:19 | **propensity** 79:25, 80:4, 80:22, 82:8, 122:7 | |
| | **procedures** 5:24, 5:25, 47:16, 49:2, 49:25, 52:20, 52:22 | **proper** 36:8 | |
| | | **proportion** 112:3, 119:20, 130:13 | **pulled** 95:6 |
| | **process** 35:11, 39:2, 90:18, 92:17, 92:22, 94:25, 95:3, 99:15, 100:10, 102:23, 105:3, 105:6, 105:23, 107:21, 108:8, 108:17, | **proportions** 111:24 | **purpose** 54:4, 64:18, 86:19 |
| **prisons** 58:18 | | **prosecution** 66:22, 66:24, 67:7, 67:8 | **purposes** 31:14, 171:5 |
| **privy** 153:11 | | **provide** 34:8, 34:9, 35:12, 36:4, 55:7, 81:8, | **pursuant** 2:8 |

**put**
14:21, 15:19,
30:22, 41:1,
74:10, 86:24,
133:21, 134:14,
137:5, 144:21,
153:16, 155:5
**puts**
161:23
**putting**
95:9, 149:1

**Q**

**qualification**
37:7
**quarter**
132:5, 132:6
**question**
8:23, 26:25,
30:7, 31:10,
36:5, 43:2,
43:13, 53:1,
53:6, 58:23,
60:1, 60:6,
60:11, 60:19,
60:21, 66:12,
70:11, 74:25,
77:16, 85:15,
88:18, 97:11,
117:9, 117:10,
140:1, 143:14,
150:25, 151:8,
159:1, 167:1,
173:2, 179:3,
181:11
**questioning**
176:18
**questions**
47:22, 47:25,
50:25, 51:9,
57:20, 64:14,
73:5, 101:16,
127:6, 128:13,
132:13, 148:4,
148:5, 162:21,
173:12, 173:14,
177:3, 179:10,
181:9, 181:25

**quick**
95:18, 133:6
**quickly**
53:23, 61:16,
131:21
**quite**
8:7, 42:22,
58:4, 59:20,
63:22, 77:16,
79:21, 168:11,
168:17
**quote**
89:9, 154:4,
165:13
**quoted**
69:2

**R**

**race**
117:1
**racial**
116:20, 119:12
**raise**
19:23
**rampant**
103:12
**random**
140:6
**rate**
19:9, 19:10,
19:11, 19:20,
60:16, 71:1,
71:9, 76:25,
78:16, 79:2,
79:23, 82:4,
82:5, 118:13,
124:3, 125:13,
135:8, 149:2,
170:13, 173:2,
173:3
**rates**
19:24, 45:1,
58:15, 59:6,
60:15, 70:12,
70:15, 70:16,
71:12, 71:23,
72:1, 72:4,
72:7, 72:8,

73:8, 73:16,
75:8, 75:23,
76:19, 76:25,
77:9, 77:13,
77:22, 78:8,
79:5, 79:6,
79:11, 79:15,
79:16, 80:12,
80:21, 115:14,
123:3, 126:20,
132:23, 137:23,
138:12, 178:12
**rather**
20:23, 27:3,
43:18, 58:16,
75:15, 123:9,
124:13, 127:22
**rational**
63:11, 65:16
**rd**
47:12, 47:17
**re-enfranchised**
89:25, 90:3
**re-enfranchiseme-
nt**
96:12, 113:12
**re-infranchiseme-
nt**
76:7
**re-register**
86:13
**read**
8:6, 8:9, 8:13,
39:22, 51:7,
51:10, 70:18,
78:13, 88:23,
97:11, 133:14,
148:3, 163:9,
181:15, 181:22
**reader**
10:3
**reading**
122:25, 156:6,
183:8
**ready**
51:8
**real**
31:9, 62:25,

65:3, 133:6
**reality**
139:3
**really**
8:8, 9:12,
19:21, 20:3,
26:25, 38:1,
40:16, 53:23,
61:16, 63:25,
94:1, 99:4,
101:4, 102:13,
104:22, 118:9,
123:18, 125:18,
126:17, 135:24,
141:3, 146:10,
146:22, 147:11,
152:9, 152:11,
161:5, 170:10
**reason**
9:2, 29:16,
59:19, 60:8,
62:25, 64:23,
64:25, 65:1,
65:9, 65:14,
125:4, 146:11,
153:10, 156:9,
156:15, 156:21,
157:25, 159:19
**reasonable**
82:21
**reasons**
71:16, 81:2,
81:5, 123:8,
153:11
**recall**
11:25, 14:5,
14:11, 16:2,
16:8, 16:16,
17:12, 17:21,
18:3, 21:18,
26:4, 27:3,
38:5, 56:12,
60:2, 133:5,
156:13, 156:19,
173:25
**receive**
40:8, 44:9,
45:1, 45:6,

| | | | |
|---|---|---|---|
| 45:7, 46:4, 85:1, 97:18, 129:2, 139:21 | **reenfranchised** 98:22, 112:23 | 59:22, 62:7, 64:21, 65:1, 65:21, 65:22, | 180:18 **reinstated** 33:22, 34:12, |
| **received** 39:5, 45:20, 127:8, 127:22, 127:23, 128:10, 130:5, 141:13, 154:21, 154:23, 155:1, 156:8, 156:9, 156:11, 156:15, 156:21 | **reenfranchisement** 97:21, 112:15 **refer** 38:3, 38:13, 165:14 **referencing** 91:19, 93:5, 143:22, 174:3 **referred** 28:3, 40:19, | 65:23, 66:15, 66:17, 78:5, 84:5, 176:21 **registers** 135:7 **registrant** 175:9, 175:10 **registrants** 55:6, 70:16, 70:17, 71:12, 76:21, 77:8, | 35:13, 35:16, 36:20, 39:10, 45:19, 79:1, 80:12, 81:25, 82:18, 83:3, 84:3, 91:16, 92:5, 92:8, 92:15, 92:16, 92:18, 92:19, 92:24, 115:14, |
| **receives** 106:23 **receiving** 128:8 **recent** 127:25, 128:21, 155:15 | 83:16 **referring** 14:23, 23:2, 27:11, 34:24, 37:21, 44:22, 53:4, 127:12, 146:4, 162:24 | 79:24, 80:3, 80:7, 80:16, 80:18, 82:4, 125:11, 125:13, 126:12, 126:13, 136:15, 136:17, | 132:22, 134:11, 136:4, 143:3, 143:4, 159:18, 161:11, 161:16, 161:18, 166:11, 175:18, 181:20 |
| **recently** 19:17, 20:16, 128:22 **recess** 72:14, 114:18, 173:10 | **refraining** 10:5 **regardless** 63:4, 168:6 **register** 33:9, 33:15, | 167:24, 169:12 **registrar** 33:24, 34:10, 35:13, 36:18, 43:1, 43:21, 50:17, 53:10, | **reinstatement** 78:8, 79:6, 79:16, 79:18, 83:25, 142:6, 142:11, 143:1, 153:18, 167:24, |
| **recognize** 28:20, 29:6, 29:20, 109:8 **recollection** 15:15, 93:17 | 35:7, 35:8, 35:14, 35:17, 35:21, 35:25, 36:11, 44:25, 45:18, 59:3, | 53:22, 54:21, 55:8, 69:1, 69:5, 69:8, 69:11, 69:16, 85:9, 85:18, | 174:25, 175:12, 175:14, 178:5, 178:6, 178:23 **related** 11:14, 21:2, |
| **record** 7:17, 41:2, 57:15, 57:25, 61:16, 61:18, 72:13, 72:16, 97:13, 114:17, 173:9, 182:1, 183:5 | 59:19, 60:25, 67:21, 68:15, 70:14, 72:1, 76:8, 76:19, 78:10, 80:23, 81:2, 81:12, 81:17, 82:10, | 88:3, 91:2, 91:15, 92:1, 132:21, 151:7, 153:7, 153:15, 157:13, 157:25, 161:21, 167:12, | 24:19, 25:6, 26:13, 26:24, 41:21, 65:19, 93:13, 107:11, 157:23, 168:16, 183:10 |
| **records** 17:3, 21:1 **redistricting** | 82:11, 86:12, 90:14, 97:14, 98:7, 109:23, | 169:24, 175:18 **registrars** 168:15, 168:19, | **relates** 53:2 **relationship** 59:1, 115:19 |
| 19:21, 19:25, 20:1, 20:4 **reduce** 75:4 | 114:9, 123:2, 129:3, 136:21, 137:1, 141:4, 145:2, 149:1, | 169:7, 171:25 **registrations** 76:20 **registry** | **relatively** 20:16, 63:5, 73:7, 73:15, 76:24, 83:3 |
| **reduced** 183:7 **reducing** 63:24 | 166:5, 167:18, 175:20, 178:19 **registering** 13:15, 36:14, | 60:18 **regression** 118:11 **reinstate** 170:1, 178:19, | **release** 105:12 **released** 105:18, 128:22, |

145:16, 145:21, 145:25, 146:6, 146:18

**relevance**
53:2, 54:7, 55:20, 59:13, 133:16

**relevant**
9:14, 60:19, 76:18, 90:8, 90:9, 90:17, 96:2, 112:24, 121:22, 121:23, 123:9, 124:16, 135:20, 143:8, 168:3

**reliable**
15:25

**relied**
27:13, 28:6, 28:24, 29:10, 30:2, 32:8

**religious**
121:5

**rely**
121:22, 123:22, 140:8

**relying**
91:9

**remain**
124:18, 124:20, 124:22

**remained**
134:15

**remaining**
137:13

**remains**
43:25, 125:22, 174:16

**remember**
11:23, 13:20, 13:25, 17:24, 18:4, 27:7, 39:11, 114:22, 155:3, 174:18, 177:4

**remind**
8:10

**reminder**
8:8

**remit**
97:6

**remotely**
1:16

**removes**
180:18

**renee**
5:18, 18:9, 18:18, 56:17

**repeat**
41:15, 42:12, 43:13, 96:3, 129:23, 156:16

**repeated**
83:24, 84:8, 84:15, 85:9, 86:7

**replied**
43:3

**reported**
1:25

**reporter**
8:4, 14:22, 95:10

**reporter-notary**
183:1

**reports**
20:14, 22:13, 148:12, 155:10

**represent**
47:15, 49:1, 49:24, 139:19, 141:12, 150:2, 173:20

**represented**
62:13

**representing**
140:22

**republican**
93:22

**request**
27:20, 28:12, 39:19, 39:23, 40:6, 40:8, 45:9, 45:23, 46:24, 53:14,

53:19, 54:12, 54:15, 54:19, 55:23, 55:25

**requested**
13:16, 16:10, 183:9

**requesting**
17:1, 45:25, 55:15

**requests**
12:15, 16:16, 53:8

**require**
99:2

**required**
34:1, 39:23, 40:19, 43:17, 49:12, 55:7, 137:6, 139:20, 139:21, 167:23, 172:10, 172:12

**requirement**
132:16, 133:20, 133:23

**requirements**
33:8, 36:13

**requires**
90:1

**requiring**
168:5, 169:11, 171:22, 172:1

**reregistered**
89:20

**research**
20:13, 24:23, 24:25, 25:3, 25:9, 25:15, 26:8, 58:13, 63:23, 108:20

**residence**
14:15, 16:20

**respect**
15:18, 59:7, 59:18, 121:17, 132:16, 146:20, 146:21, 162:13, 166:23, 180:22

**respond**
62:19, 66:21,

66:23, 67:5, 67:10, 67:11

**responding**
11:11, 20:22, 22:25, 42:9, 42:10, 42:16, 43:1, 50:16, 59:4, 131:1

**response**
23:11, 101:8

**rest**
21:2, 89:17, 113:21

**restate**
80:15, 166:19

**restated**
91:5

**restoration**
6:4, 6:8, 6:11, 25:24, 94:7, 94:12, 106:21

**restorations**
94:19

**restored**
87:23, 88:4, 88:6, 103:16, 104:17, 108:4, 113:19, 145:16, 146:4, 146:7, 146:18

**restores**
93:11, 106:4

**restoring**
86:23, 107:24

**restrictive**
93:20, 93:21

**results**
144:10

**resume**
7:25, 24:18, 24:20, 25:7, 26:3

**retained**
5:10

**retainer**
18:19, 18:21, 18:22, 19:4

**return**
51:22

| | | | |
|---|---|---|---|
| **returned** | 114:19, 116:10, | **said** | **saw** |
| 157:12 | 121:15, 125:23, | 10:24, 11:15, | 42:23, 42:24, |
| **review** | 130:18, 133:8, | 13:7, 15:12, | 87:5 |
| 21:21, 121:19 | 137:10, 145:12, | 42:16, 73:19, | **say** |
| **reviewing** | 145:18, 154:2, | 83:11, 94:14, | 7:23, 17:22, |
| 176:1 | 154:7, 155:22, | 95:20, 98:5, | 19:10, 20:4, |
| **revised** | 158:18, 158:22, | 99:22, 106:4, | 21:9, 35:24, |
| 49:3, 63:16 | 162:19, 166:25, | 117:24, 118:23, | 37:3, 38:17, |
| **richard** | 173:8, 173:11, | 121:2, 131:21, | 39:13, 39:18, |
| 47:18 | 179:1, 179:25, | 137:13, 145:7, | 39:21, 40:11, |
| **richardson** | 181:10, 181:14, | 148:10, 156:19, | 40:12, 49:11, |
| 3:3, 5:3, 7:8, | 181:24 | 158:9, 160:8, | 53:7, 54:22, |
| 7:10, 7:14, | **right-hand** | 164:2, 174:16, | 57:6, 57:25, |
| 15:10, 22:14, | 117:17, 118:23 | 176:24, 177:14, | 61:11, 64:25, |
| 25:13, 27:9, | **rights** | 181:1, 183:6 | 66:13, 67:23, |
| 27:25, 29:5, | 6:8, 6:11, | **samantha** | 73:12, 74:24, |
| 29:15, 31:21, | 25:24, 33:24, | 3:4 | 85:17, 93:11, |
| 36:23, 37:17, | 34:5, 74:5, | **same** | 103:14, 103:18, |
| 40:23, 41:14, | 86:23, 87:6, | 8:3, 8:10, | 107:15, 108:21, |
| 43:9, 43:14, | 93:11, 103:16, | 19:14, 30:8, | 110:3, 118:8, |
| 44:17, 46:20, | 104:13, 106:4, | 30:9, 30:12, | 123:10, 126:7, |
| 47:5, 47:13, | 106:21, 107:25, | 30:18, 30:20, | 126:15, 135:24, |
| 47:20, 48:2, | 113:18, 115:12, | 30:24, 35:4, | 138:5, 138:6, |
| 48:16, 48:21, | 167:11 | 38:1, 43:8, | 139:8, 139:9, |
| 49:9, 50:2, | **robinson** | 43:11, 48:23, | 139:17, 140:16, |
| 50:7, 50:12, | 162:7, 162:11 | 49:7, 49:12, | 142:1, 142:15, |
| 50:18, 51:3, | **roles** | 50:21, 50:23, | 142:19, 144:9, |
| 51:11, 52:15, | 151:10 | 55:1, 55:19, | 148:8, 149:15, |
| 56:5, 56:14, | **room** | 65:7, 65:17, | 153:17, 154:20, |
| 56:20, 57:12, | 9:5 | 65:25, 67:14, | 154:22, 154:25, |
| 58:12, 61:9, | **rouge** | 68:22, 78:6, | 155:16, 156:25, |
| 61:15, 61:19, | 3:19, 4:7 | 84:17, 86:11, | 163:14, 163:24, |
| 70:5, 72:10, | **route** | 95:22, 96:5, | 164:6, 165:9, |
| 72:15, 72:22, | 97:21 | 107:11, 117:6, | 171:6, 174:9, |
| 72:25, 74:13, | **row** | 119:23, 120:11, | 177:17 |
| 74:20, 78:3, | 141:8 | 120:17, 124:19, | **saying** |
| 83:5, 86:15, | **rule** | 124:20, 124:22, | 15:25, 39:1, |
| 89:1, 93:3, | 73:9, 73:17, | 124:25, 133:7, | 51:16, 51:18, |
| 93:25, 95:5, | 75:17, 76:17 | 141:16, 142:17, | 60:2, 66:14, |
| 95:13, 96:14, | **rules** | 149:1, 149:17, | 78:25, 80:25, |
| 96:19, 97:7, | 8:2 | 153:24, 157:9, | 82:2, 97:15, |
| 97:22, 98:5, | **run** | 157:15, 161:16, | 99:7, 99:9, |
| 98:10, 98:11, | 32:1, 118:10, | 169:20, 170:6, | 99:10, 121:7, |
| 99:20, 100:24, | 119:18, 120:3, | 170:13, 172:11, | 122:24, 123:22, |
| 101:3, 101:11, | 153:9, 153:13 | 175:10, 176:8, | 130:11, 139:10, |
| 104:2, 104:21, | **running** | 176:21, 181:7 | 146:22, 148:15, |
| 106:7, 108:13, | 117:16 | **sample** | 158:4, 159:15, |
| 109:2, 114:16, | | 140:7 | 168:2, 168:24, |
| | **S** | | |
| | **safety** | | |
| | 37:6 | | |

172:9, 172:21

**says**
30:10, 30:12, 30:13, 31:6, 38:1, 38:3, 39:16, 40:7, 41:8, 41:9, 41:24, 42:2, 44:13, 44:23, 46:23, 49:3, 51:25, 52:1, 52:2, 52:10, 56:16, 56:25, 57:2, 57:24, 65:7, 70:12, 73:7, 74:2, 75:1, 87:9, 90:3, 93:10, 94:6, 94:7, 94:10, 94:21, 97:1, 104:13, 105:1, 105:8, 107:10, 107:23, 108:14, 121:19, 131:5, 133:18, 137:14, 138:18, 138:23, 139:22, 154:3, 154:23, 155:3, 155:4, 155:12, 155:20, 155:23, 155:25, 156:2, 156:14, 156:20, 156:22, 161:21, 163:5, 173:4, 180:14, 181:16

**scheme**
96:12, 106:13

**scholarship**
12:2

**science**
58:13, 61:1, 63:23, 67:17, 70:10, 151:19

**scientific**
115:5

**scientist**
62:2

**scope**
10:19, 10:21, 11:8, 41:22, 42:9, 42:17, 54:8, 55:20, 133:12

**scratch**
22:12

**screen**
14:20, 22:17, 41:10, 94:1, 94:2, 130:17, 145:23

**scroll**
24:6, 24:7, 40:25, 50:8, 58:1, 87:18, 101:6, 104:21

**searched**
87:3

**seasoned**
7:25

**second**
30:23, 41:15, 49:14, 78:6, 128:14, 137:9, 138:22, 145:24, 180:4, 180:9

**secondly**
136:5

**secretary**
1:10, 17:14, 17:18, 50:15, 158:21, 173:21

**section**
58:13, 70:10, 78:5, 89:4, 89:5, 106:22, 115:2, 146:2, 147:24, 169:4

**see**
13:13, 22:16, 23:8, 24:4, 32:3, 37:8, 38:2, 38:7, 39:10, 41:6, 41:8, 41:10, 41:11, 42:2,

42:3, 48:10, 49:3, 49:4, 51:6, 56:16, 57:14, 64:24, 74:8, 87:18, 92:6, 94:2, 106:19, 107:8, 113:5, 113:8, 114:12, 120:12, 121:10, 126:22, 127:3, 128:16, 131:12, 131:23, 137:13, 148:9, 152:4, 152:5, 152:18, 152:19, 155:23, 159:4, 170:15, 173:8, 180:12

**seeing**
156:13

**seek**
79:18, 153:18

**seems**
100:4, 141:6

**seen**
28:22, 47:8, 47:23, 50:25, 51:4

**sees**
30:19

**send**
21:24, 52:11, 95:7, 158:3

**sense**
11:7, 13:24, 15:13, 16:5, 61:2, 63:21, 65:15, 117:14, 165:11, 169:15

**sent**
9:10, 11:18, 11:19, 11:21, 11:22, 11:25, 12:1, 12:3, 12:4, 23:20, 129:8, 136:12, 157:11, 157:23

**sentence**
14:8, 14:13,

33:14, 37:14, 39:19, 40:2, 40:10, 40:12, 43:25, 44:13, 44:21, 67:15, 73:6, 78:6, 87:23, 91:14, 97:2, 112:14, 123:11, 130:1, 134:19, 137:14, 140:15, 145:3, 155:24, 156:24, 164:19, 167:17, 180:10, 181:15

**sentenced**
94:23

**separate**
99:15, 100:10, 102:22, 105:23, 108:8, 108:17

**serious**
98:15, 103:11

**serve**
43:6, 45:5, 45:16, 45:21, 64:18

**served**
25:10

**serves**
45:2, 55:15, 71:6

**services**
18:22

**set**
7:12, 29:15, 128:4, 148:15, 148:21, 183:13

**sets**
25:4, 126:9

**setting**
124:7

**several**
11:20, 93:19, 121:1, 126:8

**shaded**
87:21

**shall**
94:7

**share**
14:20, 93:25, 130:17
**sharing**
12:7, 130:19, 179:22
**she'd**
139:23
**she'll**
8:5
**sherri**
6:13
**shifts**
70:1
**short**
19:24, 101:4, 116:3
**shorthand**
130:3, 183:1
**should**
15:24, 36:19, 51:20, 51:21, 53:24, 59:23, 60:15, 61:7, 63:10, 63:12, 71:8, 74:10, 74:24, 88:14, 92:18, 106:9, 123:9, 126:19, 126:22, 135:13, 135:17, 139:4, 151:8, 151:9, 151:17, 151:21, 157:16, 158:11, 163:14, 164:25, 166:1, 170:13, 170:14, 172:2, 178:17, 178:24
**shouldn't**
142:22, 150:23, 151:11, 151:19, 151:20, 152:6
**show**
36:18, 50:11, 80:19, 81:7, 84:12, 125:6, 142:22, 143:5, 143:15, 160:3

**showed**
52:22
**showing**
59:5, 71:7, 90:19
**shown**
121:10, 159:21, 175:23, 176:2, 179:19
**shows**
3:17, 63:23, 71:4
**sic**
73:21
**side**
92:23, 117:17, 118:23
**signature**
50:11
**signature-p1kal**
183:18
**signed**
48:12
**significance**
116:17, 125:6
**significant**
13:23, 116:7, 117:4, 124:9, 125:7, 144:6
**signing**
183:8
**similar**
26:15, 67:6, 95:2, 95:23, 96:9, 108:22, 111:22, 113:24, 113:25, 114:13, 126:19, 175:17
**similarly**
57:16, 124:4
**simple**
62:3
**simply**
144:11
**since**
8:11, 8:16, 9:22, 24:3, 30:15, 39:15,

59:2, 88:1, 105:14, 110:1, 111:12, 115:5, 115:7, 126:8, 128:2, 132:19, 134:10, 180:17, 181:11
**single**
107:2, 119:5, 120:3, 165:24
**sitting**
9:18
**situ**
86:25
**situated**
111:11, 124:4
**situation**
153:24
**skip**
12:18
**slightly**
19:20, 60:14, 83:25, 114:3
**slope**
119:3, 119:4
**sls**
47:18, 50:9
**small**
41:10, 63:5, 83:3, 139:7
**smaller**
169:13, 169:17
**snapshots**
143:17
**social**
62:2, 115:4
**some**
10:16, 11:22, 11:24, 12:1, 12:2, 12:3, 12:4, 12:15, 13:12, 13:16, 17:15, 20:16, 25:1, 26:14, 26:15, 28:19, 32:9, 32:10, 40:7, 51:19, 52:1, 62:2,

66:16, 67:20, 68:2, 69:14, 69:15, 70:3, 75:7, 75:23, 76:5, 83:20, 86:21, 86:24, 92:17, 106:4, 108:20, 111:23, 113:16, 114:2, 118:10, 122:2, 122:9, 122:10, 129:5, 138:21, 141:5, 147:10, 152:13, 154:9, 155:2, 155:17, 157:25, 158:10, 158:14, 159:18, 159:22, 161:17, 167:11, 172:9, 172:10, 172:23, 173:14, 179:17, 179:20, 180:16
**somebody**
26:9, 35:21, 54:14, 62:4, 62:23, 64:19, 65:2, 66:16, 69:9, 69:25, 70:1, 81:17, 161:11
**somebody's**
63:5, 92:17
**someone**
17:20, 57:21, 98:24, 99:13, 100:8, 102:21, 105:22, 120:4, 122:1, 129:20, 130:18, 131:22, 135:8, 141:25, 155:1, 156:21
**someone's**
103:5
**something**
13:6, 38:6, 66:14, 66:16, 74:6, 90:1, 108:22, 154:6,

| | | | |
|---|---|---|---|
| 155:5, 173:8, 175:20, 179:14 | **sought** 142:5, 142:11, 142:25 | **spoke** 14:6, 18:13 | 100:16, 101:20, 102:8, 102:12, 104:10, 104:18, 104:23, 105:2, 106:3, 107:17, 107:19, 108:15, 108:19, 108:22, 112:4, 113:6, 127:16, 139:4, 140:12, 146:15, 146:19, 147:11, 157:11, 157:22, 168:25, 172:1, 173:21 |
| **sometimes** 12:3, 13:4, 19:12, 30:22, 123:16, 179:9 | **sound** 18:5, 18:9, 18:11, 29:25 | **spoken** 10:14, 17:13 | |
| **somewhere** 20:8, 38:8, 154:11 | **sounds** 7:24, 18:15, 30:17, 38:6, 40:3, 42:21, 74:6, 87:8, 96:8, 98:1, 103:4, 159:14, 160:24, 161:13, 161:14, 162:4 | **spot** 37:2 | |
| **son** 22:5 | | **spurious** 115:19 | |
| **sorry** 12:21, 12:22, 14:6, 15:8, 19:3, 22:4, 31:17, 37:25, 40:24, 41:9, 42:12, 43:9, 44:18, 50:3, 54:6, 54:25, 55:18, 58:15, 66:23, 73:3, 77:16, 85:24, 89:2, 89:20, 94:21, 96:3, 98:2, 102:1, 102:8, 107:6, 129:23, 138:4, 140:14, 147:23, 155:8, 156:16, 172:22, 173:15, 179:2, 179:9 | | **ss** 50:8 | |
| | **source** 109:9 | **st** 3:18, 131:24, 183:15 | **state's** 17:14, 17:18, 50:15, 158:21, 175:24, 176:1 |
| | **sources** 87:16 | **stamps** 83:8, 83:14, 83:17, 84:6, 84:16, 85:2 | **stated** 68:25, 71:25 |
| | **speak** 8:11, 8:14, 17:25, 55:24 | **standard** 19:9, 19:11, 115:4 | **statement** 37:10, 49:20, 75:14, 76:16, 90:6, 112:25, 113:13, 135:16, 174:10, 174:20, 176:23, 179:12, 179:13, 181:6 |
| | **speaking** 24:22, 68:24 | **stands** 152:24 | |
| | **speaks** 57:22 | **start** 39:7, 76:12, 86:16, 115:25, 133:11, 146:12, 164:3 | |
| | **specific** 14:13, 16:9, 123:6, 128:24, 134:1, 141:9, 143:16, 169:10 | **started** 8:16, 39:6, 39:12, 39:14, 56:23, 72:16, 146:12, 149:23 | **states** 1:1, 59:6, 86:19, 86:22, 86:25, 88:9, 88:19, 103:19, 108:17, 109:25, 111:11, 111:20, 112:17, 112:21, 113:2, 113:5, 114:2 |
| **sort** 17:8, 18:25, 26:13, 32:13, 54:16, 61:5, 67:11, 68:9, 68:25, 75:17, 76:4, 77:4, 77:20, 78:19, 86:25, 115:4, 118:10, 122:20, 124:1, 131:15, 135:2, 152:19 | **specifically** 10:24, 12:21, 22:4, 25:23, 26:8, 26:24, 34:23, 56:12, 67:10, 67:13, 85:4, 102:4, 105:1, 108:24, 110:21, 135:2, 154:22, 176:23 | **starts** 56:10, 56:23, 137:12, 139:3, 139:6 | |
| | **specifics** 11:4, 68:2 | **state** 1:10, 19:18, 36:3, 39:7, 46:13, 48:3, 52:20, 68:13, 78:9, 86:4, 86:6, 86:17, 87:2, 87:11, 89:3, 89:10, 89:12, 89:17, 90:8, 90:12, 91:10, 93:19, | **stating** 7:16 |
| | **speculative** 76:4 | | **statistical** 25:3, 116:17, 117:16, 119:2 |
| **sorts** 119:15 | **spent** 20:6, 20:18, 20:19, 21:4 | | **statistically** 117:4, 124:9, 125:7 |
| **sos** 6:2 | | | **stats** 117:21 |

**status**
158:7, 180:6
**statutes**
97:8, 176:1
**stay**
23:24
**staying**
78:2
**steal**
103:5
**stenographically**
183:6
**step**
58:24, 71:8,
85:14, 85:16,
85:18, 85:21,
86:2, 117:8,
126:18, 126:25,
132:20, 151:6,
152:11, 153:7,
165:23, 166:7,
167:17, 169:14,
171:22, 172:19,
181:16
**stepping**
129:16
**steps**
34:19, 85:11,
112:15
**still**
33:20, 44:6,
44:10, 54:24,
56:3, 63:6,
65:24, 78:22,
94:17, 105:4,
124:9, 125:16,
125:21, 134:16,
142:4, 142:8,
142:12, 145:8,
145:10, 152:23,
157:5, 157:9,
158:5, 167:25,
169:11, 169:18,
172:1, 172:9,
172:16, 173:1,
173:2
**stop**
61:5

**stopping**
61:12, 72:12
**straight**
147:9
**straightforward**
62:25
**street**
3:10, 3:18
**strictly**
178:18
**studies**
115:5
**study**
26:5
**stuff**
9:12, 10:2,
12:14, 17:8,
40:19, 88:22,
146:21, 147:9
**subject**
47:25, 101:17
**submission**
90:25, 91:23
**submit**
86:5, 91:25,
92:1, 92:4,
92:7, 110:7
**submits**
34:15, 34:20
**submitting**
85:8, 90:22,
91:1, 91:6,
95:20, 96:1,
96:5, 96:6
**subset**
118:7, 140:6,
140:10, 140:13,
140:18
**subsetting**
118:6
**suddenly**
64:2
**sufficient**
117:11
**suite**
3:9, 4:6
**super**
153:22, 168:23

**supervision**
127:15, 141:22,
149:22
**supplemental**
159:7
**support**
38:14, 49:20,
87:1
**suppose**
74:10, 75:12,
85:13, 86:9,
133:21
**supposed**
162:12, 168:20
**sure**
8:2, 10:17,
16:3, 17:15,
30:16, 31:13,
35:23, 42:21,
42:22, 46:14,
51:12, 61:15,
62:1, 75:12,
75:13, 77:16,
86:20, 96:4,
110:2, 115:4,
128:6, 130:12,
147:17, 148:3,
148:7, 148:24,
152:10, 158:5,
160:16, 160:17,
166:20, 168:11,
168:17, 169:2,
175:7
**surprised**
100:23, 168:12
**surrounding**
155:10
**survey**
168:14
**suspension**
151:4
**suspensions**
138:21
**switch**
30:6, 116:10,
121:16
**sworn**
7:4, 7:16

**system**
40:1

**T**

**tab**
48:17
**table**
109:4, 109:5,
110:17, 116:12,
120:7, 121:17
**tabs**
30:6
**take**
9:20, 19:23,
68:8, 69:14,
71:7, 85:11,
85:12, 88:3,
91:13, 101:5,
106:8, 115:9,
125:10, 132:18,
132:20, 144:6,
153:6, 153:14,
166:7, 167:10,
167:16, 169:24
**taken**
49:23, 72:14,
114:18, 151:6,
164:25, 173:10,
183:3, 183:6
**takes**
53:21, 118:21
**taking**
8:4, 85:17,
90:6, 132:20,
135:16, 140:20,
151:7, 153:7,
165:23, 166:7
**talk**
40:16, 97:12,
99:21, 106:2,
117:15, 146:20,
177:20
**talked**
13:13, 17:15,
22:2, 73:1,
79:21, 144:14,
144:24, 152:10,
168:14, 181:2

**talking**
13:4, 13:19,
53:8, 58:14,
62:6, 62:20,
66:20, 68:5,
77:15, 79:11,
82:12, 116:1,
126:1, 128:14,
151:13, 152:22,
152:25, 154:12,
177:7
**talks**
154:11, 154:13
**task**
85:20, 141:2
**tax**
9:12
**technically**
35:20, 78:20,
88:5, 151:2,
151:3
**telephonic**
54:16
**tell**
18:2, 30:16,
31:6, 31:7,
31:10, 31:15,
31:16, 31:23,
42:25, 112:6,
154:18, 158:2
**tells**
106:23
**tennessee**
110:22
**term**
62:12, 62:14,
63:9, 63:19,
74:4, 89:22,
89:24, 98:4,
134:22, 137:14,
147:1, 148:9,
165:13, 175:15
**terminology**
132:25, 146:14,
146:15
**terms**
35:5, 95:19,
95:24, 96:1,

119:2, 134:12,
141:8, 145:16,
146:6, 146:23,
147:10, 151:14,
174:25
**terribly**
153:14
**testified**
7:6, 11:19,
41:20, 47:23,
167:2
**testify**
7:4, 57:3
**testifying**
10:6, 51:2
**testimony**
8:4, 9:3,
56:11, 57:21,
160:4, 176:10,
183:5, 183:6
**text**
46:25, 52:18,
54:22, 55:15,
57:4, 57:11,
58:7
**th**
3:10, 49:3,
109:12, 112:11
**thank**
15:11, 29:18,
44:19, 50:22,
58:12, 73:19,
77:17, 80:2,
83:10, 83:11,
98:8, 125:25,
154:7, 180:5,
180:7, 181:24
**thanks**
98:8
**theoretically**
160:14, 161:13
**theory**
63:1, 65:5,
65:7, 70:21,
169:14, 169:22
**thereafter**
183:7
**therefore**
136:12, 140:8

**therefrom**
55:25
**they'd**
69:13, 69:14
**thing**
8:10, 9:25,
48:23, 49:12,
54:17, 62:6,
65:7, 68:9,
84:17, 120:13,
124:10, 125:5,
134:12, 147:12,
160:10, 161:20,
164:1, 164:14,
170:5, 170:11,
181:7
**things**
13:4, 19:21,
23:19, 80:8,
111:21, 113:3,
113:8, 113:16,
117:2, 119:15,
119:16, 121:3,
121:6, 121:8,
123:16, 123:17,
125:20, 141:9,
144:14, 144:24,
151:23, 156:1,
161:4, 161:6,
161:10
**thinks**
143:20, 157:13
**thomas**
1:15, 2:1, 5:2,
7:3, 7:18
**thought**
15:18, 19:3,
168:21
**through**
8:2, 8:18,
21:19, 21:20,
34:13, 34:18,
53:15, 57:4,
58:6, 69:9,
69:10, 69:11,
70:11, 101:23,
105:2
**throughout**
23:3, 23:15

**timber**
103:3
**time**
8:21, 12:6,
16:19, 19:24,
20:6, 20:10,
20:16, 20:18,
20:19, 21:4,
27:19, 27:20,
33:18, 37:22,
38:23, 39:24,
42:13, 45:15,
61:17, 62:2,
69:13, 70:7,
77:18, 80:14,
81:24, 86:12,
90:15, 91:11,
100:22, 105:12,
105:15, 117:6,
119:23, 120:11,
120:17, 126:2,
126:12, 128:4,
134:16, 135:3,
141:2, 143:17,
144:2, 144:6,
144:11, 149:16,
156:18, 161:16,
161:18, 161:25,
162:18, 163:22,
167:24, 169:12,
171:3, 171:19,
172:4, 175:20,
178:7, 179:17
**timeline**
128:19
**times**
7:22, 7:23,
59:21, 89:13,
93:19, 126:9
**timing**
129:11, 134:12,
141:1, 161:4
**tiny**
63:14
**title**
14:25, 27:6,
29:23, 30:9,
31:1

**titled**
47:16
**today**
8:25, 9:3,
24:10, 24:16,
111:19, 174:25,
175:24, 176:2,
176:10, 176:18
**today's**
21:5
**together**
15:19, 181:4
**told**
10:21, 10:23,
14:7
**tomeny**
3:16
**top**
26:4, 38:2,
50:12, 61:21,
116:12, 154:19
**topic**
25:11
**total**
118:2, 132:3
**totally**
144:10, 152:12
**tough**
17:3
**tougher**
66:12, 69:12,
91:17
**towards**
162:20, 176:17
**tracy**
5:16, 12:23,
22:21
**trade**
70:1
**transcript**
8:9, 8:12,
56:6, 56:8,
57:22, 72:21,
158:20, 158:23,
183:4
**transform**
64:2
**treason**
97:1, 103:15

**treated**
170:6
**treating**
155:16
**treatment**
59:7, 115:7
**treats**
154:5
**trees**
103:6
**tried**
26:16, 26:22,
135:1
**trouble**
29:16
**true**
20:5, 84:18,
86:6, 99:5,
99:12, 129:15,
130:14, 142:7,
156:2, 170:12,
172:18, 176:3,
178:15, 179:8,
183:4
**truism**
67:22
**trust**
68:13, 152:10
**truth**
7:5, 7:6
**try**
8:9, 8:14,
8:17, 13:12,
63:18, 113:2,
116:2
**trying**
13:20, 15:19,
39:11, 60:22,
61:15, 62:3,
62:19, 71:3,
79:13, 81:19,
126:7, 126:15,
143:15, 147:8,
147:15, 153:2,
160:16
**turn**
20:12, 61:9,
62:4, 83:25,

158:22
**turnout**
58:16, 59:6,
59:8, 59:9,
59:18, 60:15,
64:7, 64:11,
70:12, 75:5,
79:22, 80:21,
82:5, 115:18
**turpitude**
98:17, 98:20,
98:25
**twice**
30:18, 109:19
**two**
18:17, 30:19,
31:15, 40:25,
49:11, 59:6,
83:18, 116:20,
118:22, 124:12,
153:20, 156:1,
165:5, 174:15,
175:2
**type**
99:2, 123:11
**types**
68:23, 141:10
**typewriting**
183:7

**U**

**uh-huhs**
8:8
**uh-uhs**
8:8
**ultimate**
125:10, 135:5
**ultimately**
16:7, 59:23,
60:11, 60:13,
60:22, 61:6,
64:20, 65:1,
66:1, 66:17,
71:1, 81:11,
127:8, 127:13,
138:10, 149:21,
152:24
**unclear**
152:14

**undeliverable**
157:24, 161:21
**under**
8:25, 19:15,
37:5, 44:1,
44:10, 65:6,
78:5, 93:14,
95:21, 100:18,
104:18, 105:4,
105:5, 105:13,
108:19, 121:17,
127:15, 141:22,
143:22, 157:18,
163:8, 175:2,
177:1, 180:5,
183:7
**underlying**
12:20, 169:14
**understand**
8:25, 37:13,
42:24, 42:25,
51:17, 58:23,
60:12, 61:3,
61:6, 62:21,
66:3, 77:16,
82:1, 117:7,
121:23, 135:4,
144:13, 148:24,
149:11, 160:7,
165:22, 166:18,
175:19
**understanding**
33:7, 33:25,
34:14, 34:17,
34:18, 36:13,
44:4, 44:8,
64:12, 65:6,
67:1, 76:18,
84:14, 89:11,
96:25, 132:15,
139:25, 154:14,
165:8, 166:16,
166:22, 167:21,
177:22, 177:23,
180:21
**undertake**
115:23, 143:23,
162:14

**undertaken**
92:22, 96:5
**undiscovered**
123:19
**unfortunately**
24:14
**union**
121:4
**unit**
118:16
**united**
1:1
**unless**
56:25, 57:14,
57:24, 167:1
**unlike**
89:9
**unrepresentative**
140:8
**unsuspended**
152:16, 167:13,
175:14
**until**
8:18, 65:13
**up-to-date**
24:10, 24:15,
111:16
**updated**
15:1
**use**
15:13, 16:7,
30:4, 53:17,
57:8, 69:15,
87:1, 119:7,
137:14, 137:19,
146:23, 147:10,
147:11, 164:11,
165:6, 169:18
**useful**
13:6, 14:2,
88:10, 88:15,
113:1, 113:5
**uses**
116:20, 146:15,
164:13
**using**
14:5, 15:24,
54:15, 116:18,

132:25, 169:4,
181:21
**usually**
19:22, 19:23,
68:6, 90:1,
117:14, 152:2
**utility**
125:5

**V**

**vague**
15:20
**valencia**
3:3, 7:10,
15:8, 50:22,
61:11, 98:2,
153:17
**valid**
144:23
**value**
66:4, 66:9,
90:7, 135:16
**values**
118:22
**variable**
31:4, 31:5,
115:11, 118:3,
118:12, 118:18,
118:21, 118:25,
119:5, 119:6,
119:19, 119:21,
120:4, 125:6
**variables**
13:14, 115:9,
115:10, 116:6,
117:6, 117:13,
117:17, 117:24,
118:1, 118:8,
118:9, 119:7,
119:8, 119:23,
120:18, 120:21,
121:21, 121:23,
122:3, 122:20,
123:18, 124:2,
124:13, 124:24,
125:1, 125:8,
125:17
**variance**
119:20, 124:25

**varies**
19:10
**variety**
113:4, 113:11
**various**
15:21, 25:4,
54:11, 54:15,
86:21, 87:4,
89:23, 155:9,
171:25
**vary**
124:24
**varying**
77:13
**vcr**
173:3
**veracity**
88:23
**verbal**
8:5
**verified**
57:6
**verify**
57:1, 57:7,
58:5
**vermont**
58:15, 88:21
**version**
30:23, 63:16,
83:12
**versus**
53:4, 75:24,
79:23, 92:1,
95:20, 96:6,
170:21, 171:1,
173:3
**via**
51:19, 53:16,
53:19, 53:20,
55:15
**vining**
18:11
**violent**
103:15, 106:6,
108:2, 113:17,
113:20, 113:24,
114:11
**virginia**
2:10, 110:25

**virtual**
9:22
**virtually**
2:2, 20:12,
24:25, 64:7
**virtue**
122:8
**voice**
1:4
**voted**
26:18, 26:19,
27:5, 31:2,
31:4, 31:7,
31:11
**voter**
25:21, 26:2,
26:11, 29:22,
34:15, 34:20,
35:6, 36:19,
39:4, 42:7,
42:18, 55:6,
59:11, 59:13,
59:17, 60:4,
60:7, 60:9,
60:13, 60:24,
61:5, 63:3,
64:5, 64:11,
64:16, 65:18,
66:9, 67:1,
67:12, 67:19,
67:20, 71:4,
77:5, 80:24,
82:11, 83:24,
86:5, 86:8,
88:1, 91:5,
91:25, 92:9,
92:13, 92:23,
95:22, 95:25,
96:5, 108:18,
121:18, 125:18,
135:7, 136:13,
143:1, 143:5,
146:21, 150:6,
151:10, 151:22,
152:3, 155:14,
156:3, 156:8,
157:3, 157:19,
158:5, 158:7,

159:2, 159:11, 159:16, 160:2, 160:7, 165:16, 170:1, 170:13, 170:22, 175:15, 180:6, 180:15, 180:16, 180:17, 180:19, 181:18, 181:21

**voter's**
62:16

**voters**
33:24, 35:13, 36:18, 50:17, 53:10, 58:22, 63:24, 64:2, 76:19, 78:17, 79:3, 79:25, 80:4, 80:17, 80:22, 85:18, 88:3, 91:2, 91:15, 112:7, 118:5, 122:7, 125:12, 137:20, 151:7, 153:8, 153:15, 157:2, 157:3, 157:4, 157:7, 157:16, 158:9, 158:13, 162:2, 162:13, 167:12, 168:6, 169:12

**votes**
81:4

**voting**
6:4, 21:1, 25:6, 25:16, 25:18, 25:24, 26:6, 26:23, 33:23, 34:4, 41:21, 42:18, 59:2, 59:8, 59:22, 59:24, 60:3, 60:11, 61:4, 61:7, 62:7, 62:10, 62:11, 62:12, 62:21, 62:22,

63:2, 63:21, 64:22, 65:8, 65:14, 65:20, 66:1, 66:5, 71:22, 74:5, 77:5, 78:6, 81:4, 81:21, 81:22, 82:23, 86:23, 87:6, 90:15, 93:11, 103:15, 106:4, 106:21, 107:25, 108:15, 109:10, 112:3, 113:18, 151:25, 167:11, 176:21, 177:25, 178:1

**vrcs**
39:12, 43:2, 51:19, 52:11, 54:13

**W**

**wait**
50:20, 92:6, 92:9, 155:19, 163:15

**walk**
34:13, 34:18, 53:15, 68:14

**walsh**
3:17

**want**
19:18, 35:5, 41:12, 41:15, 41:17, 61:11, 66:13, 68:2, 68:16, 68:19, 68:21, 74:8, 101:5, 116:15, 116:16, 117:2, 118:10, 125:24, 145:15, 148:3, 148:23, 152:17, 153:13, 160:15, 160:17, 163:25, 167:1, 167:4, 177:20, 179:11,

179:20, 180:9

**wanted**
11:1, 19:19, 31:13, 86:20, 116:2

**wanting**
16:12

**wants**
151:16, 152:3, 153:8, 165:2

**washington**
3:11

**way**
63:18, 65:25, 70:5, 78:4, 89:21, 89:24, 101:21, 115:20, 116:15, 124:23, 133:21, 146:20, 153:8, 153:16, 168:19, 176:9

**ways**
26:15, 46:7, 46:8, 54:11, 69:24, 70:2, 70:25, 157:21

**we'll**
8:13, 9:20, 12:17, 23:2, 23:7, 23:14, 23:15, 23:23, 29:19, 32:14, 42:4, 42:6, 101:3, 173:6

**we're**
8:3, 8:12, 9:22, 49:9, 62:9, 64:20, 66:1, 66:20, 71:1, 73:4, 74:18, 78:18, 80:24, 92:20, 115:7, 117:15, 118:12, 118:15, 119:11, 126:1, 129:17, 149:17, 152:25, 158:6, 160:12, 160:16,

161:6, 162:20, 170:19, 170:20, 172:9, 172:21, 181:11

**we've**
12:9, 61:12, 70:21, 121:7, 122:6, 123:14, 149:13, 152:10

**web**
87:3

**website**
95:7

**wednesday**
1:17

**weeks**
12:9

**welcome**
114:21

**went**
11:5, 123:2, 136:8, 137:4, 137:25, 138:2, 163:22, 164:9, 164:23, 165:2, 165:4, 166:6

**weren't**
16:11, 16:22, 17:10, 76:20, 136:7, 137:6, 156:12, 166:5, 175:25

**wharton**
6:13

**whatever**
12:8, 101:16, 105:18, 105:21, 153:10, 157:14, 161:9, 164:19

**whereas**
81:23, 92:7, 92:25

**whereof**
183:13

**whereupon**
7:2

**whether**
13:20, 26:9,

31:3, 31:7, 33:11, 43:2, 66:5, 66:10, 68:10, 76:6, 93:21, 99:16, 100:11, 102:1, 102:23, 105:24, 116:5, 116:21, 116:24, 117:10, 118:17, 118:25, 120:4, 121:23, 124:7, 126:11, 128:11, 133:15, 135:6, 140:9, 152:11, 153:19, 160:7, 165:6, 168:7

**white**
3:15, 5:4, 15:8, 15:9, 15:11, 41:12, 41:17, 43:8, 43:11, 47:19, 47:21, 49:6, 50:22, 52:25, 54:6, 55:1, 55:19, 57:19, 61:11, 98:2, 98:3, 98:8, 101:13, 118:4, 120:8, 130:8, 166:24, 173:14, 173:19, 173:20, 179:23, 180:2, 180:5, 181:8

**whoever**
179:24

**whole**
7:5, 115:16, 119:1, 134:15, 137:22, 140:4, 163:22

**wide**
113:4, 113:10

**willing**
68:11

**wish**
144:7, 152:15

**within**
33:5, 41:22, 42:9, 54:8, 55:20, 77:13, 86:4, 130:1, 130:6

**without**
62:17, 120:24

**witness**
25:5, 55:18, 173:13, 173:17, 183:13

**wives**
22:11

**woman**
18:3

**women**
18:17

**wondering**
92:21

**word**
179:14

**words**
38:19, 168:4

**work**
11:8, 17:17, 18:20, 19:1, 19:7, 19:22, 22:3, 25:5, 26:14, 53:18, 68:8, 69:19, 69:22, 95:22, 96:4, 113:6, 113:8, 144:6

**worked**
19:17, 24:21

**working**
12:9, 13:3, 20:7, 22:6

**works**
17:20, 50:15, 69:9

**world**
63:17, 63:19

**worries**
98:10, 156:18, 164:5, 173:17

**worse**
111:11

**worth**
63:13

**wouldn't**
14:7, 17:19, 70:22, 82:2, 82:8, 85:6, 85:7, 96:4, 122:1, 122:8, 122:9, 124:6, 127:25, 129:19, 130:4, 137:19, 139:19, 140:1, 150:1, 160:19, 160:23, 161:15, 163:12, 169:19

**wrenwood**
4:5

**written**
10:25, 19:2, 19:5

**wrong**
135:9, 139:15, 147:24, 168:15, 175:25

**wrote**
26:14, 26:16

**wyoming**
106:2, 106:4, 106:8, 106:12, 108:4, 108:6, 110:8, 113:18

**Y**

**yay**
173:13

**year**
131:17, 170:14

**years**
11:20, 32:22, 33:1, 33:5, 44:2, 44:5, 86:11, 111:22, 126:17, 129:21, 130:1, 130:6, 136:23, 142:1, 142:9, 145:1, 164:16

**yellow**
87:22

**yesterday**
13:19

**yourself**
7:16, 115:24, 143:24, 162:15, 174:7

**yup**
49:17, 73:20, 145:20

**Z**

**zoom**
8:12, 10:1, 14:21, 110:16

**zooming**
131:8

**.**

**.1453**
4:8

**.1461**
3:20

**.2200**
3:12

**.26**
6:12

**.36**
96:25

**0**

**002007**
6:2

**002009**
50:9

**00331**
1:7

**025074**
47:18

**07**
182:1

**1**

**1**
30:10, 30:14

**1,000**
153:1

**1,000,096**
153:20

**1,096**
147:21, 149:6,
150:1, 150:7,
150:22, 151:12,
153:20
**1.7**
6:12
**1/7/2026**
130:21
**1/7/26**
15:1
**10**
1:18, 5:21,
31:18, 31:19,
71:6, 93:3,
99:20, 101:24
**10,000**
132:4
**104**
6:7
**105**
6:10
**106**
6:9, 6:11
**11**
5:22, 32:14,
32:15, 103:2,
106:2, 108:12,
112:14
**11,070**
148:13
**1101**
3:10
**1105**
29:24, 30:13
**12**
5:23, 49:3,
72:17, 72:19,
109:3, 109:12,
112:11, 114:20,
120:23, 124:2
**13**
5:24, 6:10,
48:18, 48:19,
56:25, 125:24
**130**
6:12
**14**
3:10, 5:25,

**50:4, 50:5,**
145:13, 145:19,
146:7, 147:19,
148:11, 158:25
**15**
5:12, 6:2,
7:23, 53:24,
53:25, 54:1,
86:11, 97:8,
98:14, 154:2,
179:21, 180:1
**15,886**
148:20
**15.22**
96:25
**15.8**
148:20
**16**
6:3, 15:2,
76:13, 76:14,
111:22, 157:1
**161**
6:13
**17**
6:4, 70:6,
78:4, 95:6,
95:11, 137:11,
155:8, 162:20,
163:3, 165:12,
176:13
**173**
5:4
**17331**
97:23
**18**
6:5, 57:13,
58:11, 58:14,
70:9, 79:22,
96:20, 96:21,
121:16
**180**
5:3
**18176**
52:6
**183**
1:24
**19**
6:6, 104:4,

104:5
**1900**
103:11
**1st**
107:3, 107:20,
131:22, 131:24

---
**2**
---

**20**
6:8, 7:23,
106:9, 106:10,
119:7, 136:23,
141:25, 142:9,
144:25
**2000**
142:2
**20005**
3:11
**2005**
142:3
**2009**
50:19, 101:2
**2010**
107:3, 107:20,
109:14, 109:17,
110:1, 110:9,
110:20, 110:25,
111:5
**2015**
6:3, 44:23
**2017**
110:5
**2019**
39:12, 39:14,
39:15, 103:24,
110:14, 126:10,
126:17, 167:22,
168:1, 169:5,
169:6, 170:5,
170:9, 171:18,
171:20, 172:16
**202.736**
3:12
**2020**
93:8, 110:10,
131:21
**2021**
172:20

**2022**
126:11, 126:13,
126:17, 128:1,
131:22, 131:24,
132:19, 133:17,
143:23, 166:18,
166:22, 167:5,
167:22, 169:5,
169:6, 169:13,
170:5, 170:7,
170:9, 170:14,
171:20, 171:24,
172:21
**2023**
5:25, 49:2,
49:3, 52:22,
142:20
**2024**
21:1, 29:24,
30:13, 31:2,
31:8, 49:24,
110:8, 142:12,
142:17, 142:21,
142:23
**2026**
1:17, 5:24,
15:2, 47:12,
47:17, 52:23,
168:1, 171:18,
183:14
**2029**
183:15
**21**
6:10, 106:16,
106:17, 116:12,
158:4, 161:23
**22**
6:12, 97:8,
98:14, 131:2,
131:3, 162:12
**225.231**
4:8
**225.346**
3:20
**23**
1:7, 5:13,
5:14, 5:15,
6:13, 47:12,

**47:17, 162:8, 162:9**

**26**
158:23, 158:25

**2668**
148:21

**27**
5:16

**28**
5:17

**29**
5:18, 5:19, 56:7, 56:10, 56:17, 56:22, 56:25

**2a**
48:3

**2b**
48:8

---
**3**
---

**3-year**
126:21

**30**
57:13, 96:24, 119:7, 164:16

**31**
5:20, 5:21, 56:17, 58:1, 131:24, 183:15

**32**
5:22, 37:20, 37:22, 38:15, 39:3, 39:22, 40:11

**34**
1:18

**36**
96:24

**36.1**
97:8, 98:14

**39**
74:21

**3:-cv--jwd-sdj**
1:7

**3rd**
131:23

---
**4**
---

**4**
182:1

**40**
132:4

**400**
3:9

**4276**
49:5

**45,994**
132:2

**48**
5:24

---
**5**
---

**5.9**
148:14

**50**
5:25, 86:25, 88:9, 88:19

**51**
56:17

**52**
56:18, 181:16

**54**
6:2

---
**6**
---

**60**
20:9

**600**
19:8

**627513**
1:23

**628**
3:18

**653**
148:15

**69313**
5:23, 41:2

---
**7**
---

**7-**
6:10

**70802**
3:19

**70809**
4:7

**72**
5:23

**75**
132:8

**76**
6:3

**7914**
4:5

---
**8**
---

**8th**
183:14

---
**9**
---

**9,853**
131:25

**95**
6:4

**96**
6:5

**97**
39:11