# EXHIBIT 22

Declaration of Dr. Traci Burch

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| VOICE of the EXPERIENCED, *on behalf of itself and its members*; POWER COALITION for EQUITY and JUSTICE, *on behalf of itself and its members*; *and* LEAGUE of WOMEN VOTERS of LOUISIANA, *on behalf of itself and its members*;<br><br>Plaintiffs,<br>v.<br><br>NANCY LANDRY, *in her official capacity as Secretary of State of Louisiana*,<br><br>Defendant. | Civil No. 3:23-cv-00331-JWD-SDJ |

**DECLARATION OF DR. TRACI BURCH**

Pursuant to 28 U.S.C. § 1746, I, Traci Burch, declare as follows:

1. I am competent to make this declaration.
2. As part of my work on this case, I was asked to update my report from January 27, 2026 with data from more recent ineligible and suspended voter lists. The January 27, 2026 report is attached as Attachment A.
3. I followed the same methodology as in my January 27, 2026 report. First, I estimate the size of the population on probation and parole as of January 2026 who were, as of March 20, 2026 ineligible to vote, eligible to vote, and eligible but subject to the additional paperwork requirement.[1] Then, I distinguish the people who had suspended voter registrations from those who did not, allowing me to compare the two relevant populations.

[1] My estimates of the size of the total ineligible population and the overall size of the population subject to the reinstatement requirements are conservative because I do not have and do not include data on 1) people who are not currently serving time on probation and parole in Louisiana and 2) people serving sentences from other jurisdictions such as federal or out-of-state courts. The files

*Determining Eligibility and Additional Paperwork Requirement*

4. For the first part of the analysis, I relied on three data sources provided by counsel for the Plaintiffs. First, I was provided an Excel file of 45,993 individuals who are currently on probation or parole as of January 7, 2026 "P&P Population as of 1.7.2026.xlsx." ("P&P list").[2] Of these individuals, 43,001 are listed as having an address in Louisiana. Second, I received an Excel file with 184,826 entries representing people who were currently ineligible to vote as of March 20, 2026, "RFP40.txt" ("ineligible list"). I define presence on the ineligible list as not having the right to vote; I do not make my own determinations of eligibility by reviewing individual records. In the file containing ineligible individuals, several people were included more than once; the file contains 45,212 unique Department of Correction (DOC) identification numbers. Third, I received an Excel file with 161,082 entries representing voters with suspended registrations ("suspended list"). To calculate the different categories of eligibility, I attempted to match the 43,001 individuals currently on probation and parole with a Louisiana address first to the list of people on the ineligible list and then to the list of suspended voters. I outline the matching process below.

*Identifying People on the Ineligible List*

5. The first step in the process involves matching individuals on the P&P list to individuals on the ineligible list. This matching procedure was relatively straightforward because both the file containing people on probation and parole and the file containing people who are

---

I was provided on voters suspended for felony convictions contain many more Louisianans than I was able to match to the current probation and parole population.

[2] The list of individuals on probation and parole represents only a fraction of the universe of individuals whose rights may have been restored under law, because individuals may be released from DOC custody without serving time on probation or parole, or may have never served DOC time at all and therefore did not lose their right to vote. Therefore, this analysis represents the *minimum* number of individuals who are eligible to vote despite having a felony conviction.

presently ineligible to vote contained common identifiers such as the DOC identification number, last name, first name, and year of birth. I matched individuals in the two files based on an exact match to the DOC identification number. This matching analysis yielded the number of people who had lost their right to vote, and their right to vote had *not* yet been restored under law because they still appeared on the ineligible list. The individuals who did not appear on the ineligible list, therefore, represent the population whose rights have been restored, regardless of whether their registration had been reinstated.

*Identifying People on the Suspended List*

6. Once the people on the P&P list whose voting rights had been restored had been identified, the next step requires distinguishing the people who had suspended voter registrations from those who did not. To do so, I attempted to match the restored population to the suspended list. Unlike the ineligible list, the suspended list did not contain DOC identification numbers. However, the file did contain the last name, first name, and age of each suspended voter. As with the ineligible voters, I was able to use these common elements in the files to match the community supervised population to the suspended list. I, like several other scholars, routinely have used such protocols to match DOC records to voter files.

7. For the initial round of matching, the method through which most restored individuals were matched to the suspended list, I relied on exact matching: the last name, first name, and the age of individuals had to be the same in both files in order for a person to be marked as having a suspended registration.

8. As mentioned, I used age as one of the matching criteria. However, the suspended list only contains age rather than the exact date of birth, while the P&P list contained the exact date

of birth from which I was able to calculate the individual's age in years. Because I was not sure of the date from which the age was calculated in the suspended list, I accounted for the possibility that there would be discrepancies between the age I calculated and the age listed in the suspended list.[3] I allowed matches to the suspended list when last and first names were an exact match and restored individuals' ages were within one year above or below the listed age in the suspended list.

9. Finally, to account for typographical errors, I attempted to match restored individuals to the suspended list using a final round that matched using the exact last name, exact age, and the first three letters of the first name.

*Results*

10. Table 1 presents the breakdown of the population on community supervision by eligibility status in January 2026 (from the original report) and March 2026.[4] In March, there were 14,336 individuals with a Louisiana address (33.3%) matched from the January P&P List to the March ineligible list that was provided by the DOC. All 14,336 were matched using exact matching to the DOC identification number. This total represents the number of individuals living in Louisiana who are currently on probation and parole whose right to vote has *not* been restored.

11. Also shown in Table 1, 28,665 individuals (66.6%), were *not* matched to the March ineligible list ("eligible population"). This final number contains known Louisiana

[3] Meredith, Marc, and Michael Morse. "The politics of the restoration of ex-felon voting rights: The case of Iowa." *Quarterly Journal of Political Science* 10 (2015): 41-100.
[4] Because I was provided only updated ineligible and suspended lists, I could not update all of the information contained in my original report. Instead, I was able to update only the number of people still ineligible and suspended as of March 2026.

residents who are currently on probation and parole whose right to vote *has* been restored. This figure is comparable to that estimated by Dr. White in 2023 ("nearly 30,000").[5]

12. Of the 28,665 restored individuals with Louisiana addresses, I matched 8,880 (31.0% of the eligible population) to the suspended list, meaning that these people would need to provide additional documentation from a corrections officer to reinstate their registration. 8,442 of individuals were matched to the suspended list by matching for last name, first name, and age ±1 year. The remaining 438 were matched to entries using the exact last name, exact age, and first 3 letters of the first name.

13. The remaining 19,785 (69.0%) restored individuals with Louisiana addresses were not matched to the March suspended list, meaning that they should not need to provide further documentation from a corrections officer to register to vote.

14. There is a racial disparity in eligibility and the additional paperwork for reinstatement. Black voters are 60.4% of the ineligible population and 35.7% of Black people on community supervision were ineligible to register as of March 2026 compared with 30.7% of White people on community supervision. Among the eligible population, Black people are 58.5 percent of the population that is subject to the additional paperwork requirement; 33.3% of Black people on community supervision must reinstate their registration in order to vote, compared with 28.7% of White people.

15. *Table 1: Results of Matching Analysis to Ineligible and Suspended Voter Lists. Includes people on community supervision with Louisiana addresses only.*

| **Status** | **January 2026** | | **March 2026** | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| **Matched to Ineligible List[6]** | **15,045** | **35.0** | **14,336** | **33.3** |

[5] Plaintiff's Exhibit 19: Voice of the Experienced, Dr. Ariel White. 2023. "No Surrender, No Retreat! Removing Barriers to the Ballot Box for Formerly Incarcerated People in Louisiana."
[6] Matched using DOC identification number.

| | | | | | |
|---|---|---|---|---|---|
| **Not Matched to Ineligible List[7]** | | **27,956** | **65.0** | **28,665** | **66.6** |
| | *Matched to Suspended List[8]* | *8,534* | *30.5* | *8,880* | *31.0* |
| | *Not Matched to Suspended List[9]* | *19,422* | *69.5* | *19,785* | *69.0* |
| **Total** | | **43,001** | **100** | **43,001** | **100** |

16. I reserve the right to continue to supplement this report upon receiving additional facts, testimony and/or materials that may come to light. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Dated: July 22, 2026

Traci Burch

[7] Matched using DOC identification number.
[8] Matched using exact matching of last name, first name, and age; exact matching of last name, first name and age ± 1 year; or exact matching of last name, age, and first three letters of the first name.
[9] Matched using exact matching of last name, first name, and age; exact matching of last name, first name and age ± 1 year; or exact matching of last name, age, and first three letters of the first name.

# ATTACHMENT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| VOICE of the EXPERIENCED, *on behalf of itself and its members*; POWER COALITION for EQUITY and JUSTICE, *on behalf of itself and its members*; *and* LEAGUE of WOMEN VOTERS of LOUISIANA, *on behalf of itself and its members*;<br><br>Plaintiffs,<br>v.<br><br>NANCY LANDRY, *in her official capacity as Secretary of State of Louisiana*,<br><br>Defendant. | Civil No. 3:23-cv-00331-JWD-SDJ |

**EXPERT REPORT OF DR. TRACI BURCH**

**BACKGROUND AND QUALIFICATIONS**

I am a Professor of Political Science at Northwestern University and a Research Professor at the American Bar Foundation. I also serve as Editor-in-Chief of *Law and Social Inquiry*, a peer-reviewed law and social science journal. I received my Ph.D. in Government and Social Policy from Harvard University.

I have led several large, long-term quantitative and qualitative research projects on political participation in the United States. I have participated in and coauthored several book chapters and articles that examine race, political participation, and inequality, and I am widely regarded as an expert on political behavior, barriers to voting, race and politics, and political participation. My work has been widely cited and replicated and has won several awards. I have received several grants for my work. I routinely review the work of my peers for tenure, promotion, scholarly journals, university presses, and grants and have served as a reviewer for the American Political Science Review, The American Journal of Political Science, The Journal of Politics, Political Behavior, the National Science Foundation, Cambridge University Press, Princeton University Press, the University of Chicago Press, Oxford University Press, Science Advances, and many other entities.

I am the author of several books and articles examining voter turnout and political participation, race and ethnic politics, and criminal justice using multiple methods. In particular, my articles "Did Disfranchisement Laws Help Elect President Bush? New Evidence on the Turnout and Party Registration of Florida's Ex-Felons" and "Turnout and Party Registration among Criminal Offenders in the 2008 General Election," which appeared in the peer-reviewed journals Law and Society Review and Political Behavior, respectively, included my calculations of felony disenfranchisement and voter turnout among people with felony convictions. My academic book on the community-level effects of criminal convictions on political participation, *Trading Democracy for Justice*, was published by the University of Chicago Press and also won multiple national awards from the American Political Science Association and its sections, including the Ralph J. Bunche Award for the best scholarly work that explores the phenomenon of ethnic and cultural pluralism and best book awards from the law and politics and urban politics sections. *Trading Democracy for Justice*, along with many of my articles, relies on the analysis of large criminal justice and voter registration data files.

In addition to my published work, I have conducted analyses of legal financial obligations, re-registration after felony convictions and barriers to voting as an expert witness. I have testified in cases involving *Arlington Heights* and the Senate Factors under Section 2 of the Voting Rights Act. I have also testified before the U.S. Commission on Civil Rights about the collateral consequences of felony convictions with respect to voting and other issues.

Several of these projects have involved conducting research on voting after a felony conviction. I examined voting among people with felony convictions and people who live near people with felony convictions in my book *Trading Democracy for Justice*, as well as for several articles published in peer-reviewed journals. I have testified in several court cases regarding voting after a felony conviction. I also have testified in redistricting cases in federal district court in Louisiana.

My curriculum vitae is provided in the appendix. I am being compensated at the rate of $350 per hour for work in this case, plus expenses. My compensation does not depend on the opinions I render. My prior expert engagements are set forth in my CV. In all cases where an opinion was issued, the courts admitted me as an expert.

## SCOPE OF REPORT

I was asked by counsel for the plaintiffs to assess whether requiring additional paperwork to register to vote after a felony conviction poses a barrier to voting as best understood under applicable principles in political science. I was also asked to estimate the number and proportion of people whose registrations are currently suspended, including those currently on probation or parole in Louisiana who are eligible to vote who would need to provide additional paperwork to register to vote beyond a valid voter registration form because they are in suspended status according to the Louisiana Secretary of State. To address these issues, I review the literature in political science and related disciplines and analyze data from the state of Louisiana using sources and methods that are widely accepted in my field.

## OPINIONS OFFERED

- Administrative requirements pose barriers to voter registration due to the information, compliance, and psychological costs associated with fulfilling those requirements. People with lower socioeconomic status will find these costs more difficult to overcome.

- According to previous research, in general, people with felony convictions who were registered to vote prior to their convictions re-register to vote at higher rates post-conviction than people who were not registered prior to their convictions, all other factors being equal.

- Unlike the relationship documented uniformly in previous studies of other states, for Louisiana, I find that the relationship between pre- and post-conviction registration is reversed: people subject to the additional administrative barrier *because they were registered to vote prior to their convictions* have lower post-conviction voter registration rates than people who were not registered prior to their convictions (who were not subject to the additional requirements).

- In Louisiana, 65.0% of people serving a felony sentence in the community on probation and parole who had a Louisiana residential address as of January 2026 (27,956 people) were not disenfranchised. (“restored population”).

- 30.5% of this restored population on probation or parole still would need to provide additional documentation to vote under the Secretary of State’s current policy (8,534 “suspended individuals”).

- There are racial disparities with respect to both eligibility and the registration process: Black people on community supervision are more likely to be ineligible for restoration than White people (37.2% vs 32.4%), and Black people on community supervision are

more likely to have to submit additional documentation to vote than White people (33.1% vs. 28.0%). Black people on community supervision also are more likely than White people ever to have been subject to the additional documentation requirement (41.5% vs 37.9%).

- Among the population on community supervision with felony convictions as of January 2026 who were never on the suspended voter list, 15.8% were registered to vote as of November 14, 2025. Among the population on community supervision for felony convictions as of January 2026 who were currently or previously on the suspended voter list, only 5.9% were registered to vote. Again, based on estimates from other states, the expectation is that post-conviction registration among people who were registered to vote prior to their convictions would be much higher than that of people who were not registered prior to their convictions.

- These disparities between people who have been subject to the additional paperwork requirement and those who have not also can be found within racial, age, and gender subgroups as well.

## INTRODUCTION

In Louisiana, people with felony convictions are ineligible to vote while "under an order of imprisonment." La. R.S. § 18:102(A)(1)(a). However, individuals still under an order of imprisonment are eligible to register and vote if they have "not been incarcerated pursuant to the order within the last five years." La. R.S. § 18:102(A)(1)(b). In other words, individuals with felony convictions are eligible to vote if they 1) never served time in prison, 2) have been released from prison and are no longer under an order of imprisonment, such as being on parole, or 3) have been on parole post-release for five years or more. Individuals convicted for election fraud or other election offenses also are ineligible to register to vote until they have been fully discharged from prison, probation, or parole.[1]

As such, many people with past convictions have the right to vote. However, people who were previously registered to vote before their conviction may have had their voter registration placed in suspended status as a result of that conviction. For these "suspended voters," the Secretary of State provides the following instructions:

> To reinstate your voter registration that was suspended for a felony conviction, you must appear in person at the registrar of voters office and provide documentation from the appropriate correction official showing that you are no longer under an order of imprisonment or, if under such order of imprisonment, that you have not been incarcerated pursuant to the order within the last five years and that you are not under an order of imprisonment related to a felony conviction for election fraud or any other election offense.
>
> The personal appearance requirement does not apply to a person approved as eligible for

[1] La. R.S. § 18:102(A)(1)(c); Louisiana Secretary of State. "Register to Vote." Available online https://www.sos.la.gov/ElectionsAndVoting/RegisterToVote/Pages/default.aspx. Accessed 12 Sep 2023.

the Special Program for Handicapped Voters prior to January 1, 2010, or a person who has submitted to the registrar a current proof of disability from a physician as described in La R.S. 18:177(A)(2)(6).[2]

These instructions for "reinstatement" back onto the voter rolls do not apply to people who have the right to vote but who were *not* registered to vote in Louisiana before their convictions (because they would be "first time registrants"). Because they were not registered prior to their conviction and thus there was no registration record to "suspend," they are *not* in suspended status and therefore do not need to provide documentation from a correction official and do not need to appear in person to register to vote.

For this report, I will review the literature in political science and other fields with respect to administrative barriers and voting participation. As I will show, past researchers have found that administrative hurdles, especially those related to re-registering after a felony conviction, reduce voting participation. Importantly, previous research also shows that people who were registered to vote before their felony conviction generally are more likely to re-register to vote after they have served their time. Next, I will analyze data provided by the State of Louisiana to estimate the size of the population that was previously registered and thus will be subject to the paperwork requirement. Also, I will estimate the population that should not be subject to the paperwork requirement. Finally, to look at the impact of the additional paperwork requirement, I will compare the voter registration rates of the group subject to the requirement with those who have not been subject to the requirement. As I will show, in Louisiana, voter registration is higher among people who were *not* registered prior to their convictions and thus were not subject to the additional paperwork requirement than among people who have to complete additional paperwork because they were registered to vote pre-conviction and whose registration is thus "suspended." This pattern is the *opposite* of what researchers found in other states, where people who were registered to vote pre-conviction are much more likely to register post-conviction. I opine that this unusual relationship, whereby people with the most interest and experience with voting register to vote at lower rates than people who had not demonstrated interest in electoral participation in the past, is evidence of the barriers posed by the administrative requirement.

## LITERATURE REVIEW

Although people with felony convictions tend to vote less than similar individuals who have not been convicted of crimes, it is clear from several studies that many do participate in the electoral process when they have the opportunity. Overall, as I will discuss below, most analysts have measured post-conviction voter registration at 30-40% in presidential election years in states in which voter registration is automatically restored when an individual is once again eligible to vote.[3] Registration rates are higher among certain subgroups: voting was more

[2] Louisiana Secretary of State. "Frequently Asked Questions." Available online https://www.sos.la.gov/ElectionsAndVoting/RegisterToVote/FrequentlyAskedQuestions/Pages/default.aspx?OwnershipName=RegisterToVote&faqid=0. Accessed 27 Jan 2026.

[3] Burch, Traci. "Turnout and party registration among criminal offenders in the 2008 general election." *Law & Society Review* 45, no. 3 (2011): 699-730.; Meredith, Marc, and Michael Morse. "The politics of the restoration of ex-felon voting rights: The case of Iowa." *Quarterly Journal of Political Science* 10 (2015): 41-100.

common among older and more educated people, for example.[4] Restoring voting eligibility automatically rather than requiring additional steps before a person can register and notifying people that their rights have been restored also can increase voting participation.[5]

To establish a baseline expectation for post-conviction registration, I compiled research into voting participation rates among people who have finished serving felony sentences in states with automatic restoration in Table 1.[6] Registration rates vary across these states; however, in the three closest southern states with automatic restoration, voter registration rates among people who have finished serving felony sentences was 34.5% in Georgia, 35.1% in Missouri, and 41.3% in North Carolina.

*Table 1: Post Sentence Voter Registration Rates among People with Felony Convictions in States with Automatic Restoration*

| **State** | **Year** | **Registration Rate** | **Population** | **State Rule** |
|---|---|---|---|---|
| Iowa[7] | 2008 | 29.1% | All years | Automatic restoration |
| Georgia[8] | 2008 | 34.5% | Males, all years | Automatic restoration |
| Michigan[9] | 2008 | 58.9% | Males, all years | Automatic restoration |
| Missouri[10] | 2008 | 35.1% | Males, all years | Automatic restoration |
| North Carolina[11] | 2008 | 35.3% | Males, all years | Automatic restoration |
| Connecticut | 2012 | 37.4% | Discharged 2009-2012 | Automatic restoration |
| Maine[12] | 2012 | 39.1% | Discharged 2009-2010 | No disfranchisement |
| Rhode Island[13] | 2012 | 43.3% | Discharged 2009-2010 | Automatic restoration |
| North Carolina[14] | 2012 | 41.3% | Discharged 11/2004-9/2008 | Automatic restoration |
| New York[15] | 2013 | 32.4% | Discharged 11/2008-9/2012 | Automatic restoration |

4 Burch 2011.
5 Meredith and Morse 2015; Meredith, Marc, and Michael Morse. "Do voting rights notification laws increase ex-felon turnout?." *The ANNALS of the American Academy of Political and Social Science* 651, no. 1 (2014): 220-249.
6 In each study, registration rates were calculated by matching lists of people discharged from supervision for felony convictions with voter registration lists. There are some key differences among the states. For instance, the Iowa entry contains the brief window during which the state switched to automatic restoration from having an application process.
7 After previously requiring applications. See Meredith and Morse 2015, 60.
8 Burch 2011, 716.
9 Burch 2011, 716.
10 Burch 2011, 716.
11 Burch 2011, 716.
12 Meredith and Morse 2015, 72.
13 Meredith and Morse 2015, 72.
14 Meredith and Morse 2014, 234.
15 Meredith and Morse 2014, 230.

| | | | | |
|---|---|---|---|---|
| New Mexico[16] | 2009 | 25.6% | Discharged 11/2004-9/2008 | Automatic restoration |

*Re-registration Drives Post Conviction Voting*

Who registers to vote after serving a felony sentence? Political scientists understand electoral participation as a function of whether the benefits of voting outweigh the costs.[17] Similar to people who have not been convicted of a crime, people with felony convictions who are older, more educated, and more residentially stable are more likely to vote.[18] Political scientists also have found that voting can be habit-forming: people who have participated in the electoral process in the past are more likely to do so in the future.[19] Based on these observations, then, we would expect that past voters would be more likely to re-register after a felony conviction than people who had not previously voted.[20]

In line with the theoretical expectations, several empirical studies support the notion that the majority of people who register post-conviction also were registered to vote before their convictions. Studies that compare pre-and post-conviction registration rates in automatic restoration states typically find only small differences in pre- and post-conviction voting, suggesting that previous voters are coming back to the polls when they can even after experiencing incarceration and other punishments.[21] Moreover, several researchers have shown directly that the rates of registration after conviction between people who were previously registered and those who were never registered are large and statistically significant. Haselswerdt (2004) finds that 25% of the people who were previously registered to vote in his sample had re-registered in the months since they regained their eligibility, compared with only 6% of people

---

[16] Meredith and Morse 2014, 232.

[17] Riker, William H., and Peter C. Ordeshook. "A Theory of the Calculus of Voting." *American political science review* 62, no. 1 (1968): 25-42.

[18] See Verba, Sidney, Kay Lehman Schlozman, and Henry E. Brady. *Voice and equality: Civic voluntarism in American politics*. Harvard University Press, 1995; See also Smets, Kaat, and Carolien Van Ham. "The embarrassment of riches? A meta-analysis of individual-level research on voter turnout." *Electoral studies* 32.2 (2013): 344-359.

[19] Green, Donald P., and Ron Shachar. "Habit formation and political behaviour: Evidence of consuetude in voter turnout." *British Journal of Political Science* 30, no. 4 (2000): 561-573. Plutzer, Eric. "Becoming a habitual voter: Inertia, resources, and growth in young adulthood." *American political science review* 96, no. 1 (2002): 41-56. Gerber, Alan S., Donald P. Green, and Ron Shachar. "Voting may be habit-forming: evidence from a randomized field experiment." *American journal of political science* 47, no. 3 (2003): 540-550. Coppock, Alexander, and Donald P. Green. "Is voting habit forming? New evidence from experiments and regression discontinuities." *American Journal of Political Science* 60, no. 4 (2016): 1044-1062.

[20] Scholars also argue that the persistence of voting habits over time is a function of both the act of participating itself, but also of the over-time persistence of factors that encourage voting such as socioeconomic status.

[21] Gerber, Alan S., Gregory A. Huber, Marc Meredith, Daniel R. Biggers, and David J. Hendry. "Does incarceration reduce voting? Evidence about the political consequences of spending time in prison." *The Journal of Politics* 79, no. 4 (2017): 1130-1146.

who had never registered before their conviction.[22] In Haselswerdt's study, previously-registered people made up the majority of post-conviction registrants overall: 71% of the people who were registered in the months post-conviction also had been registered previously.[23] Other, larger studies find positive, statistically significant effects of pre-conviction voting participation on post-conviction voting participation, meaning that individuals who were registered previously were more likely to be registered post-conviction than people who were not registered prior to their convictions.[24]

Based on the work of Haselswerdt, Meredith and Morse, and others, one should expect to see a large advantage in post-release registration for people who were registered previously compared with people who were not. In other words, *if the Louisiana reinstatement requirement for "suspended" voters to submit documentation did not pose a barrier to registration, we should expect there to be a large registration gap in favor of people who were previously registered relative to those who were not previously registered (and therefore not subject to the extra steps involved in obtaining and presenting documentation in-person).*

*Requiring Additional Steps Hinders Voting Rights Restoration*

In Louisiana, someone whose right to vote has been suspended because of a felony conviction regains the right to vote once they are no longer under an order of imprisonment, or, if still under such an order, has not been incarcerated pursuant to it in the last five years. La. R.S. § 18:102(A). However, as described previously, certain people must submit paperwork verifying their eligibility in person before they are able to reinstate their registration and vote. Research shows that requiring people with felony convictions to complete additional steps in addition to registration can impede voting among this group. For example, Meredith and Morse found that in Iowa, removing the requirement that individuals must apply for restoration prior to registering in favor of automatic voter restoration increased voter registration and turnout.[25] They write:

> Our findings suggest that application requirements in lifetime disenfranchisement states prevent a sizable number of ex-felons from voting. We show that requiring applications reduced ex-felon turnout in Iowa by about 10 p.p. A similar application process is currently active in a number of states, including Alabama, Florida, Kentucky, Mississippi, and Tennessee. Uggen et al. (2012) estimate that more than 2,000,000 exfelons are disenfranchised in these five states, which suggests that about 200,000 more ex-felons would vote if these application requirements were eliminated.[26]

---

[22] Haselswerdt, Michael V. "Con Job: An Estimate of Ex-Felon Voter Turnout Using Document-Based Data." *Social Science Quarterly* 90, no. 2 (2009): 262-273.
[23] Haselswerdt 2009.
[24] Gerber et al. 2017; Morris, Kevin. "Welcome home—Now vote! Voting rights restoration and postsupervision participation." *Social Science Quarterly* 102, no. 1 (2021): 140-153; Gerber, Alan S., Gregory A. Huber, Marc Meredith, Daniel R. Biggers, and David J. Hendry. "Can incarcerated felons be (Re) integrated into the political system? Results from a field experiment." *American Journal of Political Science* 59, no. 4 (2015): 912-926.
[25] Meredith and Morse 2015.
[26] Meredith and Morse 2015: 76-77.

Meredith and Morse argue that in states that require additional steps in addition to registration, people with felony convictions are less likely to vote than in other states that do not have these requirements.

Requiring additional documents or other administrative steps can reduce voting because they impose additional costs on claiming benefits. Rational choice theory posits that individuals choose to participate in or abstain from politics based on whether they believe the benefits they receive from participation will outweigh the associated costs of activity.[27] Most acts of participation are costly in that the tasks of acquiring political information, attending meetings, registering, or donating to campaigns require time and money.[28] The literature shows that voters are sensitive to the imposition or easing of the costs of voting.[29]

The scholarly literature identifies three types of costs associated with administrative processes: learning costs, psychological costs, and compliance costs.[30] Learning costs are the costs associated with acquiring information about a program, such as its existence and eligibility. Psychological costs are associated with negative emotional consequences of a policy, such as stress, stigma, or disempowerment. Compliance costs are those associated with the time, effort, and financial costs of meeting administrative demands. Louisiana's process for reinstatement imposes information, compliance, and psychological costs that make it difficult for people to regain their voting rights.

*Information Costs*

Scholars have found that lack of information prevents voting after a felony conviction. Researchers have found that people who have finished serving their time and are eligible to

---

[27] Riker and Ordeshook 1968.

[28] Verba, Schlozman, and Brady 1995.

[29] For example, experiencing administrative burdens such living far away from polling places, changing polling places and other disruptions, and other seemingly small problems can measurably decrease the likelihood of voting under certain circumstances. See Haspel, Moshe, and H. Gibbs Knotts. "Location, location, location: Precinct placement and the costs of voting." *The Journal of Politics* 67, no. 2 (2005): 560-573; Dyck, Joshua J., and James G. Gimpel. "Distance, turnout, and the convenience of voting." *Social Science Quarterly* 86, no. 3 (2005): 531-548; Brady, Henry E., and John E. McNulty. "Turning out to vote: The costs of finding and getting to the polling place." *American Political Science Review* 105, no. 1 (2011): 115-134. Several studies also have shown that registration requirements generally decrease voter turnout, and studies show that more restrictive administrative burdens involved with registration, such as closing dates, have even greater impact. See Burden, Barry C., and Jacob R. Neiheisel. "Election administration and the pure effect of voter registration on turnout." *Political Research Quarterly* 66, no. 1 (2013): 77-90; Highton, Benjamin. "Voter registration and turnout in the United States." *Perspectives on Politics* 2, no. 3 (2004): 507-515.

[30] Moynihan, Donald, Pamela Herd, and Hope Harvey. "Administrative burden: Learning, psychological, and compliance costs in citizen-state interactions." *Journal of Public Administration Research and Theory* 25, no. 1 (2015): 43-69; Selin, Jennifer L. "The best laid plans: How administrative burden complicates voting rights restoration law and policy." *Mo. L. Rev.* 84 (2019): 999.

register believe, often mistakenly, that they cannot vote.[31] These mistaken beliefs may result from misinformation: state agencies often give out incorrect information about voting eligibility after a felony conviction.[32]

There is some evidence that Louisiana agencies have given out incorrect information to people seeking to register post-conviction. I reviewed a report and underlying survey data of Louisiana registrars undertaken by Voice of the Experienced, one of the plaintiffs in this case.[33] The survey involved calling registrars asking four questions about the process for registration.[34] The study found that registrars in several parishes gave incorrect information with respect to the eligibility of people to register while they were currently on probation or parole.[35] Further, registrars often gave incorrect answers with respect to the requirement to provide additional documentation of felony status:

> The majority of responding parishes stated incorrectly that all people with convictions seeking to register and vote are required to take additional steps, including obtaining documentary proof of eligibility from the Department of Corrections and bringing that document in person to the registrar's office in order to register to vote. Only one registrar correctly stated the Secretary of State's current position on this paperwork requirement: Those who are "suspended" voters must bring in the paperwork, but "new registrants" do not have to bring in the paperwork.[36]

These findings are in line with those found in other audit studies of registrars.[37]

More complex rules with respect to eligibility and process also may engender confusion, especially because people convicted of felonies are less likely to have graduated from high school than people without felony records.[38] Navigating a complex system of eligibility rules and requirements can be difficult. As Zhang writes:

---

[31] Drucker, Ernest, and Ricardo Barreras. "Studies of voting behavior and felony disenfranchisement among individuals in the criminal justice system in New York, Connecticut, and Ohio." *The Sentencing Project* (2005). Sugie, Naomi F., Juan R. Sandoval, Daniela E. Kaiser, Delaney Mosca, Kyle Winnen, Emily Rong Zhang, and Iris H. Zhang. "Accessing the right to vote among system-impacted people." *Punishment & Society* 26, no. 4 (2024): 711-731.
[32] Ewald, Alec. *A Crazy-Quilt of Tiny Pieces: State and Local Administration of American Criminal Disenfranchisement Law*. Sentencing Project, 2005; Allen, Jessie. "Documentary disenfranchisement." *Tul. L. Rev.* 86 (2011): 389.
[33] Plaintiff's Exhibit 19: Voice of the Experienced, Dr. Ariel White. 2023. "No Surrender, No Retreat! Removing Barriers to the Ballot Box for Formerly Incarcerated People in Louisiana."
[34] PL0231 (Voice of the Experienced & White 2023: 7).
[35] PL0231-PL0232 (Voice of the Experienced & White 2023: 7-8).
[36] PL0232 (Voice of the Experienced & White 2023: 8).
[37] Ewald (2005); White, Ariel R., Noah L. Nathan, and Julie K. Faller. "What do I need to vote? Bureaucratic discretion and discrimination by local election officials." *American Political Science Review* 109, no. 1 (2015): 129-142.
[38] Uggen, Christopher, Jeff Manza, and Melissa Thompson. "Citizenship, democracy, and the civic reintegration of criminal offenders." *The Annals of the American Academy of Political and Social Science* 605, no. 1 (2006): 281-310.

> The complexity of disenfranchising and re-enfranchising conditions requires voters to apply a complicated set of facts to a confusing set of laws. In other words, they are asked to act like lawyers. This puts an immense burden on voters not only to be aware of the legal requirements of the state in which they are eligible to vote but also to be competent in applying those requirements to their own distinctive situations. How well voters will navigate this process depends on their access to both factual and legal information, their appetite for risk, and their desire to vote.[39]

The reinstatement requirements in Louisiana, in which people have to complete additional steps based on whether they were registered in the past, add another layer of complexity that potential voters must navigate.

*Compliance Costs*

The literature is clear that administrative costs decrease benefit uptake. In particular, compliance costs that stem from "verification extremism," or requiring applicants to meet large numbers of requirements to prove their eligibility for a program, can lead to the erroneous denial of benefits, lengthy delays, and even invasions of privacy.[40] Some administrative requirements may be expensive, difficult, or impossible to meet. Requirements that involve the submission of government forms such as birth certificates or payment receipts may prevent registration to the extent that those documents are expensive to obtain or otherwise unavailable. Likewise, several studies, discussed below, show that requiring too much paperwork, in-person meetings and invasive interviews might discourage program participation even among eligible individuals.

Several studies have shown that benefit uptake is reduced by bureaucratic red tape. For instance, 61% of eligible nonparticipants in the Food Stamp program listed administrative barriers related to applying or participating in the program as factors in their decision not to participate.[41] These included hurdles such as too much paperwork, transportation problems, or time away from work. Medicaid participation also is shaped by the administrative burden; take up is higher in states that "required fewer questions, required lower expense reporting burden, and did not require an interview" to receive benefits.[42] Uptake for the State Children's Health Insurance Program among eligible families was shown to be influenced by the requirement for a

[39] Zhang, Emily Rong. "New Tricks for an Old Dog: Deterring the Vote Through Confusion in Felon Disenfranchisement." *Mo. L. Rev.* 84 (2019): 1037.

[40] Casey, Timothy J., and Mary R. Mannix. "Quality control in public assistance: Victimizing the poor through one-sided accountability." *Clearinghouse Rev.* 22 (1988): 1381.

[41] Bartlett, Susan, Nancy R. Burstein, and Margaret S. Andrews. "Food Stamp Program access study [electronic resource]." https://www.ers.usda.gov/webdocs/publications/43380/30621_efan03013-2c_002.pdf?v=5316.4 (2004); 27.

[42] Moynihan, Donald P., Pamela Herd, and Elizabeth Ribgy. "Policymaking by other means: Do states use administrative barriers to limit access to Medicaid?" *Administration & Society* 48, no. 4 (2016): 497-524; 510.

face-to-face interview.[43] Closing Social Security offices increases application costs such as travel and wait times and has been shown to reduce program uptake.[44]

Louisiana's reinstatement policy imposes costs on people who were previously registered to vote that have been shown to reduce program uptake among eligible beneficiaries in other contexts. Not only does the state require individuals to obtain documentation from the department of corrections, the state also requires people to submit those forms in person to have their registration reinstated. In contrast, people who have not registered before may register simply by completing the voter registration form and submitting it online, by mail, or in person, without needing to provide any additional documentation regarding their felony status in person.

*Psychological Costs*

Threatened or actual arrests or prosecutions can impose significant costs on voting by causing voters stress, embarrassment, fear, and even the loss of freedom. Voter intimidation demobilizes voters by imposing very high costs on participation. [45] A threat, such as arrest for outstanding warrants or voting illegally, imposes costs on the voters who experience them.

A growing body of evidence suggests that high-profile prosecutions are deterring people with felony convictions from voting, even though they are eligible. The psychological costs are exacerbated by prominent examples of prosecutions for voting after a felony conviction, especially when the evidence suggests that the individuals who voted, or attempted to vote, were unaware that they were not eligible to do so or had received information from state officials that indicated that they were eligible to vote. Prosecuting people for making mistakes, especially given the confusing nature of eligibility in the wake of a felony conviction, can discourage voter registration.

In focus groups of people with felony convictions, respondents describe fear of arrest or prosecution as a deterrent to voting, even though they are eligible under the laws of their state. High-profile prosecutions are driving some of this fear. Sugie et al. found:

> Beyond eligibility, participants often invoked punitive practices of other states, expressing concern about the criminal consequences of voting if ineligible. During a focus group in Ohio, Sheri, a 66-year-old Black woman, referenced Crystal Mason, who was convicted of voting while ineligible in Texas: "[People think] they gonna get arrested, or they're gonna feel something's gonna happen." Darren, a 41-year-old Black man in California, noted this, too: "They tell you, if you [are] not supposed to vote, you know, you can get locked up for voter fraud."

---

[43] Wolfe, Barbara, and Scott Scrivner. "The devil may be in the details: how the characteristics of SCHIP programs affect take-up." *Journal of Policy Analysis and Management: The Journal of the Association for Public Policy Analysis and Management* 24, no. 3 (2005): 499-522.
[44] Deshpande, Manasi, and Yue Li. "Who is screened out? Application costs and the targeting of disability programs." *American Economic Journal: Economic Policy* 11, no. 4 (2019): 213-48.
[45] Rauschenbach, Mascha, and Katrin Paula. 2019. "Intimidating voters with violence and mobilizing them with clientelism." *Journal of Peace Research* (56.5): 682-696; 684. Riker and Ordeshook 1968: 27.

> This statement prompted agreement from others in the focus group, one calling this explanation "ordinary."[46]

Again, confusion coupled with high penalties for mistakes can make voting feel too risky, even for people who are eligible to do so.

People also may hesitate to initiate contact with criminal justice authorities, such as probation and parole officers. Fear of adverse consequences such as prosecution or rearrest can have a chilling effect on benefit uptake, largely through the mechanism of system avoidance. System avoidance refers to the act of avoiding formal institutions out of fear of surveillance or apprehension by authorities.[47] System avoidance due to fear of adverse consequences has been shown to affect benefit uptake across several domains, many of which involve essential needs such as food, medical care, and safety. Numerous studies have shown how people with previous experiences with police and other authorities, especially racial and ethnic minorities, undertake behavior designed to avoid further unnecessary contact with the criminal justice system.[48]

*Summary*

Previous researchers have found that after serving their time, between 30% and 40% of eligible people with felony convictions eventually register to vote. Typically, post-conviction registration is driven by people who were registered to vote prior to their convictions. However, administrative barriers that impose information, compliance, and psychological costs on voters diminishes registration. Louisiana's requirement that people who were registered to vote prior to their convictions acquire a voter certificate or other documentation and submit it in person is similar to barriers that have been shown to reduce program participation in other contexts. Although people who were registered prior to their convictions are expected to register and vote at higher rates post-conviction than people who were not, the imposition of these additional barriers may eliminate this advantage.

## METHODOLOGY

To estimate the number of people who might be subject to the additional paperwork requirement and the extent to which this additional requirement burdened voter registration, I undertake two analyses. First, I estimate the size of the population on probation and parole as of January 2026 who were ineligible to vote, eligible to vote, and eligible but subject to the additional paperwork requirement. Second, to look at the effect of the additional paperwork on voting, I estimate and compare the voter registration rates for those eligible voters currently on

---

[46] Sugie, et al. 2024.

[47] Brayne, Sarah. 2014. "Surveillance and System Avoidance: Criminal Justice Contact and Institutional Attachment." *American Sociological Review*, *79*(3), pp.367-391.

[48] Stuart, Forrest. "Becoming 'copwise': Policing, culture, and the collateral consequences of street-level criminalization." *Law & society review* 50, no. 2 (2016): 279-313; Jones, Nikki. "'The regular routine': Proactive policing and adolescent development among young, poor black men." *New directions for child and adolescent development* 2014, no. 143 (2014): 33-54.

probation and parole who have been subject to the additional paperwork requirement to reinstate their voting rights and those have never been subject to the requirement.[49]

*Determining Eligibility and Additional Paperwork Requirement*

For the first part of the analysis, I relied on three data sources provided by counsel for the Plaintiffs. First, I was provided an Excel file of 45,993 individuals who are currently on probation or parole as of January 7, 2026 "P&P Population as of 1.7.2026.xlsx." ("P&P list").[50] 43,001 of these individuals are listed as having an address in Louisiana. Second, I received an Excel file with 193,461 entries representing people who were currently ineligible to vote as of January 2026, "RFP38.txt" ("ineligible list"). I define presence on the ineligible list as not yet having the right to vote as of the date of the list; I do not make my own determinations of eligibility by reviewing individual records. In the file containing ineligible individuals, several people were included more than once; the file contains 46,090 unique Department of Correction (DOC) identification numbers. Third, I received an Excel file with 161,217 entries representing voters with suspended registrations ("suspended list"). To calculate the different categories of eligibility, I attempted to match the 43,001 individuals currently on probation and parole with a Louisiana address first to the list of people on the ineligible list and then to the list of suspended voters. I outline the matching process below.

*Identifying People on the Ineligible List*

The first step in the process involves matching individuals on the P&P list to individuals on the ineligible list. This matching procedure was relatively straightforward because both the file containing people on probation and parole and the file containing people who are presently ineligible to vote contained common identifiers such as the DOC identification number, last name, first name, and year of birth. I matched individuals in the two files based on an exact match to the DOC identification number. This matching analysis yielded the number of people who had lost their right to vote, and their right to vote had *not* yet been restored under law because they still appeared on the ineligible list. The released individuals who did not appear on the ineligible list, therefore, represent the released population whose rights have been restored, regardless of whether their registration had been reinstated.

*Identifying People on the Suspended List*

Once the people on the P&P list whose voting rights had been restored had been identified, the next step requires distinguishing the people who had suspended voter registrations

---

[49] My estimates of the size of the total ineligible population and the overall size of the population subject to the reinstatement requirements are conservative because I do not have and do not include data on 1) people who are not currently serving time on probation and parole in Louisiana and 2) people serving sentences from other jurisdictions such as federal or out-of-state courts. The files I was provided on voters suspended for felony convictions contain many more Louisianans than I was able to match to the current probation and parole population.

[50] The list of individuals on probation and parole represents only a fraction of the universe of individuals whose rights may have been restored under law, because individuals may be released from DOC custody without serving time on probation or parole, or may have never served DOC time at all and therefore did not lose their right to vote. Therefore, this analysis represents the *minimum* number of individuals who are eligible to vote despite having a felony conviction.

from those who did not. To do so, I attempted to match the restored population to the suspended list. Unlike the ineligible list, the suspended list did not contain DOC identification numbers. However, the file did contain the last name, first name, and age of each suspended voter. As with the ineligible voters, I was able to use these common elements in the files to match the eligible population under community supervision to the suspended list.

For the initial round of matching, the method through which most restored individuals were matched to the suspended list, I relied on exact matching: the last name, first name, and age of individuals had to be the same in both files in order for a person to be marked as having a suspended registration.

As mentioned, I used age as one of the matching criteria. However, the suspended list only contains age rather than the exact date of birth, while the P&P list contained the exact date of birth from which I was able to calculate the individual's age in years. Because I was not sure of the date from which the age was calculated in the suspended list, I accounted for the possibility that there would be discrepancies between the age I calculated and the age listed in the suspended list.[51] I allowed matches to the suspended list when last and first names were an exact match and restored individuals' ages were within one year above or below the listed age in the suspended list.

Finally, to account for typographical errors, I attempted to match restored individuals to the suspended list using a final round that matched using the exact last name, exact age, and the first three letters of the first name.

*Determining Voter Registration Status*

Once I ascertained information about the presence on the ineligible and suspended voter lists as described above, I performed an analysis of voter participation. First, to determine the number of people who were not on the suspended voters list currently but may have been in the past, I relied on five additional files that I obtained from Plaintiffs' counsel: the voter registration file, the voter certificate file, and three past versions of the suspended voters file. First, I was provided with a list of people who had received voter certificates from the Department of Corrections. The voter certificate file was dated January 7, 2026 and contained 123,064 entries, some of which were duplicates. I matched the list of people on community supervision with the list of people who had obtained voter certificates using the DOC identification number that was contained in both files. This process assumes that people who had been issued a voter certificate were on the suspended voter list at some point, since obtaining a voter certificate allows people to reinstate their registration and removes them from the suspended voter list.[52] I also matched the people who were not suspended to past versions of the suspended list.[53]

Next, I matched the data of eligible people under community supervision with voter registration data containing information on all registered voters in Louisiana. The voter

---

[51] Meredith and Morse 2015.

[52] This step also accounts for people who may not have been on the suspended voter list, but who mistakenly believed that they needed to provide additional paperwork. I also account for people who might have been reinstated using paperwork other than a voter certificate in the appendix.

[53] "October 2024 Suspended List.xlsx" "Suspended List June 2025.xlsx" and "RFP 19 – Suspended List.xlsx"

registration file is updated regularly and contains the last name, first name, age, and city of residence for all voters. The voter file that I obtained was current as of November 14, 2025. I first introduced similar matching procedures in my dissertation and have used them to produce estimates of voting participation among people convicted of felonies in several other articles.[54] The procedure was also replicated by other researchers.[55]

To create the datasets used for the analysis of registration, I linked the names of eligible individuals on community supervision to those found in the voter file in a multi-step, electronic process. The last name, first name, city of residence, and age on November 14, 2025 (the date of the voter file) were used to match as many eligible people on community supervision to an active voter entry as possible through exact matching. In instances in which voters' last name, first name, and age produced duplicate identifiers, subsequent inactive entries were deleted.[56] I conducted an additional round of matching using the exact last name, exact age, exact city of residence, and first three letters of the first name for those persons who remained unmatched after the first round.[57] The first round produced 3,128 matches. The subsequent round added 205 matches. In total, 3,333 of the 27,956 people on community supervision with a Louisiana address were matched to an active voter registration record (11.9%). This figure is roughly in line with the "one-in-ten" registration rate calculated by Dr. White in 2023.[58]

**RESULTS**

Table 2 presents the breakdown of the population on community supervision by eligibility status. First, there were 15,045 individuals with a Louisiana address (35.0%) matched from the P&P List to the ineligible list. All 15,045 were matched using exact matching to the DOC identification number. This total represents the number of individuals living in Louisiana who are currently on probation and parole whose right to vote has *not* been restored.

Also shown in Table 2, 27,956 individuals (65.0%), were *not* matched to the ineligible list after matching. This final number contains known Louisiana residents who are currently on probation and parole whose right to vote *has* been restored. This figure is comparable to that estimated by Dr. White in 2023 ("nearly 30,000").[59]

Of the 27,956 restored individuals with Louisiana addresses, I matched 8,534 (30.5% of the eligible population) to the suspended list, meaning that these people would need to provide additional documentation from a corrections officer to reinstate their registration. 7,352 of these voters were matched to the suspended list by exact matching for last name, first name, and age. The remaining 1,182 were matched to entries using the exact last name, exact age, and first 3

---

[54] Burch, Traci. "Punishment and Participation: How Criminal Convictions Threaten American Democracy." (2007) Ph.D. thesis, Harvard University.; Burch 2011; Burch, Traci. "Did disfranchisement laws help elect President Bush? New evidence on the turnout rates and candidate preferences of Florida's ex-felons." *Political Behavior* 34, no. 1 (2012): 1-26.
[55] For example, see Gerber et al. 2017.
[56] Based on last name, first name, age, and city of residence I removed 4,497 duplicate entries after the first round and 4,916 after the second round, leaving 2,513,283 voters.
[57] Meredith and Morse, 2015.
[58] PX 19.
[59] PX 19.

letters of the first name or using the exact last name, exact first name, and allowing age to vary up or down by one year.

The remaining 19,422 (69.5%) individuals were not matched to the suspended list, meaning that they are not disqualified by a felony conviction and should not need to provide further documentation from a corrections officer to register to vote. However, as discussed previously in this report, there may be some people in this population who were once on the suspended voter list in the past. In order to estimate the population of people who had ever had their voter registration suspended, I use information on issuance of voter certificates provided by the Department of Corrections as described previously in this report. I also matched eligible people to previous lists of suspended voters provided by the state for this case. Using these methods, I found an additional 2,536 people who were not currently on the suspended list, but may have been on a list in the past.[60] I use the term "never suspended" to refer to the people who are not matched to any of the suspended lists that I was provided *and* who have not been issued a voter certificate. Everyone in the "ever suspended" group was either issued a voter certificate or was matched to either the most recent or an earlier suspended list.[61] These calculations of the eligible, ineligible, and suspended populations are summarized in Figure 1.

Further analysis reveals racial disparities in both eligibility and in the requirement to submit additional documentation. First, with respect to race, Black Louisianans are more likely to be on the ineligible list than White Louisianans: 37.2% of Black Louisianans on probation and parole are ineligible to have their voting rights restored, compared with 32.4% of White Louisianans. With respect to the additional paperwork requirement, 33.1% of Black people on community supervision would need to submit additional paperwork in order to register to vote, compared with 28.0% of white people. Black people are 54.5% of the probation and parole population but 59.0% of the people who would need to submit additional paperwork in order to vote. Even further, 41.5% of Black people on community supervision in Louisiana had been on the suspended voter list now or at some point in the past, compared with 37.9% of White people on community supervision. Black people are 54.5% of the probation and parole population but 57.2% of the people who had ever been subjected to the additional paperwork requirement.

---

[60] See Footnote 53 for a list of past suspended voter lists. As I explain in the appendix, 2,488 people were not on the suspended list but issued voter certificates. It also is possible that some people made it off the suspended list by providing something other than a voter certificate from the Department of Corrections. I analyzed the people who were on past suspended lists but were not on the most recent suspended list. I found that of the people who were no longer on the list, about half were issued voter certificates, which means that half may have been reinstated in other ways. I re-estimate voter registration figures in the appendix, doubling the number of people I removed from the "never suspended" category for having voter certificates to account for the people who may have been reinstated using other documentation. As shown in the appendix, moving a larger number of people out of the "never suspended" category to the "ever suspended" category does not change my overall opinion about the effect of the additional paperwork requirement.

[61] A small number of people have been matched to the suspended list but are currently registered to vote; this discrepancy is most likely due to the time lag between when the files were generated.

Second, I find disparities between men and women. Men on community supervision are more likely to be matched to the ineligible list: 38.6% of men are on the ineligible list compared with 19.5% of women. 24.8% of men still would need to submit additional paperwork in order to register and vote, compared with 5.8% of women. Overall, 32.2% of men have been subject to the additional paperwork requirement either now or at some point in the past, compared with 7.4% of women.

*Table 2: Results of Matching Analysis to Ineligible and Suspended Voter Lists. Includes people on community supervision with Louisiana addresses only.*

| Status | Number | Percent |
|---|---|---|
| **Matched to Ineligible List[62]** | **15,045** | **35.0** |
| **Not Matched to Ineligible List[63]** | **27,956** | **65.0** |
| ***Ever Suspended*** | ***11,070*** | ***39.6*** |
| *Currently Matched to Suspended List[64]* | *8,534* | *30.5* |
| ***Previously Suspended*** | *2,536* | *22.9* |
| ***Never Suspended[65]*** | ***16,886*** | ***60.4*** |
| **Total** | **43,001** | **100** |

With respect to voter registration, to reiterate, based on my review of the extant literature, we should expect to see that people who had been voters before their conviction were more likely to have reregistered post-conviction than people who had not registered before. To put this expectation in more concrete terms, based on previous studies we should expect to see higher post-conviction registration among people who had been on the suspended list than among those people who had never been suspended, all other factors being equal. However, because these groups are not equal with respect to the steps they must take to register to the extent that previously registered voters are subject to additional steps to reinstate their registration, we find the *opposite* of what previous scholarship would predict: the registration rates of people who had been or are currently on the suspended list are *lower* than those of people who were never on the suspended list. Figure 2 shows the voter registration rates among the eligible community supervision population. Taking just the 27,956 individuals who were eligible to register as of January 2026, we see registration rates more than twice as high among the 16,886 individuals who had never been suspended (15.8%) than among the 11,070 people who have been on the suspended list (5.9%). Again, because of the additional steps required to register in Louisiana, the pattern of re-registration after a felony conviction is the opposite of what other empirical studies of rights restoration in other states have found.

---

[62] Using DOC identification number; exact matching of last name, first name, and year of.
[63] Using DOC identification number; exact matching of last name, first name, and year of birth.
[64] Using exact matching of last name, first name, and age; exact matching of last name, first name and age ± 1 year; or exact matching of last name, age, and first three letters of the first name.
[65] Using exact matching of last name, first name, and age; exact matching of last name, first name and age ± 1 year; or exact matching of last name, age, and first three letters of the first name.

*Figure 1: Results of Matching Analysis*



*Figure 2: Results of Voter Registration Analysis*



*Table 3: Voter registration and history of suspension by race, age, and gender for eligible Louisiana residents on community supervision*

| Characteristic | Never Suspended | Ever Suspended | Total |
|---|---|---|---|
| Black | 16.9% registered N=8914 | 7.1% registered N=6327 | 12.8% registered N=15,241 |
| White | 14.9% registered N=7705 | 4.4% registered N=4698 | 10.9% registered N=12403 |
| Male | 14.9% registered N=12378 | 6.4% registered N=8996 | 11.3% registered N=21374 |
| Female | 18.4% registered N=4508 | 3.9% registered N=2074 | 13.8% registered N=6582 |
| Age 18-30 | 13.5% registered N=6180 | 4.1% registered N=1490 | 11.7% registered N=7670 |
| Age 31-44 | 16.8% registered N=6084 | 4.4% registered N=5155 | 11.1% registered N=11239 |
| Age 45-64 | 17.5% registered N=3935 | 7.2% registered N=3845 | 12.4% registered N=7780 |
| Age 65+ | 19.5 registered N=687 | 15.7% registered N=580 | 17.8% registered N=1267 |
| Total | 15.8% registered N=16,886 | 5.9% registered N=11,070 | 11.9% registered N=27,956 |

Looking within racial groups in Table 3, I also find evidence that the requirement to submit additional paperwork suppresses voter registration. Among Black people who are eligible, only 7.1% of people who have been subject to the additional paperwork requirement are registered to vote, compared with 16.9% of people who have never been on the suspended list. Among White people, 4.4% of people who have been subject to the additional paperwork requirement are registered to vote, compared to 14.9% of White people who have never been subjected to the requirement. Table 2 shows disparities in voter registration between people who have had to submit additional paperwork and those who have not within each gender and age category as well.

**SUMMARY**

To summarize the findings, in Louisiana, thousands of people's registrations are suspended but they are eligible to register to vote, and thousands are eligible to vote while serving sentences on probation and parole. However, only 11.9% of the eligible population is registered to vote. My analysis shows that this number would be higher in the absence of the requirement to produce documents in person in order to reinstate voter registration. My analysis supports the claim that the requirement for previously registered voters to submit additional documents poses an administrative barrier to voting. My calculations show that voter registration among the people subject to the requirement is much lower (5.9%) than we would expect given the level of voting among people not subject to the requirement both in Louisiana and in other states.

# APPENDIX

**Recalculating Voter Registration with Doubled Voter Certificates (to account for reinstatement using documentation other than a voter certificate).** For this analysis, I reallocated an additional 320 registered voters and 2,488 people total from the "never suspended" category to the "ever suspended" category (doubling the numbers of people with voter certificates). This reallocation is intended to account for the people who were reinstated using something other than a voter certificate from the Department of Corrections, according to the list provided by them, which, based on my review of people who were on past suspended voter lists but not the current one, is about 50%. As shown in the table below, the disparity in registration between the people who had ever been subjected to the requirement and those who had never been subject to the requirement is still greater than 2:1. The figures calculated here represent a more conservative estimate of the effect of the reinstatement requirement but still support my overall conclusion regarding the existence and magnitude of the disparity between people who have been on the suspended voter list and those who have not.

| | **# Registered Voters** | **# Not Registered to Vote** | **Total** | **Registration Rate** |
|---|---|---|---|---|
| Not suspended January 2026, but have voter certificate or other documentation used for reinstatement | 640 | 4337 | 4977 | 12.9 |
| Ever Suspended and known to have been on past or current suspended list | 338 | 8243 | 8581 | 3.9 |
| Ever Suspended (New Total) | 978 | 12580 | 13558 | 7.2% |
| Never Suspended (New Total) | 2355 | 12043 | 14398 | 16.4% |
| Overall Total | 3333 | 24623 | 27956 | 11.9% |

I reserve the right to continue to supplement this report upon receiving additional facts, testimony and/or materials that may come to light. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Dated: January 27, 2026

Traci Burch

**Traci Burch**

---

**Employment**

- Professor, Northwestern University Department of Political Science (2024-Present)
- Associate Professor, Northwestern University Department of Political Science (2014-2024)
- Research Professor, American Bar Foundation (2007- Present)
- Assistant Professor, Northwestern University Department of Political Science (2007-2014)

**Education**

- *Harvard University*
  Ph.D. in Government and Social Policy
  Dissertation: *Punishment and Participation: How Criminal Convictions Threaten American Democracy*
  Committee: Jennifer Hochschild (Chair), Sidney Verba, and Gary King

- *Princeton University*
  A.B. in Politics, *magna cum laude*

**Publications**

- Burch, Traci. 2025. "Gun Control and Democratic Accountability." *Science Advances* 11(46).
- Levi, Ron, Traci Burch, and Robert L. Nelson. 2023. "Streets, Suites, and States: John Hagan's Contributions to the Study of Law, Power, and Inequality." *Law & Social Inquiry* 48(4): 1109-1116.
- Burch, Traci. 2023. "Which Lives Matter: Factors Shaping Public Attention to and Protest of Officer-Involved Killings." *Cambridge Elements in Race, Ethnicity, and Politics*.
- Burch, Traci. 2022. "Adding Insult to Injury: the Justification Frame in Official Narratives of Officer-Involved Killings." *Journal of Race, Ethnicity, and Politics.*
- Burch, Traci. 2022. "Officer-Involved Killings and the Repression of Protest." *Urban Affairs Review.*
- Burch, Traci. 2021. "Not All Black Lives Matter: Officer-Involved Deaths and the Role of Victim Characteristics in Shaping Political Interest and Voter Turnout." *Perspectives on Politics*.

- Kay Lehman Schlozman, Philip Edward Jones, Hye Young You, Traci Burch, Sidney Verba, Henry E. Brady. 2018. "Organizations and the Democratic Representation of Interests: What Happens When Those Organizations Have No Members?" *Perspectives on Politics*.

- Burch, Traci. 2016. "Political Equality and the Criminal Justice System." In Resources, Engagement, and Recruitment. Casey Klofstad, ed. Philadelphia: Temple University Press.

- Burch, Traci. 2016. "Review of The First Civil Right by Naomi Murakawa." *The Forum.*

- Kay Lehman Schlozman, Philip Edward Jones, Hye Young You, Traci Burch, Sidney Verba, Henry E. Brady. 2015. "Louder Chorus – Same Accent: The Representation of Interests in Pressure Politics, 1981-2011." In Darren Halpin, David Lowery, Virginia Gray, eds. The Organization Ecology of Interest Communities. New York: Palgrave Macmillan.

- Burch, Traci. 2015. "Skin Color and the Criminal Justice System: Beyond Black-White Disparities in Criminal Sentencing." *Journal of Empirical Legal Studies* 12(3): 395-420.

- Burch, Traci. 2014. "The Old Jim Crow: Racial Residential Segregation and Neighborhood Imprisonment." *Law & Policy* 36(3) 223-255.

- Burch, Traci. 2014. "The Effects of Imprisonment and Community Supervision on Political Participation." Detaining Democracy Special Issue. *The Annals of the American Academy of Political and Social Science* 651 (1) 184-201.

- Burch, Traci. 2013. Trading Democracy for Justice: Criminal Convictions and the Decline of Neighborhood Political Participation. Chicago: University of Chicago Press.

- Hochschild, Jennifer, Vesla Weaver, and Traci Burch. 2012. Transforming the American Racial Order. Princeton: Princeton University Press.

- Schlozman, Kay Lehman, Sidney Verba, Henry Brady, Traci Burch, and Phillip Jones. 2012. "Who Sings in the Heavenly Chorus? The Shape of the Organized Interest System." In Schlozman, Kay Lehman, Sidney Verba, and Henry Brady, The Unheavenly Chorus, Princeton: Princeton University Press.

- Schlozman, Kay Lehman, Sidney Verba, Henry Brady, Phillip Jones, and Traci Burch. 2012. "Political Voice through Organized Interest Activity." In Schlozman, Kay Lehman, Sidney Verba, and Henry Brady, The Unheavenly Chorus, Princeton: Princeton University Press.

- Burch, Traci. 2012. "Did Disfranchisement Laws Help Elect President Bush? New

Evidence on the Turnout and Party Registration of Florida's Ex-Felons." *Political Behavior* 34 (1); 1-26.

- Burch, Traci. 2011. "Turnout and Party Registration among Criminal Offenders in the 2008 General Election." *Law and Society Review* 45(3): 699-730.

- Burch, Traci. 2011. "Fixing the Broken System of Financial Sanctions." *Criminology and Public Policy* 10(3).

- Hochschild, Jennifer; Vesla Weaver, and Traci Burch. 2011. "Destabilizing the American Racial Order." *Daedalus* 140; 151-165.

- Burch, Traci. 2009. "Can the New Commander-In-Chief Sustain His All Volunteer Standing Army?" *The Dubois Review on Race* 6(1).

- Burch, Traci. 2009. "Review of *Imprisoning Communities,* by Todd Clear." *Law and Society Review* 43(3) 716-18.

- Burch, Traci. 2009. "American Politics and the Not-So-Benign Neglect of Criminal Justice," in The Future of American Politics, ed. Gary King, Kay Schlozman, and Norman Nie. (New York: Routledge).

- Schlozman, Kay Lehman and Traci Burch. 2009. "Political Voice in an Age of Inequality," in America at Risk: Threats to Liberal Self-Government in an Age of Uncertainty, ed. Robert Faulkner and Susan Shell (Ann Arbor: University of Michigan Press).

- Hochschild, Jennifer and Traci Burch. 2007. "Contingent Public Policies and the Stability of Racial Hierarchy: Lessons from Immigration and Census Policy," in Political Contingency: Studying the Unexpected, the Accidental, and the Unforseen, ed. Ian Shapiro and Sonu Bedi (New York: NYU Press).

**Grants**

- Co-Principal Investigator. "Fellowship and Mentoring Program on Law and Inequality." September 1, 2020 to August 31, 2023. $349, 313. National Science Foundation.

**Honors and Fellowships**

- American Political Science Association 2014 Ralph J. Bunche Award **(**for Trading Democracy for Justice).

- American Political Science Association Urban Section 2014 Best Book Award (for Trading Democracy for Justice).

- American Political Science Association Law and Courts Section 2014 C. Herman Pritchett Award (for Trading Democracy for Justice).

- Research grant, Stanford University Center for Poverty and Inequality (2012).

- American Political Science Association E. E. Schattschneider Award for the best doctoral dissertation in the field of American Government (2009)

- American Political Science Association William Anderson Award for the best doctoral dissertation in the field of state and local politics, federalism, or intergovernmental relations (2008)

- American Political Science Association Urban Section Best Dissertation in Urban Politics Award (2008)

- Harvard University Robert Noxon Toppan Prize for the best dissertation in political science (2007)

- Institute for Quantitative Social Sciences Research Fellowship (2006-07)

- *European Network on Inequality* Fellowship (2005)

- Research Fellowship, The Sentencing Project (2005)

- Doctoral Fellow, Malcolm Weiner Center for Inequality and Social Policy (2004-07)

**Professional Service**

- Editor-in Chief, *Law and Social Inquiry* (2024-Present)

- Co-Editor, *Law and Social Inquiry* (2024)

- APSA Law and Courts Section Best Paper Award Committee (2020-2021)

- APSA Elections, Public Opinion, and Voting Behavior Executive Committee (2020-2023)

- General Social Survey Board of Overseers (2020-2024)

- APSA Kammerer Prize Committee (2017)

- Associate Editor, *Political Behavior* (2015-2019)

- APSA Law and Courts Section, Lifetime Achievement Award Prize Committee (2014-2015)

- Law and Society Association, Kalven Prize Committee (2013-2014)
- American Political Science Association, Urban Politics Section Dissertation Prize Committee (2012-13)
- American Political Science Association, Urban Politics Section Executive Committee (2012-13)
- Law and Society Association Diversity Committee, (2012-2013)
- American Political Science Association, Urban Politics Section Program Co-Chair (2011)
- Associate Editor, *Law and Social Inquiry*
- American Political Science Association, Urban Politics Section Book Prize Committee (2009)
- Reviewer for *The American Political Science Review, Public Opinion Quarterly, American Politics Research, Time-Sharing Experiments in the Social Sciences, etc.*

**Presentations and Invited Talks**

- University of Notre Dame, South Bend, IN. "Re-enfranchisement after a Felony Conviction in Tennessee." January 2026.
- University of Chicago, Chicago, IL. "Re-enfranchisement after a Felony Conviction in Tennessee." November 2025.
- Harvard Law School Charles Hamilton Houston Institute Research Roundtable, San Juan, Puerto Rico. January 2025.
- Harvard University, Cambridge MA. "Which Lives Matter?" Race, Ethnicity, and Politics Workshop. March 2024.
- Princeton University, Princeton, NJ. "Re-enfranchisement and the Limits of Policy Feedback." Princeton University Center for the Study of Democratic Politics. February 2024.
- Harvard University, Cambridge, MA. Panel on Reform and Representation. Race, Electoral Systems, and Reform Conference. September 2023.

- Northwestern University, Evanston, IL. "Chicago Area Behavior Conference: The Politics of Officer Involved Killings." May 2023.

- Loyola University, Chicago, IL. "Hartigan Lecture: Limits on the Use of Force by Police: Perspectives from Law, Courts, and the Public." February 2023.

- American Political Science Association Annual Conference, Montreal, Canada. "Not All Black Lives Matter: Officer-Involved Deaths and the Role of Victim Characteristics in Shaping Political Interest and Voter Turnout." September 2022.

- University of Pennsylvania. Virtual. "Voice and Representation in American Politics." April 2021.

- University of Michigan. Virtual. "Which Lives Matter? Factors Affecting Mobilization in Response to Officer-Involved Killings." February 2021.

- University of Pittsburgh. Virtual. "Policing and Participation." November 2020.

- Hamilton College Constitution Day Seminar. Virtual. "Racial Protests and the Constitution." September 2020.

- New York Fellows of the American Bar Foundation. New York, NY. "Police Shootings and Political Participation." March 2020.

- Pennsylvania State University, State College, PA. "Effect of Officer Involved Killings on Protest. November 2019.

- Princeton University. Princeton NJ. "Effects of Police Shootings on Protest among Young Blacks." November 2019.

- Missouri Fellows of the American Bar Foundation. Branson, MO. Police Shootings and Political Participation in Chicago. September 2019.

- Northwestern University. "Police Shootings and Political Participation." November, 2018.

- Princeton University. Princeton, NJ. "Police Shootings and Political Participation." September, 2018.

- University of California at Los Angeles. Los Angeles, CA. "Police Shootings and Political Participation." August, 2018.

- American Bar Association Annual Meeting. Chicago, IL. "Police Shootings and Political Participation." August 2018.

- American Bar Endowment Annual Meeting. Lexington, KY. "Effects of Police Shooting in Chicago on Political Participation." June 2018.

- Vanderbilt University. "Effects of Police Shootings in Chicago on Political Participation." April 2018.

- Washington University in St. Louis. "Effects of Pedestrian and Auto Stops on Voter Turnout in St. Louis." February 2018.

- Fellows of the American Bar Foundation, Los Angeles. "Assaulting Democracy." January 2018.

- Northwestern University Reviving American Democracy Conference. Panel presentation. "Barriers to Voting." January 2018.

- University of Illinois at Chicago. "Effects of Police Shootings in Chicago on Political Participation." October, 2017.

- Chico State University. "Constitution Day Address: Policing and Political Participation." September, 2017.

- Fellows of the American Bar Foundation, Atlanta, Georgia. "Policing in Georgia." May 2017.

- United States Commission on Civil Rights. Testimony. "Collateral Consequences of Mass Incarceration." May 2017.

- Northwestern University Pritzker School of Law. "Effects of Police Stops of Cars and Pedestrians on Voter Turnout in St. Louis." April 2017.

- University of California at Los Angeles. Race and Ethnic Politics Workshop. "Effects of Police Stops of Cars and Pedestrians on Voter Turnout in St. Louis." March 2017.

- University of North Carolina at Chapel Hill. American Politics Workshop. "Effects of Police Stops of Cars and Pedestrians on Voter Turnout in St. Louis." February 2017.

- National Bar Association, St. Louis MO. "Political Effects of Mass Incarceration." July 2016.

- Harvard University, Edmond J. Safra Center for Ethics. Inequalities/Equalities in Cities Workshop. April 2016.

- American Political Science Association Annual Meeting. September 2015. "Responsibility for Racial Justice." Discussant.

- St. Olaf College. April 2015. "The Collateral Consequences of Mass Incarceration."

- Northwestern University. Institute for Policy Research. February 2015. "The Civic ~~Culture~~ Structure."

- Texas A&M University. Race, Ethnicity, and Politics Workshop. September 2014. "Trading Democracy for Justice."

- Columbia University Teachers College. The Suburban Promise of Brown Conference. May 2014. "Can We All Get Along, Revisited: Racial Attitudes, the Tolerance for Diversity, and the Prospects for Integration in the 21st Century."

- University of Kentucky. Reversing Trajectories: Incarceration, Violence, and Political Consequences Conference. April 2014. "Trading Democracy for Justice."

- University of Chicago. American Politics Workshop. March 2014. "How Geographic Differences in Neighborhood Civic Capacity Affect Voter Turnout."

- Kennedy School of Government, Harvard University. February 2014. "Trading Democracy for Justice.

- University of Michigan. American Politics Workshop. December 2013. "Trading Democracy for Justice."

- Yale University. American Politics and Public Policy Workshop. September 2013. "Trading Democracy for Justice."

- American Political Science Association Annual Meeting. August 2013. "The Heavenly Chorus Is Even Louder: The Growth and Changing Composition of the Washington Pressure System." With Kay Lehman Schlozman, Sidney Verba, Henry Brady, and Phillip Jones.

- National Bar Association, Miami Florida, July 2013. "The Collateral Consequences of Mass Imprisonment."

- Loyola University. American Politics Workshop. December 2012. "Mass Imprisonment and Neighborhood Voter Turnout."

- Marquette University School of Law. November 2012. "The Collateral Consequences of Mass Imprisonment."

- Yale University. Detaining Democracy Conference. November 2012. "The Effects of Imprisonment and Community Supervision on Political Participation."

- Brown University. American Politics Workshop. October 2012. "Mass Imprisonment and Neighborhood Voter Turnout."

- American Bar Association National Meeting, August 2012. "Mass Imprisonment: Consequences for Society and Politics."

- University of Madison-Wisconsin. American Politics Workshop. March 2012. "The Spatial Concentration of Imprisonment and Racial Political Inequality."

- American Political Science Association Annual Meeting. 2011. "Theme Panel: How Can Political Science Help Us Understand the Politics of Decarceration?"

- University of Pennsylvania. Democracy, Citizenship, and Constitutionalism Conference. April, 2011. "Vicarious Imprisonment and Neighborhood Political Inequality."

- University of Chicago School of Law. Public Laws Colloquium. Chicago, IL. November, 2010. """The Effects of Neighborhood Incarceration Rates on Individual Political Efficacy and Perceptions of Discrimination."

- Pomona College. November, 2010. "Incarceration Nation."

- University of Washington. Surveying Social Marginality Workshop. October 2010. "Using Government Data to Study Current and Former Felons."

- American Bar Foundation, Chicago, IL, September 2010. "The Effects of Neighborhood Incarceration Rates on Individual Political Attitudes."

- Northwestern University. Chicago Area Behavior Conference. May 2010. "Trading Democracy for Justice: The Spillover Effects of Incarceration on Voter Turnout in Charlotte and Atlanta."

- Annual Meeting of the Law and Society Association, Chicago, IL, May 2010. "Neighborhood Criminal Justice Involvement and Voter Turnout in the 2008 General Election."

- Annual Meeting of the Southern Political Science Association, Atlanta, GA, January 2010. "The Art and Science of Voter Mobilization: Grassroots Perspectives on Registration and GOTV from Charlotte, Atlanta, and Chicago."

- University of Illinois at Chicago. Institute for Government and Public Affairs. November 2009. "Turnout and Party Registration among Convicted Offenders during the 2008 Presidential Election."

- Annual Meeting of the American Political Science Association, Toronto, Ontario, Canada, September 2009. "'I Wanted to Vote for History:' Turnout and Party Registration among Convicted Offenders during the 2008 Presidential Election."

- Harris School of Public Policy, University of Chicago. American Politics Workshop. December 2008. "Trading Democracy for Justice? The Spillover Effects of Imprisonment on Neighborhood Voter Participation."

- Northwestern University School of Law. Law and Political Economy Colloquium. November 2008. "Did Disfranchisement Laws Help Elect President Bush? New Evidence on the Turnout Rates and Candidate Preferences of Florida's Ex-Felons."

- University of California, Berkeley. Center for the Study of Law and Society. October 2008. "Trading Democracy for Justice? The Spillover Effects of Imprisonment on Neighborhood Voter Participation."

- Law and Society Association Annual Meeting, Montreal, Canada, May 2008. "Did Disfranchisement Laws Help Elect President Bush? New Evidence on the Turnout Rates and Candidate Preferences of Florida's Ex-Felons."

- Law and Society Association Annual Meeting, Montreal, Canada, May 2008. "Trading Democracy for Justice? The Spillover Effects of Imprisonment on Neighborhood Voter Participation."

- Midwest Political Science Association Conference, Chicago, IL, April 2007. Paper: "Concentrated Incarceration: How Neighborhood Incarceration Decreases Voter Registration."

**Additional Activities**

- Expert witness in *Kelvin Jones vs. Ron DeSantis, etc. et al.* (U.S. District Court for the Northern District of Florida Consolidated Case No. 4:19-cv-00).

- Expert witness in *Community Success Initiative, et al., Plaintiffs v. Timothy K. Moore* (Superior Court, Wake County, NC Case No. 19-cv-15941).

- Expert witness in *People First of Alabama v. Merrill* (U.S. District Court in Birmingham, Alabama, Case No. 2: 20-cv-00619-AKK)

- Expert witness in *Florida State Conference of the NAACP v. Lee* (U.S. District Court in the Northern District of Florida, Case No. 4:21-cv-00187-MW-MAF)

- Expert witness in *One Wisconsin Institute Inc. v. Jacobs* (U.S. District Court in the Western District of Wisconsin, Case No. 15-CV-324-JDP).

- Expert witness in *Alpha Phi Alpha Fraternity Inc., et al. v. Raffensperger* (U.S. District Court for the Northern District of Georgia, Case No. 1:21-cv-05337-SCJ)

- Expert witness in *Robinson, et al. v. Ardoin* (U.S. District Court for the Middle District of Louisiana, Civil Action No. 22-cv-00211).

- Expert witness in *Nairne, et al. v. Ardoin* (U.S. District Court for the Middle District of Louisiana, Civil Action No. 3:22-cv-00178 SDD-SDJ).

- Expert witness in *White, et al. v. State Board of Election Commissioners, et al.* (U. S. District Court for the Northern District of Mississippi, Civil Action No. 4:22-cv-00062-SA-JMV).

- Expert witness *in Honorable Terry Petteway et al. v. Galveston County et al.* (U.S. District Court for the Southern District of Texas, Galveston, Civil Action No. 3:22-cv-57-JVB).

- Expert Witness in *Tennessee Conference of the NAACP et al. v. Lee, et al.* (U.S. District Court for the Middle District of Tennessee, Nashville, Civil Action No. 3:20-cv-01039).

- Expert Witness in *Mi Familia Vota et al. v. Fontes et al.* (U.S. District Court for the District of Arizona, Civil Action No. CV-22-00509-PHX-SRB).

- Expert Witness in *Stone v. Allen* (U.S. District Court for the Northern District of Alabama, Southern Division, Civil Action No. 2:21-cv-01531-AMM).

- Expert Witness in *Milligan v. Allen* (U.S. District Court for the Northern District of Alabama, Southern Division, Civil Action No. 2:21-cv-01530-AMM).

- Expert Witness in *The Christian Ministerial Alliance et al. v. Thurston* (U.S. District Court for the Eastern District of Arkansas, Central Division, Case No. 4:23-CV-471-DPM).

- Expert Witness in *Pierce et al. v. North Carolina State Board of Elections* (U.S. District Court for the Eastern District of North Carolina, Eastern Division, Case No. 4:23-cv-193D).

- Expert Witness in *Moses v. Goins et al.* (Tennessee Circuit Court for the 30th Judicial District at Memphis, Case No. CT-1579-19).

- Expert Witness in *Driver et al. v Houston County Board of Elections et al.* (U.S. District Court for the Middle District of Georgia, Macon Division, Case No. 5:25-cv-00025-MTT).